## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

In re:

StoreWorks Technologies, Limited,
ATA Development, LLC,

       Debtors.

Case No. 19-43814
Case No. 19-43815

Chapter 11 Cases

Jointly Administered under
Case No. 19-43814

StoreWorks Technologies, Limited,

       Plaintiff,

   v.

ScanSource, Inc., Anil Konkimalla, Troy
Stelzer, Andrew Teitscheid, and Xenia
Retail, Inc.,

       Defendants.

Adv. No. _____

## COMPLAINT

For its Complaint against Defendants ScanSource, Inc. ("ScanSource"), Anil Konkimalla ("Konkimalla"), Troy Stelzer ("Stelzer"), Andrew Teitscheid ("Teitscheid," and, together with Konkimalla and Stelzer, the "Guarantors"), and Xenia Retail, Inc. ("Xenia" and, together with ScanSource and the Guarantors, the "Defendants"), Plaintiff StoreWorks Technologies, Limited ("StoreWorks") alleges as follows:

### GENERAL PROVISIONS

1.     StoreWorks is a Minnesota corporation formed in 2004.  Its principal place of

business is located in Eden Prairie, Minnesota.

2.     StoreWorks is currently a debtor in the above-captioned chapter 11 case commenced on December 20, 2019, and currently pending in this Court.  StoreWorks' chapter 11 case is jointly administered with the case of one of its affiliates, ATA Development, LLC, which is not a party to this Adversary Proceeding.

3.     Upon information and belief, ScanSource is a South Carolina corporation based in Greenville, South Carolina.

4.     Konkimalla is an individual residing in Minnesota and is the current chief executive officer of StoreWorks.

5.     Upon information and belief, Stelzer is an individual residing in Minnesota and is the chief executive officer of Xenia and a former officer and former partial owner of StoreWorks.

6.     Upon information and belief, Teitscheid is an individual residing in Minnesota and is a former officer and former partial owner of StoreWorks.

7.     Upon information and belief, Xenia is a Delaware corporation with its registered office address in Minneapolis, MN.

8.     This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 7001(7) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  Venue is proper in this Court.  This is a core proceeding.

9.     The statutory basis for relief sought in this action includes 11 U.S.C. §§ 105(a) and 362(a).

## FACTUAL BACKGROUND

10.     For more than 20 years, StoreWorks has been a trusted retail technology integration partner for retailers and others within the industry.

11.     Specifically, StoreWorks provides a single source hub of information through every step of a customer's retail technology project.  Through a team of technologists, retail experts, consultants, and project managers, StoreWorks provides store-level solutions in the following solution segments:

- Kiosk;
- Mobility;
- Payments;
- Digital Signage;
- Store-Level Peripherals;
- Back Office Revolution;
- Network Infrastructure.

In addition to hardware, StoreWorks provides comprehensive solutions through a full suite of services to ensure successful implementation including consultation, customer application development, integration and staging, and field services.

12.     StoreWorks's customers include Fortune 500 companies with stores located across the country, such as Target, Regis Corporation, and O'Reilly Auto Parts.  StoreWorks's annual revenues have previously exceeded $20 million.

## I.     THE SCANSOURCE LITIGATION.

13.     Beginning in 2008 and continuing until 2019, StoreWorks procured certain products and services from ScanSource for resale.

14.     As part of this business relationship, StoreWorks and ScanSource entered into a Purchase Money Security Interest Agreement dated January 18, 2008 (the "Security Agreement"), under which StoreWorks granted ScanSource a purchase money security interest in all of StoreWorks' rights, title, and interest in all equipment and inventory that ScanSource then or thereafter sold to StoreWorks, as well as any and all proceeds of that equipment and inventory in any form.  A copy of the Security Agreement is attached to the Adversary Complaint as **Exhibit A**.

15.     Additionally, on or about November 9, 2009, the Guarantors executed personal guarantees agreeing to pay any outstanding obligation of StoreWorks when due to ScanSource.

16.     As of February 2018, StoreWorks failed to pay the outstanding balance on invoices for products shipped and delivered to StoreWorks from ScanSource when due.

17.     On or about February 23, 2018, ScanSource sent a letter to StoreWorks demanding full payment of the amount owed.

18.     On or about May 10, 2018, ScanSource sent a letter to StoreWorks and the Guarantors again demanding full payment of the amount owed.

19.     ScanSource commenced an action against StoreWorks and the Guarantors on or about June 6, 2018, in the South Carolina Court of Common Pleas, Thirteenth Judicial Circuit, County of Greenville, captioned as *Scansource, Inc. v. Storeworks Technolgies, Limited et. al*, Case No. 2018-CP-23-03195  (the "ScanSource Litigation").

20.     The ScanSource Litigation sought to enforce the guarantees and require StoreWorks and the Guarantors to pay the outstanding balance of StoreWorks's indebtedness allegedly totaling approximately $1,061,286.23, and also sought claims for fraudulent transfers against StoreWorks and the Guarantors.  Copies of the summons and complaint in the ScanSource Litigation are attached to the Adversary Complaint as **Exhibit B** and **Exhibit C**, respectively.

21.     On November 5, 2019, the Court of Common Pleas entered an order (the "ScanSource Order") granting ScanSource partial summary judgment against StoreWorks and Konkimalla for breach of contract and entered judgment (the "ScanSource Judgment") against them in the amount of $962,754.50.  Copies of the ScanSource Order and ScanSource Judgment are attached to the Adversary Complaint as **Exhibit D** and **Exhibit E**, respectively.  The

ScanSource Order did not direct the entry of a final judgment as to StoreWorks or Konkimalla's rights.

22.     ScanSource filed the ScanSource Judgment in Hennepin County, Minnesota, on December 13, 2019.

23.     In violation of Minn. Stat. § 548.28, ScanSource immediately commenced collection actions against StoreWorks and Konkimalla, including serving bank garnishments on accounts in the name of StoreWorks and Konkimalla.

24.     The ScanSource Litigation is not currently stayed as to the Guarantors.

25.     ScanSource has refused to stay the ScanSource Litigation as it relates to the Guarantors, which includes fraudulent transfer claims that ScanSource asserts against the Guarantors.

26.     To the extent any fraudulent transfer claims exist, such claims belong to the bankruptcy estate under 11 U.S.C. § 541(a)(3).

27.     StoreWorks's corporate documents provide for indemnification of StoreWorks's officers and directors as set forth in Minn. Stat. § 302A.521.

28.     Under the indemnification provisions and common law, the Guarantors have or may demand that StoreWorks bear the cost of defending the ScanSource Litigation, including satisfying the ScanSource Judgment and paying their attorney's fees.

## II.     THE XENIA LITIGATION.

29.     In June 2019, Xenia and Stelzer commenced a lawsuit against StoreWorks and Konkimalla by serving a complaint alleging breaches of certain contracts (the "Xenia Litigation"). A true and correct copy of the complaint is attached as **Exhibit F**.  The Xenia Litigation was

subsequently filed in Hennepin County District Court, captioned as *Xenia Retail, Inc. et al. v StoreWorks Technologies Limited et al.,* Case No. 27-CV-19-19104.

30.    As part of the Xenia Lawsuit, Xenia and Stelzer asserted a claim for indemnification as to the claims asserted against them in the ScanSource Litigation and on the underlying ScanSource debt against StoreWorks and Konkimalla pursuant to a redemption agreement. A true and correct copy of the redemption agreement is attached as **Exhibit G**.

31.    Xenia and Stelzer also asserted that StoreWorks and Konkimalla's indemnification obligation was reaffirmed under a 2018 settlement agreement.  A true and correct copy of the redemption agreement is attached as **Exhibit H**.

32.    StoreWorks and Konkimalla denied liability and counterclaimed against Xenia and Stelzer, also alleging breaches of contract.  A true and correct copy of the answer and counterclaim is attached as **Exhibit I**.

33.     No discovery has yet occurred in the case but, upon information and belief, discovery will begin soon.

34.    As Konkimalla was an officer of StoreWorks at the time of the allegations made by Xenia and Stelzer, Konkimalla has demanded that StoreWorks indemnify and defend him as to the claims against him under Minn. Stat. § 302A.521 and Minnesota common law.

35.    Konkimalla has not been otherwise indemnified and, to the best of StoreWorks's knowledge, Konkimalla received no improper benefit from any of the acts alleged by Xenia and Stelzer.

36.    Konkimalla contends that he was acting in good faith and in his official capacity with StoreWorks at the time of the allegations.

37.     StoreWorks filed a notice of automatic stay in the Xenia Litigation.  Xenia and Stelzer declined to stipulate to a stay of the entire Xenia Litigation, which means that Xenia and Stelzer's claims against Konkimalla and StoreWorks's counterclaims against Xenia and Stelzer, are currently not stayed.

38.     Upon information and belief, the parties will soon commence discovery in the case and StoreWorks anticipates that Xenia and Stelzer will seek discovery directly from StoreWorks.

39.     Xenia's and Stelzer's claims against Konkimalla involve the same facts and legal theory as Xenia's and Stelzer's claims against StoreWorks.

40.     Thus, in addition to the potential indemnification claim by Konkimalla and the burden of complying with discovery requests, proceeding with Xenia Litigation may further negatively impact StoreWorks to the extent the court makes factual and legal determinations that have some type of preclusive effect.

41.     StoreWorks has discussed this adversary proceeding with counsel for the official committee of unsecured creditors (the "Committee") and counsel for the Committee has informed StoreWorks' counsel that the Committee supports the proceeding and agrees with staying the ScanSource Litigation and the Xenia Litigation either through the extension of the automatic stay or through an injunction.

42.     As the Committee contains members that are directly impacted by this adversary proceeding, including Stelzer and ScanSource, the Committee's counsel confirmed that Stelzer did not participate in the discussion regarding the stay of the Xenia Litigation, which was approved with a vote of 2-0, and ScanSource did not participate in the discussion regarding the stay of the ScanSource Litigation, which was approved with a vote of 2-0.

## COUNT I - INJUNCTIVE RELIEF
**STAY OF SCANSOURCE LITIGATION**

43.     All previous paragraphs are realleged and incorporated by reference.

44.     StoreWorks' reorganization efforts and bankruptcy estate will be irreparably harmed without the granting of permanent injunctive relief as to the ScanSource Litigation.

45.     The ScanSource Litigation continues to involve significant outstanding claims and future litigation against StoreWorks and the Guarantors, raising costs to the estate and its potential liability as to claims against it and the Guarantors while also distracting it and its chief executive officer, Konkimalla, from their reorganization efforts.

46.     StoreWorks additionally holds claims in the ScanSource Litigation that are not stayed by the automatic stay but could significantly impact StoreWorks and its bankruptcy estate, including potential fraudulent transfer claims against its co-defendants.

47.     Continued litigation by ScanSource would distract StoreWorks and Konkimalla from effectively pursuing these claims, detracting from the potential assets of the estate.

48.     ScanSource also asserts fraudulent transfer claims against the Guarantors, which may affect StoreWorks's right to assert such claims if the ScanSource litigation is not stayed.

49.     The balance of harm between StoreWorks and ScanSource weighs heavily in favor of granting permanent injunctive relief to Storeworks as to the ScanSource litigation.

50.     The injunction will not eliminate ScanSource's claims against StoreWorks' co-defendants but will instead only delay adjudication of those claims until after StoreWorks' bankruptcy case.

51.     Because the liabilities asserted against the Guarantors are essentially identical to the liabilities asserted against StoreWorks, StoreWorks will be addressing those liabilities in its

plan of reorganization, under which ScanSource's claims will be satisfied to some measure that is currently unknown.

52.     To the extent that separate personal liability for the Guarantors survives the bankruptcy case, ScanSource will be able to pursue its claims against the Guarantors after plan confirmation.

53.     Imposition of the stay, consequently, causes little harm to ScanSource.

54.     Failure to enjoin the ScanSource Litigation will adversely affect StoreWorks' bankruptcy estate by potentially reducing the estate's assets available for distribution by rising litigation and indemnification costs and affecting the estate's right to pursue potential fraudulent transfer actions against its co-defendants in the ScanSource litigation.

55.     The public interest is protected by the granting of a permanent injunction as to the ScanSource Litigation.

56.      Enjoining the ScanSource Litigation will increase the chances for StoreWorks' successful reorganization and a greater recovery for its creditors in general.

57.     StoreWorks is therefore entitled to a permanent injunction enjoining the continuation of the ScanSource Litigation.

## COUNT II - INJUNCTIVE RELIEF
### STAY OF XENIA LITIGATION

58.     All previous paragraphs are realleged and incorporated by reference.

59.     StoreWorks' reorganization efforts and bankruptcy estate will be irreparably harmed without the granting of permanent injunctive relief as to the Xenia Litigation.

60.     The Xenia Litigation involves significant outstanding claims and future litigation and discovery against both StoreWorks and Konkimalla, raisings costs to the estate and its

potential liability while also distracting it and its chief consecutive office from their reorganization efforts.

61.    StoreWorks also asserts counterclaims in the Xenia Litigation that are not stayed by the automatic stay but could impact StoreWorks and its bankruptcy estate by bringing in more funds to the estate for distribution to creditors, but to which StoreWorks and Konkimalla may be unable to devote their full time and attention to during the pendency of this bankruptcy case.

62.    The balance of harm between StoreWorks and Xenia weighs heavily in favor of granting permanent injunctive relief to Storeworks as to the Xenia litigation.

63.    The injunction will not eliminate Xenia's claims against StoreWorks' co-defendants but will instead only delay adjudication of those claims until after StoreWorks' bankruptcy case.

64.    Because the liabilities asserted against Konkimalla are essentially identical to the liabilities asserted against StoreWorks, StoreWorks will be addressing that liability in its plan of reorganization, under which Xenia's claims will be satisfied to some measure that is currently unknown.

65.    To the extent that separate personal liability for Konkimalla survives the bankruptcy case, Xenia will be able to pursue its claims against Konkimalla after plan confirmation.

66.    Imposition of the stay, consequently, causes little harm to Xenia.

67.    Failure to enjoin the Xenia Litigation with adversely affect StoreWorks' bankruptcy estate by potentially reducing the estate's assets available for distribution by rising litigation and indemnification costs and affecting the estate's ability to successfully litigate StoreWorks' counterclaims.

68.     The public interest is protected by the granting of a permanent injunction as to the Xenia Litigation.

69.     Enjoining the Xenia Litigation will increase the chances for StoreWorks' successful reorganization and a greater recovery for its creditors in general.

70.     StoreWorks is therefore entitled to a permanent injunction enjoining the continuation of the Xenia Litigation.

<div align="center"><b>PRAYER FOR RELIEF</b></div>

WHEREFORE, StoreWorks prays for the following relief:

A.     Extending the automatic stay provided for in 11 U.S.C. § 362(a) to stay all proceedings in the ScanSource Litigation until the close of the bankruptcy case or further order of this Court;

B.     Extending the automatic stay provided for in 11 U.S.C. § 362(a) to stay all proceedings in the Xenia Litigations until the close of the bankruptcy case or further order of this Court; and

C.     Such other relief as the Court deems just and equitable.

Dated:  March 6, 2020

/e/ Samuel M. Andre
Ryan T. Murphy (#0311972)
Steven R. Kinsella (#0392289)
Samuel M. Andre (#0399669)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Phone: 612.492.7000
rmurphy@fredlaw.com
skinsella@fredlaw.com
sandre@fredlaw.com

**ATTORNEYS FOR DEBTORS**

69441206 v4

## VERIFICATION

I, Anil Konkimalla, am the Chief Executive Officer of StoreWorks Technologies, Limited. Based upon my personal information and belief, I declare under penalty of perjury that the facts set forth in the preceding Complaint are true and correct, according to the best of my knowledge, information, and belief.

Dated: March 5, 2020                        Signed:_____
                                                     Anil Konkimalla

**<u>EXHIBIT A</u>**

FROM :Storeworks Technologies          FAX NO. :952 746 5556          Jan. 30 2008 12:33PM P2

## PURCHASE MONEY SECURITY INTEREST AGREEMENT

This Security Agreement (this *"Agreement"*), dated as of 01/18/2008, is entered into between StoreWorks Technologies, Limited, a Minnesota Corporation, as debtor (*"Debtor"*), and ScanSource, Inc. and its subsidiaries and/or affiliates, a South Carolina corporation, as secured party (*"Secured Party"*).

**1. Security Interest.** Debtor grants to Secured Party a security interest in the items of collateral shown on **Exhibit A** attached hereto and all proceeds thereof (the *"Collateral"*).

**2. Purchase Money Security Interest.** To the extent any portion of the Collateral is purchased from Secured Party, Secured Party's security interest shall be a purchase money security interest.

**3. Obligations Secured.** This Security Agreement secures all indebtedness of Debtor to Secured Party, now or hereafter (the *"Obligations"*), including but not limited to amounts arising from the sale of goods by Secured Party to Debtor.

**4. Change of Name/Status and Notice of Changes.** Without the written consent of Secured Party, Debtor shall not change its name, change its corporate status, use any trade name or engage in any business not reasonably related to its business as presently conducted. Debtor shall notify Secured Party immediately of (i) any material change in the Collateral, (ii) a change in Debtor's name, trade name, corporate status, residence or location, (iii) a material change in any material matter warranted or represented by Debtor in this Agreement, or in any of the Loan Documents furnished to Secured Party pursuant to this Agreement, and (iv) the occurrence of an Event of Default (hereinafter defined). Debtor agrees that from time to time, at the expense of Debtor, Debtor will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that Secured Party may request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral.

**5. Filing.** Debtor authorizes Secured Party, and appoints Secured Party as its attorney-in-fact, to prepare and file financing, amendment and continuation statements covering the Collateral and any other necessary documents, whenever and wherever determined by Secured Party. Secured party agrees to pay the cost of preparation, filing and recording of such documents.

**6. Maintenance And Insurance.** Debtor shall maintain the Collateral in good condition and repair and shall pay and timely discharge all taxes, levies, and other impositions levied thereon, and all rent due on premises where any of the Collateral may be located. Debtor shall maintain insurance on all Collateral against any loss damage in amounts which are commercially reasonable. All proceeds of such insurance shall be applied to reduce the obligations secured hereunder.

**7. Inspection And Reports.** Upon 5 days advance written notice, and at any time after any default, Debtor shall allow Secured Party, by or through any of its agents, to examine and inspect the Collateral wherever located and all books, records and documentation with respect thereto, and to make copies or extracts from such books, records and documentation as Secured Party may deem to be advisable.

**8. Events of Default.** Debtor shall be in default under this agreement if: (a) Debtor shall fail to pay, when due, any amount due from Debtor to Secured Party; (b) there shall be any default under any covenant, term or condition of this Agreement or of any other contract or agreement between Debtor or Secured Party; or (c) Debtor breaches any representation or warranty herein.

Nothing herein shall prevent Secured Party from canceling or suspending further extensions of credit in the event of a default by Debtor.

**9.   Remedies.** If an event of default shall have occurred and be continuing, Secured Party, without any other notice to or demand upon Debtor have in any jurisdiction in which enforcement hereof is sought, in addition to all other rights and remedies, the rights and remedies of a Secured Party under the Uniform Commercial Code and any additional rights and remedies which may be provided to a secured party in any jurisdiction in which Collateral is located, including, without limitation, the right to take possession of the Collateral, and for that purpose Secured Party may, so far as Debtor can give authority therefor, enter upon any premises on which the Collateral may be situated and remove the same therefrom. Secured Party may in its discretion require Debtor to assemble all or any part of the Collateral at such location or locations within the jurisdiction(s) of Debtor's principal office(s) or at such other locations as Secured Party may reasonably designate. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Secured Party shall give to Debtor at least five business days prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made. Debtor hereby acknowledges that five business days prior written notice of such sale or sales shall be reasonable notice. In addition, Debtor waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of Secured Party's rights and remedies hereunder, including, without limitation, its right following an event of default to take immediate possession of the Collateral and to exercise its rights and remedies with respect thereto.

Executed as of the day and year first above written.

StoreWorks Technologies, Limited              ScanSource, Inc

By: _____              By: _____
Name: _Andrew Teitscheid_              Name: _____
Title: _Controller_              Title: _Exec. Director_
Address: _14451 Ewing Ave, #200_              Address: 6 Logue Ct.
_Burnsville, MN 55306_                     Greenville, SC 29615

**EXHIBIT A**
**COLLATERAL DESCRIPTION**

The Collateral shall consist of all now owned and hereafter acquired and wherever located personal property of Debtor identified below. References to the "UCC" shall mean the Uniform Commercial Code as adopted in the State of South Carolina:

I.   Debtor, StoreWorks Technologies, Limited hereby grants to ScanSource, Inc. a purchase money security interest in all of Debtor's rights, title, and interest in and all equipment and inventory (including without limitation all software included therein and all accessions thereto), which ScanSource, Inc. now or hereafter sells to the Debtor and any and all proceeds of the foregoing in whatever form (the "Collateral").

Initial_____

# EXHIBIT B

ELECTRONICALLY FILED - 2018 Jun 06 3:24 PM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

| | | |
|---|---|---|
| IN THE STATE OF SOUTH CAROLINA | ) | COURT OF COMMON PLEAS |
| COUNTY OF GREENVILLE | ) | THIRTEENTH JUDICIAL CIRCUIT |
| | ) | |
| SCANSOURCE, INC. | ) | CA. No.:  2018-CP-13- |
| Plaintiff | ) | |
| v. | ) | |
| | ) | SUMMONS |
| STOREWORKS TECHNOLOGIES, | ) | |
| LIMITED, AND ANDREW C. | ) | |
| TEITSCHEID, INDIVIDUALLY, TROY | ) | |
| STELZER, INDIVIDUALLY, AND ANIL | ) | |
| KONKIMALLA, INDIVIDUALLY | ) | |
| Defendants | ) | |

TO THE DEFENDANTS ABOVE-NAMED:

YOU ARE HEREBY SUMMONED and required to answer the complaint herein, a copy of which is herewith served upon you, and to serve a copy of your answer to this complaint upon the Plaintiff, at the address shown below, within thirty (30) days after service hereof, exclusive of the day of such service, and if you fail to answer the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Greenville, South Carolina

Dated: June 6, 2018

         s/Brian R. Miller, Esq.
Brian R. Miller, Esq./Attorney for Plaintiff
The Miller Law Firm, P.A.
18 Parkway Commons Way
Greer, SC 29650
Ph.: (864) 527-0413
Fax: (864) 527-0414
S.C. Bar #73901
brian@themillerlawfirmpa.com

**<u>EXHIBIT C</u>**

ELECTRONICALLY FILED - 2018 Jun 06 3:24 PM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

| | | |
|---|---|---|
| IN THE STATE OF SOUTH CAROLINA | ) | COURT OF COMMON PLEAS |
| COUNTY OF GREENVILLE | ) | THIRTEENTH JUDICIAL CIRCUIT |
| | ) | |
| SCANSOURCE, INC. | ) | CA. No.: 2018-CP-13- |
| Plaintiff | ) | |
| v. | ) | |
| | ) | COMPLAINT |
| STOREWORKS TECHNOLOGIES, | ) | (JURY TRIAL DEMANDED) |
| LIMITED, AND ANDREW C. | ) | |
| TEITSCHEID, INDIVIDUALLY, TROY | ) | |
| STELZER, INDIVIDUALLY, AND ANIL | ) | |
| KONKIMALLA, INDIVIDUALLY | ) | |
| Defendants | ) | |

Plaintiff, SCANSOURCE, INC. ("Plaintiff"), a South Carolina corporation, complaining of the above-named Defendants, STOREWORKS TECHNOLOGIES, LIMITED, a Minnesota Company, et. al., will respectfully establish to the Court the following:

I.

**BACKGROUND FACTS**

1. Defendant StoreWorks Technologies, Limited, ("Defendant StoreWorks") through its CFO Andrew C. Teitscheid, procured certain products and services ("Products") from Plaintiff for resale under credit terms. Andrew C. Teitscheid signed a customer application on behalf of Defendant StoreWorks. The customer application contained certain terms and conditions of sale ("the Customer Agreement"), a copy of said Customer Agreement is attached hereto as "Exhibit A".

2. On or about November 9, 2009 the following officers, principal partners, and/or major shareholders of Defendant StoreWorks executed personal guarantees (collectively "Personal Guarantees") agreeing to pay any obligation Defendant StoreWorks when due to Plaintiff: Andrew S. Teitscheid, CFO and/or Major Accounts Controller of Defendant StoreWorks ("Defendant Teitscheid"), Troy Stelzer, President of Defendant StoreWorks ("Defendant Stelzer") and Anil Konkimalla, CTO of Defendant StoreWorks ("Defendant Konkimalla")(collectively Defendant

ELECTRONICALLY FILED - 2018 Jun 06 3:24 PM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

Teitscheid, Defendant Stelzer and Defendant Konkimalla "Defendant Guarantors") , a copy of said Personal Guarantees are attached hereto as "Exhibit B".

3. Defendant Teitscheid executed a Guarantor Acknowledgment on or about July 20, 2015, Defendant Konkimalla executed a Guarantor Acknowledgment on or about September 29, 2017 and again on October 31, 2017, Defendant Stelzer executed a Guarantor Acknowledgment on or about July 31, 2015, a copy of said Guarantor Acknowledgements are attached hereto as "Exhibit C".

4. Defendant StoreWorks failed to pay its outstanding balance on invoices for products shipped and delivered to Defendant StoreWorks when due.

5. Defendant StoreWorks last payment made was in February, 2018.

6. Plaintiff sent Defendant StoreWorks a letter dated February 23, 2018, demanding full payment of the amount owed.

7. Plaintiff sent all Defendants a letter dated May 10, 2018, demanding full payment of the amount owed.

8.  As of the date of this filing, upon information and belief Defendant StoreWorks has made no further payments to Plaintiff.

9. As of June 5, 2018, the outstanding balance, including interest was One Million, Sixty-One Thousand, Two Hundred Eighty-Six 23/100 DOLLARS ($1,061,286.23) (the "Debt").

10. Upon information and belief, Defendant StoreWorks, purchased the shares of Defendant Teitscheid and Defendant Stelzer for a sizable amount in an effort to dispose of assets and avoid payment to Plaintiff.

## PARTIES AND JURISDICTION

11. Plaintiff incorporates all of the above allegations of this Complaint as if fully rewritten herein.

12. Plaintiff is organized under the laws of South Carolina with its principal place of business located at 601 Logue Court, Greenville, SC 29615.

13. Upon information and belief, Defendant, StoreWorks is organized under the laws of Minnesota and has its principal place of business in the State of Minnesota.

14. Upon information and belief, Guarantors are individuals residing in the state of Minnesota.

ELECTRONICALLY FILED - 2018 Jun 06 3:24 PM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

15. The Customer Agreement contained a governing law and venue provision in Section 16 which clearly defined that the contract would be governed by South Carolina law and that venue was proper in South Carolina.

16. The Guarantees also contained a provision that the Guarantees would be governed by South Carolina law and that venue would be proper in South Carolina.

17. Defendant StoreWorks and Guarantors conducted business with Plaintiff in Greenville County, South Carolina.

18. Pursuant to the Customer Agreement and the Guarantees, jurisdiction and venue are properly in this Court.

19. Furthermore, pursuant to S.C. Code § 36-2-803(A)(1) and (A)(7), this Court has *in personam* jurisdiction over Defendants.

20.  In addition, pursuant to S.C. Code § 15-7-30(D)(1), venue is proper in this Court.

### FOR A FIRST CAUSE OF ACTION
### (Breach of Contract against Defendant StoreWorks)

21. Plaintiff incorporates all of the above allegations of the Complaint as if fully rewritten herein.

22. Defendant StoreWorks executed a Customer Agreement for the procurement of certain products and services from Plaintiff for resale. A copy of the Customer Agreement signed by Defendant StoreWorks is attached hereto as "Exhibit A".

23. The Customer Agreement required Defendant StoreWorks to, among other things, make timely payments to Plaintiff for the products received.

24. Defendant StoreWorks did in fact receive products from Plaintiff.

25. Defendant StoreWorks has breached the Customer Agreement by, among other things, failing to make the payments to Plaintiff when due.

26. As a result of Defendant StoreWorks' breach of the Customer Agreement, there is currently due and owing a balance of One Million, Sixty-One Thousand, Two Hundred Eighty-Six 23/100 DOLLARS ($1,061,286.23).

27. Plaintiff has made verbal and written demands upon Defendant StoreWorks for the sums due. Defendant StoreWorks has failed and refused to tender payment.

28. Plaintiff respectfully prays the Court for actual and consequential damages, prejudgment and post-judgment interest, penalties, costs, expenses, and reasonable attorneys' fees.

ELECTRONICALLY FILED - 2018 Jun 06 3:24 PM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

## FOR A SECOND CAUSE OF ACTION

### (Breach of Contract Against Defendant Guarantors)

29. Plaintiff incorporates all of the above allegations of this Complaint as if fully contained herein.

30. The Personal Guarantees required Defendant Guarantors to guaranty debts owed by Defendant StoreWorks to Plaintiff.

31. Defendant Guarantors have breached the Personal Guarantees by, among other things, failing to make the payments due to Plaintiff from Defendant StoreWorks when due or demanded.

32. As a result of Defendant Guarantors breach of the Personal Guarantees, there is currently due and owing to Plaintiff the sum of One Million, Sixty-One Thousand, Two Hundred Eighty-Six 23/100 DOLLARS ($1,061,286.23), and Plaintiff is therefore entitled to a judgment in this amount, together with pre-judgment contractual, and post-judgment interest, penalties, costs, expenses and reasonable attorney's fees.

## FOR A THIRD CAUSE OF ACTION

### (Fraudulent Transfer Against Defendant StoreWorks and Defendant Teitscheid and Defendant Stelzer)

33. Plaintiff incorporates all of the above allegations of this Complaint as if fully contained herein.

34. Upon information and belief Defendant StoreWorks transferred substantial assets to Defendant Teitscheid and Defendant Stelzer with the intent to defraud Defendant StoreWorks creditors.

35. Defendant StoreWorks, Defendant Teitscheid and Defendant Stelzer were aware of amounts owing to Plaintiff at the time of the transfer, and accepted funds or other valuable consideration from Defendant StoreWorks in furtherance of a scheme to defraud Plaintiff.

36. The transfers were allegedly for payment of outstanding shares owned by Defendant Teitscheid and Defendant Stelzer, but said transfers were not made for justifiable consideration.

37. The transfers left Defendant StoreWorks unable to pay its creditors, including Plaintiff and were made with the intent to defraud Plaintiff in violation of the Statute of Elizabeth, S.C. Code § 27-23-10.

38. Defendant Teitscheid and Defendant Stelzer as owners of Defendant StoreWorks prior to the transfer were aware of the debts owed Plaintiff and Defendant StoreWorks' intent is reasonably imputed to Defendants Teitscheid and Defendant Stelzer.

39. As a result, Plaintiff is entitled to an order of this Court setting aside the funds paid to Defendants Teitscheid and Defendant Stelzer and all three Defendants should be required to pay Plaintiff the

ELECTRONICALLY FILED - 2018 Jun 06 3:24 PM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

sums owed along with pre and post judgment interest, damages, including punitive damages, and costs and attorney's fees.

## FOR A FOURTH CAUSE OF ACTION

### (Breach of Contract Accompanied by a Fraudulent Act Against all Defendants)

40. Plaintiff incorporates all of the above allegations of this Complaint as if fully rewritten herein.

41. Plaintiff had a binding contract with Defendant StoreWorks in the Customer Agreement and a binding contract with Defendants Guarantors in the personal guarantees.

42. Defendants received valuable consideration in the form of products from Plaintiff.

43. Defendant StoreWorks breached the Customer Agreement in failing to pay for products.

44. Defendants Guarantors breached the Personal Guarantees in failing to pay the debts owed by Defendant StoreWorks.

45. Upon information and belief, Defendants knowingly and willingly transferred a large sum of assets from Defendant StoreWorks to Defendant Stelzer and Defendant Teitscheid in an effort to avoid creditors, including but not limited to Plaintiff.

46. As a result, Plaintiff is entitled to an order of this Court that Defendants should be required to pay Plaintiff the sums owed along with pre and post judgment interest, damages, including punitive damages, and costs and attorney's fees.

## FOR A FIFTH CAUSE OF ACTION

### (Fraud and Misrepresentation Against all Defendants)

47. Plaintiff incorporates all of the above allegations of this Complaint as if fully rewritten herein.

48. Defendants represented to Plaintiff that it would pay for products purchased.

49. Defendants knew that said representations were false or had reckless disregard for the truth and knew that said promises were material to Plaintiff extending credit for the purchase of products.

50. Defendant StoreWorks transferred large sums of money to Defendant Stelzer and Defendant Teitscheid as evidence of such reckless disregard.

51. Defendants knew that Plaintiff was ignorant of the falsity of their representations and did in fact rely upon said representations in extending credit.

52. Plaintiff had a right to rely upon such representations.

ELECTRONICALLY FILED - 2018 Jun 06 3:24 PM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

53. As a result of Plaintiff's reliance Plaintiff has been damaged and is entitled to an award for the amounts owed, pre and post judgment interest, damages, including punitive damages, costs and attorney's fees.

### FOR A SIXTH CAUSE OF ACTION

#### (Account Stated)

54. Plaintiff incorporates all of the above allegations of this Complaint as if fully rewritten herein.

55. Plaintiff duly delivered to Defendant StoreWorks invoices setting the purchase price for the point-of-sale equipment and goods sold and delivered to Defendant StoreWorks.

56. Defendant StoreWorks received and accepted the invoices without objection, thereby acknowledging its debt to Plaintiff and that it was due and owed.

57. Defendant StoreWorks further expressly acknowledged the amount of the Debt that it was due and owed.

58. As of June 5th, 2018, Defendant StoreWorks has failed to pay the sum of One Million, Sixty-One Thousand, Two Hundred Eighty-Six 23/100 DOLLARS ($1,061,286.23) inclusive of interest, to Plaintiff for the Products and other goods sold and delivered to Defendant StoreWorks.

59. ScanSource has made numerous written and verbal demands upon Defendant for these sums.

60. Defendant StoreWorks failed and refused to comply with these demands or its obligations under the Customer Agreement.

61. Plaintiff is therefore entitled to judgment in its favor against Defendant StoreWorks in this amount, together with actual and consequential damages, pre-judgment and post-judgment interest, penalties, costs, expenses, and reasonable attorneys' fees.

### FOR A SEVENTH CAUSE OF ACTION

#### (Goods Sold and Delivered)

62. Plaintiff incorporates all of the above allegations of this Complaint as if fully rewritten herein.

63. Plaintiff sold and delivered Products to Defendant StoreWorks for resale to third parties per the credit Customer Agreement and duly provided invoices setting the purchase prices for those Products.

64. Defendant StoreWorks received and accepted invoices for Products delivered to it without objection, further evidencing its acceptance of the Products.

ELECTRONICALLY FILED - 2018 Jun 06 3:24 PM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

65. As of June 5, 2018, Defendant StoreWorks owes Plaintiff One Million, Sixty-One Thousand, Two Hundred Eighty-Six 23/100 DOLLARS ($1,061,286.23), together with pre-judgment and post-judgment interest, penalties, costs, expenses, and reasonable attorneys' fees, for goods sold and delivered by Plaintiff to Defendant StoreWorks.

66. Plaintiff is therefore entitled to judgment in its favor against Defendant StoreWorks in the amount of One Million, Sixty-One Thousand, Two Hundred Eighty-Six 23/100 DOLLARS ($1,061,286.23), together with pre-judgment and post-judgment interest, penalties, costs, expenses, and reasonable attorneys' fees.

## FOR AN EIGHTH CAUSE OF ACTION
### (Unjust Enrichment against all Defendants)

67. Plaintiff incorporates all of the above allegations of this Complaint as if fully rewritten herein.

68. At the request of Defendant StoreWorks, Plaintiff sold and delivered the Products and other goods to Defendant StoreWorks.

69. Defendant StoreWorks received and accepted those Products without objection.

70. Defendant StoreWorks has failed to pay the sum of One Million, Sixty-One Thousand, Two Hundred Eighty-Six 23/100 DOLLARS ($1,061,286.23) inclusive of interest, that it owes to Plaintiff for the Products and other goods it sold and delivered to StoreWorks.

71. Without justification, Defendant StoreWorks has been unjustly enriched in the amount of One Million, Sixty-One Thousand, Two Hundred Eighty-Six 23/100 DOLLARS ($1,061,286.23) inclusive of interest.

72. Upon information and belief Defendant StoreWorks transferred funds to Defendant Stelzer and Defendant Teitscheid and said funds were available as a result of Defendant StoreWorks failure to pay Plaintiff.

73. As a result, Defendant Stelzer and Defendant Teitscheid were unjustly enriched.

74. Upon information and belief Defendant Konkimalla has personally benefitted from Defendant Storeworks as a result of Defendant Storeworks failure to pay Plaintiff, and as a result Defendant Knkimall has been unjustly enriched.

75. Plaintiff is entitled to judgment in its favor against Defendant StoreWorks, Defendant Teitscheid and Defendant Stelzer, for all sums owed together with pre-judgment and post-judgment interest, penalties, costs, expenses, and reasonable attorneys' fees.

ELECTRONICALLY FILED - 2018 Jun 06 3:24 PM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

## FOR A NINTH CAUSE OF ACTION

### (Promissory Estoppel Against All Defendants)

76. Plaintiff incorporates all of the above allegations of this Complaint as if fully rewritten herein.

77. On numerous occasions, Defendants made promises to pay Plaintiff for the products and other goods that it sold and delivered to Defendant StoreWorks.

78. Plaintiff reasonably relied on Defendants' promises, to its detriment, and sold and delivered goods to Defendant StoreWorks.

79. Defendants reasonably expected to pay and induced Plaintiff to act in reliance upon their promises to pay.

80. Plaintiff has been injured by Defendants' failure to abide by their promises to pay the amount owed.

81. Justice can only be served by holding Defendants to the terms of the promises made to Plaintiff, or otherwise by awarding Plaintiff damages in such amount as is reasonably necessary that Plaintiff receives the benefit of the bargain.

82. As a result, Plaintiff is entitled to judgment in its favor against Defendants in the amount of One Million, Sixty-One Thousand, Two Hundred Eighty-Six 23/100 DOLLARS ($1,061,286.23) together with pre-judgment, and post-judgment interest, penalties, costs, expenses, and reasonable attorneys' fees.

## FOR A TENTH CAUSE OF ACTION

### (Money Had and Received against Defendant StoreWorks)

83. Plaintiff incorporates all of the above allegations of this Complaint as if fully rewritten herein.

84. Plaintiff in good faith extended credit to Defendant StoreWorks upon the express understanding and condition that these amounts would be repaid by Defendant StoreWorks as required by the Customer Agreement.

85. Pursuant to this understanding and condition, Defendant StoreWorks received credit from Plaintiff to purchase Products.

86. Defendant StoreWorks then transferred the monies earned through the resale of such Products to individual owners.

87. When the time came for Defendant StoreWorks to repay the monies given to it by Plaintiff, it refused to do so.

ELECTRONICALLY FILED - 2018 Jun 06 3:24 PM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

88. Plaintiff made numerous verbal and written demands for payment of these monies upon Defendant StoreWorks; however, it refused to repay any of the amounts advanced by Plaintiff.

89. Defendant StoreWorks is not entitled, in equity or good conscience, to retain the monies advanced to it by Plaintiff, as allowing Defendant StoreWorks to retain such monies would permit it to be unjustly enriched at the expense of Plaintiff.

90. Defendant StoreWorks is obliged by the ties of natural justice and equity to remit to Plaintiff all monies advanced.

91. Plaintiff is entitled to recover from Defendant StoreWorks all of the monies advanced by Plaintiff, together with actual and consequential damages, pre-judgment and post-judgment interest, penalties, costs, expenses, and reasonable attorneys' fees.

### FOR AN ELEVENTH CAUSE OF ACTION

#### (Accounting)

92. Plaintiff incorporates all of the above allegations of this Complaint as if fully rewritten herein.

93. Plaintiff requires immediate access to Defendant StoreWorks' accounting records. Without said access Plaintiff cannot ascertain precisely where all of Defendant StoreWorks' money went that was supposed to pay for the amounts owed Plaintiff. Plaintiff is also unable to ascertain what other co-conspirators and joint tortfeasors may have participated in the fraudulent liquidation of Defendant StoreWorks.

94. Plaintiff is entitled to an accounting, on an emergent basis, for the purpose of ascertaining the information it needs to be made whole. Defendants fraudulent behavior demonstrates that only through an immediate accounting can Plaintiff avoid additional harm resulting from Defendants having additional funds to conceal their misconduct.

### FOR A TWELFTH CAUSE OF ACTION

#### (Attorney's Fees and Costs)

95. Plaintiff incorporates all of the above allegations of this Complaint as if fully rewritten herein.

96. Both the Customer Agreement and the Guarantees have clear provisions entitling Plaintiff to recover attorneys' fees and costs in the event Defendants default on payment.

97. As a result, Plaintiff is entitled to reasonable attorney's fees and costs associated with this action.

ELECTRONICALLY FILED - 2018 Jun 06 3:24 PM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

**WHEREFORE**, Plaintiff ScanSource prays for judgment against Defendants as follows:

a)      Ordering a jury trial on all claims against Defendants;

b)      Entering judgment for actual damages in favor of Plaintiff against Defendants in the amount of One Million, Sixty-One Thousand, Two Hundred Eighty-Six 23/100 DOLLARS ($1,061,286.23) together with pre-judgment, and post-judgment interest, penalties, costs, expenses, and reasonable attorneys' fees;

c)      Awarding Plaintiff actual, consequential and punitive damages as a result of Defendants fraudulent conveyances, and fraud and intentional misrepresentation;

d)      Awarding Plaintiff an accounting;

e)      Ordering Defendant StoreWorks' fraudulent conveyances to Defendant Guarantors be set aside;

f)      Awarding Plaintiff its attorneys' fees;

g)      Awarding Plaintiff its costs and expenses herein; and

h)      Awarding Plaintiff ScanSource such other and further relief as the Court deems just and proper.

Respectfully submitted:

                                    _____s/Brian R. Miller_____
                                    Brian R.. Miller, Esq. (S.C. Bar #73901)
                                    *Attorney for the Plaintiff*
                                    **THE MILLER LAW FIRM, P.A.**
                                    18 Parkway Commons Way
                                    Greer, SC 29650
                                    P: (864) 527-0413 / F: (864) 527-0414
                                    brian@themillerlawfirmpa.com

June 6, 2018

ELECTRONICALLY FILED - 2018 Jun 06 3:24 PM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS

)

COUNTY OF GREENVILLE ) VERIFICATION

I, Neeraj Walia, declare as follows:

I am a Manager of Reseller Financial Services for ScanSource, Inc., a South Carolina corporation, which is the Plaintiff in this action, and I have been authorized to make this verification on its behalf.

I have read the foregoing Complaint herein and know the contents thereof. I am informed and believe and, on that ground, allege that the matters stated in the foregoing document are true.

I declare under penalty of perjury under the laws of the State of South Carolina that the foregoing Complaint is true and correct to my knowledge, and that any allegations therein that are stated on information and belief, I believe them to be true.

Executed at Greenville, South Carolina on June 05, 2018.

Neeraj Walia
_____        _____
Print Name of Signature                Signature

SWORN to and Subscribed before me

this ___5th___ day of ___June___ , ___2018___

_____
Notary Public for South Carolina

My Commission expires: _____9/9/2022_____

BERNARDO PERKINSON
Notary Public - State of South Carolina
My Commission Expires July 9, 2022

12

**EXHIBIT D**

ELECTRONICALLY FILED - 2019 Nov 05 10:13 AM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

STATE OF SOUTH CAROLINA

COUNTY OF GREENVILLE

Scansource, Inc.,
                                    Plaintiff,

v.

Storeworks Technologies, Limited, and
Andrew C. Teitscheid, individually, Troy
Stelzer, Individually, and Anil
Konkimalla, Individually,
                                    Defendants.

IN THE COURT OF COMMON PLEAS

C/A NO: 2018-CP-23-03195

**ORDER GRANTING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

THIS MATTER COMES BEFORE THE UNDERSIGNED pursuant to Plaintiff's Motion for Partial Summary Judgment against all Defendants (the "Motion"). The undersigned conducted a hearing on the Motion on October 31, 2019 at 9:30 a.m. (the "Hearing"). During the Hearing, the undersigned received oral argument from Brian R. Miller, Esq. of The Miller Law Firm, PA for the Plaintiff ("Scansource"); Shaun C. Blake, Esq. of Rogers Lewis Jackson Mann & Quinn, LL for Storeworks Technologies, Ltd. ("Storeworks") and Anil Konkimalla; Konstantine Diamaduros, Esq. of Nexsen Pruet, LLC for Andrew Teitscheid; and Steven E. Buckingham, Esq. of The Law Office of Steven Edward Buckingham for Troy Stelzer.

Based on the materials submitted by the parties prior to and during the hearing, as well as the arguments of counsel, the Court finds and concludes that the Motion should be granted in part and denied in part, as further stated below.

<u>MATERIAL FACTS NOT IN DISPUTE</u>

ScanSource and Storeworks are engaged in providing point of sale (POS) hardware and software technologies to retailers. On November 9, 2009, Andrew Teitscheid and Troy Stelzer each executed an "Individual Personal Guarantee" agreeing to pay any obligation Storeworks may owe Scansource, Inc. ("ScanSource") arising out of services, goods, merchandise or other property

ELECTRONICALLY FILED - 2019 Nov 05 10:13 AM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

sold or delivered by Scansource to Storeworks. Likewise, Anil Konkimalla executed such an "Individual Personal Guarantee" on December 15, 2009.

On July 25, 2012, Andrew Teitscheid, as Storeworks's Chief Financial Officer, completed a Customer Application of ScanSource's, which included certain "Terms and Conditions of Sale" on the reverse page. On December 31, 2015, Andrew Teitscheid executed a "Guarantor Acknowledgement" referencing his 2009 Individual Personal Guarantee, and Anil Konkimalla executed a "Guarantor Acknowledgement" on both September 29, 2017 and October 31, 2017.

At certain times in 2017 and 2018 Storeworks submitted purchase orders for equipment, and Scansource generated invoices for goods and services delivered to Storeworks. The invoices submitted in support of the Motion demonstrate an outstanding principal balance of $962,754.50 due from Storeworks to Scansource. At the hearing Storeworks and Anil Konkimalla disputed neither that Storeworks owes ScanSource the principal amount of $962,754.50 nor that Anil Konkimalla's Individual Personal Guarantee applied to this obligation of Storeworks.

### STANDARD FOR MOTION

"Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Bd. of Trs. For the Fairfield Cty. Sch. Dist. v. State, 409 S.C. 119, 125, 761 S.E.2d 241, 244 (2014). "Summary judgment should be granted when plain, palpable, and indisputable facts exist on which reasonable minds cannot differ." Pee Dee Stores, Inc. v. Doyle, 381 S.C. 234, 240, 672 S.E.2d 799, 802 (Ct. App. 2009).

While all evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences resolved in the same manner, Standard Fire Ins. Co. v. Marine Contracting & Towing Co., 301 S.C. 418, 392 S.E.2d 460 (1990), a court "cannot ignore facts unfavorable to that party and [it] must determine whether a verdict for the party opposing the

ELECTRONICALLY FILED - 2019 Nov 05 10:13 AM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

motion would be reasonably possible under the facts." Hopson v. Clary, 321 S.C. 312, 314, 468 S.E.2d 305, 307 (Ct. App. 1996). Furthermore, when a motion for summary judgment is supported by affidavits, the nonmoving party cannot rest on the general denials of its answer, but must show that there is a genuine issue of material fact, through its own affidavits. S.C.R.C.P. 56(e). If the nonmoving party fails to do this, "summary judgment, if appropriate, shall be entered against [it]." Id., *see* Bd. of Trs. For the Fairfield Cty. Sch. Dist. v. State 409 S.C. at 126, 761 S.E.2d at 245 ("It is well settled that the non-moving party may not rely on mere allegations to resist summary judgment but must present some evidence in the form of affidavits or otherwise in support of its position.").

## CONCLUSIONS

The elements for breach of contract are the existence of the contract, its breach, and the damages caused by such breach. Branche Builders, Inc. v. Coggins, 386 S.C. 43, 48, 686 S.E.2d 200, 202 (Ct. App. 2009). Defendants have not disputed that the respective purchase orders and invoices exchanged between the parties each constitute a contract between Storeworks and Scansource. Likewise, Defendants have not disputed that the principal balance owed under the numerous invoices presented by Scansource at the Hearing equals $962,754.50, and that Storeworks is in breach of these contracts by failing to pay this amount. Finally, Anil Konkimalla does not dispute that his Individual Personal Guarantee extends to Storeworks' obligation of payment of $962,754.50 to Scansource, placing Anil Konkimalla in breach of his guarantee.

However, there are disputes of material fact regarding the amount of interest that may be due Scansource from the Defendants. Likewise, there remains disputes of material fact regarding whether the "Individual Personal Guarantee" signed by Andrew Teitscheid and Troy Stelzer maintain their effectiveness as it relates to any liability owed to ScanSource. At the hearing,

ELECTRONICALLY FILED - 2019 Nov 05 10:13 AM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

Andrew Teitscheid and Troy Stelzer disputed their liability under the "Individual Personal Guarantee" based upon they are no longer owners of Storeworks. Andrew Teitscheid further disputed his liability on the basis that his liability had allegedly been discharged following his buy out from Storeworks and Anil Konkimalla's subsequent "Guarantor Acknowledgment." Troy Stelzer further disputed his liability on the basis that the "Individual Personal Guarantee" itself may not be valid. Finally, there remains disputes of material fact regarding Scansource's claims for attorneys' fees and costs.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Partial Summary Judgment is hereby GRANTED to the extent that Scansource seeks the entry of an order granting it partial summary judgment against Storeworks on its First Cause of Action (Breach of Contract against Defendant Storeworks) and to the extent that Scansource seeks the entry of an order granting it partial summary judgment against Anil Konkimalla on its Second Cause of Action (Breach of Contract against Defendant Guarantors).

IT IS FURTHER ORDERED that the Plaintiff's Motion for Partial Summary Judgment, to the extent it seeks any further relief, is DENIED.

IT IS FURTHER ORDERED that judgement shall be entered jointly against Storeworks and Anil Konkimalla in the amount of $962,754.50. The undersigned will contemporaneously issue a Form 4 Judgment that conforms with this Order.

AND IT IS SO ORDERED.



Greenville Common Pleas

**Case Caption:**   Scansource Inc  vs.   Storeworks Technologies Limited  , defendant, et al

**Case Number:**   2018CP2303195

**Type:**   Order/Other

So Ordered

s/ Robin B. Stilwell 2158

Electronically signed on 2019-11-04 11:39:27    page 5 of 5

ELECTRONICALLY FILED - 2019 Nov 05 10:13 AM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

# EXHIBIT E

ELECTRONICALLY FILED - 2019 Nov 05 10:13 AM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

**FORM 4**

STATE OF SOUTH CAROLINA                                    **JUDGMENT IN A CIVIL CASE**
COUNTY OF GREENVILLE
IN THE COURT OF COMMON PLEAS            **CASE NO. 2018-CP-23-03195**

SCANSOURCE, INC                                    STOREWORKS TECHNOLOGIES, LTD.; ANDREW
                                                   TEITSCHEID, INDIVIDUALLY; TROY STELZER,
_____                    INDIVIDUALLY; AND ANIL KONKIMALLA
PLAINTIFF(S)                                       _____
                                                   DEFENDANT(S)

| | |
|---|---|
| **Submitted by:** BRIAN R. MILLER, ESQ. | **Attorney for :** ☒ Plaintiff    ☐ Defendant<br>or<br>☐ Self-Represented Litigant |

### DISPOSITION TYPE (CHECK ONE)

☐   **JURY VERDICT**. This action came before the court for a trial by jury. The issues have been tried and a verdict rendered.

☒   **DECISION BY THE COURT**. This action came to trial or hearing before the court. The issues have been tried or heard and a decision rendered. ☐ See Page 2 for additional information.

☐   **ACTION DISMISSED** (*CHECK REASON*): ☐ Rule 12(b), SCRCP; ☐ Rule 41(a), SCRCP (Vol. Nonsuit); ☐ Rule 43(k), SCRCP (Settled); ☐ Other

☐   **ACTION STRICKEN** (*CHECK REASON*): ☐ Rule 40(j), SCRCP; ☐ Bankruptcy; ☐ Binding arbitration, subject to right to restore to confirm, vacate or modify arbitration award; ☐ Other

☐   **STAYED DUE TO BANKRUPTCY**

☐   **DISPOSITION OF APPEAL TO THE CIRCUIT COURT** (*CHECK APPLICABLE BOX*): ☐ Affirmed; ☐ Reversed; ☐ Remanded; ☐ Other

NOTE: ATTORNEYS ARE RESPONSIBLE FOR NOTIFYING LOWER COURT, TRIBUNAL, OR ADMINISTRATIVE AGENCY OF THE CIRCUIT COURT RULING IN THIS APPEAL.

**IT IS ORDERED AND ADJUDGED:** ☒ See attached order (formal order to follow) ☐ Statement of Judgment by the Court:

### ORDER INFORMATION

This order ☐ ends ☒ does not end the case.
Additional Information for the Clerk : Summary Judgment granted as to the below-named defendants. The issues of interest calculation, attroney's fees, and the liability of the remaining defendants were not determined at the motion hearing.

### INFORMATION FOR THE JUDGMENT INDEX
**Complete this section below when the judgment affects title to real or personal property or if any amount should be enrolled. If there is no judgment information, indicate "N/A" in one of the boxes below.**

| Judgment in Favor of<br>(List name(s) below) | Judgment Against<br>(List name(s) below) | Judgment Amount To be Enrolled<br>(List amount(s) below) |
|---|---|---|
| SCANSOURCE, INC | STOREWORKS TECHNOLOGIES, LTD. AND ANIL KONKIMALLA, JOINTLY | $962,754.50 |
| | | $ |
| | | $ |
| If applicable, describe the property, including tax map information and address, referenced in the order: | | |

The judgment information above has been provided by the submitting party.  Disputes concerning the amounts contained in this form may be addressed by way of motion pursuant to the SC Rules of Civil Procedure. Amounts to be computed such as interest or additional taxable costs not available at the time the former and final order are submitted to the judge may be provided to the clerk. **Note:** Title abstractors and researchers should refer to the official court order for judgment details.
**E-Filing Note: In E-Filing counties, the Court will electronically sign this form using a separate electronic signature page.**

_____    _____    _____

SCRCP Form 4C (02/2017)                                                                    Page 1 of 4

Circuit Court Judge                                    Judge Code                    Date

## For Clerk of Court Office Use Only

This judgment was entered on the          day of             , 20        and a copy mailed first class or
placed in the appropriate attorney's box on this          day of          , 20        to attorneys of record or
to parties (when appearing pro se) as follows:

_____          _____
_____          _____
_____          _____

**ATTORNEY(S) FOR THE PLAINTIFF(S)**          **ATTORNEY(S) FOR THE DEFENDANT(S)**

                                          _____

                                          **CLERK OF COURT**

## Court Reporter:

**E-Filing Note: In E-Filing counties, the date of Entry of Judgment is the same date as reflected on the Electronic File Stamp and the clerk's entering of the date of judgment above is not required in those counties. The clerk will mail a copy of the judgement to parties who are not E-Filers or who are appearing pro se. See Rule 77(d), SCRCP.**

**ADDITIONAL INFORMATION REGARDING DECISION BY THE COURT AS REFERENCED ON PAGE 1**.

This action came to trial or hearing before the court. The issues have been tried or heard and a decision rendered.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

ELECTRONICALLY FILED - 2019 Nov 05 10:13 AM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

ELECTRONICALLY FILED - 2019 Nov 05 10:13 AM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## FORM 4C INSTRUCTIONS—JUDGMENT IN A CIVIL CASE
### (Instructions for Information Only-Not to be filed with Form 4C)

1. Form 4C-Judgment in a Civil Case has been modified to add order information and enrollment instructions for the clerk of court.  The purpose of Form 4 has not changed with the exception that judgment information is provided when applicable.

2. Please note that the Form 4C must be attached to all orders that include information to enroll in the judgment index.  The clerk will not be responsible for reading the order to determine enrollment information.

   The attorney or prevailing party will prepare and attach the Form 4C when submitting the proposed order that includes judgment enrollment information for the judgment index. The judge will review and sign Form 4C when he or she signs an order that includes judgment enrollment information for the judgment index.

3. Form 4C is not required to be submitted to the Court with orders that do not include information to enroll in the judgment index.  If the clerk receives such an order without Form 4C attached, the clerk should enter and process the order pursuant to Rule 58 and Rule 77(d), SC Rules of Civil Procedure (i.e., the clerk should serve notice of entry of the judgment by mail or provide the attorneys with copies of the signed order by other means).

4. The "Information for the Judgment Index" section should be completed when the judgment affects title to real or personal property or if any amount should be enrolled.  In the "Judgment in Favor of" column, enter the name of the party to whom the judgment is awarded.  In the "Judgment Against" column, enter the name of the person to whom the judgment is against.  The judgment amount to be enrolled should be noted in the "Judgment Amount" column.  As necessary, describe any property referenced in the order if it is to be enrolled in the judgment index. If there is no judgment information to enroll, indicate "N/A" in one of the boxes in this section of the form.

5. To enter information to accommodate multiple parties, additional Form 4Cs may be used as necessary. Additional space may be inserted on the form as necessary.

6. The section "For the Clerk of Court Office Use Only" should be completed by the clerk as it has been with the previous version of Form 4.

7. If the matter is on appeal to the Circuit Court, then the parties on the form should be changed from Plaintiff and Defendant to Appellant and Respondent.

8. If an arbitrator prepares an order after arbitration, the arbitrator should strike through "Circuit Court Judge" and indicate "Arbitrator" in the signature block.

ELECTRONICALLY FILED - 2019 Nov 05 10:13 AM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

9.  If a Special Circuit Court Judge, Master in Equity, or Special Referee prepares an order after hearing a Circuit Court matter, then he or she should strike through the title "Circuit Court Judge" below the signature line and indicate the appropriate title.

10. When an Order of Foreclosure is filed, neither the parties or debt owed should be listed in the Information for the Judgment Index Section, unless the foreclosure order specifically requires entry of the full judgment amount before the foreclosure sale, pursuant to Section 29-3-650 of the SC Code.

11. If the deficiency judgment is waived in a Foreclosure action, indicate N/A in the "Judgment Amount To Be Enrolled" box.

12. Foreclosure actions should be ended by the Clerk of Court upon receipt of the Order of Foreclosure. Subsequent information, including deficiency judgments, can be added to the action after the case is ended. The Master in Equity should end the action in the MIE system upon the receipt of the Order of Foreclosure.

13. When judgment enrollment information is included in the Information for the Judgment Index Section (for example, when there is a deficiency judgment), only the parties who the judgment is for and against should be included in the Section.  Subordinate parties and lienholders should not be included in the box if there is not a judgment amount specifically for or against them.

14. Form 4C is not required to be attached to Transcripts of Judgment and Confession of Judgment.



Greenville Common Pleas

**Case Caption:**     Scansource Inc  vs.   Storeworks Technologies Limited  , defendant, et al

**Case Number:**     2018CP2303195

**Type:**            Order/Form 4

So Ordered

s/ Robin B. Stilwell 2158

Electronically signed on 2019-11-04 11:39:40    page 5 of 5

ELECTRONICALLY FILED - 2019 Nov 05 10:13 AM - GREENVILLE - COMMON PLEAS - CASE#2018CP2303195

## **EXHIBIT F**

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT
Case Type: Contract

Xenia Retail, Inc. and Troy Stelzer,

        Plaintiffs,

vs.

StoreWorks Technologies Ltd. and
Anil Konkimalla,

        Defendants.

Court File No:

**SUMMONS**

**THIS SUMMONS IS DIRECTED TO THE ABOVE-NAMED DEFENDANT, <u>XENIA RETAIL, INC.</u>:**

1.     **YOU ARE BEING SUED.** The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this summons.

2.     **YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this Summons **a written response** called an Answer within twenty (20) days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this Summons; that address is:

> Arthur, Chapman, Kettering, Smetak & Pikala, P.A.
> Sarah E. Bushnell
> Perssis Meshkat
> 500 Young Quinlan Building
> 81 South Ninth Street
> Minneapolis, MN 55402-3214

3.     **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

4.     **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not answer within twenty (20) days, you will lose your case. You will not get to tell your side of the story, and the court may decide against you and award the Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the

8496093

Complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the Complaint.

5.      **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written answer to protect your rights or you may lose the case.**

6.      **ALTERNATIVE DISPUTE RESOLUTION Pursuant to M.S.A. § 543.22.** The parties may agree to be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

RESPECTFULLY SUBMITTED,

ARTHUR, CHAPMAN, KETTERING,
SMETAK & PIKALA, P.A.

Dated: August 6, 2019

Sarah E. Bushnell (#326859)
Perssis Meshkat (#390057)
500 Young Quinlan Building
81 South Ninth Street
Minneapolis, MN 55402-3214
P: (612) 339-3500
F: (612) 339-7655
sebushnell@ArthurChapman.com
pmeshkat@ArthurChapman.com

*Attorneys for Defendants and Counterclaim Plaintiffs StoreWorks Technologies Ltd. and Anil Konkimalla*

**ACKNOWLEDGMENT**

The undersigned attorney acknowledges that sanctions may be imposed for violations of

Minn. Stat. § 549.211.

Sarah E. Bushnell

2

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT
Case Type: Contract

Xenia Retail, Inc. and Troy Stelzer,

Plaintiffs,

vs.

StoreWorks Technologies Ltd. and
Anil Konkimalla,

Defendants.

Court File No:

**DEFENDANTS STOREWORKS
TECHNOLOGIES LTD.'S AND ANIL
KONKIMALLA'S ANSWER TO
COMPLAINT AND STOREWORKS
TECHOLOGIES, LTD'S
COUNTERCLAIMS**

Defendants StoreWorks Technologies Ltd. ("Storeworks") and Anil Konkimalla ("Konkimalla" and, with Storeworks, the "Defendants") as their Answer to the Complaint of Plaintiffs Xenia Retail, Inc. ("Xenia") and Troy Stelzer ("Stelzer" and, with Xenia, the "Plaintiffs"), state and alleges as follows:

### FIRST DEFENSE
#### (Responses to Individual Paragraphs of the Complaint)

1.      Defendants admit the allegations in paragraph 1 of the Complaint, except state that there is some ambiguity in the language of paragraph 1 and that only the former software division of Storeworks is operated now as Xenia.

2.      Defendants admit the allegation in paragraph 2 of the Complaint on information and belief.

3.      As to paragraph 3 of the Complaint, Defendants admit that Stelzer is a former officer and shareholder of Storeworks and admit, on information and belief, that Stelzer is the controlling shareholder in Xenia.

4.      Defendants admit the allegations in paragraph 4 of the Complaint.

5.     Defendants admit the allegations in paragraph 5 of the Complaint.

6.     As to paragraph 6 of the Complaint, Defendants admit that the Shareholder Lawsuit was resolved by settlement in August 2017 and that Storeworks, Konkimalla, and Stelzer are parties to a Redemption and Acquisition Agreement ("Redemption Agreement"). Defendants affirmatively allege that there are other parties to the Redemption Agreement.

7.     Defendants generally deny the allegations in paragraph 7 of the Complaint and affirmatively state that there is no provision in the Redemption Agreement titled "tax neutral" nor do the words "tax neutral" appear anywhere in the Redemption Agreement.  Defendants deny Plaintiffs' characterization of the Redemption Agreement and state that the Redemption Agreement speaks for itself.  Defendants affirmatively allege that there were aggressive negotiations among the parties (all represented by their own lawyers) regarding the terms of the Redemption Agreement.

8.     As to paragraph 8 of the Complaint, Defendants admit that Exhibit A to the Complaint is a copy of the Redemption Agreement.  Defendants state that the Redemption Agreement speaks for itself and deny Plaintiffs' characterization of the same.

9.     Defendants deny the allegations in paragraph 9 of the Complaint.

10.     Defendants admit that in or about November 2017, Plaintiffs sued them in another lawsuit.  Defendants deny that Plaintiffs' lawsuit was justified and affirmatively allege that they asserted counterclaims in the Second Lawsuit.

11.     As to paragraph 11 of the Complaint, Defendants admit that the Second Lawsuit was settled after mediation and that the terms of the settlement are set forth in a written Settlement Agreement and Release (the "Settlement Agreement") that was signed by Plaintiffs on or about July 11, 2018. Defendants affirmatively state that the Settlement Agreement, by its

8498612

terms, "constitute[s] the entire agreement of the Parties [and] shall supersede any prior or contemporaneous oral or written agreements relating to the subject matter of this Agreement . . ." Defendants deny that Exhibit B that was served with the Complaint is a complete copy of the Settlement Agreement in that it is missing the referenced exhibits.

12.     As to paragraph 12 of the Complaint, Defendants state that the Settlement Agreement speaks for itself and deny Plaintiffs' characterization and excerpting of the same.

13.     As to paragraph 13 of the Complaint, Defendants state that the Settlement Agreement speaks for itself and deny Plaintiffs' excerpting of the same.

14.     As to paragraph 14 of the Complaint, Defendants state that the Redemption Agreement speaks for itself and deny Plaintiffs' excerpting of the same.

15.     In response to the allegations in paragraph 15 of the Complaint, Defendants admit that ScanSource sued Storeworks and others in 2018, seeking to collect monies allegedly owed by Storeworks.

16.     In response to the allegations in paragraph 16 of the Complaint, Defendants admit that Stelzer provided a personal guarantee to ScanSource and that ScanSource named him as a defendant in its lawsuit.

17.     The allegations in paragraph 17 of the Complaint are legal conclusions rather than allegations of fact.  Accordingly, they require no response from Defendants here.  Konkimalla specifically alleges that he is not a proper defendant and that the obligations about which Plaintiffs have sued are Storeworks' obligations.

18.     Defendants deny the allegations in paragraph 18 of the Complaint.

19.     Defendants admit that Stelzer has requested that Storeworks defend him in the ScanSource lawsuit but state that the effectiveness of his purported tender is a question of law.

20.     Defendants deny the allegations in paragraph 20 of the Complaint.

21.     Defendants deny the allegations in paragraph 21 of the Complaint.

22.     As to paragraph 22 of the Complaint, Defendants admit that their accountant, Andy Knutson, proposed a strategy to Plaintiffs' accountant at Redpath & Associates that Knutson believed could have modified certain of the tax consequences of the transactions described in the Redemption Agreement.   Defendants deny the remaining allegations in paragraph 22 of the Complaint and, in particular, deny Plaintiffs' characterization of the Redemption Agreement.

23.     Defendants deny the allegations in paragraph 23 of the Complaint.

24.     Defendants deny the allegations in paragraph 24 of the Complaint.

25.     Defendants admit that Plaintiffs have legal counsel and otherwise deny the allegations in paragraph 25 of the Complaint.

<div align="center">

### COUNT I
### Breach of Contract – Tax Liability

</div>

26.     Defendants incorporate their preceding answers as though fully restated here.

27.     Defendants admit the allegations in paragraph 27 of the Complaint.

28.     In response to the allegations in paragraph 28 of the Complaint, Defendants state that the Redemption Agreement speaks for itself and deny Plaintiffs' characterization of the Redemption Agreement.

29.     In response to the allegations in paragraph 29 of the Complaint, Defendants state that the Settlement Agreement speaks for itself and deny Plaintiffs' characterization of the same.

30.     Defendants deny the allegations in paragraph 30 of the Complaint.

31.     Defendants deny the allegations in paragraph 31 of the Complaint.

32.     Defendants deny the allegations in paragraph 32 of the Complaint.

8498612

## COUNT II
### Breach of Contract – Indemnification

33.     Defendants incorporate their preceding answers as though fully restated here.

34.     Defendants admit the allegations in paragraph 34 of the Complaint.

35.     In response to the allegations in paragraph 35 of the Complaint, Defendants state that the Redemption Agreement speaks for itself and deny Plaintiffs' characterization of the same.

36.     In response to the allegations in paragraph 36 of the Complaint, Defendants state that the Redemption Agreement speaks for itself and deny Plaintiffs' characterization of the same.

37.     In response to the allegations in paragraph 37 of the Complaint, Defendants state that the Redemption Agreement speaks for itself and deny Plaintiffs' characterization of the same.

38.     In response to the allegations in paragraph 38 of the Complaint, Defendants state that the Settlement Agreement speaks for itself and deny Plaintiffs' characterization of the same.

39.     Defendants deny the allegations in paragraph 39 of the Complaint.

40.     Defendants deny the allegations in paragraph 40 of the Complaint.

### PRAYER FOR RELIEF

41.     Defendants deny that they have any liability to Plaintiffs and, therefore, respectfully ask the Court to render judgment in their favor and to dismiss the Complaint with prejudice and to award Defendants' costs and disbursements.

## SECOND DEFENSE
### (General Denial)

42.     Defendants deny each and every allegation in the Complaint to the extent the allegation has not been specifically admitted above.

## THIRD DEFENSE
### (Failure to State a Claim)

43.     The Complaint fails to state a claim upon which relief can be granted and/or fails to plead with sufficient particularity.

## FOURTH DEFENSE
### (Plaintiffs' Failure to Perform/Prior Breach)

44.     The claims in the Complaint are barred, in whole or in part, because Plaintiffs have breached the parties' agreements and/or failed to perform their obligations under the parties' agreements.

## FIFTH DEFENSE
### (No Harm/Damages)

45.     The claims in the Complaint are barred, in whole or in part, to the extent Plaintiffs did not suffer harm or damages caused by any breach of contract by Defendants or either of them.

## SIXTH DEFENSE
### (Failure to Mitigate)

46.     The claims in the Complaint are barred, in whole or in part, by Plaintiffs' failure to mitigate their alleged damages.

## SEVENTH DEFENSE
### (Waiver/Estoppel/Laches/Unclean Hands)

47.     The claims in the Complaint are barred, in whole or in part, by the equitable doctrines of waiver, estoppel, laches, and/or unclean hands.

8498612

## EIGHTH DEFENSE
### (Statutes of Limitation and Repose)

48. The claims in the Complaint are barred, in whole or in part, to the extent that they are untimely under the applicable statutes of limitation and repose.

## NINTH DEFENSE
### (Accord and Satisfaction/Settlement/Release)

49. The claims in the Complaint are barred, in whole or in part, to the extent that they have been resolved through accord and satisfaction, settlement, and/or have been released.

## TENTH DEFENSE
### (Failure of a Condition Precedent)

50. The claims in the Complaint are barred, in whole or in part, by the failure of a condition precedent to Defendants' performance.

## ELEVENTH DEFENSE
### (Plaintiffs' Interference)

51. The claims in the Complaint are barred, in whole or in part, by Plaintiffs' interference with Defendants' ability to perform their obligations under the parties' agreements.

## TWELFTH DEFENSE
### (Claim Splitting)

52. The claims in the Complaint are barred, in whole or in part, by Plaintiffs' failure to assert them in the Second Lawsuit.

## THIRTEENTH DEFENSE
### (Konkimalla Not a Proper Defendant)

53. The claims in the Complaint are barred to the extent that they are asserted against Konkimalla and seek to impose liability on Konkimalla personally for obligations of Storeworks.

8498612

## FOURTEENTH DEFENSE
### (Failure to Tender)

54.     Stelzer's claim for a defense in the ScanSource action is barred, in whole or in part, by his failure to effectively tender his defense to Storeworks.

## FIFTEENTH DEFENSE
### (Rule 8.03)

55.     Defendants affirmatively allege, but without relieving Plaintiffs of their burden of proof in any respect, that the claims asserted are or may be barred by any and all of the affirmative defenses contemplated by Rule 8.03 of the Minnesota Rules of Civil Procedure. The extent to which the Plaintiffs' claims are or may be barred by one or more of said affirmative defenses, not specifically set forth herein, cannot be determined until there has been further discovery. Defendants, therefore, incorporate all such affirmative defenses set forth in Rule 8.03.

## RESERVATION OF DEFENSES

56.     Defendants reserve the right to assert additional defenses that may present themselves during discovery or otherwise in the course of this case.

## COUNTERCLAIMS

### Introduction

1.     Counterclaim Defendants Xenia Retail, Inc. ("Xenia") and Troy Stelzer ("Stelzer") have repeatedly and flagrantly breached written contracts with Counterclaim Plaintiff Storeworks Technologies Ltd. ("Storeworks") by: (1) competing with Storeworks' hardware and service business and diverting business from Storeworks in violation of a non-competition agreement; (2) Stelzer encouraging at least one employee of Storeworks to leave his employment and join a Storeworks competitor in violation of Stelzer's non-solicitation agreement; (3) failing

8

to pay rent and defaulting on a sub-lease agreement (Xenia) and personal guarantee (Stelzer); and (4) Stelzer failing to obtain releases of Storeworks by third parties that Stelzer had promised to deliver. By these actions, Xenia and Stelzer have caused significant harm to Storeworks. Storeworks brings this action for an injunction, damages, interest, and attorney fees.

## Parties

2.      Storeworks is a Minnesota corporation with its primary office in Eden Prairie, Minnesota. Storeworks provides technology consulting and solutions to large retailers.

3.      On information and belief, Xenia is a Delaware corporation with its primary office in Bloomington, Minnesota.

4.      On information and belief, Stelzer is an individual who lives in Edina, Minnesota. Stelzer is a former shareholder, officer, and employee of Storeworks.

## Facts

5.      As of August 2017, Storeworks had three shareholders: Anil Konkimalla, Andrew Teitscheid, and Stelzer.

6.      In or about September 2016, Konkimalla commenced a shareholder lawsuit against Stelzer and Teitscheid that was settled in August 2017. The terms of the settlement are set forth in a written Redemption and Acquisition Agreement ("Redemption Agreement"). A true and correct copy of the Redemption Agreement is attached to the Complaint as **Exhibit A.**

7.      Just before the Redemption Agreement was signed, Storeworks operated a hardware and services business (e.g., providing and managing credit card payment terminals among other things) and a software business (e.g., providing point of sale software).

8.      Among other things, through the Redemption Agreement, Storeworks redeemed Stelzer's ownership interest in Storeworks in return for transferring Storeworks' ownership

interests in the software business to Xenia, a corporation formed and solely owned by Stelzer. **Compl. Ex. A §§ 2.1, 2.2.**

Stelzer and Xenia Breach Their Commitment to Obtain Releases of Storeworks

9.      One of the software entities that Xenia acquired from Storeworks was Storeworks SNT-IP, LLC ("SNT"). In the Redemption Agreement, Stelzer undertook to "ensure that Xenia acquires the express consent of the former SNT owners, David Hawkins, Amy Byers, Paul Leung, Larry Gibbs and Rathin Devchoudhury, that Store Works is released and Xenia assumes any remaining payment obligation to them as of the Closing Date, in the form of the Consent and Release attached hereto as **Exhibit 3.5b**." **Compl. Ex. A § 3.5, Ex. 3.5(b).**

10.     Stelzer and Xenia have not delivered the promised consents and releases to Storeworks.

Xenia Breaches Its Duty to Pay Rent

11.     In the Redemption Agreement, Xenia agreed that it would sign a sublease for warehouse space in Wake Forest, North Carolina that had been leased and used by Storeworks and would be used by Xenia for the software business. **Compl. Ex. A § 3.5.**

12.     Specifically, the Redemption Agreements states: "Xenia acknowledges that StoreWorks will be terminating the current Wake Forest lease as of the end of the current lease period (February 201[9]) and will require Xenia to enter into a sublease agreement as required by the landlord. Xenia acknowledges and agrees that it shall, if necessary, indemnify and release Store Works from any liability under the Lease as of the Closing Date." *Id.*

13.     Xenia breached the Redemption Agreement by failing to pay the rent that it owed for the Wake Forest lease and by not indemnifying Storeworks from liability under the Wake Forest lease.

Stelzer and Xenia Compete with Storeworks in Violation of the Redemption Agreement

14.     Stelzer and Xenia promised in the Redemption Agreement that they would "not directly or indirectly, as an affiliate, contracting party, employee, contractor, consultant, agent, principal, proprietor, partner, corporate officer, stockholder, board member, director, or in any other individual or representative capacity, engage or attempt to engage in any hardware sales or leases competitive to the hardware business of Store Works for three (3) years after the Closing Date." **Compl. Ex. A § 3.8.**

15.     Three years from the Closing Date is August 28, 2021.

16.     In violation of this agreement, Stelzer and Xenia approached Target Corporation ("Target") and successfully offered to provide hardware sales and services that Target had contracted with Storeworks to provide for Target pop-up stores.

17.     Prior to Xenia taking over the pop-up store business, Storeworks had earned total revenues of $1,432,316.62 from 2014-2017 on that work.   The pop-up business has a very high gross profit margin - in the 70-80% range.

Stelzer Encourages a Storeworks Salesman to Leave Storeworks in Violation of the Redemption Agreement

18.     Xenia and Stelzer warranted in the Redemption Agreement that they would not "attempt to induce to leave the employ of StoreWorks any employee or contractor of StoreWorks for three (3) years after the Closing Date." **Compl., Ex. A § 3.7.**   Certain Storeworks employees were excluded by name from this non-solicitation agreement. *Id.*

19.     In November and December 2017, in direct violation of this promise, Stelzer encouraged Sean Barnes – a Storeworks salesman who was not excluded from the non-solicitation agreement – to leave Storeworks and to accept employment from Storeworks' competitor Barcodes, LLC ("Barcodes").

8498612

20.     On information and belief, with Stelzer's active encouragement, Barnes breached his duty of loyalty to Storeworks and diverted multiple millions of dollars in business from Storeworks in 2018 alone and also caused significant long-term damage to certain of Storeworks' customer relationships.

21.     Storeworks sued Barcodes and Barnes and settled the case.

22.     Storeworks did not recover all of its losses in the Barcodes lawsuit.

The Parties Engage in and Settle a Second Lawsuit

23.     In November 2017, Xenia and Stelzer sued Konkimalla and Storeworks, alleging that they had diverted receivables that belonged to Xenia ("Second Lawsuit").

24.     Storeworks and Konkimalla denied liability and alleged counterclaims for Xenia's failure to pay for expenses allocated to it under the Redemption Agreement, for personal expenses charged by Xenia employees to Storeworks credit cards, for the theft of Target equipment from Storeworks by a Xenia employee, and for Xenia and Stelzer's violation of the non-compete agreement by taking Target pop-up store business.

25.     In May 2018, the parties to the Second Lawsuit participated in a successful mediation. The resulting settlement was documented in a July 2018 Settlement Agreement and Release ("Settlement Agreement"). A true and correct copy of the Settlement Agreement is attached as **Exhibit 1**.

26.     The Settlement Agreement allocated the disputed receivables as follows: (1) $55,000 to Storeworks, (2) $29,000 to Xenia, and (3) $67,229 to the owner/landlord of the Wake Forest, North Carolina property to pay Xenia's rent through July 2018. **Ex. 1 § 3.**

27.     Storeworks released Xenia and Stelzer from liability for the acts that formed the basis for the Storeworks counterclaims in the Second Lawsuit, including Xenia and Stelzer's

usurpation of the Target pop-up business "through May 17, 2018," but the parties otherwise "restate[d], repeat[ed] and reaffirm[ed] all of their respective obligations under and pursuant to the Redemption Agreement" and agreed that "to the extent not specifically modified or specifically released herein, the terms and conditions of the Redemption Agreement shall remain in full force and effect." **Ex. 1 §§ 2, 5.**

28.     This required Xenia and Stelzer to stop competing with Storeworks for the Target pop-up business after May 17, 2018 and rendered them liable to Storeworks for any ongoing competition.

Xenia and Stelzer Reaffirm Their Promises to Pay Rent for the Wake Forest Property

29.     In the Settlement Agreement, Xenia and Stelzer promised to, and did, execute a Sublease Agreement and a personal Guaranty respectively for the Wake Forest property. **Ex. 1 § 4; Ex. 1, pp. 5-14.**

30.     In the Sublease Agreement, Sections 2.1, 3.1, 4(a), Xenia promised to pay to Storeworks monthly base rent in the amount of $13,444.00, together with any other rent or expense that Storeworks owed to the landlord under the Master Lease, by the first day of each month through the termination of the master lease on February 28, 2019. **Ex. 1, pp. 5-6.**

31.     Xenia further promised that it would "indemnify, defend and hold [Storeworks] harmless from all loss, cost, liability, claim, damage and expense (including reasonable attorneys' fees and disbursements) . . . incurred in connection with or arising from (1) any default by [Xenia] in the observance or performance of any of the terms, covenants or conditions of this Sublease . . ." **Ex. 1, p. 9 (Sublease Agreement § 10.2).**

32.     The Sublease Agreement requires Xenia to "immediately pay all of" Storeworks' attorney fees, costs, and expenses in the event of any litigation between Xenia and Storeworks

and/or the landlord to enforce the terms of the Sublease. **Ex. 1, p. 12 (Sublease Agreement §
19.2)**.

33.     The Sublease Agreement states that if "any payment of Base Rent or Additional
Rent or any portion thereof, is not paid within five (5) days after the date such payment was due.
. . and if Subtenant shall fail to cure the same within ten (10) days after receipt of written notice
from Sublandlord or Landlord, Subtenant shall be deemed to be in default and Sublandlord shall
have the rights and remedies against Subtenant as would be available to Landlord against
Sublandlord in the event of default by Sub landlord under the Master Lease. **Ex. 1, p. 10
(Sublease Agreement § 13.1)**.

34.     The Master Lease provides that, in the event of default, the landlord is entitled,
among other things, to a late fee in the amount of 5% of the monthly rent if a payment is more
than seven days past due. A true and correct copy of the Master Lease is attached as **Exhibit 2.**

35.     In the Guaranty, Stelzer "personally guarantee[d] the payment of rents, the
performance of all obligations of [Xenia] under the Sublease, as well as all other terms,
covenants and conditions contained in the Sublease (collectively, 'Obligations')." **Ex. 1, p. 16
(Guaranty, Recital A)**.

36.     Thus, Storeworks could "demand payment or performance from or by Guarantor
of any or all of the Obligations, when such payment or performance is required, and Guarantor
shall promptly provide such payment or performance." **Ex. 1, p. 16 (Guaranty, § (1))**.

Xenia and Stelzer Default on Rent Obligations

37.     After the Settlement Agreement, Sublease Agreement, and Guaranty were
executed, Xenia continued to be chronically late on its rent payments and incurred late fees for

14

the months of October, November, and December 2018 and January and February 2019 in the total amount of $3,361.00 that has not been paid to date.

38.    In addition, Xenia has not paid rent for the last two months of the Sublease Agreement (January and February 2019).  Xenia owes a total of $26,888 in base rent.

39.    On March 5, 2019, Storeworks requested in writing that Xenia and Stelzer cure the default. **Exhibit 3.**

40.    Neither Xenia nor Stelzer did so.

41.    On May 28, 2019, Storeworks again gave notice of the amounts that were "way past due." *Id.*

42.    Through the date of this Complaint, Xenia and Stelzer have not paid the outstanding late fees or base rent.

43.    Xenia and Stelzer owe Storeworks $30,249 for rent and late fees to date.

44.    Xenia and Stelzer are also obligated to pay Storeworks' attorney fees and litigation expenses to collect these overdue amounts, together with any additional charges the landlord may assess.

45.    In the event that the landlord commences litigation against Storeworks, Xenia and Stelzer are obligated to defend and indemnify Storeworks.

Stelzer and Xenia Continue to Compete for and Divert the Target Pop-Up Business

46.    In direct and flagrant violation of its promises in both the Redemption Agreement and the Settlement Agreement, Xenia, under Stelzer's direction, has continued to compete with Storeworks for the Target pop-up business by providing hardware and services for Target pop-up stores.

Stelzer and Xenia Divert Business from Storeworks: QuikTrip

47.     From 2009 until the spring of 2018, Storeworks provided hardware and services
to QuikTrip gas stations and convenience stores.

48.     On information and belief, in May 2018 (the same month in which the mediation
of the Second Lawsuit occurred), Stelzer persuaded QuikTrip to discontinue its contract with
Storeworks in favor of a Storeworks competitor.

49.     Before Stelzers' sales activity on behalf of Storeworks' competitor – in violation
of his non-compete obligation - Storeworks had earned revenues from the QuikTrip of almost
$18 million.

50.     Stelzer's interference with the QuikTrip contract was not a subject of the Second
Lawsuit or the Settlement Agreement.

<div align="center">

**COUNT I**
**Breach of Contract – Redemption Agreement**
**Xenia and Stelzer**

</div>

51.     Storeworks incorporates the previous allegations in its Counterclaims as if fully
restated here.

52.     The Redemption Agreement is an enforceable contract to which Storeworks,
Stelzer, and Xenia (among others) are parties.

53.     Storeworks has fulfilled its obligations under the Redemption Agreement.

54.     Xenia and Stelzer have breached the Redemption Agreement by competing with
Storeworks for hardware and services business and by diverting hardware and services business
from Storeworks, by failing to obtain consents and releases from the former SNT owners, and by
encouraging a Storeworks employee to leave his employment with Storeworks.

55.     Xenia and Stelzer's breaches of the Redemption Agreement have harmed Storeworks in an amount exceeding $50,000 to be proved at trial.

## COUNT II
### Breach of Contract – Sublease Agreement
### Xenia

56.     Storeworks incorporates the previous allegations in its Counterclaims as if fully restated here.

57.     The Sublease Agreement is an enforceable contract to which Storeworks and Xenia are parties.

58.     Storeworks has fulfilled its obligations under the Sublease Agreement.

59.     Xenia has breached the Sublease Agreement by failing to pay rent and late fees when due and after written requests for cure.

60.     Storeworks has been damaged in the amount of $30,249 by Xenia's breach of the Sublease Agreement.

61.     In addition, Storeworks is entitled to its attorney fees, costs, disbursements, and expenses incurred to recover the amounts Xenia owes under the Sublease Agreement, together with any additional amounts the landlord may assess.  These amounts continue to accrue.

62.     Further, in the event of litigation with the landlord, Xenia must defend and indemnify Storeworks.

## COUNT III
### Breach of Contract – Guaranty
### Stelzer

63.     Storeworks incorporates the previous allegations in its Counterclaims as if fully restated here.

64.     The Stelzer Guaranty is an enforceable contract.

65.     Storeworks has fulfilled its obligations under the Sublease Agreement.

66.     Stelzer has breached his obligations under the Guaranty by failing to pay Storeworks for the rent and late fees owed by Xenia under the Sublease Agreement after written request that he do so.

67.     To date, Storeworks has been damaged in the amount of $30,249 by Stelzer's refusal to honor the Guaranty.

68.     In addition, Storeworks is entitled to recover from Stelzer its attorney fees, costs, disbursements, and expenses incurred to recover the amounts owed under the Sublease Agreement and Guaranty, which amounts continue to accrue, together with any additional amounts the landlord may assess.

69.     Further, in the event of litigation with the landlord, Stelzer must defend and indemnify Storeworks.

## Prayer for Relief

Counterclaim Plaintiff Storeworks Technologies, Ltd. respectfully asks that judgment be entered in its favor and against Xenia Retail, Inc. and Troy Stelzer, awarding the following relief:

1.     An injunction ordering Xenia and Stelzer to honor the terms of the Redemption Agreement, including Section 3.5 and Sections 3.7 and 3.8 through August 28, 2021 and for such additional period as may be warranted by law;

2.     Damages in excess of $50,000, in a precise amount to be determined at trial;

3.     Storeworks' attorney fees, costs, and disbursements;

4.     Interest; and

5.     Such other and further relief as the Court deems just and equitable.

RESPECTFULLY SUBMITTED,

ARTHUR, CHAPMAN, KETTERING,
SMETAK & PIKALA, P.A.

Dated: August 6, 2019

Sarah E. Bushnell (#326859)
Perssis Meshkat (#390057)
500 Young Quinlan Building
81 South Ninth Street
Minneapolis, MN 55402-3214
P: (612) 339-3500
F: (612) 339-7655
sebushnell@ArthurChapman.com
pmeshkat@ArthurChapman.com

*Attorneys for Defendants and Counterclaim*
*Plaintiffs StoreWorks Technologies Ltd. and Anil*
*Konkimalla*

## ACKNOWLEDGMENT

The undersigned attorney acknowledges that sanctions may be imposed for violations of

Minn. Stat. § 549.211.

Sarah E. Bushnell

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (the "Agreement") is effective as of May 17, 2018. The parties to this Agreement are Xenia Retail, Inc. ("Xenia"), Troy Stelzer ("Stelzer"), Storeworks Technologies Ltd. ("Storeworks") and Anil Konkimalla ("Konkimalla") and are sometimes collectively referred to herein as the "Parties."

### Recitals

WHEREAS, on or about August 25, 2017, the Parties, among others, entered into a Redemption and Acquisition Agreement (the "Redemption Agreement");

WHEREAS, a dispute arose between the Parties regarding, among other things, the Parties' rights and obligations under the Redemption Agreement;

WHEREAS, as a result of the dispute, Xenia and Stelzer commenced an action styled Xenia Retail, Inc. and Troy Stelzer vs. Storeworks Technologies Ltd. and Anil Konkimalla, currently venued in Hennepin County District Court, Court File No. 27-CV-17-16152 (the "Action");

WHEREAS, the Parties previously entered into a Stipulation for Order and Order for Deposit of Funds, pursuant to which the Parties agreed that Best Buy Canada, Ltd. would pay into Court $151,299.00 in disputed funds, to be held until ordered disbursed by the Court;

WHEREAS, the Parties mediated their dispute in front of James Dunn, Esq. on May 17, 2018; and

WHEREAS, the Parties now desire to formally document the compromise and settlement reached as a result of the May 17, 2018 mediation.

NOW THEREFORE, in consideration of the promises, the respective covenants and commitments set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties do hereby agree to the following:

### Agreement

1.    Incorporation of Recitals. The recitals set forth above are integral hereto, are true and correct, and are hereby incorporated into this Agreement as express terms and conditions hereof.

2.    Ratification/Reaffirmation of the Redemption Agreement. To the extent not specifically modified or specifically released herein, the Parties hereby restate, repeat and reaffirm all of their respective obligations under and pursuant to the Redemption Agreement. The Parties acknowledge, stipulate and agree that, to the extent not specifically modified or specifically released herein, the terms and conditions of the Redemption Agreement shall remain in full force and effect.

**EXHIBIT**

**1**

3.      <u>Distribution of the Disputed Best Buy Canada, Ltd. Funds</u>.  The Parties shall jointly apply to the Hennepin County District Court for an order disbursing the $151,299.00 in Best Buy Canada, Ltd disputed funds as follows:  (a) $29,000 to Xenia Retail, Inc., (b) $67,229 to the owner/landlord of the leased premises located at 11635 Northpark Drive, Suite 360, Wake Forest, North Carolina (to be used to pay the $41,000 currently in arrears and the lease charges due in June and July of 2018) and (c) $55,000 to Storeworks Technologies Ltd.

4.      <u>Sublease Agreement/Personal Guaranty</u>.  At the same time the Parties execute this Agreement, Xenia shall execute a Sublease Agreement, and Stelzer shall execute a personal guaranty, in the forms attached hereto as <u>Exhibit A</u>.

5.      <u>Release</u>.  The Parties hereby mutually release, acquit, and forever discharge each other, along with each other's employees, owners, officers, directors, attorneys, agents, affiliates, subsidiaries, divisions, successors and assigns, from any and all claims asserted against each other through May 17, 2018 in the Action.  In addition, and to the extent not already released by the preceding sentence, Xenia and Stelzer hereby release, acquit and forever discharge Storeworks and Konkimalla from any and all claims Xenia and Stelzer have, had or may in the future have under Paragraph 2.3 of the Redemption Agreement for reimbursement of and/or indemnification for attorneys' fees.  This release does not affect the Parties' other rights or other obligations under the ratified/reaffirmed Redemption Agreement.

6.      <u>Dismissal of the Action</u>.  At the same time the Parties execute this Agreement, the Parties shall file a stipulation for dismissal, dismissing the Action with prejudice.

7.      <u>Further Assurances</u>.  The Parties to this Agreement hereby agree to execute such other documents and to take such other action as may reasonably be necessary to further the purposes of this Agreement.

8.      <u>Governing Law</u>.  This Agreement shall be construed and interpreted under the laws of the State of Minnesota without regard to its conflict-of-law principles.

9.      <u>Binding Effect; Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and, to the extent permitted by applicable law, to their respective successors and permitted assigns.

10.     <u>Construction</u>.  The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof.  The Parties agree that each of them and their respective legal counsel have reviewed and had an opportunity to revise this Agreement and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Agreement.  Instead, the language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent.

11.     <u>Representation/No Coercion</u>.  The Parties represent, warrant and acknowledge that they have been represented by legal counsel in connection with the negotiation and documentation of this Agreement, that they have legal and other options available to them other than the execution of this Agreement, and that they have chosen to execute this Agreement of their own free will.

2

12. <u>Counterparts.</u> This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same agreement. Any electronically transmitted signature or photocopy of a signature to the Agreement shall be deemed an original signature to the Agreement and shall have the same force and effect as an original signature. For purposes of this section, an "electronically transmitted signature" means a manually-signed original signature that is sent in the form of a facsimile or sent via the internet as a "pdf" (portable document format) or other replicating image attached to an email message.

13. <u>Severability</u>. Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such portion without invalidating the remaining provisions of this Agreement.

14. <u>Entire Agreement</u>. This Agreement shall constitute the entire agreement of the Parties, shall supersede any prior or contemporaneous oral or written agreements relating to the subject matter of this Agreement, and shall not be subject to any change, modification, amendment, or addition without the express written consent of the Parties.

Dated: June 11, 2018

XENIA RETAIL, INC.

By _Troy Stelzer_

Its: _CEO_

Dated: June __, 2018

_[signature]_

TROY STELZER

Dated: ~~June __~~, 2018
    July, 20, 2018

STOREWORKS TECHNOLOGIES LTD.

By _[signature]_

Its: _CEO_

3

Dated: ~~June ___,~~ 2018

July, 20, 2018

_____
ANIL KONKIMALLA

15496619v2

SUBLEASE AGREEMENT

This **SUBLEASE AGREEMENT** ("*Sublease*"), is made this 25th day of August, 2017 by and between StoreWorks Technologies, Limited, a Minnesota corporation ("*Sublandlord*") and Xenia Retail, Inc., a Delaware corporation ("*Subtenant*").

**WHEREAS**, Sublandlord entered into that certain Master Lease by and between Sublandlord, as tenant and Beacon Ventures LLC, a North Carolina limited liability company, as landlord, as assigned to CCP Property Raleigh-Durham, LLC, a Delaware limited liability company ("*Landlord*") dated May 23, 2014 ("*Master Lease*"), for the premises described in the Master Lease ("*Premises*"), a copy of which Master Lease is attached hereto as Exhibit A and made a part hereof; and

**WHEREAS**, Subtenant and Sublandlord wish to enter into an agreement whereby Subtenant will sublease the Premises from Sublandlord pursuant to the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the mutual promises herein, contained and other good and valuable consideration, it is agreed:

ARTICLE 1
Premises

1.1    Premises.    Sublandlord leases to Subtenant, and Subtenant leases from Sublandlord, on the terms and conditions set forth in this Sublease, the Premises, located at 11635 Northpark Drive, Suite 360 in the City of Wake Forest, State of North Carolina, together with all rights, privileges, easements and appurtenances granted to Sublandlord pursuant to the Master Lease.

ARTICLE 2
Term

2.1    Term.  This Sublease shall commence on the date hereof (the "*Commencement Date*") and shall end on February 28, 2019  unless the term of the Master Lease shall be sooner terminated as provided therein (the earlier of which date shall be the "*Expiration Date*") (the "*Term*"). Upon the expiration of this Sublease, Subtenant shall surrender the Premises in as good a condition as existed as of the effective date of this Sublease, reasonable wear and tear excepted.

ARTICLE 3
Base Rent: Security Deposit

3.1    Base Rent.  (a)  Subtenant shall base rent ("*Base Rent*"), commencing on the Commencement Date, in the amount specified below. Base Rent shall be due in advance on the first day of each month during the Term.

| Period | Annual Base Rent PSF | Annual Base Rent | Monthly Base Rent |
|---|---|---|---|
| Commencement Date – February 28, 2018 | $23.50 | $157,967.04 | 13,163.92 |
| March 1, 2018 – February 28, 2019 | $24.00 | $161,328.00 | $13,444.00 |

(b)    All payments of Base Rent and all other amounts payable by Subtenant under this Sublease shall be paid without notice or demand, and without deduction or setoff, in lawful money of the United States of America to Sublandlord at such address as provided for in Article 16. All payments of Base Rent and other amounts shall be made by check jointly payable to both Sublandlord and Landlord.  Upon receipt of any check made jointly payable to Sublandlord and Landlord, Sublandlord shall endorse the check and forward to Landlord.

(c)    If the Commencement Date shall be a date other than the first day of a calendar month, or if the Expiration Date shall be other than the last day of a calendar month, then the Base Rent for the first or last partial month of the Term, as the case may be, shall be prorated on a per diem basis.

## ARTICLE 4
### Additional Rent

(a)    Additional Rent.  In addition to Base Rent, and commencing on the Commencement Date, Subtenant shall pay Sublandlord each month, all other amounts payable by Sublandlord to Landlord (even though not necessarily payable to Landlord) under the terms of the Mater Lease, including, but not limited to Operating Expenses and utilities ("*Additional Rent*," which, along with the Base Rent, shall be the "*Rent*").  In the event that Subtenant fails to pay Additional Rent when due, Sublandlord shall have all the rights and remedies provided for in this Sublease, or by law, for the non-payment of Base Rent.  Additional Rent shall be due in advance on the first day of each month during the Term.  All payments of Additional Rent shall be made by check jointly payable to both Sublandlord and Landlord.  Upon receipt of any check made jointly payable to Sublandlord and Landlord for Additional Rent, Sublandlord shall endorse the check and forward to Landlord.

4.2    Right to Fulfill Obligations.  If Subtenant fails to pay any amount due to any third party for services rendered with respect to the Premises, Sublandlord shall have the right, but not the obligation to make such payment on behalf of Subtenant and demand repayment of the same as Additional Rent.  Any sums so paid by Sublandlord shall bear interest at the Late Rate from the date of such payment.  No such payment or expenditure by Sublandlord shall be construed as a waiver of Subtenant's default nor shall it affect any other right or remedy of Sublandlord under this Sublease.

2

## ARTICLE 5
### Use and Operation

5.1    Use.  Subtenant agrees that the Premises shall be used in accordance with the terms of the Master Lease and for no other purposes.    Notwithstanding the foregoing, the Permitted Use must comply with all applicable laws, codes, rules and regulations and Subtenant, at its sole cost and expense, must secure all permits and licenses required for such use.

5.2    Signage.  Subtenant shall not install any exterior signage on the Premises or within the interior of the Premises if visible from the exterior of the Premises without the prior written consent of Sublandlord and Landlord, which may be withheld in the sole discretion of Sublandlord and Landlord. All other signage shall be in accordance with the terms of the Master Lease.

## ARTICLE 6
### Utilities and Other Charges

6.1    Utilities.  Commencing on the Commencement Date, Subtenant shall be liable for any and all costs for utilities payable by Sublandlord to Landlord under the Master Lease, including but not limited to heating and air condition costs outside of the hours of operation (as set forth in the Master Lease) and any and all charges for excess services (as set forth in the Master Lease). No temporary interruption or failure of utility services, whether incidental to the making of repairs, alterations or improvements, or due to accidents or strike or conditions or events not under Sublandlord's control, shall be deemed as an eviction of the Subtenant or relieve the Subtenant from any of the Subtenant's obligations hereunder.

## ARTICLE 7
### Quiet Enjoyment; Maintenance; Repairs

7.1    Subtenant Repairs.  Provided Subtenant is not in default of the terms hereof, the Subtenant shall have the peaceful and quiet enjoyment of the Premises without interference from the Sublandlord.  Subtenant covenants, throughout the term hereof, at Subtenant's sole cost and expense, to keep and maintain the Premises in accordance of the terms of the Master Lease.

## ARTICLE 8
### Environmental Matters

8.1    Definitions.  For the purposes of this Sublease, the following terms shall have the following definitions:

(a)    "*Hazardous Materials*" means asbestos, polychlorinated biphenyl and such materials, waste, contaminates or other substances defined as toxic, dangerous to health or otherwise hazardous by cumulative reference to the following sources as amended from time to time:   (i) the Resource Conservation and Recovery Act of 1976, 42 USC §6901 *et. seq.* ("RCRA"); (ii) the Hazardous Materials Transportation Act, 49 USC §1801, *et. seq.*; (iii) the Comprehensive Environmental Response Compensation and Liability Act of 1980, 42 USC §9601 *et. seq.* ("CERCLA"); (iv) applicable laws of the jurisdiction where the Premises are located; and (v) any federal, state or local statutes, regulations, ordinances, rules or orders issued

3

or promulgated under or pursuant to any of those laws or otherwise by any department, agency or other administrative, regulatory or judicial body.

(b)    "*Environmental Law*" means any current or future federal, state or local law, regulation, ordinance or code regarding the manufacture, processing, use, handling, release, transportation, storage, or disposal of Hazardous Materials.

8.2    Hazardous Materials.  Subtenant shall not cause or permit any Hazardous Material to be brought on, kept or used in or about the Premises without the prior written consent of Sublandlord.  Subtenant will indemnify and hold harmless Sublandlord from any losses, liabilities, damages, costs or expenses (including reasonable attorneys' fees) which Sublandlord may suffer or incur as a result of Subtenant's breach of this Article.

8.3    Compliance with Laws.  Subtenant will promptly notify Sublandlord, in writing, if Subtenant has or acquires notice of knowledge that any Hazardous Material has been or is threatened to be released, generated, manufactured, stored, treated, transported, or disposed of, on, in, under, or from the Premises; and if any Hazardous Material is found on the Premises, Sublandlord will immediately take such action as is necessary to detain the spread of and remove the Hazardous Material to the complete satisfaction of the appropriate governmental authorities. Subtenant will immediately notify Sublandlord and provide copies upon receipt of all written complaints, claims, citations, demands, inquiries, reports, or notices relating to the condition of the Premises or compliance with environmental laws.

8.4    Survival.  The provisions of this Article shall survive the Expiration Date or sooner termination of this Sublease.

ARTICLE 9
Insurance

9.1    Subtenant Insurance.  Subtenant agrees to maintain such policies of insurance required of Sublandlord, as tenant, under the terms of the Master Lease.

9.2    Subrogation.  Sublandlord and Subtenant hereby waive any rights each may have against the other on account of any loss or damage occasioned by either Sublandlord or Subtenant, as the case may be, their respective property, the Premises, or its contents or to other portions of the Premises, arising from any risk actually covered or to be covered by the insurance policies required hereunder.  Sublandlord and Subtenant hereby release each other from any and all liability or responsibility to the other or anyone claiming through or under them by way of subrogation or otherwise for any loss or damage to property caused by fire or any of the extended coverage or supplementary contract casualties, even if such fire or other casualty shall have been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible.

ARTICLE 10
Non-Liability

10.1    Non-Liability.  Except for damages or losses which (i) arise from any breach or default by Sublandlord of this Sublease; or (ii) arise from any gross negligence or intentional

misconduct of Sublandlord in, about or to the Premises, Sublandlord shall not be liable for damage to any property of Subtenant or of others located on the Premises, nor for the loss of or damage to any property of Subtenant or of others by theft or otherwise. Without limiting the foregoing, Sublandlord shall not be liable for any injury or damage to persons or property resulting from any natural or unnatural cause including, but not limited to, fire, explosion, gas, electricity, water, rain, snow or dampness or by any such damage caused by occupants, other than Sublandlord or its employees or agents, of the Premises or adjacent property, or the public or caused by operations in construction of any private, public or quasi-public work. Sublandlord shall not be liable for any latent defect in the Premises.

10.2  Indemnification. (a) Subtenant shall indemnify, defend and hold the Sublandlord harmless from all loss, cost, liability, claim, damage and expense (including reasonable attorneys' fees and disbursements), penalties and fines, incurred in connection with or arising from (1) any default by Subtenant in the observance or performance of any of the terms, covenants or conditions of this Sublease, (2) the use or occupancy or manner of use or occupancy of the Premises by Subtenant or any person claiming through or under Subtenant or (3) any acts, omissions or negligence of Subtenant or any person claiming through or under Subtenant, or the contractors, agents, servants, employees, visitors or licensees of Subtenant or any person claiming through or under Subtenant, in the Premises during, the Term, including any acts, omissions  or negligence in the making or performing of any repairs, restoration, alterations or improvements.

The indemnification provisions of this Article shall survive the expiration or sooner termination of this Sublease.

## ARTICLE 11
### Assignment, Subletting and Mortgaging

11.1  Assignment; Subletting; Mortgaging. Subtenant shall not assign, sell, transfer or mortgage its interest in this Sublease without the prior written consent of the Sublandlord.

11.2  No Release. Any assignment or subletting that is allowed or approved under this Sublease shall not release or discharge Subtenant from any liability, whether past, present or future, under this Sublease, and Subtenant shall remain fully liable hereunder. Any sublease or assignment must be in a form that is satisfactory to Sublandlord and must require that any subtenant or assignee agree to be bound by and to comply with all of the terms, covenants, conditions and provisions of this Sublease to the extent that the space is sublet or assigned.

## ARTICLE 12
### Access to Premises

12.1  Sublandlord's Access. The Sublandlord reserves the right to enter upon, inspect and examine the Premises during normal business hours.

## ARTICLE 13
### Event of Default

5

13.1    Default.  If any payment of Base Rent or Additional Rent or any portion thereof, is not paid within five (5) days after the date such payment was due, or if any other term, condition or covenant of this Sublease, express or implied, on the part of the Subtenant is violated or neglected and if Subtenant shall fail to cure the same within ten (10) days after receipt of written notice from Sublandlord or Landlord, Subtenant shall be deemed to be in default and Sublandlord shall have the rights and remedies against Subtenant as would be available to Landlord against Sublandlord in the event of default by Sublandlord under the Master Lease.

## ARTICLE 14
### Subordination: Estoppel Certificate

14.1    Subordination.  Landlord and Sublandlord reserve the right and privilege to subject and subordinate this Sublease at all time to the lien of any mortgage or mortgages now or hereafter placed upon the Landlord's or Sublandlord's interest in the Premises provided that such subordination does not disturb the possession or other rights of Subtenant under this Sublease. Subtenant agrees to execute and deliver, within ten (10) days after written request from Landlord or Sublandlord, such further instrument or instruments as may be required by Landlord or Sublandlord's lender to subordinate this Sublease to the lien of any such mortgage as shall be desired by Landlord or Sublandlord so long as such subordination agreement conforms with the requirements of this Article.

14.2    Estoppel Certificates.  Either party to this Sublease will, at any time from time to time, within ten (10) days after written request from the other party, execute, acknowledge and deliver to the requesting party a statement in writing certifying that this Sublease is unmodified (or if modified then disclosure of such modification shall be made) and in full force and effect on the date to which the rents and other charges have been paid, and stating whether or not said party has knowledge of any default hereunder on the part of the other party in the performance of any covenant, agreement or condition contained herein and if so, specifying each such default, it being intended that any such statement delivered pursuant to this Article may be relied upon by any prospective purchaser, mortgagee or holder of a deed of trust of the Premises or any assignee of any such party.

## ARTICLE 15
### Brokers

15.1    No Brokers.  Sublandlord and Subtenant represent that the negotiation of this Sublease did not involve any real estate brokers.  Each party shall indemnify and hold the other harmless from and against any and all liabilities, claims, losses, damages, costs and expenses arising out of any inaccuracy or alleged inaccuracy of the above representation, including reasonable attorneys' fees and disbursements.  The provisions of this Article shall survive the termination of this Sublease.

## ARTICLE 16
### Notices

16.1    Notice.  Except as otherwise expressly provided in this Sublease, any bills, statements, notices, demands, requests, consents or other communications given or required to be given under this Sublease shall be effective only if given in writing signed by the party giving

6

the same or its attorney, and sent by (a) certified or registered U.S. mail, postage prepaid, return receipt requested, (b) personal delivery, or (c) a nationally recognized overnight courier service, addressed as follows:

if to Subtenant:

> Xenia Retail, Inc.
> 7760 France Avenue South
> Suite 1112
> Bloomington, MN 55435
> Attention:  Troy Stelzer

if to Sublandlord:

> StoreWorks Technologies, Limited
> 7300 Washington Ave. S
> Eden Prairie, MN 55344
> Attn:  Anil Konkimalla

with a copy to:

> Winthrop & Weinstine, P.A.
> 225 South Sixth Street, Suite 3500
> Minneapolis, MN 55402-4629
> Attn:  Matthew R. McBride
> (612) 604-6426
> Email: mmcbride@winthrop.com

16.2    <u>Timing of Notice</u>.  Any such bill, statement, notice, demand, request, consent or other communication shall be deemed to have been rendered or given on the date which is: (a) three (3) days after the date mailed, (b) one (1) business day after deposit with a nationally recognized overnight courier service for overnight delivery, or (c) on the date of personal delivery, as the case may be.  Either party may change its address for delivery by giving notice to the other party as provided in this Article.

ARTICLE 17
Assumption; Termination

17.1    <u>Assumption of Master Lease Obligations</u>.  Except as expressly set forth herein, Subtenant hereby assumes and agrees to perform with respect to the Premises, each and every obligation of Sublandlord as tenant under the Master Lease, in accordance with the terms of the Master Lease.  Except as expressly set forth herein, the Subtenant hereby agrees and acknowledges that its tenancy and occupation of the Premises shall be subject to such obligations and to all of the terms and conditions of the Master Lease.  Except as expressly set forth herein, for purposes of this Sublease, and Subtenant's obligations hereunder, any obligations of

7

Sublandlord as Tenant under the Master Lease with respect to the Premises shall be obligations of Subtenant.

17.2    Termination of Sublease.  Notwithstanding anything in the Master Lease or this Sublease to the contrary, if at any time the Master Lease shall be terminated by the Landlord thereunder for any reason, this Sublease shall automatically terminate effective as of the date of such termination of the Master Lease.  In the event of any such termination, Sublandlord and Subtenant shall have no further rights or obligations under this Sublease, except as otherwise specifically set forth herein.

## ARTICLE 18
### End of Term

18.1    Surrender of Premises.  Subtenant shall, on or before the Expiration Date or sooner termination of this Sublease, peaceably and quietly leave and surrender to Sublandlord the Premises, in good condition, reasonable wear and tear excepted, together with all Improvements and fixtures which may have been made or placed upon the Premises, except movable furniture, movable personal property or movable trade fixtures put in at the expense of Subtenant.  All property removable by Subtenant pursuant to this Article which shall not be removed by Subtenant on or before the date when Subtenant shall vacate and surrender the Premises shall be deemed abandoned by Subtenant.

18.2    Holdover.  In the event that Subtenant retains possession of the Premises after the expiration or earlier termination of this Sublease and Sublandlord is no longer the Tenant under the Master Lease, Subtenant shall indemnify and hold Sublandlord harmless from any claims, costs and damages incurred by Sublandlord as a result of Subtenant's hold over tenancy.   The foregoing provisions are in addition to, and do not affect Sublandlord's right of re-entry or any other rights of Sublandlord hereunder or provided by law.

## ARTICLE 19
### Miscellaneous

19.1    No Waiver.  The receipt of rent by Sublandlord with knowledge of any breach of this Sublease by Subtenant or of any default on the part of Subtenant in the observance or performance of any of the conditions or covenants of this Sublease, shall not be deemed to be a waiver of any of the terms, covenants or conditions of this Sublease.  No failure on the part of either the Sublandlord or the Subtenant to enforce any term, covenant or condition of this Sublease, nor any waiver of any right by Sublandlord or Subtenant shall discharge or invalidate such term, covenant or condition, or affect the right of Sublandlord or Subtenant to enforce the same in the event of any subsequent breach or default.

19.2    Enforcement.  In the event of any litigation between Subtenant and Sublandlord or Landlord to enforce the terms of this Sublease, Subtenant shall immediately pay all of Sublandlord or Landlord's costs and expenses, including attorneys' fees, incurred in enforcing Subtenant's obligations hereunder.

19.3    Captions.  The Article and Section headings in this Sublease are inserted only as a matter of convenience in reference and are not to be given any effect in construing any provision

of this Sublease. All references in this Sublease to Article and Section numbers shall be deemed to refer to Articles and Sections and of this Sublease unless otherwise stated.

19.4    Successors and Assigns.    The covenants and agreements contained in this Sublease shall apply to, inure to the benefit of, and be binding upon Sublandlord and Subtenant and upon their respective successors and permitted assigns, except as otherwise stated to the contrary in this Sublease.

19.5    Amendments: Modifications.    This Sublease may not be changed, cancelled or discharged orally, but only by an agreement in writing and signed by the party against whom enforcement of any waiver, change, modification or discharge is sought. All understandings and agreements between Sublandlord and Subtenant are merged in this Sublease which represents the entire agreement between the parties and which fully and completely sets forth all terms and conditions of the transactions embodied in this Sublease.

19.6    Severability. If any term or provision of this Sublease or any portion of a term or provision of this Sublease or the application of any such term or condition to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Sublease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected, and each term and provision of this Sublease shall be valid and be enforced to the fullest extent permitted by law.

19.7    Counterparts. This Sublease may be signed in any number of counterparts, each of which when taken together shall be deemed to be a complete document.

19.8    Governing Law. This Sublease shall be governed by the internal laws of the State of North Carolina, without regard to principles of conflicts of law.

*[Remainder of page left intentionally blank]*

9

IN WITNESS WHEREOF, the parties hereto have duly executed this Sublease as of the day and year first above written.

**SUBLANDLORD**

STOREWORKS TECHNOLOGIES, LIMITED, a Minnesota corporation

By: _____

Name:  Anil Konkimalla

Its:  Chief Officer

**SUBTENANT:**

XENIA RETAIL, INC., a Delaware corporation

By: _____

Name:  Troy Stelzer

Its:  CEO

Consented to by LANDLORD this _____ day of _____, 2017

CCP PROPERTY RALEIGH-DURHAM, LLC

By: _____
Name: _____
Its: _____

14157450v2

S-1

## EXHIBIT A

THE MASTER LEASE

(see attached)

A-1

## GUARANTY

THIS GUARANTY ("**Guaranty**") is provided by Troy Stelzer ("**Guarantor**") to Storeworks Technologies, Ltd., a Minnesota corporation ("**Sublandlord**") pursuant to that certain SUBLEASE AGREEMENT ("**Sublease**") by and between Xenia Retail, Inc. ("**Subtenant**") and Sublandlord to which this Guaranty is attached.

### RECITALS:

A.     Guarantor acknowledges that as a condition of Sublandlord leasing the Premises to Subtenant, Sublandlord is requiring Guarantor to personally guarantee the payment of rents, the performance of all obligations of Subtenant under the Sublease, as well as all other terms, covenants and conditions contained in the Sublease (collectively, "**Obligations**").

B.     Guarantor is willing to provide this Guaranty.

NOW THEREFORE, Guarantor hereby covenants, acknowledges and agrees that:

(1)     Sublandlord may demand payment or performance from or by Guarantor of any or all of the Obligations, when such payment or performance is required, and Guarantor shall promptly provide such payment or performance.

(2)     Sublandlord shall not be required to first seek payment or performance from the Subtenant or from any other guarantor, person or entity, or seek any other right or remedy, prior to enforcing this Guaranty.

(3)     Sublandlord shall not be required to provide Guarantor with any notice of any default under the Sublease prior to seeking payment or performance under this Guaranty.

(4)     Guarantor agrees that this Guaranty shall remain in full force and effect and be binding upon Guarantor until the Obligations are satisfied in full, or Guarantor is released from this Guaranty under applicable provisions in this Guaranty or the Sublease.

(5)     Guarantor consents to any modifications and amendments of the terms, provisions, covenants and conditions of the Sublease which may be made by Subtenant and Sublandlord hereafter.

(6)     Guarantor agrees that this Guaranty shall be binding upon the undersigned, its successors and assigns, and shall inure to the benefit of Sublandlord, its successors and assigns.

(7)     Guarantor agrees that this Guaranty shall be governed by the laws of the State of Minnesota.

(8)     Guarantor acknowledges that no failure on the part of Sublandlord to exercise, and no delay in exercising, any right or remedy hereunder shall operate as, or constitute a waiver of, any rights available to Sublandlord, nor shall any single or partial exercise of any right or remedy hereunder preclude, or further exercise thereof or the exercise of, any other right or remedy granted hereby or by any related document or by law.

(9)      Guarantor agrees that (i) Guarantor will indirectly benefit by and from the Sublease; (ii) Guarantor has received legal and adequate consideration for the execution of this Guaranty and has executed and delivered this Guaranty to Sublandlord in good faith in exchange for reasonably equivalent value; and (iii) Guarantor is not presently insolvent and will not be rendered insolvent by virtue of the execution and delivery of this Guaranty.

IN WITNESS WHEREOF, this Guaranty is effective as of the _11_ day of _July_, 2018.


_____
Troy Stelzer

15511474v1

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

CASE TYPE: Contract

Xenia Retail, Inc. and Troy Stelzer,

Plaintiffs,

vs.

StoreWorks Technologies Ltd. and
Anil Konkimalla,

Defendants.

Court File No.: 27-CV-17-16152
Judge Kathleen D. Sheehy

**STIPULATION FOR DISMISSAL
WITH PREJUDICE**

## STIPULATION

All issues in the above-captioned action by and between Plaintiffs and Defendants having been fully and finally compromised and settled,

IT IS HEREBY STIPULATED AND AGREED, by and between the parties hereto, through their respective counsel of record, that all claims and counterclaims, if any, shall be dismissed with prejudice, upon the merits and without costs, disbursements or attorneys' fees to any party, and that any party hereto may forthwith, without notice to the other, apply to the Court pursuant to this Stipulation for an Order directing entry of judgment of dismissal of the entire action with prejudice and on the merits.

Dated:  June __, 2018                    MALKERSON GUNN MARTIN LLP


                                         By: _____
                                            Thomas F. DeVincke, #301759

                                            220 South Sixth Street, Suite 1900
                                            Minneapolis, MN 55402
                                            (952) 224-3644
                                            tfd@mgmllp.com

                                            **Attorneys for Plaintiffs**


Dated:  June __, 2018                    WINTHROP & WEINSTINE, P.A.


                                         By: _____
                                            Matthew R. McBride, #261981

                                            3500 Capella Tower
                                            225 South Sixth Street
                                            Minneapolis, MN 55402
                                            (612) 604-6400
                                            mmcbride@winthrop.com

                                            **Attorneys for Defendants**


15514367v1

# LEASE
## FACE PAGE

**LEASE DATE:**     May 23, 2014

**LANDLORD:**     Beacon Ventures LLC, a North Carolina limited liability company

**LANDLORD'S NOTICE**
**ADDRESS:**     610 East Morehead Street
Suite 250
Charlotte, NC  28202
Attn: Gregg E. Sandreuter

         **ALL PAYMENTS SHOULD BE MAILED TO:**

         Beacon Ventures, LLC
c/o Beacon Partners
610 East Morehead Street
Suite 260-AR
Charlotte, NC 28202

**TENANT:**     Storeworks Technologies, Limited, a Minnesota corporation

**TENANT'S NOTICE ADDRESS:**  Storeworks Technologies
7300 Washington Ave. S.
Eden Prairie,  MN  55344

         Email:  anilk@storeworks.com

         Phone:  ( 952) 746-5555
Fax:  (952) 746-5556

**PROJECT:**     That certain building or project known as NorthPark I ("Project"), with an address of 11635 Northpark Drive, Wake Forest, North Carolina 27587.

**PREMISES:**     Shall be deemed to be 6,722 rentable square feet ("SF"), located at 11635 Northpark Drive, Suite 360 and more particularly described in Exhibit "A" ("Premises").

**LEASE TERM:**     A period of fifty-six (56) months, beginning on the Commencement Date and ending as set forth in Section 1.3 of this Lease.

**ANNUAL BASE RENT:**   Initially, $147,884.04 per year subject to increases as set

**EXHIBIT**
**2**

forth in Exhibit "C".

**MONTHLY BASE RENT:**    Initially, $12,323.67 per month subject to increases as set forth in Exhibit "C".

**SECURITY DEPOSIT:**    $12,323.67 ("Security Deposit").

**PROPORTIONATE SHARE:**    16.05%.

**BASE YEAR FOR OPERATING EXPENSES:**    Calendar year ending December 31, 2014.

**LEASE**

This Lease including the Face Page and all exhibits and attachments hereto ("Lease") is made and entered into as of the date set forth on the Face Page, by and between Beacon Ventures, LLC, a North Carolina limited liability company (hereinafter referred to as "Landlord") and Storeworks Technologies, Limited, a Minnesota corporation (hereinafter referred to as "Tenant").

## SECTION 1
## PREMISES, PROPORTIONATE SHARE AND TERM

**1.1. Premises.** Landlord hereby demises and leases to Tenant, and Tenant hereby accepts and leases from Landlord the Premises (defined on the Face Page of this Lease) together with all rights, privileges, easements, appurtenances, and amenities belonging to or in any way pertaining to the Premises.

**1.2. Proportionate Share.** Tenant's proportionate share ("Proportionate Share") shall be equal to a fraction which has as its numerator the SF of the Premises and as its denominator the total SF of the Project. Tenant's Proportionate Share is shown on the Face Page of this Lease. Should the SF of the Project change at any time during the Term, as a result of a recalculation, reconfiguration or addition to the Project by Landlord, Landlord shall notify Tenant in writing of the new SF of the Project and Tenant's new Proportionate Share, which new Proportionate Share shall replace the Proportionate Share in effect at such time and shall be used for all relevant calculations under this Lease.

**1.3. Term.** The term of this Lease ("Term") shall begin on the Commencement Date (as hereinafter defined) and end at midnight on February 28, 2019. For the purposes of this Lease any reference to "days" shall be deemed to refer to calendar days unless specifically noted as "business days".

**1.4. Commencement Date.** The commencement date ("Commencement Date") of this Lease shall be June 1, 2014.

**1.5. Possession.** Unless identified in writing to Landlord prior to the time of taking of possession, taking of possession by Tenant shall be deemed conclusively to establish that the Premises are in good and satisfactory condition, as of such date of possession. Tenant acknowledges that no representations or warranties as to the condition or repair of the Premises have been made by Landlord, unless such are expressly set forth in this Lease. In the event of any dispute as to substantial completion of work performed or required to be performed by Landlord, an AIA certificate of substantial completion from Landlord's architect or a temporary or final Certificate of Occupancy, issued by the Engineering & Building Standards Department of the county where the Project is located, or other applicable governmental authority, shall be conclusive.

## SECTION 2
## MONTHLY BASE RENT AND ADDITIONAL RENT

**2.1. Monthly Base Rent.** Tenant agrees to pay to Landlord Monthly Base Rent (as defined on the Face Page of this Lease) for the Premises, in advance, without demand, deduction or set off, for the entire Term. One (1) such monthly installment shall be due and payable on the date hereof, and this payment shall be

applied to the first payment due at the beginning of the Term.  Each installment of Monthly Base Rent shall be due and payable on or before the first day of each calendar month during the Term.  The payment for any fractional calendar month at the commencement or end of the Term shall be prorated.

**2.2.  Additional Rent.**  Any payments due Landlord hereunder with respect to Operating Expenses (as defined in Section 5 of this Lease), or any other payment or reimbursement other than Monthly Base Rent shall be defined as additional rent ("Additional Rent").  Payments of Additional Rent shall be due and payable within twenty (20) days of the date of Landlord's invoice to Tenant unless specified otherwise in Section 5 of this Lease.

**2.3.  Payment Address.**  All Monthly Base Rent, Additional Rent and other payments required to be made by Tenant to Landlord hereunder shall be payable to Landlord at the address set forth on the Face Page of this Lease or at such other address as Landlord may specify from time to time by written notice.  Tenant's obligation to pay Monthly Base Rent, Additional Rent and other amounts to Landlord under the terms of this Lease shall not be deemed satisfied until such payments have been actually received by Landlord.  In the event that any check, draft or other instrument of payment given by Tenant is dishonored for any reason, Tenant agrees to pay to Landlord the sum of $50.00 on demand in addition to any Late Payment Charge that may be due.

## SECTION 3
## LATE PAYMENT CHARGE AND SECURITY DEPOSIT

 **3.1.  Late Payment.**  In the event that any installment of Monthly Base Rent or Additional Rent or any other payment or reimbursement due hereunder is not received by Landlord within seven (7) days of the date when such payment or reimbursement is due, Tenant shall pay to Landlord on demand a late charge ("Late Payment Charge") in an amount equal to five percent (5%) of such payment or reimbursement.  The provision for such Late Payment Charge shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as liquidated damages or as limiting Landlord's remedies in any manner.

**3.2.  Security Deposit.**  Tenant agrees to deposit with Landlord on the date hereof the Security Deposit (as defined on the Face Page of this Lease).  Landlord will hold the Security Deposit, without obligation for interest, as security for the performance of Tenant's covenants and obligations under this Lease.  The Security Deposit will not be deemed an advance payment of Monthly Base Rent or other amounts due under this Lease nor will the Security Deposit be deemed a measure of Landlord's damages for any Tenant default.  Upon the occurrence of any event of default by Tenant, Landlord may, from time to time, without prejudice to any other remedy provided herein or provided by law, use the Security Deposit to the extent necessary to make good any arrearages of Monthly Base Rent, Additional Rent or other payments due Landlord hereunder, and any other damage, injury, expense (including, without limitation, court costs and reasonable attorneys' fees) or liability caused by such event of default; and Tenant shall pay to Landlord on demand the amount so applied in order to restore the Security Deposit to its original amount.  Any remaining balance of such Security Deposit shall be returned to Tenant at such time after termination of this Lease that all of Tenant's obligations under this Lease have been fulfilled.

## SECTION 4
## SURRENDER OF PREMISES AND HOLDOVER

**4.1.  Surrender of Premises.**  Upon the expiration or termination of this Lease or the termination of Tenant's right of possession of the Premises, Tenant shall surrender and vacate the Premises immediately and deliver possession thereof to Landlord in a clean, good and tenantable condition, ordinary wear excepted.  If the Premises are not surrendered in such condition, Landlord may undertake all necessary cleaning, trash removal and repair work, including, without limitation, removal of Tenant's equipment (including telecommunications equipment and wiring) and fixtures, all at the expense of Tenant, which expense Tenant shall pay on demand by Landlord.  Without limiting its remedies, Landlord may apply any Security Deposit of Tenant against the cost of such work.  Upon any termination which occurs other than by reasons of Tenant's default, prior to such termination Tenant shall be entitled to remove from the Premises all unattached and movable trade fixtures and personal property of Tenant without credit or compensation from Landlord, provided Tenant immediately shall repair all damage resulting from such removal and shall restore the Premises to a good and tenantable condition.  If Tenant shall fail to remove any unattached and movable trade fixtures and personal property which Tenant is entitled to remove prior to any termination, Landlord may remove the same without any liability to Tenant.  Any fixtures and personal property not so removed upon the vacancy of the Premises by Tenant shall be conclusively presumed to have been abandoned by Tenant, and to the extent Landlord elects to accept the same, title to such property shall pass to Landlord without any payment or credit.  Landlord may, at its option and at Tenant's expense, store and/or dispose of any such property remaining in the Premises.

**4.2.  Holdover.**  Tenant will, at the termination of this Lease by lapse of time or otherwise, yield up immediate possession of the Premises to Landlord with all repairs and maintenance required herein to be performed by Tenant completed.  If Tenant remains in possession after such termination without Landlord's written consent, such holdover shall not be deemed to be a renewal of this Lease but shall be deemed to create a month-to-month term which may be terminated by either party on the tenth (10th) day after written notice is delivered to the other party.  In the event that any such holdover exists, all of the terms and provisions of this Lease shall be applicable during such holdover period, except that Tenant shall pay Landlord from time to time upon demand, as rent for the period of any holdover, an amount equal to one hundred fifty percent (150%) of the Monthly Base Rent in effect on the termination date, computed on a daily basis for each day of the holdover period.  Tenant agrees to indemnify, defend and hold Landlord harmless from any and all claims, loss or damage arising from Tenant's holdover.

<div align="center">

**SECTION 5**
**TAXES, INSURANCE EXPENSE, AND CAM CHARGES**

</div>

**5.1.  Operating Expenses Defined.**  The charges outlined in this Section 5, relating to the operation, maintenance and repair of the Project shall be referred to collectively as operating expenses ("Operating Expenses").  Operating Expenses shall include without limitation all taxes, assessments and governmental charges of any kind or nature whatsoever levied or assessed against the Project and any land, buildings or other improvements located on the property of which the Project is a part ("Property"), by any municipality, county, or other governmental authority ("Taxes"), the Insurance Expense (as such term is defined in Section 14.1 of this Lease) and any costs and expenses associated with the operation, maintenance, repair or replacement (including parts) of, without limitation: water and sewer services, electricity and natural gas, janitorial services, interior and exterior window washing, pest control, landscaping, irrigation and lawn maintenance, rubbish removal, sidewalks, curbs and gutters, parking lots and driveways, common area lighting, heating, air conditioning and ventilation systems, common signs for the Project, common area and exterior painting, security services, property management services (including administrative and operating costs), snow and ice removal, fire alarm monitoring,

miscellaneous maintenance and repair expenses, fees or dues paid to any property owner's association, any and all storm water related fees and charges and any other fees or charges levied against the Project by an agency or other authority having jurisdiction, adequate reserve allowances for future expenses relating to the aforementioned costs, an onsite management office and a reasonable overhead charge for the administration of all such work.

**5.2.  Base Year.**  The Operating Expenses shall be paid by Landlord during the Term, provided, however that the maximum amount of Operating Expenses to be paid by Landlord in any one calendar year during the Term shall be equal to that amount paid by Landlord in the Base Year, as the Base Year is defined on the Face Page of this Lease (hereinafter referred to as the "Base Year Operating Expenses").  If in any calendar year during the Term or any renewal or extension thereof,  the Operating Expenses incurred by Landlord shall exceed the Base Year Operating Expenses, Tenant shall pay to Landlord as Additional Rent, the amount of Tenant's Proportionate Share of such excess.

**5.3.  Monthly Payments.**  Landlord shall reserve the right to require Tenant to pay monthly, as Additional Rent (due and payable in advance on the first day of each month), an amount which shall equal one-twelfth (1/12th) of Tenant's Proportionate Share of the excess Operating Expenses (as reasonably estimated by Landlord) for the current year.

**5.4.  Annual Reconciliation.**  After the completion of each calendar year during the Term, Landlord shall provide written notice to Tenant of the actual amount of Operating Expenses for such calendar year and Tenant's Proportionate Share of any excess Operating Expenses over the Base Year Operating Expenses.  In the event Tenant's payments during such calendar year exceeded Tenant's Proportionate Share of such excess, Tenant shall receive a credit against the next due installment of Monthly Base Rent or Additional Rent unless this Lease has expired or been otherwise terminated, in which event Landlord shall pay such amount to Tenant within twenty (20) days following receipt by Tenant of Landlord's notice.  In the event Tenant's payments during such calendar year were less than Tenant's Proportionate Share of  such excess, Tenant shall pay as Additional Rent the amount owed to Landlord within twenty (20) days of written notice from Landlord .

**5.5.  Proration.**  If the first year and/or the final year of the Term do not coincide with the calendar year, all of Tenant's obligations hereunder to pay Operating Expenses for such year(s), if any, shall be prorated.

**5.6.  Final Year Adjustments.**  Prior to the expiration or earlier termination of this Lease, Landlord shall have the option to update its estimate of Operating Expenses for the calendar year of such expiration or termination, and Tenant shall pay to Landlord the amount, so estimated by Landlord, of Tenant's obligation hereunder for Operating Expenses for the year in which the Lease expires or terminates.  All such amounts shall be used and held by Landlord for payment of such obligations of Tenant hereunder, with Tenant being liable for any additional costs therefor upon demand by Landlord, or with any excess to be returned to Tenant after all such obligations have been determined and satisfied, as the case may be.

## SECTION 6
## USE AND COMPLIANCE

The Premises shall be used and occupied for office space only and for no other purpose without the prior written consent of Landlord.  Outside storage, including, without limitation, trucks and other

vehicles, is prohibited without Landlord's prior written consent. Tenant covenants that it (i) shall comply with all governmental laws, ordinances and regulations (including specifically all zoning, access, and safety regulations) applicable to the operation of Tenant's business or use of the Premises, (ii) shall promptly comply with all governmental orders and directives for the correction, prevention and abatement of any violations and any nuisances in, upon or connected with the Premises, all at Tenant's sole expense, (iii) shall not permit nor take any action, which would constitute a nuisance or would disturb or endanger any other tenants or occupants of the Project or unreasonably interfere with their use of their respective premises or the common areas of the Project and (iv) shall abide by and conform to the Rules and Regulations attached hereto as Exhibit "D" and such further reasonable rules and regulations as Landlord may from time to time make or adopt for the care of the Project or the comfort and welfare of the Project's occupants as long as such are enforced in a non-discriminatory manner.

## SECTION 7
## HAZARDOUS SUBSTANCES

**7.1. Definitions.** As used in this Section, "Hazardous Substance" means any pollutant, contaminant, toxic or hazardous substance, hazardous waste, dangerous substance, potentially dangerous substance, noxious substance, hazardous, ignitable, explosive, toxic or radioactive material, urea formaldehyde foam insulation, asbestos, PCBs, petroleum products or any other substances the removal of which is required, or the manufacture, production, generation, use, maintenance, disposal, treatment, storage, transfer, handling or ownership of which is restricted, prohibited, regulated or penalized, by any federal, state or local statute, law, regulation or other legal requirement now or at any time hereafter in effect, including but not limited to, the Comprehensive Environmental Response, Compensation, and Liability Act (U.S.C. 9601 *et. seq.*), the Hazardous Materials Transportation Act (49 U.S.C. 1801 *et seq.*), the Resource Conservation and Recovery Act (42 U.S.C. 6901 *et. seq.*), the Federal Water Pollution Control Act (33 U.S.C. 1251 *et seq.*), the Clean Air Act (42 U.S.C. 7401 *et seq.*), the Toxic Substances Control Act, as amended (15 U.S.C. 2601 *et seq.*), and the Occupational Safety and Health Act (29 U.S.C. 651 *et seq.*), as these laws and legal requirements have been or are in the future amended or supplemented.

**7.2. Covenants.** Tenant shall not use or permit others to use, the Premises or any other part of the Project for the production, generation, manufacture, treatment, transportation, storage or disposal of any Hazardous Substance, except with the prior written consent of Landlord and in compliance with any and all applicable legal requirements. Tenant covenants with Landlord that it will: (i) deliver promptly to Landlord true and complete copies of all notices received by Tenant from any governmental authority with respect to the generation, storage or use by Tenant of any Hazardous Substance (whether or not on or in the Premises); (ii) permit entry onto the Premises by Landlord or Landlord's representatives at any reasonable time to verify Tenant's compliance with the provisions of this Section 7 and to monitor Tenant's generation, storage or use of any Hazardous Substance, including, but not limited to, the performance of testing required by Landlord, any governmental agency or lender to determine the status of any Hazardous Substance on or in the Premises; (iii) pay to Landlord as Additional Rent, all of Landlord's actual costs and expenses in connection with such entries, verification, monitoring and testing as well as the reporting therefor; and (iv) complete fully, truthfully and promptly any questionnaires sent by Landlord with respect to Tenant's generation, storage or use of any Hazardous Substance and any affidavits, representations and the like from time to time at Landlord's request with respect to Tenant's generation, storage or use of any Hazardous Substance.

**7.3. Indemnity.** Tenant hereby indemnifies, defends and holds harmless Landlord from and against any and all liabilities, expenses (including, without limitation, court costs and reasonable attorney fees), demands, damages, costs, losses, clean-up costs, actions, causes of action, claims for relief, penalties, fines and charges incurred, assessed, resulting from or arising out of the presence of any Hazardous Substance on, in or under the Premises or the Property (and any off-site property when such Hazardous Substance emanated from the Premises) resulting from the activities, operations or occupancy of Tenant or any act or omission of Tenant or Tenant's employees, agents, visitors or invitees, regardless of whether Landlord shall have consented to, approved of, participated in or had notice of such act or omission or the presence of such Hazardous Substance. The provisions of this Section 7.3 shall survive the expiration or earlier termination of this Lease.

Notwithstanding anything to the contrary contained herein, Tenant shall not be liable for conditions existing or events occurring prior to the Commencement Date unless such conditions or events were caused by or exacerbated by Tenant or its employees, agents, visitors or invitees.

## SECTION 8
## LANDLORD'S REPAIRS AND MAINTENANCE

Landlord shall repair and maintain in good order and condition, reasonable wear and tear excepted, the common areas, foundations, structural components and exterior walls of the Project, along with the elevators, the electrical, plumbing, mechanical, fire protection and heating, air conditioning and ventilation systems and any other repair, maintenance or replacement for the Project included in the definition of Operating Expenses in Section 5.1, provided, however that Tenant shall repair and pay for any damage caused by the negligence of Tenant or Tenant's employees, agents, visitors or invitees, or caused by Tenant's default hereunder. Except as otherwise set forth in this Lease, all costs associated with the repair and maintenance obligations of Landlord under this Section, including the replacement of Project standard fluorescent light tubes in the Premises, shall be included in and constitute Operating Expenses.

## SECTION 9
## TENANT'S REPAIRS AND MAINTENANCE

**9.1. Tenant's Responsibility.** Tenant shall maintain the Premises in good repair and in a clean condition. Except as provided in Section 8 of this Lease, Landlord shall have no maintenance obligations concerning the Premises and no obligations to make any repairs or replacements in, on or to the Premises, and Tenant shall assume the full and sole responsibility for the condition, operation, repair, replacement and maintenance of the Premises, including all improvements through the Term except as specifically set forth in Section 8.

**9.2. Litter and Damage.** If Tenant is identified as being responsible for excessive litter or an unsightly mess outside of the Premises or for any damage to the common areas of the Project or the Property (such as an obstruction of a common sewer line, damage to concrete or asphalt paving, damage to the landscaping or grounds, etc.), then Tenant, as Landlord shall reasonably determine, shall pay as Additional Rent the entire cost to clean up such litter or mess and repair or replace such damage.

# SECTION 10
## INSPECTION

**10.1.  Entry.**  Landlord and Landlord's agents and representatives shall have the right to enter and inspect the Premises in the event of an emergency (when no prior notice is required) and at any reasonable time with twenty-four (24) hours' notice, which notice may be made by facsimile or telephone for the purposes of this Section 10.1, for janitorial services or for the purpose of inspecting same or to make any repairs as may be permitted or required to be made by Landlord under the terms of this Lease.  During the period that is six (6) months prior to the end of the Term, Landlord and Landlord's agents and representatives shall have the right to enter the Premises at any reasonable time during business hours with reasonable prior notice under the circumstances for the purpose of showing the Premises and shall have the right to erect on or in front of the Premises, a suitable sign indicating the Premises are available.  Landlord shall use commercially reasonable efforts to minimize any unreasonable interference with Tenant's operations in the Premises in connection with any such entry (other than in the case of an emergency).

**10.2.  Inspection on Termination.**  Upon the expiration or earlier termination of this Lease, Tenant shall give written notice to Landlord at least thirty (30) days prior to vacating the Premises and shall arrange to meet with Landlord for a joint inspection of the Premises prior to vacating.

# SECTION 11
## SERVICES AND UTILITIES

**11.1.  Services Provided.**  Landlord shall furnish the following services to the Project:  (i) heating and air conditioning in the appropriate season during the hours noted in Section 11.2 below, (ii) janitorial and general cleaning services prior to each "Business Day" which is defined as Mondays, Tuesdays, Wednesdays, Thursdays and Fridays except for New Year's Day, Good Friday, Memorial Day, July 4th, Labor Day, Thanksgiving and Christmas, (iii) passenger elevator service to all floors of the Project, (iv) reasonable amounts of cold and hot running water to lavatories and toilets and (v) electricity for the purposes of lighting and general office equipment use in amounts consistent with building standard electrical capacities.

**11.2.  Heating and Air Conditioning.**  The hours of operation of the heating and air conditioning systems in the Project shall be as follows:

Business Days from 7:00 AM to 6:00 PM
Saturday from 8:00 AM to 1:00 PM
There shall be no service provided at other times or on other days

Should Tenant desire heating or air conditioning services for hours before or after the times noted above in this Section 11.2 or on Sundays or holidays, Tenant may request such services and Landlord shall cooperate with Tenant to make such services available.  In such event, Tenant shall pay on demand a building standard charge of Thirty Dollars ($30.00) per hour, which charge may be reasonably increased or decreased from time to time (to reflect operating and administrative costs) upon prior notice by Landlord.

**11.3.  Excess Services.**  To the extent Tenant's usage of any service or utility in the Premises or Project including without limitation electricity, natural gas, water/sewage or janitorial services, exceeds the normal amounts of such services generally used by tenants in the Project, Tenant shall pay as Additional Rent the cost for such excess as reasonably estimated by Landlord.  Landlord reserves the right, in the event Landlord reasonably determines that Tenant's usage level of a utility is disproportionate compared with other tenants in the Project, to  (at Landlord's sole discretion and cost) install a separate meter for such utility to the Premises.  Upon the installation of such meter, Tenant shall pay the costs of such utility service for the Premises directly to the applicable provider.

**11.4.  Interruption of Services or Utilities.**  In no event shall Landlord be liable for any failure or interruption of any service or utility furnished by Landlord under this Lease, and no such failure or interruption shall entitle Tenant to terminate this Lease or abate any payment of Monthly Base Rent or Additional Rent hereunder.

## SECTION 12
## ALTERATIONS

**12.1.  Alterations to Premises.**  Tenant shall not make any alterations, additions or improvements ("Alterations") to the Premises without the prior written consent of Landlord which consent shall not be unreasonably withheld.  Notwithstanding anything to the contrary set forth in this Lease, "Alterations" shall not include Tenant's fixtures, furniture, furnishings, equipment, personal property or IT equipment to the extent that the same are not permanently affixed to the Premises and shall not include server racks in any event.  All such Alterations must be made at Tenant's sole cost and expense by a contractor approved in writing by Landlord and in accordance with any and all applicable laws, ordinances, regulations and insurance policy provisions.  Any Tenant request to make Alterations to the Premises shall be in writing accompanied with all construction drawings (and any additional materials reasonably requested by Landlord) and a review fee of $250.00.  Tenant agrees to pay Landlord all reasonable professional and legal fees incurred by Landlord in connection with Landlord's review of Tenant's request, whether or not Landlord consents to Tenant's request (not to exceed $2,500 without Tenant's consent).  Upon completion of any such Alterations, Tenant will provide Landlord with a copy of the Certificate of Occupancy issued by the applicable governmental authority and final lien waivers and contractors' affidavits from all contractors and subcontractors providing work or materials to the Premises.

**12.2.  Ownership of Alterations; Indemnity.**  All Alterations erected by Tenant shall be and remain the property of Tenant during the Term, and Tenant shall, unless Landlord otherwise elects as hereinafter provided, remove all such Alterations erected by Tenant and restore the Premises to its original condition, reasonable wear and tear excepted, by the expiration or earlier termination of this Lease; provided however, that if Landlord so elects, such Alterations shall become the property of Landlord as of the expiration or earlier termination of this Lease and shall be delivered up to the Landlord with the Premises.  Notwithstanding the foregoing sentence, all shelves, bins, machinery (including telecommunications equipment and wiring) and trade fixtures installed by Tenant shall be removed by Tenant prior to the termination of this Lease unless Tenant notifies Landlord in writing that such items will remain in the Premises, and Landlord consents in writing, in which event all such items shall become the property of the Landlord.  Upon any such removal, Tenant shall restore the Premises to its original condition, reasonable wear and tear excepted and shall repair any damage to the Premises and Project caused by such removal.  Tenant agrees to indemnify, defend and hold Landlord, and its agents and employees forever harmless

against all claims, liabilities and expenses (including reasonable attorney fees) of every kind, nature and description which may arise out of or in any way be connected with any of the work described in this Section 12.

## SECTION 13
## SIGNS

Tenant shall not place or permit to be placed or maintained on any portion of the Project, including on any exterior door, wall or window of the Project or Premises or within the interior of the Premises if visible from the exterior of the Premises, any signage or advertising matter of any kind, without the prior written consent of Landlord which may be arbitrarily withheld.  Landlord shall provide Tenant with a standard listing in the tenant directory located in the Project lobby and a Project standard decorative sign at the main entrance to the Premises.

## SECTION 14
## PROPERTY AND CASUALTY DAMAGE

**14.1.  Insurance.**  Landlord agrees to maintain insurance covering the Project in an amount deemed appropriate by Landlord, insuring against the perils of Fire, Lightning and Extended Coverage, Vandalism and Malicious Mischief, extended by Special Extended Coverage Endorsement to insure against all other Risks of Direct Physical Loss, casualty, liability and business income and such additional reasonable coverages as the Landlord may elect to further protect its interest in the Premises and the Project; such coverages and endorsements to be as defined, provided and limited in the standard bureau forms prescribed by the insurance regulatory authority for the state of North Carolina for use by insurance companies admitted in North Carolina for the writing of such insurance on risks located within North Carolina.  Subject to the provisions of Sections 14.4, 14.5 and 14.6 below, such insurance shall be for the sole benefit of Landlord and under its sole control.  Under no circumstances shall such insurance include nor shall Landlord have any responsibility to insure, repair, or replace Tenant's personal property, Tenant's fixtures or any Alterations or improvements made by Tenant to the Premises.  Landlord (subject to the provisions of Section 5.1 of this Lease) agrees to pay before they become delinquent, the costs and or premiums for such policies of insurance (all of which costs or premiums shall collectively be defined as the **"Insurance Expense"**).

**14.2.  Adjustments.**  If any increase in the insurance premiums to be provided by Landlord under Section 14.1 above is caused by Tenant's use or occupancy of the Premises, then Tenant shall pay to Landlord as Additional Rent, on demand, the amount of such increase.

**14.3.  Notice of Casualty.**  If the Project or Premises should be damaged or destroyed by any peril covered by the insurance to be provided by Landlord under Section 14.1 above, Tenant shall give immediate written notice thereof to Landlord.

**14.4.  Substantial Damage.**  If the Premises should be totally destroyed by any peril covered by the insurance to be provided by Landlord under Section 14.1 above or if the Premises should be so damaged thereby that rebuilding or repairs cannot in Landlord's reasonable estimation be completed within one hundred eighty (180) days after the date upon which Landlord is notified by Tenant of such damage, this

Lease shall terminate, and the Monthly Base Rent and Operating Expenses shall be abated during the unexpired portion of this Lease, effective upon the date of the occurrence of such damage.

**14.5.   Minor Damage.**   If the Premises should be damaged by any peril covered by the insurance to be provided by Landlord under Section 14.1 above, but only to such extent that rebuilding or repairs can in Landlord's reasonable estimation be completed within one hundred eighty (180) days after the date upon which Landlord is notified by Tenant of such damage, this Lease shall not terminate, and Landlord shall at its sole cost and expense (but only to the extent insurance proceeds are available) thereupon proceed with reasonable diligence to rebuild and repair the Premises to substantially the condition in which the Premises existed prior to such damage, except that Landlord shall not be required to rebuild, repair or replace any part of Tenant's personal property, Tenant's fixtures or any Alterations or improvements made by Tenant to the Premises.   If the Premises are untenantable in whole or in part following such damage, the Monthly Base Rent and Operating Expenses payable hereunder during the period in which they are untenantable shall be reduced to such extent as may be fair and reasonable under all of the circumstances.   In the event that Landlord should fail to complete such repairs and rebuilding within one hundred eighty (180) days after the date upon which Landlord is notified by Tenant of such damage, Tenant may at its option terminate this Lease by delivering written notice of termination to Landlord as Tenant's exclusive remedy, whereupon all rights and obligations hereunder shall cease and terminate.

**14.6.   Proceeds to Mortgagee.**   Notwithstanding anything herein to the contrary, in the event the holder of any indebtedness secured by a mortgage or deed of trust covering the Premises or the Project requires that the insurance proceeds paid as a result of a loss covered under the insurance to be provided under the terms of Section 14.1 above be applied to such indebtedness, then Landlord shall have the right to terminate this Lease by delivering written notice of termination to Tenant within fifteen (15) days after such requirement is made by any such holder, whereupon all rights and obligations hereunder shall cease and terminate.

## SECTION 15
## LIABILITY

**15.1.   Injury to Persons or Property.**   Landlord shall not be liable to Tenant or Tenant's employees, agents, patrons or visitors, or to any other person whomsoever, for any injury to person or damage to property on or about the Premises except for such injury or damage which results from the negligence or willful misconduct of Landlord or Landlord's employees or agents and Tenant hereby covenants and agrees that it will at all times indemnify, defend and hold safe and harmless the Premises, the Landlord, Landlord's employees, agents and lender(s) from any loss, liability, claim, suit, or expense, including without limitation attorney fees and damages, both real and alleged, arising out of or relating to any such damage or injury; except injury to persons or damage to property the cause of which is the negligence or willful misconduct of Landlord or Landlord's employees, agents or lenders.

**15.2.   Tenant Insurance.**   Tenant shall, at Tenant's sole expense, procure and maintain throughout the Term a policy or policies of (i) commercial general liability insurance, insuring against all claims, demands or actions arising out of or in connection with Tenant's liability assumed under this Lease, covering injury to persons (including death), and property damage (including loss of use thereof) in the amount of at least $2,000,000 per occurrence with an aggregate limit of at least $2,000,000.00, and (ii) all risk (special form) property insurance in an amount equal to the full replacement cost of all Alterations or improvements made by, for or on behalf of Tenant to the Premises.   All such policies procured by Tenant

shall be issued by an insurance company authorized to transact business in North Carolina with a rating of not less than A: Class VIII by A.M. Best Company.  Certified copies of such policies or valid certificates of insurance evidencing same, naming Landlord, the Project property manager and (at Landlord's sole discretion) Landlord's lender(s) as additional insureds, together with a receipt evidencing payment of premiums therefor, shall be delivered to Landlord prior to the Commencement Date of this Lease.  Not less than thirty (30) days prior to the expiration date of any such policies, certified copies of the renewal policies or valid certificates of insurance evidencing such renewal (bearing notations evidencing the payment of renewal premiums) shall be delivered to Landlord.  Such policies shall further provide that not less than thirty (30) days written notice shall be given to Landlord before such policy may be canceled or changed to reduce insurance provided thereby.  If Tenant shall not comply with this covenant, Landlord may at its option, cause insurance as aforesaid to be issued, and in such event Tenant agrees to pay the premium for such insurance promptly upon Landlord's demand.

## SECTION 16
## WAIVER OF SUBROGATION

**16.1.  Landlord Waiver.**  Tenant shall not be responsible or liable to Landlord for any loss from any event, act or omission to the extent actually paid by the proceeds of insurance obtained and maintained by Landlord in connection with the Project.  Landlord shall cause its policy or policies of insurance to contain effective waivers of subrogation for the benefit of Tenant.

**16.2.  Tenant Waiver.**  Landlord and the Project property manager shall not be responsible or liable to Tenant for any loss, event, act or omission to the extent covered by insurance required to be obtained and maintained by Tenant with respect to the Premises and its use and occupancy thereof (whether or not such insurance is actually obtained or maintained) or otherwise covered by the proceeds of such other insurance as is obtained and maintained by Tenant.  Tenant shall from time to time provide Landlord with effective waivers of subrogation by its insurers for the benefit of Landlord and the Project property manager in a form reasonably satisfactory to Landlord.

**16.3.  Survival.**  The terms and provisions of this Section 16 shall supersede any provisions to the contrary contained in this Lease and shall survive the expiration or earlier termination of this Lease with respect to any occurrences before the effective date of such termination or expiration.

## SECTION 17
## CONDEMNATION

**17.1.  Complete Taking.**  If the whole or any substantial part of the Premises should be taken for any public or quasi-public use under governmental law, ordinance or regulation, or by right of eminent domain, or by private purchase in lieu thereof and the taking would prevent or materially interfere with the use of the Premises for the purpose for which it is being used, this Lease shall terminate, and the Monthly Base Rent and Operating Expenses payable hereunder shall be abated during the unexpired portion of the Term, effective when the physical taking of the Premises shall occur.

**17.2.  Partial Taking.**  If part of the Premises shall be taken for any public or quasi-public use under any governmental law, ordinance or regulation, or by right of eminent domain, or by private purchase in lieu thereof, and this Lease is not terminated as provided in Section 17.1 above, this Lease shall not terminate, but the Monthly Base Rent and Operating Expenses payable hereunder during the

unexpired portion of the Term shall be reduced to such extent as may be fair and reasonable under all of the circumstances.

**17.3.  Proceeds.**  In the event of any such taking or private purchase in lieu thereof, Landlord shall be entitled to the proceeds arising out of any such acquisition of the Premises, or portion thereof, under the power of eminent domain; provided, however, that nothing herein contained shall be construed so as to prevent Tenant from making a claim for a separate award for any relocation expense, or for such losses as it may sustain in connection with any items belonging to Tenant and not a part of the Premises, but Tenant shall in no event be entitled to compensation for the loss of its leasehold interest in the Premises.

<div align="center">

**SECTION 18**
**EVENTS OF DEFAULT**

</div>

The following events shall be deemed to be events of default by Tenant under this Lease:

**18.1.**  Tenant shall fail to pay any installment of Monthly Base Rent or Additional Rent herein reserved when due, or any other reimbursement, Late Payment Charge or other payment to Landlord required herein when due, and such failure shall continue for a period of seven (7) days from the date such payment was due; provided however, before placing Tenant in default, Landlord agrees to give Tenant written notice (which written notice may be made by facsimile for the purposes of this Section 18.1) of any such failure to make a required monetary payment (a "Required Payment") when due one (1) time in any twelve (12) month period.  Upon receipt of said notice, Tenant shall deliver via bona fide overnight carrier the Required Payment to Landlord within three (3) business days. Notwithstanding the foregoing, if Tenant shall fail to:  (i)  deliver the Required Payment in three (3) business days, or (ii) pay any Monthly Base Rent, Additional Rent or other sum of money payable under this Lease after the same is due hereunder and any applicable grace period has expired a second time in any twelve (12) month period, then notwithstanding the fact that such previous failures to make a Required Payment may have been cured by Tenant, any further failure to make a Required Payment after the same is due and any applicable grace period has expired shall be deemed an event of default without notice or the further ability for cure.

**18.2.**  Tenant shall abandon, desert or otherwise vacate all or any substantial portion of the Premises.

**18.3.**  Tenant shall fail to comply with any term, provision or covenant of this Lease,  other than the payment to Landlord of Monthly Base Rent, Additional Rent and/or other monetary payments or reimbursements or other defaults for which a different cure period is set forth in this Section 18 and shall not cure such failure within thirty (30) days written notice thereof to Tenant.

**18.4.**  Reserved.

**18.5.**  Tenant shall become insolvent or shall make a transfer in fraud of creditors or shall make an assignment for the benefit of creditors.

**18.6.**  Tenant shall file a petition or have an involuntary petition filed against it under any section or chapter of the United States Bankruptcy Code, as amended or under any similar law or statute of the United States or any State thereof or Tenant shall be adjudged bankrupt or insolvent in any such proceedings filed against Tenant.

**18.7.**  A receiver or trustee shall be appointed for all or substantially all of the assets of Tenant.

**18.8.**  Tenant shall do or permit to be done anything which creates a lien upon the Premises.

**18.9.**  The business operated by Tenant shall be closed or otherwise caused to cease operations for failure to pay any applicable State or Federal tax as required, or shall be closed or cease to operate for any other reason.

## SECTION 19
## REMEDIES

Upon the occurrence of any of such events of default described in Section 18 of this Lease, Landlord shall have the option to pursue any one or more of the following remedies without any notice or demand whatsoever:

**19.1.  Termination of Lease.**  Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which it may have for possession or arrearages in Monthly Base Rent or Additional Rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying such Premises or any part thereof, without being liable for prosecution or any claim of damages therefor; and Tenant agrees to pay to Landlord on demand the amount of all loss and damage which Landlord may suffer by reason of such termination, whether resulting from Landlord's inability to relet the Premises on satisfactory terms, any reasonable costs incurred to upfit, modify, repair and/or relet the Premises, or otherwise.

**19.2  Termination of Possession.**  Without terminating the Lease or releasing Tenant in whole or in part, from any obligation, including without limitation, Tenant's obligation to pay Monthly Base Rent and Additional Rent, Landlord may terminate Tenant's right to possession by entering upon and taking possession of the Premises and expelling or removing Tenant and any other person(s) who may be occupying such Premises or any part thereof, without being liable for prosecution or any claim for damages therefor.  Landlord may relet the Premises and receive the rent therefor; and Tenant agrees to pay to Landlord on demand any deficiency that may arise by any reason of such reletting, together with all reasonable costs incurred by Landlord to upfit, modify or repair the Premises for reletting.  In the event Landlord is successful in reletting the Premises at a rent in excess of that agreed to be paid by Tenant pursuant to the terms of this Lease, Landlord and Tenant each mutually agree that Tenant shall not be entitled, under any circumstances, to such excess rent, and Tenant does hereby specifically waive any claim to such excess rent.

**19.3.  Performance of Tenant's Obligations.**  Enter upon the Premises without being liable for prosecution or any claim for damages therefor, and do whatever Tenant is obligated to do under the terms of this Lease; and Tenant agrees to reimburse Landlord, on demand, for any reasonable expenses which Landlord may incur in this effecting compliance with Tenant's obligations under this Lease, and Tenant further agrees that Landlord shall not be liable for any damages resulting to Tenant from such action, whether caused by the negligence of Landlord or otherwise.

**19.4.  Miscellaneous Provisions.**  Pursuit of any remedies defined in this Lease shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any payment or performance due to Landlord or Tenant hereunder or of any damages accruing to Landlord or Tenant by reason of the violation of any of the terms, provisions and covenants herein contained.  No act or thing done by the Landlord or its agents during the Term shall be deemed an acceptance of the surrender of the Premises, and no agreement to terminate this Lease or accept a surrender of the Premises shall be valid unless in writing signed by Landlord and Tenant.  No waiver by Landlord or Tenant of any violation or breach of any of the terms, provisions and covenants herein contained shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions and covenants herein contained.  Landlord's acceptance of the payment of Monthly Base Rent, Additional Rent or other payments hereunder after the occurrence of any event of default shall not be construed as a waiver of such default, unless Landlord so notifies Tenant in writing.  Forbearance by Landlord or Tenant to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of such default or of Landlord's or Tenant's right to enforce any such remedies with respect to such default or any subsequent default.   In any action at law or in equity between the parties hereto occasioned by a default hereunder, the prevailing party shall be entitled to collect its reasonable attorneys' fees and third-party costs actually incurred in the action from the non-prevailing party.  As used herein, the term "prevailing party" shall mean the party who receives substantially the relief sought.  Landlord acknowledges that it shall comply with a commercially reasonable duty to mitigate damages that would otherwise arise in the event of a Tenant default; provided, however, that in no event shall Landlord be required to place the reletting of the Premises higher in priority than the leasing of the remainder of Landlord's portfolio of available space and shall retain the right at all times to reject potential tenants whose financial status or anticipated use of the Premises are not approved by Landlord in its sole discretion.

<div align="center">

**SECTION 20**
**RESERVED**

**SECTION 21**
**MECHANIC'S LIENS AND OTHER TAXES**

</div>

Tenant shall have no authority, express or implied, to create or place any lien or encumbrance of any kind or nature whatsoever upon the Premises or the Project, or in any manner to bind the interests of Landlord in the Premises or the Project or to charge the rents payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs, and each such claim shall affect and each such lien shall attach to, if at all, only the leasehold interest granted to Tenant by this instrument.  Tenant covenants and agrees that it will pay or cause to be paid all sums due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises on which any lien is or can be validly and legally asserted against its leasehold interest in the Premises or the improvements thereon and that it will save and hold Landlord harmless from any and all loss, cost or expense based on or arising out of asserted claims or liens against the leasehold estate or against the right, title and interest of the Landlord in the Premises or under the terms of this Lease.  Tenant agrees to give Landlord immediate written notice if any lien or encumbrance is placed on the Premises.

<div align="center">

**SECTION 22**

</div>

## ASSIGNMENT AND SUBLETTING

**22.1.  Landlord's Consent.**  Tenant shall not, voluntarily, by operation of law, or otherwise, assign, transfer, mortgage, pledge or encumber this Lease, or sublease the Premises or any part thereof, or allow any person other than Tenant, its employees, agents, patrons and invitees to occupy or use the Premises or any portion thereof, without the express written consent of Landlord, such consent not to be unreasonably withheld, and any attempt to do any of the foregoing without such written consent shall be null and void and shall constitute an event of default under this Lease.  Landlord's consent to any assignment or sublease hereunder does not constitute a waiver of its right to consent to any further assignment or sublease.

**22.2.  Consent Process.**  If Tenant desires to assign this Lease or sublet the Premises or any part thereof, Tenant shall give Landlord written notice of such desire at least thirty (30) days in advance of the date on which Tenant desires to make such assignment or sublease, together with a non-refundable fee of One Thousand Dollars ($1,000.00) (the "Transfer Fee").  Landlord shall then have a period of fifteen (15) days following receipt of such notice within which to notify Tenant in writing that Landlord elects (a) to terminate this Lease as to the space so affected as of the date so specified by Tenant, in which event Tenant shall be relieved of all further obligations hereunder as to such space, (b) to permit Tenant to assign this Lease or sublet such space (provided, however, if the monthly rent agreed upon between Tenant and subtenant is greater than the Monthly Base Rent due from Tenant hereunder, any such excess shall be deemed Additional Rent owed by Tenant and payable to Landlord) or (c) to refuse to consent to Tenant's assignment or sublease of such space and to continue this Lease in full force and effect as to the entire Premises.  If Landlord shall fail to notify Tenant in writing of such election within the fifteen (15) day period, Landlord shall be deemed to have elected option (c) above.

**22.3.  Tenant Liability.**  Tenant agrees to use Landlord's standard assignment or sublease forms and to pay Landlord's actual attorney fees associated with Landlord's review and documentation of any requested assignment or sublease hereunder regardless of whether Landlord consents to any such assignment or sublease.  No assignment or sublease by Tenant shall relieve Tenant of any obligations under this Lease, and Tenant shall remain primarily liable for the payment of all amounts due and for the performance of all obligations of Tenant under this Lease.  Any transfer of this Lease by merger, consolidation or liquidation or any change in a majority of the voting rights or other controlling rights or interests of Tenant shall be deemed an assignment for the purposes of this Lease.

## SECTION 23
## SALE, ASSIGNMENT OR TRANSFER OF LANDLORD'S INTEREST

Landlord may freely sell, assign and transfer its rights under this Lease or its interest in the Project and/or Premises.  In the event of the sale, assignment or transfer by Landlord of its interest in the Project and/or Premises or of its rights in this Lease (other than a collateral assignment to secure debt) to an assignee or successor in interest who shall expressly assume the obligations of Landlord hereunder, said purchaser or assignee shall become the Landlord under this Lease and Landlord shall be released from all of its covenants, liabilities and obligations under this Lease, except such obligations which have accrued prior to any such sale, assignment or transfer, and Tenant agrees to look solely to such assignee or successor in interest of Landlord for performance of such obligations.

## SECTION 24

## QUIET ENJOYMENT

Landlord represents and warrants that it has full right and authority to enter into this Lease and that Tenant, upon paying the Monthly Base Rent, Additional Rent and other payments herein set forth and performing its other covenants and agreements herein set forth, shall peaceably and quietly have, hold and enjoy the Premises for the Term without hindrance or molestation from Landlord, subject to the terms and provisions of this Lease.

## SECTION 25
## LANDLORD'S RIGHT TO RELOCATE TENANT

Landlord shall have the right, at its option, upon at least thirty (30) days prior written notice to Tenant, to relocate Tenant and to substitute for the Premises other space in the Project or in the immediate vicinity of where the Project is located, containing a comparable SF area to the Premises. Such substituted space shall be improved by Landlord, at its expense, with improvements comparable in quantity and quality to those in the Premises. Landlord shall reimburse Tenant for all reasonable expenses incurred with and caused by such relocation (including, without limitation, telephone installation, moving of equipment and furniture, IT server room equipment, customer-specific circuits, and printing of stationery with Tenant's new address) within sixty (60) days following receipt from Tenant of invoices or receipts marked "paid in full". In no event shall Landlord be liable to Tenant for any consequential damages as a result of any such relocation, including, but not limited to, loss of business income or opportunity. Prior to Tenant's occupancy of the replacement premises, Landlord and Tenant shall amend this Lease to change the description of the Premises and any other matters affected by such change.

## SECTION 26
## LIMITATION OF LANDLORD'S LIABILITY

Tenant agrees that it will look solely to the estate of Landlord in the land and buildings comprising the Premises and the rent, issues and profits arising therefrom for the collection of any judgment (or any other judicial process requiring the payment of money by Landlord) in the event of any default or breach by Landlord of any terms or provisions of this Lease. No other property or assets of Landlord shall be subject to levy, execution or other procedures for the satisfaction of Tenant's remedies.

## SECTION 27
## SUBORDINATIONS AND ESTOPPELS

**27.1. Subordination and Attornment.** Tenant accepts this Lease subject and subordinate to any mortgages and/or deeds of trust now or at any time hereafter constituting a lien or charge upon the Premises or the improvements situated thereon, provided, however, that if the mortgagee, trustee, or holder of any such mortgage or deed of trust elects to have Tenant's interest in this Lease superior to any such instrument, then by notice to Tenant from such mortgagee, trustee or holder, this Lease shall be deemed superior to such lien, whether this Lease was executed before or after said mortgage or deed of trust. In the event of the foreclosure of any such mortgage by voluntary agreement or otherwise, or the commencement of any judicial action seeking such foreclosure, Tenant, at the request of the then Landlord, shall attorn to and recognize such mortgagee or purchaser in foreclosure as Tenant's Landlord under this Lease. Upon the request of Landlord, Tenant agrees to execute any instruments, releases, subordinations or other documents which may be required by any mortgagee for the purpose of subjecting

and subordinating this Lease to the lien of any such mortgage.  Tenant also agrees to execute a commercially reasonable subordination non-disturbance and attornment agreement with Landlord's lender(s) if requested by Landlord.

**27.2.  Estoppel Certificate.**  Tenant agrees that within ten (10) days after request of Landlord, it will deliver to Landlord or Landlord's designee, an estoppel certificate stating that this Lease is in full force and effect, the date to which rent has been paid, the unexpired Term and such other matters pertaining to this Lease as may be requested by Landlord.  It is understood and agreed that Tenant's obligation to furnish such estoppel certificates in a timely fashion is a material inducement for Landlord's execution of this Lease.

<div align="center">

**SECTION 28**
**MISCELLANEOUS PROVISIONS**

</div>

**28.1.  Notices.**  Any notice or document required or permitted to be delivered hereunder shall be deemed to be delivered (i) if and when personally delivered or (ii) on the day (not including Saturdays, Sundays, or federal holidays) after such notice is deposited with Federal Express or a comparable bona fide overnight courier, for delivery on the next business day with all postage and/or charges paid by sender, addressed to the parties hereto at the respective addresses set out on the Face Page of this Lease, or at such other address as the parties may specify by written notice delivered in accordance herewith.

<div align="center">

**ALL PAYMENTS SHALL BE DELIVERED TO THE ADDRESS SET FORTH IN THE FACE PAGE OF THIS LEASE.**

</div>

**28.2.  Processing and Review Fees.**  In the event Tenant requests Landlord to process, review and/or execute any third party documents, including, but not limited to, lien waivers, telecommunication access agreements, or other service provider agreements, then Tenant shall submit such documentation to Landlord with the payment of an administrative fee of One Thousand Dollars ($1,000.00).  Tenant agrees to pay as Additional Rent all reasonable legal costs and professional costs incurred by Landlord in connection with Landlord's review of such documents (not to exceed $2,500.00).  The fees set forth in this Section 28.2 shall not be applicable with respect to Landlord's review and approval of space plan(s) and construction specifications set forth in Exhibit B to this Lease.

**28.3.  Survival.**  All obligations of Tenant hereunder not fully performed as of the expiration or earlier termination of this Lease shall survive the expiration or earlier termination hereof, including without limitation all obligations with respect to Additional Rent payments and any other payments due Landlord hereunder and all obligations concerning the condition of the Premises.

**28.4.  Captions.**  Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires.  The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way affect the interpretation of this Lease.

**28.5.  Enforceability.**  If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws effective during the Term, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby.

**28.6. Authority.** Each party agrees to furnish to the other, promptly upon demand, a resolution, proof of due authorization by partners, or other appropriate documentation evidencing the due authorization of such party to enter into this Lease.

**28.7. Lease Amendment.** Any amendment or agreement of this Lease shall be ineffective to change, waive, amend, modify, supplement, discharge or terminate this Lease in whole or in part unless such amendment or agreement is in writing and signed by Landlord and Tenant.

**28.8. Time is of the Essence.** Time is of the essence with regard to all of the terms, covenants and conditions of this Lease.

**28.9. Governing Law.** This Lease and the rights of parties hereunder shall be construed and enforced in accordance with the laws and judicial decisions of the State of North Carolina.

**28.10. Tenant Financials.** Upon written request by Landlord, but in no event more often than once per calendar year, Tenant shall provide to Landlord annual financial statements. Such financial statements shall include at a minimum, a balance sheet, an income statement, a statement of cash flows and any necessary notes concerning both the current year-to-date operating results and comparative operating results for the previous two (2) years. Tenant shall certify that said financials are materially correct and accurate. Landlord's failure to maintain the confidentiality of Tenant's financial information shall constitute a breach of this Lease. Notwithstanding the foregoing, Landlord shall have the right to disclose Tenant's financial information to its employees, its legal counsel, lender (or proposed lender), equity investors (or proposed equity investors), any purchaser (or potential purchaser) of the Building, and professional counselors or consultants, provided the receiving party is notified of the confidential nature of such disclosures.

**28.11. Entire Agreement.** This Lease, including the Face Page and all exhibits and attachments hereto contains the entire agreement between Landlord and Tenant concerning the Premises, and there are no other agreements, either oral or written, regarding the lease of the Premises by Tenant (any prior agreements being merged into this Lease). Neither Landlord nor any agent of Landlord has made any representations, warranties or promises with respect to the Premises, the Project or the existence or use of any amenities or facilities, except as expressly set forth in this Lease.

**28.12. Brokers.** Tenant represents that, except for Cushman & Wakefield|Thalhimer, as Landlord's broker, Tenant has not dealt with any real estate broker, salesperson, or finder in connection with this Lease, and no such person initiated or participated in the negotiation of this Lease or showed the Premises to Tenant. Tenant agrees to indemnify, defend and hold harmless Landlord from and against any and all liabilities, claims, commissions, fees and other costs (including without limitation reasonable attorney fees) arising out of a breach of the foregoing representation. Landlord shall only be responsible for the payment of commissions to the broker, if any, specified in this Section 28.12, if Landlord has entered into a separate written agreement with such broker, and then only as provided in such agreement. Tenant shall not be responsible for the payment of commissions to the broker, if any, specified in this Section 28.12.

**28.13. Successors and Assigns.** The terms, provisions and covenants and conditions contained in this Lease shall apply to, inure to the benefit of, and be binding upon the Landlord and Tenant and upon their

respective heirs, legal representatives, successors and permitted assigns, except as otherwise expressly provided in this Lease.

**28.14. Incorporation of Face Page and Exhibits.**  The Face Page, the Premises set forth in Exhibit "A", the Improvements set forth in Exhibit "B", the Special Provisions set forth in Exhibit "C", the Rules and Regulations set forth in Exhibit "D", and the Memorandum set forth in Exhibit "E".

*THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK*

**IN WITNESS WHEREOF**, each party hereto has executed this Lease under seal, acknowledging and signifying its authority to enter into this Lease, by its duly authorized officer, manager, or representative, in two or more counterparts on the day and year first written above.

LANDLORD:      Beacon Ventures LLC, a North Carolina limited liability company

            By:    Beacon #7 LLC, a North Carolina limited liability company, Manager

                By: _____
                Gregg E. Sandreuter, Manager


TENANT:        Storeworks Technologies, Limited, a Minnesota corporation

         By: _____
      Name: _____
       Title: _____

**IN WITNESS WHEREOF,** each party hereto has executed this Lease under seal, acknowledging and signifying its authority to enter into this Lease, by its duly authorized officer, manager, or representative, in two or more counterparts on the day and year first written above.

LANDLORD:         Beacon Ventures LLC, a North Carolina limited liability company

                  By:    Beacon #7 LLC, a North Carolina limited liability company, Manager

                                By: _____
                                Gregg E. Sandreuter, Manager

TENANT:           Storeworks Technologies, Limited, a Minnesota corporation

          By:     _____
          Name:   ANIL KONKIMALLA
          Title:  Chief officer

**EXHIBIT A**
**PREMISES**

The Premises (deemed to be 6,722 SF) located at 11635 Northpark Drive, Suite 360 is indicated by the area outlined below.



**EXHIBIT B**
**IMPROVEMENTS**

Landlord shall deliver and Tenant shall accept the Premises in its 'as-is' condition, with no improvements whatsoever to be constructed by Landlord.  However, Landlord shall provide to Tenant a construction allowance not to exceed Sixty-Five Thousand and no/100 Dollars ($65,000.00) (the "Construction Allowance").  The Construction Allowance shall be used to construct improvements to the Premises (the "Improvements") in accordance with the space plan and construction specifications to be prepared by Tenant and approved in writing by Tenant and Landlord (which, when taken together, shall be referred to as the "Plans"); provided, however, that any unused allowance may, at Tenant's option, be applied as a credit to Monthly Base Rent as the same becomes due and payable, taken as a cash allowance, used to pay for space evaluation and design and preparation of construction documents, moving costs, or for the purchase and installation of furniture, fixtures, and equipment.  Such election on unpaid Construction Allowance shall be made on or before June 30,  2015, or any unpaid Construction Allowance as of such date shall be deemed forfeited by Tenant.  The Plans, once they have been mutually approved by Landlord and Tenant, shall not be revised or altered without the consent and approval of both parties, which shall not be unreasonably withheld or delayed.

Landlord shall remit the Construction Allowance to Tenant after the later of (i) November 1, 2014, and (ii) ten (10) days after the satisfactory completion of the following, as reasonably determined by Landlord: 1) substantial completion of the Improvements, 2) Tenant's submission to Landlord of invoice(s) for at least the amount of the Construction Allowance, and 3) a final lien waiver from Tenant's approved contractor and any applicable subcontractors who worked on the Improvements.

Tenant may make, with Landlord's written approval, modifications to the Plans.  However, should any such modifications change the cost to design or construct the Improvements, Tenant shall pay to Landlord on demand as Additional Rent the amount of such change in cost plus ten percent (10%).

## EXHIBIT C

## SPECIAL PROVISIONS

The following terms and provisions are incorporated into this Lease.  Where these Special Provisions conflict with any provision in the body of the Lease, these Special Provisions shall govern.

1.      MONTHLY BASE RENT ESCALATIONS:  Monthly Base Rent, as described in this Lease, shall increase periodically and be due and payable during the Term  in accordance with the following schedule.

| Months Following Commencement Date | Annual Base Rent PSF | Annual Base Rent | Monthly Base Rent |
|---|---|---|---|
| June 1, 2014 – February 29, 2016 | $22.00 | $147,884.04 ($246,473.40 for the 20 month period) | $12,323.67 |
| March 1, 2016- February 28, 2017 | $22.75 | $152,925.48 | $12,743.79 |
| March 1, 2017- February 28, 2018 | $23.50 | $157,967.04 | $13,163.92 |
| March 1, 2018- February 28, 2019 | $24.00 | $161,328.00 | $13,444.00 |

2.      EXISTING LEASE:  Notwithstanding anything to the contrary contained in this Lease, Tenant acknowledges that there is an existing tenant in the Premises (the "Existing Tenant").  Landlord is in negotiations with the Existing Tenant to terminate its lease with respect to the Premises pursuant to a termination agreement acceptable to Landlord, which termination agreement contains provisions for the release and waiver of claims against Existing Tenant.  Notwithstanding anything to the contrary contained herein, Landlord may terminate this Lease without liability or damages to any party by written notice to Tenant if Landlord does not reach an agreement with Existing Tenant with respect to the termination of Existing Tenant's lease with respect to the Premises or if Tenant does not thereafter vacate the Premises by May 31, 2014.

3.      OPERATING EXPENSE EXCLUSIONS:  Operating Expenses shall not include the following:
  A.  wages, salaries or fringe benefits paid to any employees above the grade of building manager, or where employees devote time to properties other than the building of which the Premises is a part, the portion properly allocated to such other properties;
  B.  leasehold improvements made for a specific tenant which improvements are not generally beneficial to all tenants in the Project;
  C.  costs incurred in connection with the making of repairs or replacements which are the obligation of another tenant or occupant of the Project;
  D.  brokerage fees or commissions;
  E.  financing and refinancing costs in respect of any mortgage or security interest placed upon the Project or any portion thereof, including payments of principal, interest, finance or other charges, and any points and commissions in connection therewith;
  F.  costs (including, without limitation, attorneys' fee' and disbursements) incurred in connection with any judgment, settlement or arbitration award resulting from any tort liability;

G.  rent or other charges payable under any ground or underlying lease;

H.  costs of any item which are reimbursed to Landlord by other tenants or third parties, or which are properly chargeable or attributable to a particular tenant or particular tenants;

I.  costs incurred in connection with Landlord's preparation, negotiation, dispute resolution and/or enforcement of leases, including court costs and attorneys' fees and disbursements in connection with any summary proceeding to dispossess any tenant, or incurred in connection with disputes with prospective tenants, employees, consultants, management agents, leasing agents, purchasers or mortgagees;

J.  costs of any additions to or expansions of the Project;

K.  costs of repairs, restoration or replacements occasioned by fire or other casualty covered by the insurance set forth in Section 14.1 of this Lease or caused by the exercise of the right of eminent domain;

L.  any costs in the nature of fees, fines or penalties arising out of Landlord's breach of any obligation (contractual or at law and including, without limitation, costs, fines, interest, penalties and costs of litigation incurred as a result of late payment of taxes and/or utility bills), including attorney's fees related thereto;

M.  depreciation or amortization;

N.  amounts paid to subsidiaries or affiliates of Landlord for services rendered to the Project to the extent such amounts exceed the competitive costs for delivery of such services were they not provided by such related parties;

O.  advertising expenses; and

P.  bad debt or rent loss.

4.    PENDING TRANSACTION.  Notwithstanding anything to the contrary contained in this Lease, Landlord acknowledges that (i) the Existing Tenant has entered into an asset purchase agreement to sell substantially all of its assets to Tenant, and (ii) that such sale has not yet closed.  Tenant is in negotiations with the Existing Tenant to finalize and satisfy several remaining closing conditions.  Accordingly, notwithstanding anything to the contrary contained herein, Tenant may terminate this Lease without liability or damages to any party by written notice to Landlord if Tenant does not close its asset purchase with Existing Tenant on or before May 31, 2014.  If Landlord does not receive Tenant's written notice on or before May 31, 2014, this Lease shall be deemed to be in full force and effect and Tenant shall have no further right to terminate pursuant to this Section 4, and Tenant shall upon Landlord's request acknowledge the same in writing no later than June 3, 2014.

5.    CONDITION OF PREMISES. Landlord acknowledges that the current occupant of the Premises has experienced issues with water leaking through the ceiling into the Premises, and Landlord will remediate all such issues before August 1,2014.

6.    MEMORANDUM OF LEASE:  Landlord and Tenant shall execute a short form memorandum of lease ("Memorandum"), in substantially the form of Exhibit "E", and Tenant may record such executed Memorandum. Tenant shall pay the costs and expenses of recordation.  In the event of an early termination of this Lease, including, without limitation, pursuant to Section 2 or Section 4 of this Exhibit C, Tenant shall promptly execute a termination of the Memorandum in commercially reasonable on request of Landlord, and Landlord, at Landlord's sole cost and expense, may record such termination (such obligation to survive the termination of the Lease).

7.      UNDERGROUND PARKING: Landlord shall provide Tenant, throughout the Term, with two (2) underground parking space so long as Tenant leases at least six thousand seven hundred twenty-two (6,722 rentable square feet) SF of Premises for use on an unreserved, non-exclusive basis in common with other Tenants of the Project in the underground parking deck serving the Project but subject to Landlord's rules and regulations governing such underground parking deck.

8.      USE OF SERVER ROOM:  The Existing Tenant currently utilizes a server room located outside of the Premises (located in Suite 320 of the Building) (the "Server Room").  Landlord hereby consents to Tenant's continued temporary use of the Server Room under the same terms and conditions of this Lease applicable to the Premises other than the payment of Rent (which shall be in the amount set forth below) and except as otherwise provided in this Section 8.  Tenant shall not be required to pay any Rent for its use of the Server Room for the month of June 2014.  After June 2014, in lieu of other Rent under this Lease, Tenant shall pay Landlord rent for the Server Room monthly, in advance, at such time as other Rent for the applicable month is due in an amount equal to Two Thousand and no/100 Dollars for the month of July 2014, and Four Thousand Seven Hundred Twenty and no/100 Dollars ($4,720.00) per month for each month or partial month thereafter that Tenant continues occupancy of the Server Room.  Tenant shall give Landlord at least fourteen (14) days written notice of its vacation of the Server Room and shall surrender the Server Room to Landlord in the condition otherwise required for the surrender of the Premises. Tenant shall have no right to reoccupy the Server Room following any such vacation.  Notwithstanding anything to the contrary contained herein, Landlord may terminate Tenant's occupancy of the Server at any time after July 31, 2014, by giving Tenant at least fourteen (14) days' notice of such termination, in which Tenant shall surrender the Server Room to Landlord in the condition otherwise required for the surrender of the Premises by the date given in Landlord's notice and Tenant shall have no further right to occupy the Server Room.  Notwithstanding anything to the contrary contained herein, the Server Room may only be used for the location and operation of servers associated with Tenant's operations in the Premises.

# EXHIBIT D
## RULES & REGULATIONS

Landlord shall control and operate the common areas, and the facilities furnished for the common use of tenants in such manner as Landlord deems best for the benefit of the tenants generally.  Adherence to the rules and regulations listed below will aid in each tenant's full use and enjoyment of the common areas.

A.    The common areas of the property shall not be obstructed by Tenant or used for any purpose other than ingress and egress to and from Tenant's Premises.  No tenant shall permit the visit to its Premises of persons in such number or under such conditions to interfere with the use by other tenants of the common areas.

B.    Outside storage of any kind is strictly prohibited without Landlord's written consent.

C.    Tenant, its servants, agents, invitees, employees and/or licensees shall only park on or utilize parking and loading areas directly related to such Tenant's premises.  No parking space shall be designated reserved or marked for special use without Landlord's written consent. Tenant shall not park in a manner which would block or restrict the access of other tenants to their leased premises.

D.    Tenant will not inscribe, affix or otherwise display signs, advertisements or notices in, on, or behind any windows, walls, doors, partitions or other part of the exterior of the property without prior written consent of Landlord.  Any sign of a temporary nature will not be permitted.

E.    Tenant will not attach or place awnings, antennas, satellites or other projections on the outside walls or any exterior portion of the property without prior written consent of Landlord.

F.    No curtains, blinds, shades or screens will be attached to, hung in or used in connection with any window or door of the Premises unless previously approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.

G.    Tenant shall not receive, store or otherwise handle any product, material or merchandise which is explosive or highly flammable without prior written consent of Landlord.

H.    Tenant shall not permit nor take any action that would constitute a nuisance or would disturb or endanger any other tenants of the property or unreasonably interfere with their use of their respective premises.

I.    The plumbing facilities will not be used for any purpose other than that for which they are constructed, and no foreign substance of any kind will be disposed into them.  The cost and expense of any breakage, stoppage, damage or excessive usage resulting from a violation of this provision by Tenant, its employees, agents or invitees will be borne by Tenant.

J.    Tenant agrees that the point pressure resulting from Tenant's racking system, inventory, forklifts and/or equipment shall not exceed allowable design floor loading for the floor slabs in the Premises.

K.    Tenant will not permit the Premises to be used for any purpose or in any manner that would render the insurance thereon void or the insurance risk more hazardous.

L.     Tenant shall comply with all governmental laws, ordinances and regulations applicable to the operation of its business in the Premises and to the use of the Premises and shall promptly comply with all governmental orders and directives for the correction, prevention and abatement of nuisances in or upon, or connected with, the Premises, all at Tenant's sole cost and expense.

M.     Tenant shall not allow smoking in the Premises or elsewhere in the Project.  Smoking is allowed in designated areas outside of the Project only.  Landlord reserves the right to relocate smoking areas from time to time.

N.     Tenant shall comply with Landlord's standard move-out policy upon vacating the Premises.

O.     If Tenant uses its own architect at any time (original build out or Alterations), Tenant must submit CAD drawings of the 'as builts' to Landlord within 30 days of completion of work.

**EXHIBIT E**
**MEMORANDUM OF LEASE**

Prepared by and return to:
Kilpatrick Townsend & Stockton LLP (JCL), 1408 Six Forks Road, Suite 1400, Raleigh, NC 27609

STATE OF NORTH CAROLINA

                                        MEMORANDUM OF LEASE

COUNTY OF WAKE

THIS MEMORANDUM OF LEASE ("Memorandum") is of that certain unrecorded Office Lease Agreement dated _____, 2014, including all Exhibits attached thereto ("Lease"), by and between Beacon Ventures LLC, a North Carolina limited liability company ("Landlord") and Storeworks Technologies, Limited, a Minnesota corporation ("Tenant").

**W I T N E S S E T H:**

Pursuant to and subject to the terms and conditions set forth in the Lease, Landlord has leased to Tenant the demised premises known as Suite 360 (as more particularly described in the Lease, the "Premises," as the same may be expanded or contracted from time to time) of that building located at 11635 Northpark Drive, Wake Forest, Wake County, North Carolina, on that parcel of land more particularly described on Exhibit A incorporated herein by reference for a term beginning on June 1, 2014, and continuing until February 28, 2019, unless sooner terminated in accordance with the terms of the Lease.

This Memorandum is not a complete summary of the Lease, and the provisions contained herein shall not be construed to modify or amend the terms thereof.  In the event of a conflict between this Memorandum and the Lease, said Lease shall control.  Upon the expiration of the stated Lease term, this Memorandum shall automatically terminate.

**(Signature pages follow)**

IN WITNESS WHEREOF, Tenant has executed this Memorandum as of the _____ day of
_____, 2014.

**TENANT:**

Storeworks   Technologies,   Limited,   a   Minnesota
corporation

By:
Name:
Title:

STATE OF _____
COUNTY OF _____

I certify that the following person(s) personally appeared before me this day, each
acknowledging to me that s/he signed the foregoing document in the capacity indicated:
_____, as _____ of Storeworks Technologies, Limited.

Date: _____, 201__.

_____
Notary Public

_____
Notary Printed Name

_____
My Commission Expires

(Official Seal)

IN WITNESS WHEREOF, Landlord has executed this Memorandum as of the _____ day of _____, 201__.

**LANDLORD:**

Beacon Ventures LLC, a North Carolina limited liability company

By:    Beacon #7 LLC, a North Carolina limited liability company, Manager

By:    _____
Gregg E. Sandreuter, Manager

STATE OF _____
COUNTY OF _____

I certify that the following person(s) personally appeared before me this day, each acknowledging to me that s/he signed the foregoing document in the capacity indicated: _____, as manager of Beacon Ventures LLC.

Date: _____, 201__.

_____
Notary Public

_____
Notary Printed Name

_____
My Commission Expires

(Official Seal)

# EXHIBIT A

## Legal Description

The Property herein referred to is situated in Wake County, State of North Carolina and is described as:

**Tract I:**

BEING all of Lot 1 of North Park Subdivision containing 3.549 acres as shown on that plat recorded in Book of Maps 1996, page 1319, Wake County Registry.

## Shetty, Susan M.

| | |
|---|---|
| **From:** | Anil Konkimalla <anilk@storeworks.com> |
| **Sent:** | Thursday, July 11, 2019 11:33 AM |
| **To:** | Bushnell, Sarah E. |
| **Subject:** | FW: Xenia Outstanding Invoices - Rent and Late Fees |
| **Attachments:** | Xenia Inv#NC-2019-01-29 (Feb'19 Rent) dtd 1.29.19.pdf; Xenia Inv#NC-2018-12-18 (Jan'19 Rent) dtd 12.18.18.pdf; Xenia Inv#NC-2018-12-28 (Late Fees) dtd 12.28.18.pdf; Xenia Inv#NC-2019-03-04 (Late Fees) dtd 3.4.19.pdf |

**From:** Anil Konkimalla
**Sent:** Tuesday, May 28, 2019 2:54 PM
**To:** Troy Stelzer <Troy.Stelzer@xeniaretail.com>; Paul Harris <Paul.Harris@xeniaretail.com>
**Subject:** FW: Xenia Outstanding Invoices - Rent and Late Fees

Any update guys? This amount is way past due.

Anil

**From:** Anil Konkimalla
**Sent:** Tuesday, March 05, 2019 8:32 PM
**To:** 'Troy Stelzer' <Troy.Stelzer@xeniaretail.com>; Paul Harris <Paul.Harris@xeniaretail.com>
**Subject:** Xenia Outstanding Invoices - Rent and Late Fees

Troy, Paul,

Please find enclosed attachments:

- Past Due Rent Invoice (January)
- Past Due Rent Invoice (February)
- Late Fee invoice (Oct-Nov-Dec)
- Late Fee Invoice (Jan – Feb)

TOTAL BALANCE DUE $30,249.00

Thank you in advance for giving this matter your immediate attention.

Anil

If you do not recognize this email or feel it is suspicious please click on the following link Submit Spam

EXHIBIT
3



# StoreWorks Technologies Limited

7300 Washington Avenue S.
Eden Prairie, MN  55344

Ph: 952-698-4600

**INVOICE #: NC-2013-01-29**

**INVOICE DATE: 1/29/2019**

**Due Date: 1/21/2019**

## BILL TO

**Xenia Retail, Inc.**
**7760 France Avenue South, Suite 1112**
**Bloomington, MN  55435**

**Attention: Troy Stelzer**

## FOR

**Office Lease**
**Monthly Rent**

| Details | AMOUNT |
|---|---|
| Monthly Base Rent - February 2019 | $13,444.00 |
| Per Sublease Agreement Article 3 | |

| | |
|---|---|
| SUBTOTAL | $13,444.00 |
| TAX at 0%: | $0.00 |
| Late Fee: | $0.00 |
| TOTAL | $13,444.00 |

**Make all checks payable to:**
***"StoreWorks Technologies Limited" AND "CCP Raleigh-Durham, LLC"***

**THANK YOU FOR YOUR PROMPT PAYMENT !**



# StoreWorks Technologies Limited

7300 Washington Avenue S.
Eden Prairie, MN  55344

Ph: 952-698-4600

**INVOICE #: NC-2018-12-18**

**INVOICE DATE: 12/18/2018**

**Due Date: 12/21/2018**

## BILL TO

**Xenia Retail, Inc.**
**7760 France Avenue South, Suite 1112**
**Bloomington, MN  55435**

**Attention: Troy Stelzer**

## FOR

**Office Lease**
**Monthly Rent**

| Details | AMOUNT |
|---|---|
| Monthly Base Rent - January 2019 | $13,444.00 |
| Per Sublease Agreement Article 3 | |

| | |
|---|---|
| SUBTOTAL | $13,444.00 |
| TAX at 0%: | $0.00 |
| Late Fee: | $0.00 |
| TOTAL | $13,444.00 |

**Make all checks payable to:**
***"StoreWorks Technologies Limited" AND "CCP Raleigh-Durham, LLC"***

**THANK YOU FOR YOUR PROMPT PAYMENT !**



# StoreWorks Technologies Limited

7300 Washington Avenue S.
Eden Prairie, MN  55344

Ph: 952-698-4600

**INVOICE #: NC-2018-12-28**

**INVOICE DATE: 12/28/2018**

**Due Date: 12/21/2018**

## BILL TO

**Xenia Retail, Inc.**
**7760 France Avenue South, Suite 1112**
**Bloomington, MN  55435**

**Attention: Troy Stelzer**

## FOR

**Office Lease**
**Late Fees of Monthly Rent**

| Details | AMOUNT |
|---|---|
| Late Fee - October 2018 | $672.20 |
| Late Fee - November 2018 | $672.20 |
| Late Fee - December 2018 | $672.20 |
| | |
| SUBTOTAL | $2,016.60 |
| TAX at 0%: | $0.00 |
| TOTAL | $2,016.60 |

**Make all checks payable to:**
***"StoreWorks Technologies Limited" AND "CCP Raleigh-Durham, LLC"***

**THANK YOU FOR YOUR PROMPT PAYMENT !**



# StoreWorks Technologies Limited

7300 Washington Avenue S.
Eden Prairie, MN  55344

Ph: 952-698-4600

**INVOICE #: NC-2019-03-04**

**INVOICE DATE: 3/4/19**

**Due Date: 03/04/2019**

## BILL TO

**Xenia Retail, Inc.**
**7760 France Avenue South, Suite 1112**
**Bloomington, MN  55435**

**Attention: Troy Stelzer**

## FOR

**Office Lease**
**Late Fees of Monthly Rent**

| Details | AMOUNT |
|---|---|
| Late Fee - January 2019 | $672.20 |
| Late Fee - February 2019 | $672.20 |
| | |
| SUBTOTAL | $1,344.40 |
| TAX at 0%: | $0.00 |
| TOTAL | $1,344.40 |

**Make all checks payable to:**
*"StoreWorks Technologies Limited" AND "CCP Raleigh-Durham, LLC"*

**THANK YOU FOR YOUR PROMPT PAYMENT !**

# **EXHIBIT G**

# REDEMPTION AND ACQUISITION AGREEMENT

This Redemption and Acquisition Agreement ("**Agreement**") is made as of the 25th day of August, 2017 ("**Effective Date**"), by and among:

STOREWORKS TECHNOLOGIES LIMITED ("**Corporation**"), a Minnesota corporation with a principal address of 7300 Washington Ave S., Eden Prairie, MN 55344, including the affiliated hardware and software division and building affiliated entities), StoreWorks Technologies Canada Limited ("**Hardware Affiliate**") and ATA Development, LLC ("**ATA**") (collectively "**StoreWorks**"), and StoreWorks Technologies (India) Private Limited and StoreWorks SNT-IP, LLC (each a "**Software Affiliate**" and collectively the "**Xenia**"),

TROY STELZER ("**Stelzer**"), a Minnesota resident, and

ANDREW TEITSCHEID ("**Teitscheid**"), a Minnesota resident, and

ANIL KONKIMALLA ("**Konkimalla**"), a Minnesota resident,

(collectively Stelzer, Teitscheid and Konkimalla constitute the Corporation's "**Shareholders**" and the joint owners of ATA).

## RECITALS

**WHEREAS**, in Stelzer, Teitscheid and Konkimalla are the sole Shareholders of the Corporation;

**WHEREAS**, the Corporation is the sole owner of the Hardware Affiliate and StoreWorks SNT-IP, LLC, and the Corporation is the majority owner holding seventy percent (70%) of the ownership interests of StoreWorks Technologies (India) Private Limited with Raghuveer Kamisetty holding the other thirty percent (30%);

**WHEREAS**, Stelzer, Teitscheid and Konkimalla have been working through managerial disputes for the past two years;

**WHEREAS**, Konkimalla brought suit against Stelzer and Teitscheid on September 9, 2016 (the "Konkimalla Lawsuit");

**WHEREAS**, Stelzer has asked to acquire Xenia in exchange for his Shares/Interests in StoreWorks and the additional consideration noted herein, and that the Konkimalla Lawsuit be withdrawn;

**WHEREAS**, each of Teitscheid and Konkimalla agree to such acquisition of the Stelzer Shares/Interests in StoreWorks in exchange for Xenia based on the terms and conditions hereinafter set forth in this Agreement.

**NOW, THEREFORE**, based upon the foregoing recitals and the mutual covenants contained herein, transfer of the interests of Xenia, and for other good and valuable consideration the receipt and sufficiency of which is acknowledged, by the Corporation, the Hardware

4819-0843-9117

EXHIBIT

A

Affiliate, each Software Affiliate, ATA, Stelzer, Teitscheid and Konkimalla, it is hereby agreed as follows:

1. <u>Definitions</u>. For purposes of this Agreement, the following terms have the meaning set forth next to them.

    1.1. "<u>Applicable Law</u>" shall mean all national, state, provincial, local or municipal laws, statutes, codes, acts, treaties, ordinances, orders, judgments, writs, decrees, injunctions, rules, regulations, governmental approvals, licenses, permits, directives, and requirements of all regulatory and other Governmental Authorities.

    1.2. "<u>Closing Date</u>" shall mean the date last signed by all parties.

    1.3. "<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended.

    1.4. "<u>Entity</u>" means any corporation, partnership, limited liability company, association, firm, joint stock company, trust, joint venture, unincorporated organization, Governmental Body or any other legal entity.

    1.5. "<u>Interests</u>" shall mean a member's interests in any of the Hardware Affiliate, a Software Affiliate and/or ATA.

    1.6. "<u>Governmental Authority</u>" shall mean any: (a) national, state, county, municipal or local government (whether domestic or foreign) or any political sub-division thereof; (b) court or administrative tribunal; (c) other governmental, quasi-governmental, judicial, public or statutory instrumentality, authority, body, agency, bureau or entity of competent jurisdiction; or (d) arbitrator with authority to bind a party at law.

    1.7. "<u>Lien</u>" shall mean any mortgage, deed of trust, lien (choate or inchoate), pledge, charge, security interest, assessment, reservation, assignment, hypothecation, license, defect in title, encroachments and other burdens, restrictive covenant, condition or restriction or easement or encumbrance of any kind, whether arising in contract or under any Applicable Law and whether or not filed, recorded or otherwise perfected or effective under any Applicable Law, or any preference, priority or preferential arrangement of any kind or nature whatsoever, including without limitation, the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement, and any subordination arrangement in favor of any Person or any Third Party right.

    1.8. "<u>Member</u>" shall mean each of Stelzer, Teitscheid and/or Konkimalla with respect to ATA; or the Corporation with respect to the Hardware Affiliate and Software Affiliates; or Raghuveer Kamisetty with respect to StoreWorks Technologies (India) Private Limited.

    1.9. "<u>Permits</u>" shall mean all permits, licenses, approvals, consents, orders, registrations, privileges, franchises, memberships, certificates, entitlements, and other authorizations issued by Governmental Authorities, including environmental, health and safety permits, certificates of occupancy, and all amendments, modifications, supplements, general conditions and addenda thereto.

1.10.   "Person" shall mean any natural person or Entity, whether acting in an individual, fiduciary or other capacity.

1.11.   "Seller" shall mean Stelzer as to his Shares of the Corporation, his Interests in ATA, or shall mean the Corporation with respect to its membership Interests in each of the Software Affiliates.

1.12.   "Shares" shall mean a Shareholder's shares in the Corporation.

1.13.   "Shareholder" shall mean each of Stelzer, Teitscheid and Konkimalla with respect to the Corporation.

1.14.   "Tax" or "Taxes" shall mean any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative, minimum, estimated, or other tax or other governmental charge of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

1.15.   "Tax Return" shall mean any return, report, statement, claim for refund, information return or other document (including any amendments thereto and any related or supporting information) filed or required to be filed with any Governmental Authority in connection with the determination, assessment, collection or administration of Taxes or the administration of any Applicable Law relating to Taxes.

1.16.   "Third Party" means any Person other than a Party or its Affiliates

2.  Basic Transaction.

2.1.   Redemption of Stelzer's Shares/Interests in StoreWorks. Subject to the terms and conditions of this Agreement, Stelzer shall sell, assign, transfer, convey and deliver to StoreWorks all of Seller's Shares in the Corporation and all of Seller's Interests in ATA. Stelzer shall transfer and deliver the Shares to Corporation at Closing by way of a stock power transfer form ("Stock Power") endorsed in a manner acceptable to Corporation as more fully set forth in **Exhibit 2.1a** attached hereto and incorporated herein by this reference. Stelzer shall transfer and deliver the Interests to ATA at Closing by way of an Interests Transfer endorsed in a manner acceptable to ATA as more fully set forth in **Exhibit 2.1b** attached hereto and incorporated herein by this reference.

2.2.   Transfer of the Corporation's Interests in Xenia. Subject to the terms and conditions of this Agreement, the Corporation shall sell, assign, transfer, convey and deliver to Xenia all of its Interests in each of the Software Affiliates. The Corporation shall transfer and deliver the Interests to each Software Affiliate at Closing by way of an interests transfer form ("Interests Transfer") endorsed in a manner acceptable to each Software Affiliate as more fully set forth in **Exhibit 2.2a** and **Exhibit 2.2b** attached hereto and incorporated herein by this reference.

- 3 -

2.3. <u>Consideration</u>. The consideration for the Seller's Shares and Interests shall include:

- The transfer of the Corporation's Interests in each Software Affiliate;

- The transfer of all right, title and interest in and to Xenia's intellectual property, including without limitation the assumed name Xenia and all software and technology developed by Xenia;

- A release from each of the Corporation, the Hardware Affiliate, ATA, Teitscheid and Konkimalla from any liability for which Stelzer may have been liable as an owner, shareholder, officer, director or employee, other than those acts which may not be released by Applicable Law;

- The payment by the Corporation of 2016 tax liability associated with the Shareholder's loans;

- The Corporation will indemnify Stelzer for Stelzer's legal fees related to the Konkimalla Lawsuit by payment directly to the Anthony & Ostlund firm;

- The Corporation shall transfer to Seller the [lease and/or vehicle loan] for the corporate vehicle (i.e. Jeep) used by Stelzer, as well as the Corporation's interest in the same;

- The Corporation shall confirm in writing that the prior $70,000 loan from Stelzer to the Corporation will be classified as a capital contribution;

- The Corporation shall pay the salaries for Stelzer, John Demgen, Dana Randeau, William Stephens, and Doug Schaff, and the contractor obligations for Katherine Ehresmann through September 30, 2017;

- The Corporation has made the payroll payment scheduled for August 15, 2017; and

- The Corporation shall release from any non-solicitation restriction for Xenia and/or Stelzer to hire or contract with John Demgen, Dana Randeau, William Stephens, Doug Schaff, and/or Katherine Ehresmann.

2.4. <u>Releases</u>. StoreWorks and Teitscheid and Konkimalla, shall release Stelzer from any and all claims that StoreWorks and Teitscheid and/or Konkimalla may have against Stelzer as a result of or arising out of Stelzer's acts or omissions as a shareholder/member, officer/manager, director and/or employee of the Corporation, the Hardware Affiliate, and/or ATA. Each Software Affiliate and Stelzer shall release the Corporation, Teitscheid and/or Konkimalla from any and all claims that each of the Software Affiliates and/or Stelzer may have against the Corporation, Teitscheid and/or Konkimalla.  The releases specified above shall be more fully set forth in the applicable release under **Exhibit 2.4a**, **Exhibit 2.4b**, **Exhibit 2.4c** attached hereto and incorporated herein by this reference.

4819-0843-9117

2.5.    <u>Tax Matters</u>. The parties hereto shall cooperate with each other with respect to any Tax related matters related to the redemption of Seller's Shares and Interests, including as to Tax Returns and any tax audits, appeals, claims or litigation with respect to such Tax Returns, or the preparation of such Tax Returns. In connection therewith, the parties shall make available to each other such files, documents, books and records for inspection and copying as may be reasonably requested and shall cooperate with respect to retaining information and documents which relate to such Tax matters.

2.6.    <u>Closing</u>. The closing of the redemption of the Seller's Shares and/or Interests contemplated under this Agreement will occur upon the execution of this Agreement and other documents associated with the consideration (the **"Closing"**).

2.7.    <u>StoreWorks' Deliveries at Closing</u>. StoreWorks will make the following deliveries at Closing: (i) release(s) as specified in Section 2.4; (ii) the Corporation's corporate certificate and attached resolutions of the Corporation, the Hardware Affiliate, ATA, and respective Shareholders and/or Members authorizing the redemption of Seller's Shares and Interests pursuant to the terms of this Agreement; and (iii) an Interest Transfer for the Corporation's Interests in each Software Affiliate.

2.8.    <u>Teitscheid's Deliveries at Closing</u>. Teitscheid will deliver at Closing: (i) the Teitscheid release as specified in Section 2.4.

2.9.    <u>Konkimalla's Deliveries at Closing</u>. Konkimalla will deliver at Closing the Konkimalla release as specified in Section 2.4.

2.10.   <u>Software Affiliate's Deliveries at Closing</u>. Each of the Software Affiliates will make the following delivery at Closing: (i) release(s) as specified in Section 2.4 for the Corporation, Teitscheid and Konkimalla for the Interests in each Software Affiliate; (ii) Consent of StoreWorks Technologies (India) Private Limited's other Members authorizing the transfer of the Corporation's Interests to Stelzer.

2.11.   <u>Stelzer's Deliveries at Closing</u>. Stelzer will deliver at Closing: (i) the Stock Power for Stelzer's Shares in the Corporation; (ii) the Interest Transfer for Stelzer's Interests in ATA; (iii) Stelzer's release as specified in Section 2.4; and (iv) a letter resigning from any employment, board or officer positions held with the Corporation and ATA.

2.12.   <u>Allocation</u>. The value of the Shares and Interests redeemed by each of the Corporation and ATA respectively from Stelzer is considered a like kind exchange equivalent to the value of the Corporation's 70% interest in StoreWorks Technologies (India) Private Limited and 100% interest in StoreWorks SNT-IP, LLC.

2.13.   <u>Other Agreements</u>. To the extent that any provision of this Agreement is inconsistent with or in conflict with a provision of another existing agreement between the parties, including, but not limited, a shareholder agreement or buy/sell agreement, the parties hereto agree that the terms of this Agreement govern and explicitly waive the inconsistent or conflicting term(s) in the other agreement(s).

4819-0843-9117

3. <u>Representations and Warranties of Xenia and/or Stelzer</u>. Xenia and/or Stelzer, as applicable, hereby represents and warrants to the StoreWorks, Teitscheid and Konkimalla that the statements contained in this Section 3 are correct and complete as of the Closing Date.

3.1.   <u>Authorization of Transaction</u>. Stelzer is the sole owner of record of Stelzer's Shares in the Corporation and Stelzer's Interests in ATA, and Stelzer has all right, title and interest necessary and legal capacity to authorize the sale of and sell Stelzer's Shares and Interests to the Corporation and ATA respectively. This Agreement has been duly authorized by all necessary action on the part of Stelzer, and it has been duly and validly executed and delivered by Stelzer. This Agreement constitutes the valid and legally binding obligations of Stelzer, enforceable in accordance with its terms and conditions.

3.2.   <u>Non-contravention</u>. Neither the execution nor the delivery of this Agreement, the Stock Power, the Interest Transfer, the releases nor the consummation of the transactions contemplated under this Agreement will violate any Applicable Law to which Xenia and/or Stelzer is subject.

3.3.   <u>Title to Shares/Interests</u>. Stelzer has the absolute right, power and capacity to sell, assign, transfer and convey Stelzer's Shares to the Corporation free and clear of any encumbrances. Stelzer has the absolute right, power and capacity to sell, assign, transfer and convey Stelzer's Interests to ATA free and clear of any encumbrances. Stelzer will cooperate with StoreWorks, as necessary, for any notice or modification to any StoreWorks' contract, mortgage, loan, lease or other corporate obligation as may be reasonably requested by StoreWorks on or after the Closing Date related to the redemption of Stelzer's Shares and/or Interests.

3.4.   <u>Declarations</u>. Stelzer has submitted all expense reimbursements for expenses incurred through the Effective Date to StoreWorks as of the Closing Date. Stelzer has reviewed and agrees with the StoreWorks balance sheet assessed as part of the redemption of his Shares/Interests attached hereto as **Exhibit 3.4**. Stelzer represents and warrants that other than the transaction contemplated under this Agreement, Stelzer has no direct or indirect knowledge of an offer for, pending sale of, or investor interest in or to Xenia and/or Xenia assets to any third party.

3.5.   <u>Consents</u>. Stelzer, as the majority owner of Xenia, will ensure that each of the Software Affiliates approves the transactions anticipated in this Agreement, including the express consent of Raghuveer Kamisetty, a 30% owner of StoreWorks Technologies (India) Private Limited, in the form of the Consent attached hereto as **Exhibit 3.5a**. Stelzer will ensure that Xenia acquires the express consent of the former SNT owners, David Hawkins, Amy Byers, Paul Leung, Larry Gibbs and Rathin Devchoudhury, that StoreWorks is released and Xenia assumes any remaining payment obligation to them as of the Closing Date, in the form of the Consent and Release attached hereto as **Exhibit 3.5b**. Xenia acknowledges that StoreWorks will be terminating the current Wake Forest lease as of the end of the current lease period (February 2018) and will require Xenia to enter into a sublease agreement as required by the landlord. Xenia acknowledges and agrees that it shall, if necessary, indemnify and release StoreWorks from any liability under the Lease as of the Closing Date.

3.6.  <u>Assumption of Liability/Obligations</u>.  Xenia alone will assume all liability for any Xenia related long-term debt, the note payable to the former SNT owners specified above, any royalty obligations, any expenses, equipment and/or office leases for each Software Affiliate, all accounts payables and any trade payables, and all other company liabilities for each Software Affiliate as of the Effective Date.  Xenia will assume the obligation for all payroll obligations of Xenia employees and/or contractors as of the Effective Date.  For the avoidance of doubt, Xenia will assume liability for any sales commissions related to Xenia employees which are not payable as of August 25, 2017.

3.7.  <u>Non-Solicitation Restrictive Covenants</u>.  Xenia and Stelzer each represents and warrant that it/he shall not directly or indirectly recruit or hire, or attempt to recruit or hire, or assist in the recruitment or hire of, or attempt to induce to leave the employ of StoreWorks any employee or contractor of StoreWorks for three (3) years after the Closing Date. Notwithstanding anything herein to the contrary, Xenia and/or Stelzer shall be free to hire the following StoreWorks employees and/or contractors working with Xenia: John Demgen, Dana Randeau, William Stephens, Doug Schaff, and Katherine Ehresmann. Such employees and/or contractors shall be free to accept employment with Xenia and/or Stelzer.

3.8.  <u>Non-Compete Restrictive Covenants</u>. Xenia and/or Stelzer shall not directly or indirectly, as an affiliate, contracting party, employee, contractor, consultant, agent, principal, proprietor, partner, corporate officer, stockholder, board member, director, or in any other individual or representative capacity, engage or attempt to engage in any hardware sales or leases competitive to the hardware business of StoreWorks for three (3) years after the Closing Date.

4.  <u>Representations and Warranties of StoreWorks, Teitscheid and/or Konkimalla</u>.  StoreWorks represents and warrants that the statements contained in this Section 4 are correct and complete as of the Closing Date.

4.1.  <u>Authorization of Transaction</u>.  Each of the Corporation and ATA has the legal right, power and authority to authorize the purchase of Seller's Shares/Interests contemplated in this Agreement.  This Agreement has been duly authorized by all necessary action on the part of the Corporation, and it has been duly and validly executed and delivered by the Corporation. This Agreement and the ancillary documents to which StoreWorks is a party constitute valid and legally binding obligations of StoreWorks, enforceable in accordance with their respective terms and conditions.  StoreWorks will execute a Corporate Certificate in the form of **Exhibit 4.1** attached hereto and incorporated herein by this reference. The Corporation represents that: (i) it is the sole owner of record of its Interests in each of the Software Affiliates; (ii) it has all right, title and interest necessary and legal capacity to authorize the sale of and sell its Interests to Xenia respectively; (iii) this Agreement has been duly authorized by all necessary action on its part; (iv) it has been duly and validly executed and delivered by it; and (v) this Agreement constitutes its valid and legally binding obligation, enforceable in accordance with its terms and conditions.

4819-0843-9117

4.2.   <u>Non-contravention</u>.   The execution and the delivery of this Agreement and the consummation of the transactions contemplated hereby will not (i) conflict with, or result in any breach of any material terms, conditions or provisions of, or constitute a default under, or result in the imposition of any Lien upon any assets or property of StoreWorks pursuant to any Applicable Law, or any contract to which StoreWorks is now a party or by which its properties, assets or rights may be bound or affected, (b) violate any provision of any Applicable Law to which StoreWorks is subject, or (c) require any Permit.

4.3.   <u>Title to Shares/Interests</u>. The Corporation each has the absolute right, power and capacity to sell, assign, transfer and convey its Interests to each of the Software Affiliates free and clear of any encumbrances. The Corporation each will cooperate with Xenia, as necessary, for any notice or modification to any Xenia contract, mortgage, loan, lease or other corporate obligation as may be reasonably requested by Xenia on or after the Closing Date related to the redemption of its Interests.

4.4.   <u>Consents</u>. Teitscheid and Konkimalla each will ensure that each of the StoreWorks Entities approves the transactions anticipated in this Agreement. StoreWorks will use commercially reasonable good faith efforts to acquire waiver or releases of any personal guaranty of Stelzer from any mortgage holder, lender or vendor creditor of StoreWorks. StoreWorks and/or ATA will indemnify, defend and hold Stelzer harmless from any claims, judgments or losses associated with any Stelzer personal guaranty signed for the benefit of either StoreWorks or ATA.

4.5.   <u>Withdrawal of Claim</u>. Konkimalla shall withdraw the Konkimalla Lawsuit within five (5) business days of the Closing Date.

4.6. <u>Non-Solicitation Restrictive Covenants</u>.   The Corporation and Konkimalla each represents and warrant that it/he shall not directly or indirectly recruit or hire, or attempt to recruit or hire, or assist in the recruitment or hire of, or attempt to induce to leave the employ of Xenia any employee or contractor of Xenia for three (3) years after the Closing Date. This restriction applies to, but is not limited to, the following individuals: Chandrasekhar Vulli, Naresh Chandragiri, Siva Prasad Varma Kantham, Samanth Moturu, Naveen Kumar BV, Madhavi Addanki, Suresh Kumar Danda, Nagendra Kumar, Raj Raavi, Rajkumar Endrala, Dande Srihari, Sasi Pochimreddy, Srinivas Rao Neppali, Jagadishwar Raju, Muhammad Idriss, Syed Mohammad, Mallick Sudhasindhu, Ramesh Namqsani, Prasanth Bommala, AVS Nataraj, Pramod Gorantla, Raghuveer Kamisetty, Kiran Karasala.

5.   <u>Indemnification</u>. It is StoreWorks' and Xenia's, Stelzer's, Teitscheid's and Konkimalla's respective and mutual intent to indemnify and holds the other parties harmless from and against any and all liability, cost and expense for federal, state or local taxes of any kind incurred by any of the foregoing parties which may be due and owing, or are alleged to be due and owing, as a result of any unintended and unequitable tax consequence as a result of the redemption and acquisition transaction under this Agreement which any of the foregoing parties may incur in handling, settling or litigating any claims or alleged claims for any taxes arising out of or in connection with the transaction contemplated by the redemption and acquisition. For the avoidance of doubt, Xenia will assume any Xenia related tax liability and

- 8 -

4819-0843-9117

StoreWorks will assume any StoreWorks related tax liability as of the Closing Date. In addition, the Corporation agrees to reimburse the Stelzer for legal costs associated with attorney's fees as specified in Section 2.3.

6.  Closing Conditions.

    6.1.  Conditions to Obligation of StoreWorks, Teitscheid and Konkimalla. The obligation of StoreWorks, Teitscheid and Konkimalla to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

        6.1.1. The representations and warranties set forth in Section 3 will be true and correct in all material respects at and as of the Closing;

        6.1.2. Xenia and/or Stelzer will have performed and complied with all of its/his covenants in all material respects through the Closing; and

        6.1.3. Xenia and/or Stelzer will have delivered such other documents and instruments as are reasonably necessary or appropriate to effect the consummation of the contemplated transactions or that may be required under any Applicable Law to which it/he is subject or any agreements to which Xenia/Stelzer is a party.

    6.2.  Conditions to Obligation of Xenia and Stelzer. The obligation of Xenia and Stelzer to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

        6.2.1. The representations and warranties set forth in Section 4 above will be true and correct in all material respects at and as of the Closing;

        6.2.2. StoreWorks, Teitscheid and/or Konkimalla will have performed and complied with all of its covenants in all material respects through the Closing;

        6.2.3. StoreWorks, Teitscheid and/or Konkimalla will have procured any consents necessary to redeem Stelzer's Shares/Interests;

        6.2.4. StoreWorks will have delivered other documents and instruments as are reasonably necessary or appropriate to effect the consummation of the contemplated transactions or that may be required under any Applicable Law to which StoreWorks; and

        6.2.5. There will not have occurred a material adverse change in the Corporation, operations, financial condition, assets, liabilities or prospects, individually or collectively as of the Closing Date.

    6.3.  Waiver. A party may waive an obligation owed to it by another party under this Section 6 by executing a written statement of such waiver before or at the Closing.

4819-0843-9117

7. Miscellaneous.

7.1.    No Third-Party Beneficiaries. The parties agree that there are no third-party beneficiaries to this Agreement.

7.2.    Counterparts and Facsimile Signatures. This Agreement may be executed in one or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument, and by facsimile.

7.3.    Notices. Any notice, request, demand, claim or other communication under this Agreement must be in writing and is duly delivered when delivered by hand or sent by overnight courier and properly addressed to the intended recipient as set forth below.

7.4.    Governing Law; Consent to Jurisdiction. This Agreement is made under and is to be governed by and construed in accordance with the laws of the State of Minnesota without regard to its conflicts of laws principles. Each of the parties consents to venue of any suit or action arising out of, under, in connection with or in relation to this Agreement in any state or federal court sitting in Hennepin County, Minnesota.

7.5.    Amendments and Waivers. No amendment of any provision of this Agreement is valid unless it is in writing and signed by the parties. No waiver by any party of any default, misrepresentation or breach of warranty or covenant under this Agreement, whether intentional or not, extends to any prior or subsequent default, misrepresentation or breach of warranty or covenant under this Agreement.

7.6.    Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions of this Agreement or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

7.7.    Entire Agreement/Assignment. This Agreement and any documents, certificates or other instruments delivered pursuant to this Agreement constitute the entire agreement by and among the parties and supersede any prior understandings, agreements or representations by or among the parties, written or oral, to the extent they related in any way to the subject matter of this Agreement. This Agreement will bind and inure to the benefit of the parties hereto, their respective heirs, assigns and successors in interest. No party may assign either this Agreement or any of its or his rights, interests or obligations under this Agreement without the prior written approval of the other party except that StoreWorks and/or Xenia may assign this Agreement in connection with a sale of substantially all of its assets or stock, a merger, consolidation or similar transaction not in the ordinary course of business, provided that such assignee assumes all of its obligations hereunder.

7.8.    Survival. The warranties in this Agreement shall survive any expiration or termination of this Agreement.

[SIGNATURE PAGE TO FOLLOW]

4819-0843-9117

**IN WITNESS WHEREOF,** an authorized representative of each of the parties have signed this Agreement as of the Effective Date.

**Hardware Affiliate:**
StoreWorks Technologies Canada Limited

By: _____

Its: ____Chief officer____

Date: ____8/28/17____

**Corporation:**
StoreWorks Technologies Limited

By: _____

Its: ____Chief officer____

Date: ____8/28/17____

**Software Affiliate:**
StoreWorks SNT-IP, LLC

By: _____

Its: ____Chief officer____

Date: ____8/28/17____

**Stelzer:**
Troy Stelzer

By: _____

Date: ____28 AUG 2017____

**Software Affiliate:**
StoreWorks Technologies (India) Private Limited

By: _____

Its: ____Chief officer____

Date: ____8/28/17____

**Teitscheid:**
Andrew Teitscheid

By: _____

Date: ____8/28/17____

**ATA:**
ATA Development, LLC

By: _____

Its: ____Chief officer____

Date: ____8/28/17____

**Konkimalla:**
Anil Konkimalla

By: _____

Date: ____8/28/17____

- 11 -

4819-0843-9117

## EXHIBIT 2.1a
## STOCK POWER
### (ASSIGNMENT SEPARATE FROM CERTIFICATE)

FOR VALUE RECEIVED, Troy Stelzer, hereby assigns and transfers unto StoreWorks Technologies, Limited a Minnesota corporation (the "Corporation"), 2,500 shares of common stock of the Corporation (Certificate No. 01) standing in his name on the books of the Corporation, and irrevocably constitutes and appoints the Corporation to transfer said shares on the Corporation's books with full power of substitution in the premises.

Dated as of August 28, 2017                    By: _____
                                                        Troy Stelzer

- 12 -

4819-0843-9117

## EXHIBIT 2.1b
### INTEREST TRANSFER

FOR VALUE RECEIVED, Troy Stelzer, hereby assigns and transfers unto ATA Development, LLC a Minnesota limited liability company ("ATA"), his 33.33% of membership units of ATA standing in his name on the books of the company, and irrevocably constitutes and appoints ATA to transfer said interests on the company's books with full power of substitution in the premises.

Dated as of August 28, 2017            By: _____
                                             Troy Stelzer

- 13 -

4819-0843-9117

## EXHIBIT 2.2a
### INTEREST TRANSFER

FOR VALUE RECEIVED, StoreWorks Technologies Limited, hereby assigns and transfers unto Troy Stelzer, its seventy percent (70%) of membership Interests in StoreWorks Technologies (India) Private Limited standing in its name on the books of the company, and irrevocably constitutes and appoints StoreWorks Technologies (India) Private Limited to transfer said Interests on the company's books with full power of substitution in the premises.

Dated as of August 28, 2017              By: _____

                                         Anil Konkimalla
                                         Its:   Chief Officer

4819-0843-9117

## EXHIBIT 2.2b
## INTEREST TRANSFER

FOR VALUE RECEIVED, StoreWorks Technologies Limited, hereby assigns and transfers unto Troy Stelzer, its one hundred percent (100%) of membership Interests in StoreWorks SNT-IP, LLC standing in its name on the books of the company, and irrevocably constitutes and appoints StoreWorks SNT-IP, LLC to transfer said Interests on the company's books with full power of substitution in the premises.

Dated as of August 28, 2017         By: _____
                                          Anil Konkimalla
                                     Its:   Chief Officer

- 15 -

4819-0843-9117

## EXHIBIT 2.4a
## STELZER RELEASE

FOR VALUE RECEIVED, StoreWorks Technologies Limited, a Minnesota corporation, its hardware affiliate, StoreWorks Technologies Canada Limited, a Canadian corporation and ATA Development, LLC, a Minnesota limited liability company, each for itself, and on behalf of its respective present and former shareholders, officers, directors, including Andrew Teitscheid and Anil Konkimalla, representatives, employees, predecessors, successors, parent, subsidiary and sibling corporations and entities, affiliates, agents, attorneys, and assigns (collectively the "StoreWorks Releasors"), do hereby completely and generally release, remise, acquit, and forever discharge Troy Stelzer, and his agents, attorneys, and assigns (collectively, the "Stelzer Releasees"), of and from any and all past, present, and future claims, demands, obligations, actions, causes of action, rights, damages, expenses, and requests for compensation or reimbursement, payment, or relief of any nature whatsoever, whether based on breach of implied or express warranty, fraud, constructive fraud, failure to disclose, tort, contract, negligent misrepresentation, negligence, statute, or any other theory of recovery, and whether for actual, compensatory, consequential, statutory, attorneys' fees, or punitive damages or any other relief or remedy, whether known or unknown, whether suspected or unsuspected, whether liquidated or unliquidated, whether mature or unmatured, whether direct, indirect or derivative, whether fixed or contingent, and whether secured or unsecured, which any StoreWorks Releasor for, upon, or by reason, directly or indirectly, ever jointly or individually had, now has or have, or hereafter can, shall, or may have against the Stelzer Releasees, or any of them, that have been or could have been asserted as a claim or defense in the Konkimalla Lawsuit, or that arise out of or are related in any way to Troy Stelzer's ownership of StoreWorks shares; provided, however, that nothing contained in the Redemption and Acquisition Agreement and/or this Stelzer Release shall be construed to constitute a waiver, release, or covenant not to sue regarding or otherwise limit any Party's rights and obligations under the Redemption and Acquisition Agreement and/or this Stelzer Release.

StoreWorks Technologies Limited

By: _____
     Anil Konkimalla
Its:   Chief Officer

Date: ___8|28|17___

ATA Development, LLC

By: _____
     Anil Konkimalla
Its:  Manager

Date: ___8|28|17___

StoreWorks Technologies Canada Limited

By: _____
     Anil Konkimalla
Its:   Manager

Date: ___8|28|17___

ACKNOWLEDGED BY: Andrew Teitscheid

By: _____

Date: ___8/28/17___

- 16 -

4819-0843-9117

## EXHIBIT 2.4b
## TEITSCHEID RELEASE

FOR VALUE RECEIVED, StoreWorks Technologies (India) Private Limited, an India company and StoreWorks SNT-IP, LLC, a Minnesota limited liability company, each for itself, and on behalf of its respective present and former members, shareholders, managers, officers, directors, including Troy Stelzer and Raghuveer Kamisetty as a 30% owner of StoreWorks Technologies (India) Private Limited, representatives, employees, predecessors, successors, parent, subsidiary and sibling corporations and entities, affiliates, agents, attorneys, and assigns (collectively the "Xenia Releasors"), do hereby completely and generally release, remise, acquit, and forever discharge Andrew Teitscheid, and his agents, attorneys, and assigns (collectively, the "Teitscheid Releasees"), of and from any and all past, present, and future claims, demands, obligations, actions, causes of action, rights, damages, expenses, and requests for compensation or reimbursement, payment, or relief of any nature whatsoever, whether based on breach of implied or express warranty, fraud, constructive fraud, failure to disclose, tort, contract, negligent misrepresentation, negligence, statute, or any other theory of recovery, and whether for actual, compensatory, consequential, statutory, attorneys' fees, or punitive damages or any other relief or remedy, whether known or unknown, whether suspected or unsuspected, whether liquidated or unliquidated, whether mature or unmatured, whether direct, indirect or derivative, whether fixed or contingent, and whether secured or unsecured, which any Xenia Releasor for, upon, or by reason, directly or indirectly, ever jointly or individually had, now has or have, or hereafter can, shall, or may have against the Teitscheid Releasees, or any of them, that have been or could have been asserted as a claim or defense in the Konkimalla Lawsuit, or that arise out of or are related in any way to Andrew Teitscheid's ownership interests in StoreWorks Technologies (India) Private Limited or StoreWorks SNT-IP, LLC; provided, however, that nothing contained in the Redemption and Acquisition Agreement and/or this Teitscheid Release shall be construed to constitute a waiver, release, or covenant not to sue regarding or otherwise limit any Party's rights and obligations under the Redemption and Acquisition Agreement and/or this Teitscheid Release.

StoreWorks Technologies (India)          StoreWorks SNT-IP, LLC
   Private Limited

By: _____          By: _____
      Anil Konkimalla                          Anil Konkimalla
Its:   Manager                          Its:   Manager

Date: ____8/28/17____                   Date: ____8/28/17____

ATA Development, LLC                     ACKNOWLEDGED BY: Troy Stelzer

By: _____          By: _____
      Anil Konkimalla
Its:   Manager

Date: ____8/28/17____                   Date: __26 AUGUST 2017__

- 17 -

**EXHIBIT 2.4c**
**KONKIMALLA RELEASE**

FOR VALUE RECEIVED, StoreWorks Technologies (India) Private Limited, an India company and StoreWorks SNT-IP, LLC, a Minnesota limited liability company, each for itself, and on behalf of its respective present and former members, shareholders, managers, officers, directors, including Troy Stelzer and Raghuveer Kamisetty as a 30% owner of StoreWorks Technologies (India) Private Limited, representatives, employees, predecessors, successors, parent, subsidiary and sibling corporations and entities, affiliates, agents, attorneys, and assigns (collectively the "Xenia Releasors"), do hereby completely and generally release, remise, acquit, and forever discharge Anil Konkimalla, and his agents, attorneys, and assigns (collectively, the "Konkimalla Releasees"), of and from any and all past, present, and future claims, demands, obligations, actions, causes of action, rights, damages, expenses, and requests for compensation or reimbursement, payment, or relief of any nature whatsoever, whether based on breach of implied or express warranty, fraud, constructive fraud, failure to disclose, tort, contract, negligent misrepresentation, negligence, statute, or any other theory of recovery, and whether for actual, compensatory, consequential, statutory, attorneys' fees, or punitive damages or any other relief or remedy, whether known or unknown, whether suspected or unsuspected, whether liquidated or unliquidated, whether mature or unmatured, whether direct, indirect or derivative, whether fixed or contingent, and whether secured or unsecured, which any Xenia Releasor for, upon, or by reason, directly or indirectly, ever jointly or individually had, now has or have, or hereafter can, shall, or may have against the Konkimalla Releasees, or any of them, that have been or could have been asserted as a claim or defense in the Konkimalla Lawsuit, or that arise out of or are related in any way to Anil Konkimalla's ownership interests in StoreWorks Technologies (India) Private Limited or StoreWorks SNT-IP, LLC; provided, however, that nothing contained in the Redemption and Acquisition Agreement and/or this Konkimalla Release shall be construed to constitute a waiver, release, or covenant not to sue regarding or otherwise limit any Party's rights and obligations under the Redemption and Acquisition Agreement and/or this Konkimalla Release.

StoreWorks Technologies (India)            StoreWorks SNT-IP, LLC
    Private Limited

By: _____            By: _____
        Anil Konkimalla                            Anil Konkimalla
Its:    Manager                        Its:    Manager

Date: ____8/28/17_____            Date: ____8/28/17_____

ATA Development, LLC                    ACKNOWLEDGED BY: Troy Stelzer

By: _____            By: _____
        Anil Konkimalla
Its:    Manager

Date: ____8/28/17_____            Date: __28 AUGUST 2017__

- 18 -

<u>EXHIBIT 3.4</u>
STOREWORKS BALANCE SHEET

*See attached.*

4819-0843-9117

**Storeworks Technologies**
**General Ledger Trial Balance**
**As of Aug 31, 2017**

Filter Criteria includes: Report order is by ID. Report is printed in Detail Format.

| Account ID | Account Description | Debit Amt | Credit Amt | Xenia | Storeworks |
|---|---|---|---|---|---|
| 1020 | Fidelity Checking Account | 56.59 | | | 56.59 |
| 1030 | Anchor Checking Account | 153.85 | | | 153.85 |
| 1040 | Platinum Checking Account | 96,415.54 | | | 96,415.54 |
| 1060 | Wells Fargo Checking Account | 34,925.09 | | | 34,925.09 |
| 1100 | Accounts Receivable | 1,985,610.87 | | | 1,985,610.87 |
| 1200 | Inventory | 252,843.24 | | | 252,843.24 |
| 1450 | Loan to ShareholderAK | 453,958.25 | | | 453,958.25 |
| 1451 | Interest Receivable SH1 | 1,409.48 | | | 1,409.48 |
| 1460 | Loan to ShareholderAT | 283,716.84 | | | 283,716.84 |
| 1461 | Interest Receivable SH2 | 1,596.37 | | | 1,596.37 |
| 1470 | Loan to Shareholder TS | 298,669.90 | | | 298,669.90 |
| 1471 | Interest Receivable SH3 | 939.56 | | | 939.56 |
| 1472 | Interest Receivable Anil | 12,893.74 | | | 12,893.74 |
| 1475 | Loan to Storeworks Canada | 9,603.16 | | | 9,603.16 |
| 1480 | Loan to ATA | 115,000.00 | | | 115,000.00 |
| 1485 | Accrued Commissions | 1,932.40 | | | 1,932.40 |
| 1500 | Property and Equipment | 138,399.84 | | | 138,399.84 |
| 1510 | Property and Equipment - SNT | 85,290.07 | | 85,290.07 | |
| 1520 | Vehicles | 81,134.19 | | | 81,134.19 |
| 1540 | Leasehold Improvements | 78,391.19 | | | 78,391.19 |
| 1560 | Furniture and Fixtures | 121,229.97 | | | 121,229.97 |
| 1600 | SNT - IP | 806,106.61 | | 806,106.61 | - |
| 1700 | SNT India | 187,392.80 | | 187,392.80 | - |
| 1750 | Investment in Subsidiary - CAN | | 6,372.50 | | (6,372.50) |
| 1800 | Security Deposit - WF Lease | 12,323.67 | | 12,323.67 | |
| 1900 | Accum. Depreciation - Prop&Eqt | | 369,597.24 | (52,081.04) | (317,516.20) |
| 1980 | Accumulated Amortization | | 400,000.00 | (400,000.00) | - |
| 1970 | Non-Compete Agreements | 400,000.00 | | 400,000.00 | - |
| 2000 | Accounts Payable | | 3,798,332.26 | | (3,798,332.26) |
| 2015 | Accrued Expense | | 56,290.00 | | (56,290.00) |
| 2040 | Bank Line of Credit - Platinum | | 95,038.98 | | (95,038.98) |
| 2041 | Bank Line of Credit - Summit | | 1,193,116.45 | | (1,193,116.45) |
| 2580 | FSA payable | 577.96 | | | 577.96 |
| 2590 | AFLAC Payable | | 2,349.54 | | (2,349.54) |
| 2795 | Note Payable - Jeep | | 17,600.71 | (17,600.71) | - |
| 2799 | Note Payable - SNT | | 485,960.61 | (485,960.61) | - |
| 3910 | Retained Earnings | 180,747.13 | | | 180,747.13 |
| 3920 | Paid-In Capital | | 1,082,000.00 | | (1,082,000.00) |
| 3930 | Common Stock | | 10,205.00 | | (10,205.00) |
| 3950 | Stock Subscription Receivable | 841,945.24 | | | 841,945.24 |
| | Current loss | 1,032,599.72 | | | 1,032,599.72 |
| | | 7,515,863.27 | 7,515,863.27 | 535,470.79 | (535,470.79) |

| | | | | | |
|---|---|---|---|---|---|
| 4000 | Hardware Revenue | | 9,828,014.11 | | |
| 4005 | Services Revenue | | 4,076,130.59 | | |
| 4010 | SNT Software Licenses Income | | 300,000.00 | | |
| 4020 | SNT Software Srvcs Incm BBY CA | | 307,275.50 | | |
| 4023 | SNT Software Services | | 20,000.00 | | |
| 4900 | Sales Discounts | | 832,592.26 | | |
| 5000 | Cost of Hardware | 8,601,921.94 | | | |
| 5005 | Cost of Services | 2,069,096.65 | | | |
| 6000 | Wages Expense | 2,718,500.87 | | | |
| 6010 | Wages Expense - SNT | 512,723.51 | | | |
| 6020 | Commissions Expense | 2,360.26 | | | |
| 6040 | India Consulting | 556,897.00 | | | |
| 6050 | Employee Benefit Programs Exp | 193,923.12 | | | |
| 6051 | Employee Benefits - SNT | 62,823.42 | | | |
| 6100 | Payroll Tax Expense | 175,475.41 | | | |

| Account ID | Account Description | Debit Amt | Credit Amt | Xenia | Storeworks |
|---|---|---|---|---|---|
| 6101 | Payroll Tax Expense - SNT | 2,878.76 | | | |
| 6210 | Interest Expense | 62,293.93 | | | |
| 6220 | Dues & Subsciptions Expense | 18,694.40 | | | |
| 6230 | Charitable Donation | 1,750.00 | | | |
| 6240 | Bank Fees Expense | 4,891.85 | | | |
| 6245 | Summit Fees / Interest Expense | 104,443.81 | | | |
| 6250 | Other Taxes Expense | 361.23 | | | |
| 6300 | Rent or Lease Expense | 170,000.00 | | | |
| 6301 | Rent or Lease Expense - SNT | 115,824.79 | | | |
| 6350 | Maintenance & Repairs Expense | 14,670.90 | | | |
| 6351 | Maintenance & Repairs Exp-SNT | 333.25 | | | |
| 6410 | Meals & Entertainment | 61,316.88 | | | |
| 6411 | Meals & Entertainment - SNT | 307.95 | | | |
| 6425 | Marketing Expenses | 37,853.85 | | | |
| 6426 | Marketing Expenses - SNT | 34,445.35 | | | |
| 6430 | Training and Education | 48,592.15 | | | |
| 6431 | Training and Education - SNT | 10,350.00 | | | |
| 6435 | Recruiting Expense | 4,180.00 | | | |
| 6436 | Recruiting Expense - SNT | 9,160.00 | | | |
| 6440 | Shop and Warehouse Expense | 13,126.56 | | | |
| 6450 | Office Supplies Expense | 15,877.80 | | | |
| 6460 | Auto Lease Expense | 23,679.73 | | | |
| 6465 | Auto Expense | 29,478.52 | | | |
| 6470 | Mileage Expense | 177.99 | | | |
| 6500 | Telephone Expense | 44,733.18 | | | |
| 6501 | Telephone Expense - SNT | 15,447.02 | | | |
| 6550 | Other Office Expense | 44,652.45 | | | |
| 6551 | Other Office Expense - SNT | 3,450.90 | | | |
| 6650 | Postage and Freight Expense | 49,118.81 | | | |
| 6700 | Travel Expense | 132,932.04 | | | |
| 6705 | Travel Expense - SNT | 29,107.70 | | | |
| 6725 | Legal Expenses | 21,092.56 | | | |
| 6726 | Legal Expenses - SNT | 4,420.00 | | | |
| 6730 | Accounting Expenses | 7,242.80 | | | |
| 6740 | Computer / Software Expense | 103,382.77 | | | |
| 6741 | Computer / Software Exp - SNT | 11,736.02 | | | |
| 6760 | Temporary Help Expense | 183,988.73 | | | |
| 6798 | NC Taxes | 1,500.00 | | | |
| 6799 | MN Taxes | 502.20 | | | |
| 6850 | Insurance Expense | 8,893.12 | | | |
| 6900 | Depreciation Expense | 44,000.00 | | | |
| 6901 | Depreciation Expense - SNT | 10,000.00 | | | |
| | Total: | 31,426,338.72 | 30,393,739.00 | | |

EXHIBIT 3.5a
## RAGHUVEER KAMISETTY CONSENT AND RELEASE

This Consent and Release Agreement ("Kamisetty Consent") is entered into as of this 25th day of August, 2017 ("Effective Date"), by and between StoreWorks Technologies (India) Private Limited, an India limited liability company ("StoreWorks India"), StoreWorks Technologies Limited ("StoreWorks") and Raghuveer Kamisetty ("Kamisetty").

RECITALS

**WHEREAS**, StoreWorks and Kamisetty are each owners of StoreWorks India representing all issued and outstanding interests; and

**WHEREAS**, StoreWorks Technologies Limited is now entering into a Redemption and Acquisition Agreement ("Redemption Agreement") under which one of its shareholders, Troy Stelzer ("Stelzer"), is acquiring all of the interests of StoreWorks SNT-IP, LLC and StoreWorks Technologies (India) Private Limited (collectively "Xenia"), and Stelzer is selling his shares in StoreWorks Technologies Limited, and his membership interests in ATA Development, LLC to each of those entities respectively; and

**WHEREAS**, as part of the Redemption and Acquisition Agreement, Stelzer is obligated to have each Kamisetty expressly consent and release StoreWorks Technologies, Limited to sell its interests to Stelzer.

**NOW, THEREFORE**, based upon the foregoing recitals and the mutual covenants contained herein, assumption of the remaining obligations under the Redemption Agreement, and for other good and valuable consideration the receipt and sufficiency of which is acknowledged, it is hereby agreed as follows:

1.  Kamisetty Consent.  Raghuveer Kamisetty, hereby consents to the sale by StoreWorks Technologies Limited of all of its interests in StoreWorks India under the Redemption Agreement.  Raghuveer Kamisetty expressly waives any corporate requirement for a meeting, vote and/or other corporate action by StoreWorks India to approve the same.

2.  StoreWorks Waiver.  StoreWorks Technologies Limited expressly waives any corporate requirement for a meeting, vote and/or other corporate action by StoreWorks India to approve the same.

3.  Release.  Raghuveer Kamisetty hereby for himself and on behalf of his representatives, agents, attorneys, and assigns (collectively the "Kamisetty Releasors"), do hereby completely and generally release, remise, acquit, and forever discharge StoreWorks Technologies Limited and its respective present and former shareholders, officers, directors, representatives, employees, predecessors, successors, parent, subsidiary and sibling corporations and entities, affiliates, agents, attorneys, and assigns (collectively, the "StoreWorks Releasees"), of and from any and all past, present, and future claims,

demands, obligations, actions, causes of action, rights, damages, expenses, and requests for compensation or reimbursement, payment, or relief of any nature whatsoever, whether based on breach of implied or express warranty, fraud, constructive fraud, failure to disclose, tort, contract, negligent misrepresentation, negligence, statute, or any other theory of recovery, and whether for actual, compensatory, consequential, statutory, attorneys' fees, or punitive damages or any other relief or remedy, whether known or unknown, whether suspected or unsuspected, whether liquidated or unliquidated, whether mature or unmatured, whether direct, indirect or derivative, whether fixed or contingent, and whether secured or unsecured, which any Kamisetty Releasor for, upon, or by reason, directly or indirectly, ever jointly or individually had, now has or have, or hereafter can, shall, or may have against the StoreWorks Releasees, or any of them, that have been or could have been asserted as a claim, or that arise out of or are related in any way to the Redemption Agreement or this Consent and Release; provided, however, that nothing contained in the Consent and Release shall be construed to constitute a waiver, release, or covenant not to sue regarding or otherwise limit any Party's rights and obligations under this Consent and Release.

4.    General Provisions. This Consent and Release is made under and is to be governed by and construed in accordance with the laws of India. No amendment of any provision of this Consent and Release is valid unless it is in writing and signed by the parties. No waiver by any party of any default, misrepresentation or breach of warranty or covenant under this Consent and Release, whether intentional or not, extends to any prior or subsequent default, misrepresentation or breach of warranty or covenant under this Consent and Release.    Any term or provision of this Consent and Release that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions of this Consent and Release or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. This Consent and Release will bind and inure to the benefit of the parties hereto, their respective heirs, assigns and successors in interest.

IN WITNESS WHEREOF, the parties have signed this Consent and Release as of the Effective Date.

StoreWorks Technologies (India) Private
Limited StoreWorks Technologies (India) Pvt. Ltd.

By: _____    Director

Its: Director

Date: 2-8/08/2017

Raghuveer Kamisetty

By: _____

Date: 2-8/08/2017

EXHIBIT 3.5a
## SUBHADRA DEVI KAMISETTY CONSENT AND RELEASE

This Consent and Release Agreement ("Kamisetty Consent") is entered into as of this 28th day of August, 2017 ("Effective Date"), by and between StoreWorks Technologies (India) Private Limited, an India limited liability company ("StoreWorks India"), StoreWorks Technologies Limited ("StoreWorks") and Subhadra Devi Kamisetty ("Kamisetty").

### RECITALS

WHEREAS, StoreWorks and Kamisetty are each owners of StoreWorks India representing all issued and outstanding interests; and

WHEREAS, StoreWorks Technologies Limited is now entering into a Redemption and Acquisition Agreement ("Redemption Agreement") under which one of its shareholders, Troy Stelzer ("Stelzer"), is acquiring all of the interests of StoreWorks SNT-IP, LLC and StoreWorks Technologies (India) Private Limited (collectively "Xenia"), and Stelzer is selling his shares in StoreWorks Technologies Limited, and his membership interests in ATA Development, LLC to each of those entities respectively; and

WHEREAS, as part of the Redemption and Acquisition Agreement, Stelzer is obligated to have each Kamisetty expressly consent and release StoreWorks Technologies, Limited to sell its interests to Stelzer.

NOW, THEREFORE, based upon the foregoing recitals and the mutual covenants contained herein, assumption of the remaining obligations under the Redemption Agreement, and for other good and valuable consideration the receipt and sufficiency of which is acknowledged, it is hereby agreed as follows:

1.   Kamisetty Consent. Subhadra Devi Kamisetty, hereby consents to the sale by StoreWorks Technologies Limited of all of its interests in StoreWorks India under the Redemption Agreement. Subhadra Devi Kamisetty expressly waives any corporate requirement for a meeting, vote and/or other corporate action by StoreWorks India to approve the same.

2.   StoreWorks Waiver. StoreWorks Technologies Limited expressly waives any corporate requirement for a meeting, vote and/or other corporate action by StoreWorks India to approve the same.

3.   Release. Subhadra Devi Kamisetty hereby for herself and on behalf of her representatives, agents, attorneys, and assigns (collectively the "Kamisetty Releasors"), do hereby completely and generally release, remise, acquit, and forever discharge StoreWorks Technologies Limited and its respective present and former shareholders, officers, directors, representatives, employees, predecessors, successors, parent, subsidiary and sibling corporations and entities, affiliates, agents, attorneys, and assigns (collectively, the "StoreWorks Releasees"), of and from any and all past, present, and future claims,

*K. Subhadra Devi*

demands, obligations, actions, causes of action, rights, damages, expenses, and requests for compensation or reimbursement, payment, or relief of any nature whatsoever, whether based on breach of implied or express warranty, fraud, constructive fraud, failure to disclose, tort, contract, negligent misrepresentation, negligence, statute, or any other theory of recovery, and whether for actual, compensatory, consequential, statutory, attorneys' fees, or punitive damages or any other relief or remedy, whether known or unknown, whether suspected or unsuspected, whether liquidated or unliquidated, whether mature or unmatured, whether direct, indirect or derivative, whether fixed or contingent, and whether secured or unsecured, which any Kamisetty Releasor for, upon, or by reason, directly or indirectly, ever jointly or individually had, now has or have, or hereafter can, shall, or may have against the StoreWorks Releasees, or any of them, that have been or could have been asserted as a claim, or that arise out of or are related in any way to the Redemption Agreement or this Consent and Release; provided, however, that nothing contained in the Consent and Release shall be construed to constitute a waiver, release, or covenant not to sue regarding or otherwise limit any Party's rights and obligations under this Consent and Release.

4.    General Provisions. This Consent and Release is made under and is to be governed by and construed in accordance with the laws of India. No amendment of any provision of this Consent and Release is valid unless it is in writing and signed by the parties. No waiver by any party of any default, misrepresentation or breach of warranty or covenant under this Consent and Release, whether intentional or not, extends to any prior or subsequent default, misrepresentation or breach of warranty or covenant under this Consent and Release. Any term or provision of this Consent and Release that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions of this Consent and Release or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. This Consent and Release will bind and inure to the benefit of the parties hereto, their respective heirs, assigns and successors in interest.

IN WITNESS WHEREOF, the parties have signed this Consent and Release as of the Effective Date.

StoreWorks Technologies (India) Private          Subhadra Devi Kamisetty
Limited For StoreWorks Technologies (India) Pvt. Ltd.

By: _____          By: _K. Subhadra Devi_____
                    Director

Its: _Director_____

Date: _28|08|2017_____          Date: _28.08.2017_____

StoreWorks Technologies Limited

By: _____

Chief officer: _____8/28/17_____

Date: _____

Acknowledged: Troy Stelzer

By: _____

Date: _____28 AUGUST 2017_____

## EXHIBIT 3.5b
## SNT FORMER OWNER CONSENT AND RELEASE

This SNT Former Owner Consent and Release ("Consent and Release") is entered into by and between StoreWorks SNT-IP, LLC, a Minnesota limited liability company, StoreWorks Technologies, Limited, a Minnesota corporation, and Stella Nova Technologies, Inc. (as acknowledged by David Hawkins, Amy Byers, Paul Leung, Larry Gibbs and Rathin Devchoudhury, each of whom is a former owner of, each hereinafter a "SNT Shareholder") as of the date last signed below ("Effective Date").

## RECITALS

**WHEREAS**, on April 28, 2014, StoreWorks SNT-IP, LLC, a Minnesota limited liability company, StoreWorks Technologies, Limited, a Minnesota corporation, and Stella Nova Technologies, Inc., entered into an Asset Purchase Agreement, under which StoreWorks SNT-IP, LLC acquired substantially all of the assets of Stella Nova Technologies, Inc. and under which StoreWorks Technologies Limited as the sole owner of StoreWorks SNT-IP, LLC agreed to pay certain sums on behalf of its wholly owned subsidiary, StoreWorks SNT-IP, LLC, to Stella Nova Technologies, Inc.; and

**WHEREAS**, StoreWorks Technologies Limited is now entering into a Redemption and Acquisition Agreement under which one of its shareholders, Troy Stelzer ("Stelzer"), is acquiring all of the interests and obligations of StoreWorks SNT-IP, LLC and StoreWorks Technologies (India) Private Limited (collectively "Xenia"), including all of the assets previously acquired from Stella Nova Technologies, Inc. under the Asset Purchase Agreement, and Stelzer is selling his shares in StoreWorks Technologies Limited, and his membership interests in ATA Development, LLC to each of those entities respectively; and

**WHEREAS**, as part of the Redemption and Acquisition Agreement, Stelzer is obligated to have Stella Nova Technologies, Inc., as acknowledged by each SNT Shareholder, consent to StoreWorks SNT-IP, LLC assuming any remaining financial obligation payable to Stella Nova Technologies, Inc. and expressly release each of StoreWorks Technologies, Limited, StoreWorks Technologies Canada Limited, ATA Development, LLC, and the other owners of each, Andrew Teitscheid and Anil Konkimalla, from any further liability with regards to any obligation under the Asset Purchase Agreement and/or any remaining payment due to Stella Nova Technologies, Inc. based on the terms and conditions hereinafter set forth in this Agreement.

**NOW, THEREFORE**, based upon the foregoing recitals and the mutual covenants contained herein, assumption of the remaining obligations under the Asset Purchase Agreement by Xenia, and for other good and valuable consideration the receipt and sufficiency of which is acknowledged, it is hereby agreed as follows:

1.      Consent.  Stella Nova Technologies, Inc. (as acknowledged by SNT Shareholder) hereby consents to the assumption by StoreWorks SNT-IP, LLC of all remaining obligations under the Asset Purchase Agreement.

2.      Release.  Stella Nova Technologies, Inc. (as acknowledged by each SNT Shareholder) hereby for itself, and on behalf of its representatives, agents, attorneys, and assigns (collectively

- 22 -

the "SNT Releasors"), do hereby completely and generally release, remise, acquit, and forever discharge StoreWorks Technologies Limited, StoreWorks Technologies Canada Limited, ATA Development, LLC, Andrew Teitscheid and Anil Konkimalla, and their respective present and former members, shareholders, managers, officers, directors, representatives, employees, predecessors, successors, parent, subsidiary and sibling corporations and entities, affiliates, agents, attorneys, and assigns (collectively, the "StoreWorks Releasees"), of and from any and all past, present, and future claims, demands, obligations, actions, causes of action, rights, damages, expenses, and requests for compensation or reimbursement, payment, or relief of any nature whatsoever, whether based on breach of implied or express warranty, fraud, constructive fraud, failure to disclose, tort, contract, negligent misrepresentation, negligence, statute, or any other theory of recovery, and whether for actual, compensatory, consequential, statutory, attorneys' fees, or punitive damages or any other relief or remedy, whether known or unknown, whether suspected or unsuspected, whether liquidated or unliquidated, whether mature or unmatured, whether direct, indirect or derivative, whether fixed or contingent, and whether secured or unsecured, which any SNT Releasor for, upon, or by reason, directly or indirectly, ever jointly or individually had, now has or have, or hereafter can, shall, or may have against the StoreWorks Releasees, or any of them, that have been or could have been asserted as a claim, or that arise out of or are related in any way to the Asset Purchase Agreement or this Consent and Release; provided, however, that nothing contained in the Consent and Release shall be construed to constitute a waiver, release, or covenant not to sue regarding or otherwise limit any Party's rights and obligations under this Consent and Release.

3.     General Provisions.   This Consent and Release may be executed in one or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument, and by facsimile. StoreWorks SNT-IP, LLC confirms its right to enter into this consent by way of the attached Company Certificate. Any notice, request, demand, claim or other communication under this Consent and Release must be in writing and is duly delivered when delivered by hand or sent by overnight courier and properly addressed to the intended recipient. This Consent and Release is made under and is to be governed by and construed in accordance with the laws of the State of Minnesota without regard to its conflicts of laws principles. Each of the parties consents to venue of any suit or action arising out of, under, in connection with or in relation to this Consent and Release in any state or federal court sitting in Wake Forest, North Carolina. No amendment of any provision of this Consent and Release is valid unless it is in writing and signed by the parties. No waiver by any party of any default, misrepresentation or breach of warranty or covenant under this Consent and Release, whether intentional or not, extends to any prior or subsequent default, misrepresentation or breach of warranty or covenant under this Consent and Release. Any term or provision of this Consent and Release that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions of this Consent and Release or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. This Consent and Release will bind and inure to the benefit of the parties hereto, their respective heirs, assigns and successors in interest.

*[SIGNATURE PAGE TO FOLLOW]*

4819-0843-9117

**IN WITNESS WHEREOF,** an authorized representative of each of the parties have signed this Consent and Release as of the Effective Date.

**Xenia:**
StoreWorks SNT-IP, LLC

By: _____
       Troy Stelzer
Its:   Manager

Date: _28 AUG 2017_

**SNT:**
Stella Nova Technologies, Inc.

By: _____

Its: _____

Date: _____

**Acknowledged by SNT Shareholder:**
Amy Byers

By: _____

Date: _____

**Acknowledged by SNT Shareholder:**
Larry Gibbs

By: _____

Date: _____

**StoreWorks:**
StoreWorks Technologies Limited

By: _____

Date: ___8|28|17___

**Acknowledged by SNT Shareholder:**
David Hawkins

By: _____

Date: _____

**Acknowledged by SNT Shareholder:**
Paul Leung

By: _____

Date: _____

**Acknowledged by SNT Shareholder:**
Rathin Devchoudhury

By: _____

Date: _____

- 24 -

**EXHIBIT 3.5c**
LANDLORD NOTICE OF TERMINATION AND SUBLEASE

*See attached.*

4819-0843-9117

**EXHIBIT 4.1**
**CORPORATE CERTIFICATE**
**OF**
**STOREWORKS TECHNOLOGIES LIMITED**

The undersigned, in his capacity as the Chief Officer of StoreWorks Technologies Limited, a Minnesota corporation (the "Corporation"), is delivering this Certificate, effective as of August 28, 2017, pursuant to that certain Redemption and Acquisition Agreement (the "Redemption Agreement") dated as of the date hereof, by and among the Corporation and Troy Stelzer, a Minnesota resident (the "Seller").

1.     The following named person is the Chief Officer of the Corporation and the signature opposite his name is his true signature:

Name                    Signature

Anil Konkimalla

Chief Officer, StoreWorks Technologies Limited

2.     Attached hereto as Exhibit A is a true, correct and complete copy of a Certificate of Good Standing issued by the Minnesota Secretary of State on August 21, 2017; and

3.     Attached hereto as Exhibit B is a complete and correct copy of resolutions duly adopted by the Shareholders of the Corporation which have not been amended since their adoption and remain in full force and effect, authorizing the execution, delivery and performance of the Redemption Agreement and the related documents to which the Corporation is a party.

IN WITNESS WHEREOF, I have hereunto signed my name as of the date first set forth above.

StoreWorks Technologies Limited

By:

Name: Anil Konkimalla
Title:  Chief Officer

Date:     8|28|17

Authentication page to follow:

- 26 -

The undersigned hereby certifies on behalf of the Corporation that he is a Shareholder of the Corporation, and hereby further certifies on behalf of the Corporation that the above signature is Anil Konkimalla's genuine signature as an authorized signatory of the Corporation.

By: _____
    Troy Stelzer

Dated: _28 AUG 2017_

By: _____
    Andrew Teitscheid

Dated: _8/28/17_

By: _____
    Anil Konkimalla

Dated: _8/28/17_

- 27 -

# EXHIBIT A

## CERTIFICATE OF STATUS

*[See Attached]*

### Office of the Minnesota Secretary of State
### Certificate of Good Standing

I, Steve Simon, Secretary of State of Minnesota, do certify that: The business entity listed below was filed pursuant to the Minnesota Chapter listed below with the Office of the Secretary of State on the date listed below and that this business entity is registered to do business and is in good standing at the time this certificate is issued.

| | |
|---|---|
| Name: | StoreWorks Technologies, Limited |
| Date Filed: | 09/22/2004 |
| File Number: | 1051094-2 |
| Minnesota Statutes, Chapter: | 302A |
| Home Jurisdiction: | Minnesota |

This certificate has been issued on:      08/21/2017



Steve Simon
Secretary of State
State of Minnesota

EXHIBIT B

SHAREHOLDER RESOLUTIONS

*[See Attached]*

WRITTEN ACTION OF THE
THE SHAREHOLDERS
STOREWORKS TECHNOLOGIES, LIMITED

The undersigned, constituting all of the Shareholders of **STOREWORKS TECHNOLOGIES, LIMITED**, a Minnesota corporation (the "**Corporation**"), in lieu of meeting of the Shareholders, do hereby, pursuant to Section 302A.441 of the Minnesota Business Corporation Act, take the following actions to be effective as of the 25th day of August, 2017:

Redemption Agreements

**WHEREAS**, the Corporation remains involved in a shareholder dispute and shareholders Troy Stelzer, Andrew Teitscheid and Anil Konkimalla have agreed to settle such dispute by entering into two redemption agreements;

**WHEREAS**, the Corporation has agreed to transfer all of its interests in StoreWorks Technologies (India) Private Limited and StoreWorks SNT-IP, LLC (collectively "Xenia") to Troy Stelzer in exchange for Troy Stelzer's shares in the Corporation and his interest in ATA Development, LLC as well as his assumption of the other obligations specified in that certain Redemption and Acquisition Agreement dated August 25, 2017;

**WHEREAS**, the Corporation has agreed to redeem the shares of Andrew Teitscheid and ATA Development, LLC shall redeem his interest in ATA Development, LLC for the purchase price and in accordance with the terms of the Redemption Agreement dated August 25, 2017; and

**WHEREAS**, the Shareholders recommend that the Redemption and Acquisition Agreement between the Corporation, its affiliates, ATA Development, LLC, Troy Stelzer, Andrew Teitscheid and Anil Konkimalla be approved;

**WHEREAS**, the Shareholders recommend that the Redemption Agreement between the Corporation, its affiliates, ATA Development, LLC, Andrew Teitscheid and Anil Konkimalla be approved;

**WHEREAS**, Anil Konkimalla has agreed to withdraw his lawsuit against Andrew Teitscheid and Troy Stelzer upon execution of each of the Redemption and Acquisition Agreement and the Redemption Agreement.

NOW, THEREFORE, BE IT

**RESOLVED**, that the Corporation is authorized to enter into the Redemption and Acquisition Agreement to transfer its interests in the software affiliates, i.e. Xenia, to Troy Stelzer in exchange for a redemption of his shares in the Corporation and his interests in ATA Development, LLC (back to that entity) and record the redemption in the Corporation's books; and

**RESOLVED FURTHER**, that the Corporation is authorized to enter into the Redemption Agreement to redeem the shares of Andrew Teitscheid in the Corporation and his interests in ATA Development, LLC (back to that entity) and record the redemption in the Corporation's books; and

**RESOLVED FURTHER,** that Anil Konkimalla shall withdraw his lawsuit; and

**RESOLVED FURTHER,** that the Corporation may enter into a loan and/or line of credit with the lenders as necessary to fund the redemption of the Andrew Teitscheid shares and to help capitalize the Corporation.

**IN WITNESS WHEREOF,** the undersigned each authorizes and approves this written action as of the effective date hereof.

SHAREHOLDER:

_____
Anil Konkimalla

SHAREHOLDER:

_____
Troy Stelzer

SHAREHOLDER:

_____
Andrew Teitscheid

4821-3722-8622, v. 2

**WRITTEN ACTION OF THE
THE MEMBERS OF
ATA DEVELOPMENT, LLC**

The undersigned, constitute all members of **ATA DEVELOPMENT, LLC**, a Minnesota limited liability company (the **"Company"**), in lieu of a meeting of the Members, do hereby, pursuant to Sections 322B.01, et seq. of the Minnesota Limited Liability Company Act, take the following actions to be effective as of the 25th day of August, 2017:

Redemption Agreements

**WHEREAS,** the Members of the Company remains involved in a dispute and Members Troy Stelzer, Andrew Teitscheid and Anil Konkimalla have agreed to settle such dispute by entering into two redemption agreements;

**WHEREAS,** the Company's tenant, StoreWorks Technologies Limited, has agreed to transfer all of its interests in StoreWorks Technologies (India) Private Limited and StoreWorks SNT-IP, LLC (collectively "Xenia") to Troy Stelzer in exchange for Troy Stelzer's shares in the Corporation and his interest in ATA Development, LLC as well as his assumption of the other obligations specified in that certain Redemption and Acquisition Agreement dated August 25, 2017;

**WHEREAS,** the Company's tenant, StoreWorks Technologies Limited, has agreed to redeem the shares of Andrew Teitscheid and ATA Development, LLC shall redeem his interest in ATA Development, LLC for the purchase price and in accordance with the terms of the Redemption Agreement dated August 25, 2017; and

**WHEREAS,** the Members recommend that the Redemption and Acquisition Agreement between the Company, the Company's tenant, StoreWorks Technologies Limited, its affiliates, and Troy Stelzer, Andrew Teitscheid and Anil Konkimalla be approved;

**WHEREAS,** the Members recommend that the Redemption Agreement between the Company, the Company's tenant, StoreWorks Technologies Limited, its affiliates, and Andrew Teitscheid and Anil Konkimalla be approved;

**WHEREAS,** Anil Konkimalla has agreed to withdraw his lawsuit against Andrew Teitscheid and Troy Stelzer upon execution of each of the Redemption and Acquisition Agreement and the Redemption Agreement.

NOW, THEREFORE, BE IT

**RESOLVED,** that the Company is authorized to enter into the Redemption and Acquisition Agreement to redeem the interests of Troy Stelzer in accordance with the terms thereof; and

**RESOLVED FURTHER,** that the Company is authorized to enter into the Redemption Agreement to redeem the interests of Andrew Teitscheid in accordance with the terms thereof; and

**RESOLVED FURTHER,** that Anil Konkimalla shall withdraw his lawsuit.

**IN WITNESS WHEREOF,** the undersigned each authorizes and approves this written action as of the effective date hereof.

ATA DEVELOPMENT, LLC:

_____
Anil Konkimalla, Manager

MEMBER:

_____
Anil Konkimalla

MEMBER:

_____
Troy Stelzer

MEMBER:

_____
Andrew Teitscheid

4822-7015-8669, v. 1

- 2 -

**EXHIBIT H**

## SETTLEMENT AGREEMENT

### Xenia Retail, Inc. & Troy Stelzer v.
### StoreWorks Technologies, Ltd. & Anil Konkimalla

1.   We have settled this case on the following terms:

_See attached Exhibit A - Settlement Terms_

2.   Signing this Settlement Agreement may adversely affect our legal rights and we have had an opportunity to consult an attorney before signing it.

3.   The parties will execute appropriate releases and dismissals.

4.   The parties understand that this written mediation settlement agreement is binding and have been advised of the provisions of the Minnesota Civil Mediation Act contained in the Mediation Agreement, paragraph 7, which is attached and incorporated herein by reference.

5.   This Agreement may be signed in counterpart electronically.

6.   We intend that this agreement is binding and enforceable upon us. While we understand and agree that more formal documents, stipulations and/or releases will be prepared to facilitate or finalize our agreements contained here, we do not intend the enforcement of our settlement to be dependent upon any such documentation or related detail. We will use our best efforts to concur as to the detail of any formal documentation. While we need not agree to the binding arbitration provision of this sentence, upon the advice of counsel, we voluntarily and knowingly agree that should any dispute develop in any documentation of our settlement set out below, the mediator will act as a binding arbitrator to decide such dispute(s) and the terms of any necessary documentation, which decision will be based on the mediator's determination of what is consistent with the intent and spirit of our negotiations, or his determination of what is fair and equitable under the circumstances. We agree to be bound by any such arbitration which will be enforceable as provided by the Minnesota Arbitration Act and by law.

WITNESS:

_____
James F. Dunn
Mediator

Anil Konkimalla

_____
Thomas F. DeVincke, Esq.    5/17/18
Attorney for Plaintiff(s)

_____
Troy Stelzer
CEO of Xenia Retail Inc.

_____
Matthew R. McBride, Esq.
Attorney for Defendant(s)

EXHIBIT
B

Exhibit A – Settlement Terms

1. To the extent not modified or released as set forth herein, the parties shall ratify/reaffirm their obligations under the August 25, 2017 Redemption and Acquisition Agreement.

2. The parties shall jointly move /apply to the Hennepin County District Court for an order disbursing the $151,229.00 currently on deposit with the Court as follows:  (a) $29,000 to Xenia Retail, Inc., (b) $67,229 to the owner/landlord of the leased premises located at 11635 Northpark Drive, Suite 360, Wake Forest, North Carolina (to be used to pay the $41,000 currently in arrears and the lease charges due in June and July of 2018) and (c) $55,000 to Storeworks Technologies Ltd.

3. Xenia Retail, Inc. shall enter into a sublease with Storeworks Technologies Ltd. for the leased premises located at 11635 Northpark Drive, Suite 360, Wake Forest, North Carolina.

4. Troy Stelzer shall provide Storeworks Technologies Ltd. with a personal guaranty, personally guaranteeing Xenia Retail, Inc.'s obligations under the sublease agreement referenced in Paragraph 3 above.

5. Troy Stelzer and Xenia Retail, Inc. shall release any claim to indemnification for/reimbursement of attorneys fees' they may have under Paragraph 2.3 of the August 25, 2017 Redemption and Acquisition Agreement.

6. The parties shall mutually release all claims that they asserted against the other arising through May 17, 2018.   This release does not affect  any parties' rights or other obligations under the ratified/reaffirmed Redemption and Acquisition Agreement.

15478355v1

## MEDIATION AGREEMENT

The parties and their representatives, agree by signing below that they are willing to participate in this  mediation in an effort to resolve the disputes or controversies in the matter entitled:

**Xenia Retail, Inc. & Troy Stelzer v.
StoreWorks Technologies, Ltd. & Anil Konkimalla**

The parties also acknowledge and agree to be bound by the following ground rules:

1.  **Duty to Meet.**  The parties and all persons with authority to address settlement shall attend the mediation conference.  Continuances shall be granted only for the most extraordinary reasons.  Any party requesting such a continuance shall provide notice to other parties and their attorneys and will be responsible for rescheduling.  If the scheduled mediation is cancelled within five (5) full business days prior to the date of the session, there will be a flat fee of $500.00.

2.  **Termination of the Mediation**.  The mediation session will conclude upon settlement or upon the declaration of an impasse by the mediator.

3.  **Good Faith**.  The parties and their representatives agree to negotiate in good faith.

4.  **Mediator.**  The mediator does not represent any of the parties.  The mediator has no duty to provide advice or information to a party or to assure that a party has an understanding of the problem and the consequences of his/her actions.  The function of the mediator is to promote and facilitate voluntary resolution of the dispute or controversy.  Neither party knows of any circumstances that would cause reasonable doubt regarding the impartiality of the mediator.

5.  **Confidentiality.**  The parties and the mediator agree to the following confidentiality provisions:

    a.   All discussions, representations and statements made during the mediation will be privileged as settlement negotiations pursuant to this agreement, Minn. Stat. §572.33, et seq. and Minn. Stat. §595.02, Subd. I(a).  The parties agree that they will not attempt to discover or use as evidence in any legal proceeding anything related to the mediation, including any communications or the thoughts, impressions or notes of the mediator.  No document produced in mediation that is not otherwise discoverable will be admissible by any of the parties in any legal proceedings for any purpose, including impeachment.

    b.   The parties will not subpoena the mediator, any members of his/her staff or any records or documents pertaining to the mediation in any legal proceeding of any kind.  If so called or subpoenaed, the mediator and/or his/her staff may refuse to testify or produce the requested documents. Should any party attempt to compel such testimony or production, such party shall be liable for and shall indemnify the mediator and/or his/her staff against any liabilities, costs or expenses, including reasonable attorney's fees, that the mediator and/or his/her staff may incur in resisting such motions to compel.

c.   The mediator will not discuss the mediation process or disclose any communications made during the mediation process to any person except his/her staff as necessary. Further, neither the parties nor their representatives shall discuss the mediation process or disclose any communication made during the mediation process to any persons except their staff and/or clients as necessary.

6.   **Fees.** The parties agree to pay the mediator a fee of $300.00 per hour for the mediation, outside preparation time and scheduling. The fees shall be paid by counsel for those parties who are represented or, if not represented by counsel, by any other representatives of the parties or, by the parties if they are otherwise unrepresented. The fees will be paid equally by the parties or their representatives unless other arrangements have been made. If the dispute or controversy is settled prior to the mediation, the mediator will also have the option to charge a fee for any time spent in scheduling, telephone calls and/or reviewing materials that may have been submitted. The parties and counsel agree that, if the mediator's fees are not paid, the mediator may apply to the District Court for relief pursuant to Rule 114.11 (c) of the Minnesota Rules of General Practice.

7.   **Minnesota Civil Mediation Act.** Pursuant to the requirements of the Minnesota Civil Mediation Act, Minn. Stat. §572.35, the mediator hereby advises the parties that: (a) the mediator has no duty to protect the parties' interest or provide them with information about their legal rights; (b) signing a mediated settlement agreement may adversely affect the parties' legal rights; and (c) the parties should consult an attorney before signing a mediated settlement agreement if they are uncertain of their rights; and (d) a written mediated settlement agreement is not binding unless it contains provisions that it is binding and a provision stating substantially that the parties were advised in writing of (a) through (c) above.

8.   **Mediation Qualifications.** The mediator is an experienced attorney who has received specific training in mediation skills and the parties acknowledge that they have been provided with a written statement of the mediator's qualifications.

9.   **Voluntary Acknowledgment.** The parties and their attorneys or other representatives hereby voluntarily sign this Mediation Agreement in order to affirm that they have read it and agree to be bound by its provisions.

Dated: _5/17/18_

_[signature]_                               _Paul Harris_

_[signature]_

_[signature]_

_[signature]_                               _[signature]_
                                            James F. Dunn, Mediator

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (the "Agreement") is effective as of May 17, 2018. The parties to this Agreement are Xenia Retail, Inc. ("Xenia"), Troy Stelzer ("Stelzer"), Storeworks Technologies Ltd. ("Storeworks") and Anil Konkimalla ("Konkimalla") and are sometimes collectively referred to herein as the "Parties."

### Recitals

WHEREAS, on or about August 25, 2017, the Parties, among others, entered into a Redemption and Acquisition Agreement (the "Redemption Agreement");

WHEREAS, a dispute arose between the Parties regarding, among other things, the Parties' rights and obligations under the Redemption Agreement;

WHEREAS, as a result of the dispute, Xenia and Stelzer commenced an action styled Xenia Retail, Inc. and Troy Stelzer vs. Storeworks Technologies Ltd. and Anil Konkimalla, currently venued in Hennepin County District Court, Court File No. 27-CV-17-16152 (the "Action");

WHEREAS, the Parties previously entered into a Stipulation for Order and Order for Deposit of Funds, pursuant to which the Parties agreed that Best Buy Canada, Ltd. would pay into Court $151,299.00 in disputed funds, to be held until ordered disbursed by the Court;

WHEREAS, the Parties mediated their dispute in front of James Dunn, Esq. on May 17, 2018; and

WHEREAS, the Parties now desire to formally document the compromise and settlement reached as a result of the May 17, 2018 mediation.

NOW THEREFORE, in consideration of the promises, the respective covenants and commitments set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties do hereby agree to the following:

### Agreement

1.    Incorporation of Recitals. The recitals set forth above are integral hereto, are true and correct, and are hereby incorporated into this Agreement as express terms and conditions hereof.

2.    Ratification/Reaffirmation of the Redemption Agreement. To the extent not specifically modified or specifically released herein, the Parties hereby restate, repeat and reaffirm all of their respective obligations under and pursuant to the Redemption Agreement. The Parties acknowledge, stipulate and agree that, to the extent not specifically modified or specifically released herein, the terms and conditions of the Redemption Agreement shall remain in full force and effect.

3.    Distribution of the Disputed Best Buy Canada, Ltd. Funds. The Parties shall jointly apply to the Hennepin County District Court for an order disbursing the $151,299.00 in Best Buy Canada, Ltd disputed funds as follows: (a) $29,000 to Xenia Retail, Inc., (b) $67,229 to the owner/landlord of the leased premises located at 11635 Northpark Drive, Suite 360, Wake Forest, North Carolina (to be used to pay the $41,000 currently in arrears and the lease charges due in June and July of 2018) and (c) $55,000 to Storeworks Technologies Ltd.

4.    Sublease Agreement/Personal Guaranty. At the same time the Parties execute this Agreement, Xenia shall execute a Sublease Agreement, and Stelzer shall execute a personal guaranty, in the forms attached hereto as Exhibit A.

5.    Release. The Parties hereby mutually release, acquit, and forever discharge each other, along with each other's employees, owners, officers, directors, attorneys, agents, affiliates, subsidiaries, divisions, successors and assigns, from any and all claims asserted against each other through May 17, 2018 in the Action. In addition, and to the extent not already released by the preceding sentence, Xenia and Stelzer hereby release, acquit and forever discharge Storeworks and Konkimalla from any and all claims Xenia and Stelzer have, had or may in the future have under Paragraph 2.3 of the Redemption Agreement for reimbursement of and/or indemnification for attorneys' fees. This release does not affect the Parties' other rights or other obligations under the ratified/reaffirmed Redemption Agreement.

6.    Dismissal of the Action. At the same time the Parties execute this Agreement, the Parties shall file a stipulation for dismissal, dismissing the Action with prejudice.

7.    Further Assurances. The Parties to this Agreement hereby agree to execute such other documents and to take such other action as may reasonably be necessary to further the purposes of this Agreement.

8.    Governing Law. This Agreement shall be construed and interpreted under the laws of the State of Minnesota without regard to its conflict-of-law principles.

9.    Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties and, to the extent permitted by applicable law, to their respective successors and permitted assigns.

10.    Construction. The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof. The Parties agree that each of them and their respective legal counsel have reviewed and had an opportunity to revise this Agreement and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Agreement. Instead, the language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent.

11.    Representation/No Coercion. The Parties represent, warrant and acknowledge that they have been represented by legal counsel in connection with the negotiation and documentation of this Agreement, that they have legal and other options available to them other than the execution of this Agreement, and that they have chosen to execute this Agreement of their own free will.

12.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same agreement.  Any electronically transmitted signature or photocopy of a signature to the Agreement shall be deemed an original signature to the Agreement and shall have the same force and effect as an original signature.  For purposes of this section, an "electronically transmitted signature" means a manually-signed original signature that is sent in the form of a facsimile or sent via the internet as a "pdf" (portable document format) or other replicating image attached to an email message.

13.    Severability.    Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such portion without invalidating the remaining provisions of this Agreement.

14.    Entire Agreement.  This Agreement shall constitute the entire agreement of the Parties, shall supersede any prior or contemporaneous oral or written agreements relating to the subject matter of this Agreement, and shall not be subject to any change, modification, amendment, or addition without the express written consent of the Parties.

Dated: June 11, 2018                XENIA RETAIL, INC.

By _Troy Stelzer_____

Its: _CEO_____


Dated: June __, 2018

_____
TROY STELZER


Dated: June __, 2018          STOREWORKS TECHNOLOGIES LTD.
      July, 20, 2018

By_____

Its:_____CEO_____

3

Dated: ~~June~~ , 2018
        July, 20, 2018

_____
ANIL KONKIMALLA

15496619v2

4

**EXHIBIT I**

STATE OF MINNESOTA                                          DISTRICT COURT

COUNTY OF HENNEPIN                              FOURTH JUDICIAL DISTRICT
                                                              Case Type: Contract

Xenia Retail, Inc. and Troy Stelzer,                          Court File No:

      Plaintiffs,

vs.

StoreWorks Technologies Ltd. and
Anil Konkimalla,                                              **SUMMONS**

      Defendants.

---

## THIS SUMMONS IS DIRECTED TO THE ABOVE-NAMED DEFENDANT, <u>XENIA RETAIL, INC.</u>:

    1.    **YOU ARE BEING SUED.** The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this summons.

    2.    **YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this Summons **a written response** called an Answer within twenty (20) days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this Summons; that address is:

<div align="center">

ARTHUR, CHAPMAN, KETTERING, SMETAK & PIKALA, P.A.
Sarah E. Bushnell
Perssis Meshkat
500 Young Quinlan Building
81 South Ninth Street
Minneapolis, MN 55402-3214

</div>

    3.    **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

    4.    **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not answer within twenty (20) days, you will lose your case. You will not get to tell your side of the story, and the court may decide against you and award the Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the

Complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the Complaint.

5.     **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written answer to protect your rights or you may lose the case.**

6.     **ALTERNATIVE DISPUTE RESOLUTION Pursuant to M.S.A. § 543.22.** The parties may agree to be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

RESPECTFULLY SUBMITTED,

ARTHUR, CHAPMAN, KETTERING, SMETAK & PIKALA, P.A.

Dated: August 6, 2019

Sarah E. Bushnell (#326859)
Perssis Meshkat (#390057)
500 Young Quinlan Building
81 South Ninth Street
Minneapolis, MN 55402-3214
P: (612) 339-3500
F: (612) 339-7655
sebushnell@ArthurChapman.com
pmeshkat@ArthurChapman.com

*Attorneys for Defendants and Counterclaim Plaintiffs StoreWorks Technologies Ltd. and Anil Konkimalla*

**ACKNOWLEDGMENT**

The undersigned attorney acknowledges that sanctions may be imposed for violations of

Minn. Stat. § 549.211.

Sarah E. Bushnell

2

8496093

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT
Case Type: Contract

Xenia Retail, Inc. and Troy Stelzer,

Plaintiffs,

vs.

StoreWorks Technologies Ltd. and
Anil Konkimalla,

Defendants.

Court File No:

**DEFENDANTS STOREWORKS
TECHNOLOGIES LTD.'S AND ANIL
KONKIMALLA'S ANSWER TO
COMPLAINT AND STOREWORKS
TECHOLOGIES, LTD'S
COUNTERCLAIMS**

Defendants StoreWorks Technologies Ltd. ("Storeworks") and Anil Konkimalla

("Konkimalla" and, with Storeworks, the "Defendants") as their Answer to the Complaint of

Plaintiffs Xenia Retail, Inc. ("Xenia") and Troy Stelzer ("Stelzer" and, with Xenia, the

"Plaintiffs"), state and alleges as follows:

## FIRST DEFENSE
### (Responses to Individual Paragraphs of the Complaint)

1.      Defendants admit the allegations in paragraph 1 of the Complaint, except state

that there is some ambiguity in the language of paragraph 1 and that only the former software

division of Storeworks is operated now as Xenia.

2.      Defendants admit the allegation in paragraph 2 of the Complaint on information

and belief.

3.      As to paragraph 3 of the Complaint, Defendants admit that Stelzer is a former

officer and shareholder of Storeworks and admit, on information and belief, that Stelzer is the

controlling shareholder in Xenia.

4.      Defendants admit the allegations in paragraph 4 of the Complaint.

8498612

5.     Defendants admit the allegations in paragraph 5 of the Complaint.

6.     As to paragraph 6 of the Complaint, Defendants admit that the Shareholder Lawsuit was resolved by settlement in August 2017 and that Storeworks, Konkimalla, and Stelzer are parties to a Redemption and Acquisition Agreement ("Redemption Agreement"). Defendants affirmatively allege that there are other parties to the Redemption Agreement.

7.     Defendants generally deny the allegations in paragraph 7 of the Complaint and affirmatively state that there is no provision in the Redemption Agreement titled "tax neutral" nor do the words "tax neutral" appear anywhere in the Redemption Agreement. Defendants deny Plaintiffs' characterization of the Redemption Agreement and state that the Redemption Agreement speaks for itself. Defendants affirmatively allege that there were aggressive negotiations among the parties (all represented by their own lawyers) regarding the terms of the Redemption Agreement.

8.     As to paragraph 8 of the Complaint, Defendants admit that Exhibit A to the Complaint is a copy of the Redemption Agreement. Defendants state that the Redemption Agreement speaks for itself and deny Plaintiffs' characterization of the same.

9.     Defendants deny the allegations in paragraph 9 of the Complaint.

10.     Defendants admit that in or about November 2017, Plaintiffs sued them in another lawsuit. Defendants deny that Plaintiffs' lawsuit was justified and affirmatively allege that they asserted counterclaims in the Second Lawsuit.

11.     As to paragraph 11 of the Complaint, Defendants admit that the Second Lawsuit was settled after mediation and that the terms of the settlement are set forth in a written Settlement Agreement and Release (the "Settlement Agreement") that was signed by Plaintiffs on or about July 11, 2018. Defendants affirmatively state that the Settlement Agreement, by its

8498612

terms, "constitute[s] the entire agreement of the Parties [and] shall supersede any prior or contemporaneous oral or written agreements relating to the subject matter of this Agreement . . ." Defendants deny that Exhibit B that was served with the Complaint is a complete copy of the Settlement Agreement in that it is missing the referenced exhibits.

12.     As to paragraph 12 of the Complaint, Defendants state that the Settlement Agreement speaks for itself and deny Plaintiffs' characterization and excerpting of the same.

13.     As to paragraph 13 of the Complaint, Defendants state that the Settlement Agreement speaks for itself and deny Plaintiffs' excerpting of the same.

14.     As to paragraph 14 of the Complaint, Defendants state that the Redemption Agreement speaks for itself and deny Plaintiffs' excerpting of the same.

15.     In response to the allegations in paragraph 15 of the Complaint, Defendants admit that ScanSource sued Storeworks and others in 2018, seeking to collect monies allegedly owed by Storeworks.

16.     In response to the allegations in paragraph 16 of the Complaint, Defendants admit that Stelzer provided a personal guarantee to ScanSource and that ScanSource named him as a defendant in its lawsuit.

17.     The allegations in paragraph 17 of the Complaint are legal conclusions rather than allegations of fact. Accordingly, they require no response from Defendants here. Konkimalla specifically alleges that he is not a proper defendant and that the obligations about which Plaintiffs have sued are Storeworks' obligations.

18.     Defendants deny the allegations in paragraph 18 of the Complaint.

19.     Defendants admit that Stelzer has requested that Storeworks defend him in the ScanSource lawsuit but state that the effectiveness of his purported tender is a question of law.

20.     Defendants deny the allegations in paragraph 20 of the Complaint.

21.     Defendants deny the allegations in paragraph 21 of the Complaint.

22.     As to paragraph 22 of the Complaint, Defendants admit that their accountant, Andy Knutson, proposed a strategy to Plaintiffs' accountant at Redpath & Associates that Knutson believed could have modified certain of the tax consequences of the transactions described in the Redemption Agreement.   Defendants deny the remaining allegations in paragraph 22 of the Complaint and, in particular, deny Plaintiffs' characterization of the Redemption Agreement.

23.     Defendants deny the allegations in paragraph 23 of the Complaint.

24.     Defendants deny the allegations in paragraph 24 of the Complaint.

25.     Defendants admit that Plaintiffs have legal counsel and otherwise deny the allegations in paragraph 25 of the Complaint.

<div align="center">

**COUNT I**
**Breach of Contract – Tax Liability**

</div>

26.     Defendants incorporate their preceding answers as though fully restated here.

27.     Defendants admit the allegations in paragraph 27 of the Complaint.

28.     In response to the allegations in paragraph 28 of the Complaint, Defendants state that the Redemption Agreement speaks for itself and deny Plaintiffs' characterization of the Redemption Agreement.

29.     In response to the allegations in paragraph 29 of the Complaint, Defendants state that the Settlement Agreement speaks for itself and deny Plaintiffs' characterization of the same.

30.     Defendants deny the allegations in paragraph 30 of the Complaint.

31.     Defendants deny the allegations in paragraph 31 of the Complaint.

32.     Defendants deny the allegations in paragraph 32 of the Complaint.

8498612

## COUNT II
### Breach of Contract – Indemnification

33.     Defendants incorporate their preceding answers as though fully restated here.

34.     Defendants admit the allegations in paragraph 34 of the Complaint.

35.     In response to the allegations in paragraph 35 of the Complaint, Defendants state that the Redemption Agreement speaks for itself and deny Plaintiffs' characterization of the same.

36.     In response to the allegations in paragraph 36 of the Complaint, Defendants state that the Redemption Agreement speaks for itself and deny Plaintiffs' characterization of the same.

37.     In response to the allegations in paragraph 37 of the Complaint, Defendants state that the Redemption Agreement speaks for itself and deny Plaintiffs' characterization of the same.

38.     In response to the allegations in paragraph 38 of the Complaint, Defendants state that the Settlement Agreement speaks for itself and deny Plaintiffs' characterization of the same.

39.     Defendants deny the allegations in paragraph 39 of the Complaint.

40.     Defendants deny the allegations in paragraph 40 of the Complaint.

### PRAYER FOR RELIEF

41.     Defendants deny that they have any liability to Plaintiffs and, therefore, respectfully ask the Court to render judgment in their favor and to dismiss the Complaint with prejudice and to award Defendants' costs and disbursements.

## SECOND DEFENSE
### (General Denial)

42.    Defendants deny each and every allegation in the Complaint to the extent the allegation has not been specifically admitted above.

## THIRD DEFENSE
### (Failure to State a Claim)

43.    The Complaint fails to state a claim upon which relief can be granted and/or fails to plead with sufficient particularity.

## FOURTH DEFENSE
### (Plaintiffs' Failure to Perform/Prior Breach)

44.    The claims in the Complaint are barred, in whole or in part, because Plaintiffs have breached the parties' agreements and/or failed to perform their obligations under the parties' agreements.

## FIFTH DEFENSE
### (No Harm/Damages)

45.    The claims in the Complaint are barred, in whole or in part, to the extent Plaintiffs did not suffer harm or damages caused by any breach of contract by Defendants or either of them.

## SIXTH DEFENSE
### (Failure to Mitigate)

46.    The claims in the Complaint are barred, in whole or in part, by Plaintiffs' failure to mitigate their alleged damages.

## SEVENTH DEFENSE
### (Waiver/Estoppel/Laches/Unclean Hands)

47.    The claims in the Complaint are barred, in whole or in part, by the equitable doctrines of waiver, estoppel, laches, and/or unclean hands.

8498612

## EIGHTH DEFENSE
### (Statutes of Limitation and Repose)

48.     The claims in the Complaint are barred, in whole or in part, to the extent that they

are untimely under the applicable statutes of limitation and repose.

## NINTH DEFENSE
### (Accord and Satisfaction/Settlement/Release)

49.     The claims in the Complaint are barred, in whole or in part, to the extent that they

have been resolved through accord and satisfaction, settlement, and/or have been released.

## TENTH DEFENSE
### (Failure of a Condition Precedent)

50.     The claims in the Complaint are barred, in whole or in part, by the failure of a

condition precedent to Defendants' performance.

## ELEVENTH DEFENSE
### (Plaintiffs' Interference)

51.     The claims in the Complaint are barred, in whole or in part, by Plaintiffs'

interference with Defendants' ability to perform their obligations under the parties' agreements.

## TWELFTH DEFENSE
### (Claim Splitting)

52.     The claims in the Complaint are barred, in whole or in part, by Plaintiffs' failure

to assert them in the Second Lawsuit.

## THIRTEENTH DEFENSE
### (Konkimalla Not a Proper Defendant)

53.     The claims in the Complaint are barred to the extent that they are asserted against

Konkimalla and seek to impose liability on Konkimalla personally for obligations of Storeworks.

8498612

## FOURTEENTH DEFENSE
### (Failure to Tender)

54.     Stelzer's claim for a defense in the ScanSource action is barred, in whole or in part, by his failure to effectively tender his defense to Storeworks.

## FIFTEENTH DEFENSE
### (Rule 8.03)

55.     Defendants affirmatively allege, but without relieving Plaintiffs of their burden of proof in any respect, that the claims asserted are or may be barred by any and all of the affirmative defenses contemplated by Rule 8.03 of the Minnesota Rules of Civil Procedure. The extent to which the Plaintiffs' claims are or may be barred by one or more of said affirmative defenses, not specifically set forth herein, cannot be determined until there has been further discovery. Defendants, therefore, incorporate all such affirmative defenses set forth in Rule 8.03.

## RESERVATION OF DEFENSES

56.     Defendants reserve the right to assert additional defenses that may present themselves during discovery or otherwise in the course of this case.

## COUNTERCLAIMS

### Introduction

1.     Counterclaim Defendants Xenia Retail, Inc. ("Xenia") and Troy Stelzer ("Stelzer") have repeatedly and flagrantly breached written contracts with Counterclaim Plaintiff Storeworks Technologies Ltd. ("Storeworks") by: (1) competing with Storeworks' hardware and service business and diverting business from Storeworks in violation of a non-competition agreement; (2) Stelzer encouraging at least one employee of Storeworks to leave his employment and join a Storeworks competitor in violation of Stelzer's non-solicitation agreement; (3) failing

to pay rent and defaulting on a sub-lease agreement (Xenia) and personal guarantee (Stelzer); and (4) Stelzer failing to obtain releases of Storeworks by third parties that Stelzer had promised to deliver. By these actions, Xenia and Stelzer have caused significant harm to Storeworks. Storeworks brings this action for an injunction, damages, interest, and attorney fees.

## Parties

2.      Storeworks is a Minnesota corporation with its primary office in Eden Prairie, Minnesota. Storeworks provides technology consulting and solutions to large retailers.

3.      On information and belief, Xenia is a Delaware corporation with its primary office in Bloomington, Minnesota.

4.      On information and belief, Stelzer is an individual who lives in Edina, Minnesota. Stelzer is a former shareholder, officer, and employee of Storeworks.

## Facts

5.      As of August 2017, Storeworks had three shareholders: Anil Konkimalla, Andrew Teitscheid, and Stelzer.

6.      In or about September 2016, Konkimalla commenced a shareholder lawsuit against Stelzer and Teitscheid that was settled in August 2017. The terms of the settlement are set forth in a written Redemption and Acquisition Agreement ("Redemption Agreement"). A true and correct copy of the Redemption Agreement is attached to the Complaint as **Exhibit A.**

7.      Just before the Redemption Agreement was signed, Storeworks operated a hardware and services business (e.g., providing and managing credit card payment terminals among other things) and a software business (e.g., providing point of sale software).

8.      Among other things, through the Redemption Agreement, Storeworks redeemed Stelzer's ownership interest in Storeworks in return for transferring Storeworks' ownership

interests in the software business to Xenia, a corporation formed and solely owned by Stelzer. **Compl. Ex. A §§ 2.1, 2.2.**

Stelzer and Xenia Breach Their Commitment to Obtain Releases of Storeworks

9.      One of the software entities that Xenia acquired from Storeworks was Storeworks SNT-IP, LLC ("SNT"). In the Redemption Agreement, Stelzer undertook to "ensure that Xenia acquires the express consent of the former SNT owners, David Hawkins, Amy Byers, Paul Leung, Larry Gibbs and Rathin Devchoudhury, that Store Works is released and Xenia assumes any remaining payment obligation to them as of the Closing Date, in the form of the Consent and Release attached hereto as **Exhibit 3.5b.**" **Compl. Ex. A § 3.5, Ex. 3.5(b).**

10.      Stelzer and Xenia have not delivered the promised consents and releases to Storeworks.

Xenia Breaches Its Duty to Pay Rent

11.      In the Redemption Agreement, Xenia agreed that it would sign a sublease for warehouse space in Wake Forest, North Carolina that had been leased and used by Storeworks and would be used by Xenia for the software business. **Compl. Ex. A § 3.5.**

12.      Specifically, the Redemption Agreements states: "Xenia acknowledges that StoreWorks will be terminating the current Wake Forest lease as of the end of the current lease period (February 201[9]) and will require Xenia to enter into a sublease agreement as required by the landlord. Xenia acknowledges and agrees that it shall, if necessary, indemnify and release Store Works from any liability under the Lease as of the Closing Date." *Id.*

13.      Xenia breached the Redemption Agreement by failing to pay the rent that it owed for the Wake Forest lease and by not indemnifying Storeworks from liability under the Wake Forest lease.

8498612

Stelzer and Xenia Compete with Storeworks in Violation of the Redemption Agreement

14.    Stelzer and Xenia promised in the Redemption Agreement that they would "not directly or indirectly, as an affiliate, contracting party, employee, contractor, consultant, agent, principal, proprietor, partner, corporate officer, stockholder, board member, director, or in any other individual or representative capacity, engage or attempt to engage in any hardware sales or leases competitive to the hardware business of Store Works for three (3) years after the Closing Date." **Compl. Ex. A § 3.8.**

15.    Three years from the Closing Date is August 28, 2021.

16.    In violation of this agreement, Stelzer and Xenia approached Target Corporation ("Target") and successfully offered to provide hardware sales and services that Target had contracted with Storeworks to provide for Target pop-up stores.

17.    Prior to Xenia taking over the pop-up store business, Storeworks had earned total revenues of $1,432,316.62 from 2014-2017 on that work.   The pop-up business has a very high gross profit margin - in the 70-80% range.

Stelzer Encourages a Storeworks Salesman to Leave Storeworks in Violation of the Redemption Agreement

18.    Xenia and Stelzer warranted in the Redemption Agreement that they would not "attempt to induce to leave the employ of StoreWorks any employee or contractor of StoreWorks for three (3) years after the Closing Date." **Compl., Ex. A § 3.7.**  Certain Storeworks employees were excluded by name from this non-solicitation agreement. *Id.*

19.    In November and December 2017, in direct violation of this promise, Stelzer encouraged Sean Barnes – a Storeworks salesman who was not excluded from the non-solicitation agreement – to leave Storeworks and to accept employment from Storeworks' competitor Barcodes, LLC ("Barcodes").

11

20.    On information and belief, with Stelzer's active encouragement, Barnes breached his duty of loyalty to Storeworks and diverted multiple millions of dollars in business from Storeworks in 2018 alone and also caused significant long-term damage to certain of Storeworks' customer relationships.

21.    Storeworks sued Barcodes and Barnes and settled the case.

22.    Storeworks did not recover all of its losses in the Barcodes lawsuit.

The Parties Engage in and Settle a Second Lawsuit

23.    In November 2017, Xenia and Stelzer sued Konkimalla and Storeworks, alleging that they had diverted receivables that belonged to Xenia ("Second Lawsuit").

24.    Storeworks and Konkimalla denied liability and alleged counterclaims for Xenia's failure to pay for expenses allocated to it under the Redemption Agreement, for personal expenses charged by Xenia employees to Storeworks credit cards, for the theft of Target equipment from Storeworks by a Xenia employee, and for Xenia and Stelzer's violation of the non-compete agreement by taking Target pop-up store business.

25.    In May 2018, the parties to the Second Lawsuit participated in a successful mediation. The resulting settlement was documented in a July 2018 Settlement Agreement and Release ("Settlement Agreement"). A true and correct copy of the Settlement Agreement is attached as **Exhibit 1**.

26.    The Settlement Agreement allocated the disputed receivables as follows: (1) $55,000 to Storeworks, (2) $29,000 to Xenia, and (3) $67,229 to the owner/landlord of the Wake Forest, North Carolina property to pay Xenia's rent through July 2018. **Ex. 1 § 3.**

27.    Storeworks released Xenia and Stelzer from liability for the acts that formed the basis for the Storeworks counterclaims in the Second Lawsuit, including Xenia and Stelzer's

12

usurpation of the Target pop-up business "through May 17, 2018," but the parties otherwise "restate[d], repeat[ed] and reaffirm[ed] all of their respective obligations under and pursuant to the Redemption Agreement" and agreed that "to the extent not specifically modified or specifically released herein, the terms and conditions of the Redemption Agreement shall remain in full force and effect." **Ex. 1 §§ 2, 5.**

28.     This required Xenia and Stelzer to stop competing with Storeworks for the Target pop-up business after May 17, 2018 and rendered them liable to Storeworks for any ongoing competition.

Xenia and Stelzer Reaffirm Their Promises to Pay Rent for the Wake Forest Property

29.     In the Settlement Agreement, Xenia and Stelzer promised to, and did, execute a Sublease Agreement and a personal Guaranty respectively for the Wake Forest property. **Ex. 1 § 4; Ex. 1, pp. 5-14.**

30.     In the Sublease Agreement, Sections 2.1, 3.1, 4(a), Xenia promised to pay to Storeworks monthly base rent in the amount of $13,444.00, together with any other rent or expense that Storeworks owed to the landlord under the Master Lease, by the first day of each month through the termination of the master lease on February 28, 2019. **Ex. 1, pp. 5-6.**

31.     Xenia further promised that it would "indemnify, defend and hold [Storeworks] harmless from all loss, cost, liability, claim, damage and expense (including reasonable attorneys' fees and disbursements) . . . incurred in connection with or arising from (1) any default by [Xenia] in the observance or performance of any of the terms, covenants or conditions of this Sublease . . ." **Ex. 1, p. 9 (Sublease Agreement § 10.2).**

32.     The Sublease Agreement requires Xenia to "immediately pay all of" Storeworks' attorney fees, costs, and expenses in the event of any litigation between Xenia and Storeworks

and/or the landlord to enforce the terms of the Sublease. **Ex. 1, p. 12 (Sublease Agreement §
19.2)**.

33.     The Sublease Agreement states that if "any payment of Base Rent or Additional
Rent or any portion thereof, is not paid within five (5) days after the date such payment was due.
. . and if Subtenant shall fail to cure the same within ten (10) days after receipt of written notice
from Sublandlord or Landlord, Subtenant shall be deemed to be in default and Sublandlord shall
have the rights and remedies against Subtenant as would be available to Landlord against
Sublandlord in the event of default by Sub landlord under the Master Lease. **Ex. 1, p. 10
(Sublease Agreement § 13.1)**.

34.     The Master Lease provides that, in the event of default, the landlord is entitled,
among other things, to a late fee in the amount of 5% of the monthly rent if a payment is more
than seven days past due.  A true and correct copy of the Master Lease is attached as **Exhibit 2.**

35.     In the Guaranty, Stelzer "personally guarantee[d] the payment of rents, the
performance of all obligations of [Xenia] under the Sublease, as well as all other terms,
covenants and conditions contained in the Sublease (collectively, 'Obligations')." **Ex. 1, p. 16
(Guaranty, Recital A)**.

36.     Thus, Storeworks could "demand payment or performance from or by Guarantor
of any or all of the Obligations, when such payment or performance is required, and Guarantor
shall promptly provide such payment or performance." **Ex. 1, p. 16 (Guaranty, § (1))**.

Xenia and Stelzer Default on Rent Obligations

37.     After the Settlement Agreement, Sublease Agreement, and Guaranty were
executed, Xenia continued to be chronically late on its rent payments and incurred late fees for

the months of October, November, and December 2018 and January and February 2019 in the total amount of $3,361.00 that has not been paid to date.

38.     In addition, Xenia has not paid rent for the last two months of the Sublease Agreement (January and February 2019). Xenia owes a total of $26,888 in base rent.

39.     On March 5, 2019, Storeworks requested in writing that Xenia and Stelzer cure the default. **Exhibit 3.**

40.     Neither Xenia nor Stelzer did so.

41.     On May 28, 2019, Storeworks again gave notice of the amounts that were "way past due." *Id.*

42.     Through the date of this Complaint, Xenia and Stelzer have not paid the outstanding late fees or base rent.

43.     Xenia and Stelzer owe Storeworks $30,249 for rent and late fees to date.

44.     Xenia and Stelzer are also obligated to pay Storeworks' attorney fees and litigation expenses to collect these overdue amounts, together with any additional charges the landlord may assess.

45.     In the event that the landlord commences litigation against Storeworks, Xenia and Stelzer are obligated to defend and indemnify Storeworks.

Stelzer and Xenia Continue to Compete for and Divert the Target Pop-Up Business

46.     In direct and flagrant violation of its promises in both the Redemption Agreement and the Settlement Agreement, Xenia, under Stelzer's direction, has continued to compete with Storeworks for the Target pop-up business by providing hardware and services for Target pop-up stores.

Stelzer and Xenia Divert Business from Storeworks: QuikTrip

47.     From 2009 until the spring of 2018, Storeworks provided hardware and services to QuikTrip gas stations and convenience stores.

48.     On information and belief, in May 2018 (the same month in which the mediation of the Second Lawsuit occurred), Stelzer persuaded QuikTrip to discontinue its contract with Storeworks in favor of a Storeworks competitor.

49.     Before Stelzers' sales activity on behalf of Storeworks' competitor – in violation of his non-compete obligation - Storeworks had earned revenues from the QuikTrip of almost $18 million.

50.     Stelzer's interference with the QuikTrip contract was not a subject of the Second Lawsuit or the Settlement Agreement.

<div align="center">

**COUNT I**
**Breach of Contract – Redemption Agreement**
**Xenia and Stelzer**

</div>

51.     Storeworks incorporates the previous allegations in its Counterclaims as if fully restated here.

52.     The Redemption Agreement is an enforceable contract to which Storeworks, Stelzer, and Xenia (among others) are parties.

53.     Storeworks has fulfilled its obligations under the Redemption Agreement.

54.     Xenia and Stelzer have breached the Redemption Agreement by competing with Storeworks for hardware and services business and by diverting hardware and services business from Storeworks, by failing to obtain consents and releases from the former SNT owners, and by encouraging a Storeworks employee to leave his employment with Storeworks.

Case 20-04027   Doc 1   Filed 03/06/20   Entered 03/06/20 11:00:37   Desc Main
Document      Page 191 of 251

55.     Xenia and Stelzer's breaches of the Redemption Agreement have harmed Storeworks in an amount exceeding $50,000 to be proved at trial.

### COUNT II
**Breach of Contract – Sublease Agreement**
**Xenia**

56.     Storeworks incorporates the previous allegations in its Counterclaims as if fully restated here.

57.     The Sublease Agreement is an enforceable contract to which Storeworks and Xenia are parties.

58.     Storeworks has fulfilled its obligations under the Sublease Agreement.

59.     Xenia has breached the Sublease Agreement by failing to pay rent and late fees when due and after written requests for cure.

60.     Storeworks has been damaged in the amount of $30,249 by Xenia's breach of the Sublease Agreement.

61.     In addition, Storeworks is entitled to its attorney fees, costs, disbursements, and expenses incurred to recover the amounts Xenia owes under the Sublease Agreement, together with any additional amounts the landlord may assess.  These amounts continue to accrue.

62.     Further, in the event of litigation with the landlord, Xenia must defend and indemnify Storeworks.

### COUNT III
**Breach of Contract – Guaranty**
**Stelzer**

63.     Storeworks incorporates the previous allegations in its Counterclaims as if fully restated here.

64.     The Stelzer Guaranty is an enforceable contract.

8498612

17

65. Storeworks has fulfilled its obligations under the Sublease Agreement.

66. Stelzer has breached his obligations under the Guaranty by failing to pay Storeworks for the rent and late fees owed by Xenia under the Sublease Agreement after written request that he do so.

67. To date, Storeworks has been damaged in the amount of $30,249 by Stelzer's refusal to honor the Guaranty.

68. In addition, Storeworks is entitled to recover from Stelzer its attorney fees, costs, disbursements, and expenses incurred to recover the amounts owed under the Sublease Agreement and Guaranty, which amounts continue to accrue, together with any additional amounts the landlord may assess.

69. Further, in the event of litigation with the landlord, Stelzer must defend and indemnify Storeworks.

## **Prayer for Relief**

Counterclaim Plaintiff Storeworks Technologies, Ltd. respectfully asks that judgment be entered in its favor and against Xenia Retail, Inc. and Troy Stelzer, awarding the following relief:

1. An injunction ordering Xenia and Stelzer to honor the terms of the Redemption Agreement, including Section 3.5 and Sections 3.7 and 3.8 through August 28, 2021 and for such additional period as may be warranted by law;

2. Damages in excess of $50,000, in a precise amount to be determined at trial;

3. Storeworks' attorney fees, costs, and disbursements;

4. Interest; and

5. Such other and further relief as the Court deems just and equitable.

8498612

18

RESPECTFULLY SUBMITTED,

ARTHUR, CHAPMAN, KETTERING,
SMETAK & PIKALA, P.A.

Dated: August 6, 2019

Sarah E. Bushnell (#326859)
Perssis Meshkat (#390057)
500 Young Quinlan Building
81 South Ninth Street
Minneapolis, MN 55402-3214
P: (612) 339-3500
F: (612) 339-7655
sebushnell@ArthurChapman.com
pmeshkat@ArthurChapman.com

*Attorneys for Defendants and Counterclaim
Plaintiffs StoreWorks Technologies Ltd. and Anil
Konkimalla*

## ACKNOWLEDGMENT

The undersigned attorney acknowledges that sanctions may be imposed for violations of

Minn. Stat. § 549.211.

Sarah E. Bushnell

19

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (the "Agreement") is effective as of May 17, 2018. The parties to this Agreement are Xenia Retail, Inc. ("Xenia"), Troy Stelzer ("Stelzer"), Storeworks Technologies Ltd. ("Storeworks") and Anil Konkimalla ("Konkimalla") and are sometimes collectively referred to herein as the "Parties."

### Recitals

WHEREAS, on or about August 25, 2017, the Parties, among others, entered into a Redemption and Acquisition Agreement (the "Redemption Agreement");

WHEREAS, a dispute arose between the Parties regarding, among other things, the Parties' rights and obligations under the Redemption Agreement;

WHEREAS, as a result of the dispute, Xenia and Stelzer commenced an action styled Xenia Retail, Inc. and Troy Stelzer vs. Storeworks Technologies Ltd. and Anil Konkimalla, currently venued in Hennepin County District Court, Court File No. 27-CV-17-16152 (the "Action");

WHEREAS, the Parties previously entered into a Stipulation for Order and Order for Deposit of Funds, pursuant to which the Parties agreed that Best Buy Canada, Ltd. would pay into Court $151,299.00 in disputed funds, to be held until ordered disbursed by the Court;

WHEREAS, the Parties mediated their dispute in front of James Dunn, Esq. on May 17, 2018; and

WHEREAS, the Parties now desire to formally document the compromise and settlement reached as a result of the May 17, 2018 mediation.

NOW THEREFORE, in consideration of the promises, the respective covenants and commitments set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties do hereby agree to the following:

### Agreement

1.     Incorporation of Recitals.  The recitals set forth above are integral hereto, are true and correct, and are hereby incorporated into this Agreement as express terms and conditions hereof.

2.     Ratification/Reaffirmation of the Redemption Agreement.  To the extent not specifically modified or specifically released herein, the Parties hereby restate, repeat and reaffirm all of their respective obligations under and pursuant to the Redemption Agreement. The Parties acknowledge, stipulate and agree that, to the extent not specifically modified or specifically released herein, the terms and conditions of the Redemption Agreement shall remain in full force and effect.

**EXHIBIT**

**1**

3.    <u>Distribution of the Disputed Best Buy Canada, Ltd. Funds</u>.  The Parties shall jointly apply to the Hennepin County District Court for an order disbursing the $151,299.00 in Best Buy Canada, Ltd disputed funds as follows:  (a) $29,000 to Xenia Retail, Inc., (b) $67,229 to the owner/landlord of the leased premises located at 11635 Northpark Drive, Suite 360, Wake Forest, North Carolina (to be used to pay the $41,000 currently in arrears and the lease charges due in June and July of 2018) and (c) $55,000 to Storeworks Technologies Ltd.

4.    <u>Sublease Agreement/Personal Guaranty</u>.  At the same time the Parties execute this Agreement, Xenia shall execute a Sublease Agreement, and Stelzer shall execute a personal guaranty, in the forms attached hereto as <u>Exhibit A</u>.

5.    <u>Release</u>.  The Parties hereby mutually release, acquit, and forever discharge each other, along with each other's employees, owners, officers, directors, attorneys, agents, affiliates, subsidiaries, divisions, successors and assigns, from any and all claims asserted against each other through May 17, 2018 in the Action.  In addition, and to the extent not already released by the preceding sentence, Xenia and Stelzer hereby release, acquit and forever discharge Storeworks and Konkimalla from any and all claims Xenia and Stelzer have, had or may in the future have under Paragraph 2.3 of the Redemption Agreement for reimbursement of and/or indemnification for attorneys' fees.  This release does not affect the Parties' other rights or other obligations under the ratified/reaffirmed Redemption Agreement.

6.    <u>Dismissal of the Action</u>.  At the same time the Parties execute this Agreement, the Parties shall file a stipulation for dismissal, dismissing the Action with prejudice.

7.    <u>Further Assurances</u>.  The Parties to this Agreement hereby agree to execute such other documents and to take such other action as may reasonably be necessary to further the purposes of this Agreement.

8.    <u>Governing Law</u>.  This Agreement shall be construed and interpreted under the laws of the State of Minnesota without regard to its conflict-of-law principles.

9.    <u>Binding Effect; Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and, to the extent permitted by applicable law, to their respective successors and permitted assigns.

10.    <u>Construction</u>.  The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof. The Parties agree that each of them and their respective legal counsel have reviewed and had an opportunity to revise this Agreement and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Agreement.  Instead, the language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent.

11.    <u>Representation/No Coercion</u>.  The Parties represent, warrant and acknowledge that they have been represented by legal counsel in connection with the negotiation and documentation of this Agreement, that they have legal and other options available to them other than the execution of this Agreement, and that they have chosen to execute this Agreement of their own free will.

12.    <u>Counterparts.</u>  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same agreement.  Any electronically transmitted signature or photocopy of a signature to the Agreement shall be deemed an original signature to the Agreement and shall have the same force and effect as an original signature.  For purposes of this section, an "electronically transmitted signature" means a manually-signed original signature that is sent in the form of a facsimile or sent via the internet as a "pdf" (portable document format) or other replicating image attached to an email message.

13.    <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such portion without invalidating the remaining provisions of this Agreement.

14.    <u>Entire Agreement</u>.  This Agreement shall constitute the entire agreement of the Parties, shall supersede any prior or contemporaneous oral or written agreements relating to the subject matter of this Agreement, and shall not be subject to any change, modification, amendment, or addition without the express written consent of the Parties.

Dated: June _11_, 2018                  XENIA RETAIL, INC.

By _Troy Stelzer_

Its: _CEO_

Dated:  June __, 2018

TROY STELZER

Dated:  ~~June~~, 2018          STOREWORKS TECHNOLOGIES LTD.
        July, 20, 2018

By _K. Anil ___

Its: _CEO_

3

Dated: ~~June ___,~~ 2018
July, 20, 2018

_____

ANIL KONKIMALLA

15496619v2

## SUBLEASE AGREEMENT

This **SUBLEASE AGREEMENT** ("*Sublease*"), is made this 25th day of August, 2017 by and between StoreWorks Technologies, Limited, a Minnesota corporation ("*Sublandlord*") and Xenia Retail, Inc., a Delaware corporation ("*Subtenant*").

**WHEREAS**, Sublandlord entered into that certain Master Lease by and between Sublandlord, as tenant and Beacon Ventures LLC, a North Carolina limited liability company, as landlord, as assigned to CCP Property Raleigh-Durham, LLC, a Delaware limited liability company ("*Landlord*") dated May 23, 2014 ("*Master Lease*"), for the premises described in the Master Lease ("*Premises*"), a copy of which Master Lease is attached hereto as Exhibit A and made a part hereof; and

**WHEREAS**, Subtenant and Sublandlord wish to enter into an agreement whereby Subtenant will sublease the Premises from Sublandlord pursuant to the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the mutual promises herein, contained and other good and valuable consideration, it is agreed:

### ARTICLE 1
### Premises

1.1    Premises.    Sublandlord leases to Subtenant, and Subtenant leases from Sublandlord, on the terms and conditions set forth in this Sublease, the Premises, located at 11635 Northpark Drive, Suite 360 in the City of Wake Forest, State of North Carolina, together with all rights, privileges, easements and appurtenances granted to Sublandlord pursuant to the Master Lease.

### ARTICLE 2
### Term

2.1    Term.    This Sublease shall commence on the date hereof (the "*Commencement Date*") and shall end on February 28, 2019 unless the term of the Master Lease shall be sooner terminated as provided therein (the earlier of which date shall be the "*Expiration Date*") (the "*Term*"). Upon the expiration of this Sublease, Subtenant shall surrender the Premises in as good a condition as existed as of the effective date of this Sublease, reasonable wear and tear excepted.

### ARTICLE 3
### Base Rent: Security Deposit

3.1    Base Rent.    (a)  Subtenant shall base rent ("*Base Rent*"), commencing on the Commencement Date, in the amount specified below. Base Rent shall be due in advance on the first day of each month during the Term.

| Period | Annual Base Rent PSF | Annual Base Rent | Monthly Base Rent |
|---|---|---|---|
| Commencement Date – February 28, 2018 | $23.50 | $157,967.04 | 13,163.92 |
| March 1, 2018 – February 28, 2019 | $24.00 | $161,328.00 | $13,444.00 |

(b)      All payments of Base Rent and all other amounts payable by Subtenant under this Sublease shall be paid without notice or demand, and without deduction or setoff, in lawful money of the United States of America to Sublandlord at such address as provided for in Article 16. All payments of Base Rent and other amounts shall be made by check jointly payable to both Sublandlord and Landlord.  Upon receipt of any check made jointly payable to Sublandlord and Landlord, Sublandlord shall endorse the check and forward to Landlord.

(c)      If the Commencement Date shall be a date other than the first day of a calendar month, or if the Expiration Date shall be other than the last day of a calendar month, then the Base Rent for the first or last partial month of the Term, as the case may be, shall be prorated on a per diem basis.

ARTICLE 4
Additional Rent

(a)      Additional Rent.  In addition to Base Rent, and commencing on the Commencement Date, Subtenant shall pay Sublandlord each month, all other amounts payable by Sublandlord to Landlord (even though not necessarily payable to Landlord) under the terms of the Mater Lease, including, but not limited to Operating Expenses and utilities ("*Additional Rent*," which, along with the Base Rent, shall be the "*Rent*").  In the event that Subtenant fails to pay Additional Rent when due, Sublandlord shall have all the rights and remedies provided for in this Sublease, or by law, for the non-payment of Base Rent.  Additional Rent shall be due in advance on the first day of each month during the Term.  All payments of Additional Rent shall be made by check jointly payable to both Sublandlord and Landlord.  Upon receipt of any check made jointly payable to Sublandlord and Landlord for Additional Rent, Sublandlord shall endorse the check and forward to Landlord.

4.2      Right to Fulfill Obligations.  If Subtenant fails to pay any amount due to any third party for services rendered with respect to the Premises, Sublandlord shall have the right, but not the obligation to make such payment on behalf of Subtenant and demand repayment of the same as Additional Rent.  Any sums so paid by Sublandlord shall bear interest at the Late Rate from the date of such payment.  No such payment or expenditure by Sublandlord shall be construed as a waiver of Subtenant's default nor shall it affect any other right or remedy of Sublandlord under this Sublease.

2

## ARTICLE 5
### Use and Operation

5.1     Use.   Subtenant agrees that the Premises shall be used in accordance with the terms of the Master Lease and for no other purposes.    Notwithstanding the foregoing, the Permitted Use must comply with all applicable laws, codes, rules and regulations and Subtenant, at its sole cost and expense, must secure all permits and licenses required for such use.

5.2     Signage.   Subtenant shall not install any exterior signage on the Premises or within the interior of the Premises if visible from the exterior of the Premises without the prior written consent of Sublandlord and Landlord, which may be withheld in the sole discretion of Sublandlord and Landlord. All other signage shall be in accordance with the terms of the Master Lease.

## ARTICLE 6
### Utilities and Other Charges

6.1     Utilities.   Commencing on the Commencement Date, Subtenant shall be liable for any and all costs for utilities payable by Sublandlord to Landlord under the Master Lease, including but not limited to heating and air condition costs outside of the hours of operation (as set forth in the Master Lease) and any and all charges for excess services (as set forth in the Master Lease). No temporary interruption or failure of utility services, whether incidental to the making of repairs, alterations or improvements, or due to accidents or strike or conditions or events not under Sublandlord's control, shall be deemed as an eviction of the Subtenant or relieve the Subtenant from any of the Subtenant's obligations hereunder.

## ARTICLE 7
### Quiet Enjoyment; Maintenance; Repairs

7.1     Subtenant Repairs.   Provided Subtenant is not in default of the terms hereof, the Subtenant shall have the peaceful and quiet enjoyment of the Premises without interference from the Sublandlord.  Subtenant covenants, throughout the term hereof, at Subtenant's sole cost and expense, to keep and maintain the Premises in accordance of the terms of the Master Lease.

## ARTICLE 8
### Environmental Matters

8.1     Definitions.   For the purposes of this Sublease, the following terms shall have the following definitions:

(a)     "*Hazardous Materials*" means asbestos, polychlorinated biphenyl and such materials, waste, contaminates or other substances defined as toxic, dangerous to health or otherwise hazardous by cumulative reference to the following sources as amended from time to time:   (i) the Resource Conservation and Recovery Act of 1976, 42 USC §6901 *et. seq.* ("RCRA"); (ii) the Hazardous Materials Transportation Act, 49 USC §1801, *et. seq.*; (iii) the Comprehensive Environmental Response Compensation and Liability Act of 1980, 42 USC §9601 *et. seq.* ("CERCLA"); (iv) applicable laws of the jurisdiction where the Premises are located; and (v) any federal, state or local statutes, regulations, ordinances, rules or orders issued

3

or promulgated under or pursuant to any of those laws or otherwise by any department, agency or other administrative, regulatory or judicial body.

       (b)   "*__Environmental Law__*" means any current or future federal, state or local law, regulation, ordinance or code regarding the manufacture, processing, use, handling, release, transportation, storage, or disposal of Hazardous Materials.

    8.2   <u>Hazardous Materials</u>.  Subtenant shall not cause or permit any Hazardous Material to be brought on, kept or used in or about the Premises without the prior written consent of Sublandlord.  Subtenant will indemnify and hold harmless Sublandlord from any losses, liabilities, damages, costs or expenses (including reasonable attorneys' fees) which Sublandlord may suffer or incur as a result of Subtenant's breach of this Article.

    8.3   <u>Compliance with Laws</u>.  Subtenant will promptly notify Sublandlord, in writing, if Subtenant has or acquires notice of knowledge that any Hazardous Material has been or is threatened to be released, generated, manufactured, stored, treated, transported, or disposed of, on, in, under, or from the Premises; and if any Hazardous Material is found on the Premises, Sublandlord will immediately take such action as is necessary to detain the spread of and remove the Hazardous Material to the complete satisfaction of the appropriate governmental authorities. Subtenant will immediately notify Sublandlord and provide copies upon receipt of all written complaints, claims, citations, demands, inquiries, reports, or notices relating to the condition of the Premises or compliance with environmental laws.

    8.4   <u>Survival</u>.  The provisions of this Article shall survive the Expiration Date or sooner termination of this Sublease.

<center>ARTICLE 9<br>Insurance</center>

    9.1   <u>Subtenant Insurance</u>.  Subtenant agrees to maintain such policies of insurance required of Sublandlord, as tenant, under the terms of the Master Lease.

    9.2   <u>Subrogation</u>.  Sublandlord and Subtenant hereby waive any rights each may have against the other on account of any loss or damage occasioned by either Sublandlord or Subtenant, as the case may be, their respective property, the Premises, or its contents or to other portions of the Premises, arising from any risk actually covered or to be covered by the insurance policies required hereunder.  Sublandlord and Subtenant hereby release each other from any and all liability or responsibility to the other or anyone claiming through or under them by way of subrogation or otherwise for any loss or damage to property caused by fire or any of the extended coverage or supplementary contract casualties, even if such fire or other casualty shall have been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible.

<center>ARTICLE 10<br>Non-Liability</center>

    10.1   <u>Non-Liability</u>.  Except for damages or losses which (i) arise from any breach or default by Sublandlord of this Sublease; or (ii) arise from any gross negligence or intentional

<center>4</center>

misconduct of Sublandlord in, about or to the Premises, Sublandlord shall not be liable for damage to any property of Subtenant or of others located on the Premises, nor for the loss of or damage to any property of Subtenant or of others by theft or otherwise. Without limiting the foregoing, Sublandlord shall not be liable for any injury or damage to persons or property resulting from any natural or unnatural cause including, but not limited to, fire, explosion, gas, electricity, water, rain, snow or dampness or by any such damage caused by occupants, other than Sublandlord or its employees or agents, of the Premises or adjacent property, or the public or caused by operations in construction of any private, public or quasi-public work. Sublandlord shall not be liable for any latent defect in the Premises.

10.2   _Indemnification_. (a) Subtenant shall indemnify, defend and hold the Sublandlord harmless from all loss, cost, liability, claim, damage and expense (including reasonable attorneys' fees and disbursements), penalties and fines, incurred in connection with or arising from (1) any default by Subtenant in the observance or performance of any of the terms, covenants or conditions of this Sublease, (2) the use or occupancy or manner of use or occupancy of the Premises by Subtenant or any person claiming through or under Subtenant or (3) any acts, omissions or negligence of Subtenant or any person claiming through or under Subtenant, or the contractors, agents, servants, employees, visitors or licensees of Subtenant or any person claiming through or under Subtenant, in the Premises during, the Term, including any acts, omissions  or negligence in the making or performing of any repairs, restoration, alterations or improvements.

The indemnification provisions of this Article shall survive the expiration or sooner termination of this Sublease.

### ARTICLE 11
### Assignment, Subletting and Mortgaging

11.1   _Assignment; Subletting; Mortgaging_. Subtenant shall not assign, sell, transfer or mortgage its interest in this Sublease without the prior written consent of the Sublandlord.

11.2   _No Release_. Any assignment or subletting that is allowed or approved under this Sublease shall not release or discharge Subtenant from any liability, whether past, present or future, under this Sublease, and Subtenant shall remain fully liable hereunder. Any sublease or assignment must be in a form that is satisfactory to Sublandlord and must require that any subtenant or assignee agree to be bound by and to comply with all of the terms, covenants, conditions and provisions of this Sublease to the extent that the space is sublet or assigned.

### ARTICLE 12
### Access to Premises

12.1   _Sublandlord's Access_. The Sublandlord reserves the right to enter upon, inspect and examine the Premises during normal business hours.

### ARTICLE 13
### Event of Default

5

13.1  <u>Default</u>.  If any payment of Base Rent or Additional Rent or any portion thereof, is not paid within five (5) days after the date such payment was due, or if any other term, condition or covenant of this Sublease, express or implied, on the part of the Subtenant is violated or neglected and if Subtenant shall fail to cure the same within ten (10) days after receipt of written notice from Sublandlord or Landlord, Subtenant shall be deemed to be in default and Sublandlord shall have the rights and remedies against Subtenant as would be available to Landlord against Sublandlord in the event of default by Sublandlord under the Master Lease.

<div align="center">

ARTICLE 14
<u>Subordination: Estoppel Certificate</u>

</div>

14.1  <u>Subordination</u>.  Landlord and Sublandlord reserve the right and privilege to subject and subordinate this Sublease at all time to the lien of any mortgage or mortgages now or hereafter placed upon the Landlord's or Sublandlord's interest in the Premises provided that such subordination does not disturb the possession or other rights of Subtenant under this Sublease. Subtenant agrees to execute and deliver, within ten (10) days after written request from Landlord or Sublandlord, such further instrument or instruments as may be required by Landlord or Sublandlord's lender to subordinate this Sublease to the lien of any such mortgage as shall be desired by Landlord or Sublandlord so long as such subordination agreement conforms with the requirements of this Article.

14.2  <u>Estoppel Certificates</u>.  Either party to this Sublease will, at any time from time to time, within ten (10) days after written request from the other party, execute, acknowledge and deliver to the requesting party a statement in writing certifying that this Sublease is unmodified (or if modified then disclosure of such modification shall be made) and in full force and effect on the date to which the rents and other charges have been paid, and stating whether or not said party has knowledge of any default hereunder on the part of the other party in the performance of any covenant, agreement or condition contained herein and if so, specifying each such default, it being intended that any such statement delivered pursuant to this Article may be relied upon by any prospective purchaser, mortgagee or holder of a deed of trust of the Premises or any assignee of any such party.

<div align="center">

ARTICLE 15
<u>Brokers</u>

</div>

15.1  <u>No Brokers</u>.  Sublandlord and Subtenant represent that the negotiation of this Sublease did not involve any real estate brokers.  Each party shall indemnify and hold the other harmless from and against any and all liabilities, claims, losses, damages, costs and expenses arising out of any inaccuracy or alleged inaccuracy of the above representation, including reasonable attorneys' fees and disbursements.  The provisions of this Article shall survive the termination of this Sublease.

<div align="center">

ARTICLE 16
<u>Notices</u>

</div>

16.1  <u>Notice</u>.  Except as otherwise expressly provided in this Sublease, any bills, statements, notices, demands, requests, consents or other communications given or required to be given under this Sublease shall be effective only if given in writing signed by the party giving

<div align="center">

6

</div>

the same or its attorney, and sent by (a) certified or registered U.S. mail, postage prepaid, return receipt requested, (b) personal delivery, or (c) a nationally recognized overnight courier service, addressed as follows:

if to Subtenant:

> Xenia Retail, Inc.
> 7760 France Avenue South
> Suite 1112
> Bloomington, MN 55435
> Attention: Troy Stelzer

if to Sublandlord:

> StoreWorks Technologies, Limited
> 7300 Washington Ave. S
> Eden Prairie, MN 55344
> Attn: Anil Konkimalla

with a copy to:

> Winthrop & Weinstine, P.A.
> 225 South Sixth Street, Suite 3500
> Minneapolis, MN 55402-4629
> Attn: Matthew R. McBride
> (612) 604-6426
> Email: mmcbride@winthrop.com

16.2   Timing of Notice.  Any such bill, statement, notice, demand, request, consent or other communication shall be deemed to have been rendered or given on the date which is: (a) three (3) days after the date mailed, (b) one (1) business day after deposit with a nationally recognized overnight courier service for overnight delivery, or (c) on the date of personal delivery, as the case may be.  Either party may change its address for delivery by giving notice to the other party as provided in this Article.

ARTICLE 17
Assumption: Termination

17.1   Assumption of Master Lease Obligations.  Except as expressly set forth herein, Subtenant hereby assumes and agrees to perform with respect to the Premises, each and every obligation of Sublandlord as tenant under the Master Lease, in accordance with the terms of the Master Lease.  Except as expressly set forth herein, the Subtenant hereby agrees and acknowledges that its tenancy and occupation of the Premises shall be subject to such obligations and to all of the terms and conditions of the Master Lease. Except as expressly set forth herein, for purposes of this Sublease, and Subtenant's obligations hereunder, any obligations of

7

Sublandlord as Tenant under the Master Lease with respect to the Premises shall be obligations of Subtenant.

17.2   Termination of Sublease.   Notwithstanding anything in the Master Lease or this Sublease to the contrary, if at any time the Master Lease shall be terminated by the Landlord thereunder for any reason, this Sublease shall automatically terminate effective as of the date of such termination of the Master Lease.   In the event of any such termination, Sublandlord and Subtenant shall have no further rights or obligations under this Sublease, except as otherwise specifically set forth herein.

## ARTICLE 18
### End of Term

18.1   Surrender of Premises.   Subtenant shall, on or before the Expiration Date or sooner termination of this Sublease, peaceably and quietly leave and surrender to Sublandlord the Premises, in good condition, reasonable wear and tear excepted, together with all Improvements and fixtures which may have been made or placed upon the Premises, except movable furniture, movable personal property or movable trade fixtures put in at the expense of Subtenant.   All property removable by Subtenant pursuant to this Article which shall not be removed by Subtenant on or before the date when Subtenant shall vacate and surrender the Premises shall be deemed abandoned by Subtenant.

18.2   Holdover.   In the event that Subtenant retains possession of the Premises after the expiration or earlier termination of this Sublease and Sublandlord is no longer the Tenant under the Master Lease, Subtenant shall indemnify and hold Sublandlord harmless from any claims, costs and damages incurred by Sublandlord as a result of Subtenant's hold over tenancy.   The foregoing provisions are in addition to, and do not affect Sublandlord's right of re-entry or any other rights of Sublandlord hereunder or provided by law.

## ARTICLE 19
### Miscellaneous

19.1   No Waiver.   The receipt of rent by Sublandlord with knowledge of any breach of this Sublease by Subtenant or of any default on the part of Subtenant in the observance or performance of any of the conditions or covenants of this Sublease, shall not be deemed to be a waiver of any of the terms, covenants or conditions of this Sublease.   No failure on the part of either the Sublandlord or the Subtenant to enforce any term, covenant or condition of this Sublease, nor any waiver of any right by Sublandlord or Subtenant shall discharge or invalidate such term, covenant or condition, or affect the right of Sublandlord or Subtenant to enforce the same in the event of any subsequent breach or default.

19.2   Enforcement.   In the event of any litigation between Subtenant and Sublandlord or Landlord to enforce the terms of this Sublease, Subtenant shall immediately pay all of Sublandlord or Landlord's costs and expenses, including attorneys' fees, incurred in enforcing Subtenant's obligations hereunder.

19.3   Captions.   The Article and Section headings in this Sublease are inserted only as a matter of convenience in reference and are not to be given any effect in construing any provision

8

of this Sublease.  All references in this Sublease to Article and Section numbers shall be deemed to refer to Articles and Sections and of this Sublease unless otherwise stated.

19.4   Successors and Assigns.   The covenants and agreements contained in this Sublease shall apply to, inure to the benefit of, and be binding upon Sublandlord and Subtenant and upon their respective successors and permitted assigns, except as otherwise stated to the contrary in this Sublease.

19.5   Amendments; Modifications.   This Sublease may not be changed, cancelled or discharged orally, but only by an agreement in writing and signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.  All understandings and agreements between Sublandlord and Subtenant are merged in this Sublease which represents the entire agreement between the parties and which fully and completely sets forth all terms and conditions of the transactions embodied in this Sublease.

19.6   Severability.  If any term or provision of this Sublease or any portion of a term or provision of this Sublease or the application of any such term or condition to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Sublease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected, and each term and provision of this Sublease shall be valid and be enforced to the fullest extent permitted by law.

19.7   Counterparts.  This Sublease may be signed in any number of counterparts, each of which when taken together shall be deemed to be a complete document.

19.8   Governing Law.  This Sublease shall be governed by the internal laws of the State of North Carolina, without regard to principles of conflicts of law.

*[Remainder of page left intentionally blank]*

9

IN WITNESS WHEREOF, the parties hereto have duly executed this Sublease as of the day and year first above written.

SUBLANDLORD

STOREWORKS TECHNOLOGIES, LIMITED,
a Minnesota corporation

By: _____

Name:  Anil Konkimalla

Its:  Chief Officer

SUBTENANT:

XENIA RETAIL, INC., a Delaware corporation

By: _____

Name:  Troy Stelzer

Its:  CEO

Consented to by LANDLORD this _____ day of _____, 2017

CCP PROPERTY RALEIGH-DURHAM, LLC

By: _____

Name: _____

Its: _____

14157450v2

S-1

## EXHIBIT A

THE MASTER LEASE

(see attached)

## GUARANTY

THIS GUARANTY ("**Guaranty**") is provided by Troy Stelzer ("**Guarantor**") to Storeworks Technologies, Ltd., a Minnesota corporation ("**Sublandlord**") pursuant to that certain SUBLEASE AGREEMENT ("**Sublease**") by and between Xenia Retail, Inc. ("**Subtenant**") and Sublandlord to which this Guaranty is attached.

### RECITALS:

A.      Guarantor acknowledges that as a condition of Sublandlord leasing the Premises to Subtenant, Sublandlord is requiring Guarantor to personally guarantee the payment of rents, the performance of all obligations of Subtenant under the Sublease, as well as all other terms, covenants and conditions contained in the Sublease (collectively, "**Obligations**").

B.      Guarantor is willing to provide this Guaranty.

NOW THEREFORE, Guarantor hereby covenants, acknowledges and agrees that:

(1)      Sublandlord may demand payment or performance from or by Guarantor of any or all of the Obligations, when such payment or performance is required, and Guarantor shall promptly provide such payment or performance.

(2)      Sublandlord shall not be required to first seek payment or performance from the Subtenant or from any other guarantor, person or entity, or seek any other right or remedy, prior to enforcing this Guaranty.

(3)      Sublandlord shall not be required to provide Guarantor with any notice of any default under the Sublease prior to seeking payment or performance under this Guaranty.

(4)      Guarantor agrees that this Guaranty shall remain in full force and effect and be binding upon Guarantor until the Obligations are satisfied in full, or Guarantor is released from this Guaranty under applicable provisions in this Guaranty or the Sublease.

(5)      Guarantor consents to any modifications and amendments of the terms, provisions, covenants and conditions of the Sublease which may be made by Subtenant and Sublandlord hereafter.

(6)      Guarantor agrees that this Guaranty shall be binding upon the undersigned, its successors and assigns, and shall inure to the benefit of Sublandlord, its successors and assigns.

(7)      Guarantor agrees that this Guaranty shall be governed by the laws of the State of Minnesota.

(8)      Guarantor acknowledges that no failure on the part of Sublandlord to exercise, and no delay in exercising, any right or remedy hereunder shall operate as, or constitute a waiver of, any rights available to Sublandlord, nor shall any single or partial exercise of any right or remedy hereunder preclude, or further exercise thereof or the exercise of, any other right or remedy granted hereby or by any related document or by law.

(9)      Guarantor agrees that (i) Guarantor will indirectly benefit by and from the Sublease; (ii) Guarantor has received legal and adequate consideration for the execution of this Guaranty and has executed and delivered this Guaranty to Sublandlord in good faith in exchange for reasonably equivalent value; and (iii) Guarantor is not presently insolvent and will not be rendered insolvent by virtue of the execution and delivery of this Guaranty.

IN WITNESS WHEREOF, this Guaranty is effective as of the _11_ day of _July_ , 2018.


Troy Stelzer

15511474v1

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

CASE TYPE: Contract

Xenia Retail, Inc. and Troy Stelzer,

    Plaintiffs,

vs.

StoreWorks Technologies Ltd. and
Anil Konkimalla,

    Defendants.

Court File No.: 27-CV-17-16152
Judge Kathleen D. Sheehy

**STIPULATION FOR DISMISSAL
WITH PREJUDICE**

## STIPULATION

All issues in the above-captioned action by and between Plaintiffs and Defendants having been fully and finally compromised and settled,

IT IS HEREBY STIPULATED AND AGREED, by and between the parties hereto, through their respective counsel of record, that all claims and counterclaims, if any, shall be dismissed with prejudice, upon the merits and without costs, disbursements or attorneys' fees to any party, and that any party hereto may forthwith, without notice to the other, apply to the Court pursuant to this Stipulation for an Order directing entry of judgment of dismissal of the entire action with prejudice and on the merits.

Dated: June __, 2018                  MALKERSON GUNN MARTIN LLP

                                      By: _____
                                          Thomas F. DeVincke, #301759

                                          220 South Sixth Street, Suite 1900
                                          Minneapolis, MN 55402
                                          (952) 224-3644
                                          tfd@mgmllp.com

                                          **Attorneys for Plaintiffs**

Dated: June __, 2018                  WINTHROP & WEINSTINE, P.A.

                                      By: _____
                                          Matthew R. McBride, #261981

                                          3500 Capella Tower
                                          225 South Sixth Street
                                          Minneapolis, MN 55402
                                          (612) 604-6400
                                          mmcbride@winthrop.com

                                          **Attorneys for Defendants**

15514367v1

2

<div align="center">

**LEASE**
**FACE PAGE**

</div>

| | |
|---|---|
| **LEASE DATE:** | May 23, 2014 |
| **LANDLORD:** | Beacon Ventures LLC, a North Carolina limited liability company |
| **LANDLORD'S NOTICE ADDRESS:** | 610 East Morehead Street<br>Suite 250<br>Charlotte, NC  28202<br>Attn: Gregg E. Sandreuter |

**ALL PAYMENTS SHOULD BE MAILED TO:**

Beacon Ventures, LLC
c/o Beacon Partners
610 East Morehead Street
Suite 260-AR
Charlotte, NC 28202

| | |
|---|---|
| **TENANT:** | Storeworks Technologies, Limited, a Minnesota corporation |
| **TENANT'S NOTICE ADDRESS:** | Storeworks Technologies<br>7300 Washington Ave. S.<br>Eden Prairie,  MN  55344<br><br>Email:  anilk@storeworks.com<br><br>Phone:  ( 952) 746-5555<br>Fax:  (952) 746-5556 |
| **PROJECT:** | That certain building or project known as NorthPark I ("Project"), with an address of 11635 Northpark Drive, Wake Forest, North Carolina 27587. |
| **PREMISES:** | Shall be deemed to be 6,722 rentable square feet ("SF"), located at 11635 Northpark Drive, Suite 360 and more particularly described in Exhibit "A" ("Premises"). |
| **LEASE TERM:** | A period of fifty-six (56) months, beginning on the Commencement Date and ending as set forth in Section 1.3 of this Lease. |
| **ANNUAL BASE RENT:** | Initially, $147,884.04 per year subject to increases as set |

**EXHIBIT 2**

forth in Exhibit "C".

**MONTHLY BASE RENT:**       Initially, $12,323.67 per month subject to increases as set
forth in Exhibit "C".

**SECURITY DEPOSIT:**        $12,323.67 ("Security Deposit").

**PROPORTIONATE SHARE:**     16.05%.

**BASE YEAR FOR OPERATING**  Calendar year ending December 31, 2014.
**EXPENSES:**

# LEASE

This Lease including the Face Page and all exhibits and attachments hereto ("Lease") is made and entered into as of the date set forth on the Face Page, by and between Beacon Ventures, LLC, a North Carolina limited liability company (hereinafter referred to as "Landlord") and Storeworks Technologies, Limited, a Minnesota corporation (hereinafter referred to as "Tenant").

## SECTION 1
## PREMISES, PROPORTIONATE SHARE AND TERM

**1.1. Premises.** Landlord hereby demises and leases to Tenant, and Tenant hereby accepts and leases from Landlord the Premises (defined on the Face Page of this Lease) together with all rights, privileges, easements, appurtenances, and amenities belonging to or in any way pertaining to the Premises.

**1.2. Proportionate Share.** Tenant's proportionate share ("Proportionate Share") shall be equal to a fraction which has as its numerator the SF of the Premises and as its denominator the total SF of the Project. Tenant's Proportionate Share is shown on the Face Page of this Lease. Should the SF of the Project change at any time during the Term, as a result of a recalculation, reconfiguration or addition to the Project by Landlord, Landlord shall notify Tenant in writing of the new SF of the Project and Tenant's new Proportionate Share, which new Proportionate Share shall replace the Proportionate Share in effect at such time and shall be used for all relevant calculations under this Lease.

**1.3. Term.** The term of this Lease ("Term") shall begin on the Commencement Date (as hereinafter defined) and end at midnight on February 28, 2019. For the purposes of this Lease any reference to "days" shall be deemed to refer to calendar days unless specifically noted as "business days".

**1.4. Commencement Date.** The commencement date ("Commencement Date") of this Lease shall be June 1, 2014.

**1.5. Possession.** Unless identified in writing to Landlord prior to the time of taking of possession, taking of possession by Tenant shall be deemed conclusively to establish that the Premises are in good and satisfactory condition, as of such date of possession. Tenant acknowledges that no representations or warranties as to the condition or repair of the Premises have been made by Landlord, unless such are expressly set forth in this Lease. In the event of any dispute as to substantial completion of work performed or required to be performed by Landlord, an AIA certificate of substantial completion from Landlord's architect or a temporary or final Certificate of Occupancy, issued by the Engineering & Building Standards Department of the county where the Project is located, or other applicable governmental authority, shall be conclusive.

## SECTION 2
## MONTHLY BASE RENT AND ADDITIONAL RENT

**2.1. Monthly Base Rent.** Tenant agrees to pay to Landlord Monthly Base Rent (as defined on the Face Page of this Lease) for the Premises, in advance, without demand, deduction or set off, for the entire Term. One (1) such monthly installment shall be due and payable on the date hereof, and this payment shall be

applied to the first payment due at the beginning of the Term.  Each installment of Monthly Base Rent shall be due and payable on or before the first day of each calendar month during the Term.  The payment for any fractional calendar month at the commencement or end of the Term shall be prorated.

**2.2.  Additional Rent.**  Any payments due Landlord hereunder with respect to Operating Expenses (as defined in Section 5 of this Lease), or any other payment or reimbursement other than Monthly Base Rent shall be defined as additional rent ("Additional Rent").  Payments of Additional Rent shall be due and payable within twenty (20) days of the date of Landlord's invoice to Tenant unless specified otherwise in Section 5 of this Lease.

**2.3.  Payment Address.**  All Monthly Base Rent, Additional Rent and other payments required to be made by Tenant to Landlord hereunder shall be payable to Landlord at the address set forth on the Face Page of this Lease or at such other address as Landlord may specify from time to time by written notice. Tenant's obligation to pay Monthly Base Rent, Additional Rent and other amounts to Landlord under the terms of this Lease shall not be deemed satisfied until such payments have been actually received by Landlord.  In the event that any check, draft or other instrument of payment given by Tenant is dishonored for any reason, Tenant agrees to pay to Landlord the sum of $50.00 on demand in addition to any Late Payment Charge that may be due.

<div align="center">

**SECTION 3**
**LATE PAYMENT CHARGE AND SECURITY DEPOSIT**

</div>

**3.1.  Late Payment.**  In the event that any installment of Monthly Base Rent or Additional Rent or any other payment or reimbursement due hereunder is not received by Landlord within seven (7) days of the date when such payment or reimbursement is due, Tenant shall pay to Landlord on demand a late charge ("Late Payment Charge") in an amount equal to five percent (5%) of such payment or reimbursement. The provision for such Late Payment Charge shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as liquidated damages or as limiting Landlord's remedies in any manner.

**3.2.  Security Deposit.**  Tenant agrees to deposit with Landlord on the date hereof the Security Deposit (as defined on the Face Page of this Lease).  Landlord will hold the Security Deposit, without obligation for interest, as security for the performance of Tenant's covenants and obligations under this Lease.  The Security Deposit will not be deemed an advance payment of Monthly Base Rent or other amounts due under this Lease nor will the Security Deposit be deemed a measure of Landlord's damages for any Tenant default.  Upon the occurrence of any event of default by Tenant, Landlord may, from time to time, without prejudice to any other remedy provided herein or provided by law, use the Security Deposit to the extent necessary to make good any arrearages of Monthly Base Rent, Additional Rent or other payments due Landlord hereunder, and any other damage, injury, expense (including, without limitation, court costs and reasonable attorneys' fees) or liability caused by such event of default; and Tenant shall pay to Landlord on demand the amount so applied in order to restore the Security Deposit to its original amount.  Any remaining balance of such Security Deposit shall be returned to Tenant at such time after termination of this Lease that all of Tenant's obligations under this Lease have been fulfilled.

<div align="center">

**SECTION 4**
**SURRENDER OF PREMISES AND HOLDOVER**

</div>

**4.1. Surrender of Premises.** Upon the expiration or termination of this Lease or the termination of Tenant's right of possession of the Premises, Tenant shall surrender and vacate the Premises immediately and deliver possession thereof to Landlord in a clean, good and tenantable condition, ordinary wear excepted.  If the Premises are not surrendered in such condition, Landlord may undertake all necessary cleaning, trash removal and repair work, including, without limitation, removal of Tenant's equipment (including telecommunications equipment and wiring) and fixtures, all at the expense of Tenant, which expense Tenant shall pay on demand by Landlord.  Without limiting its remedies, Landlord may apply any Security Deposit of Tenant against the cost of such work.  Upon any termination which occurs other than by reasons of Tenant's default, prior to such termination Tenant shall be entitled to remove from the Premises all unattached and movable trade fixtures and personal property of Tenant without credit or compensation from Landlord, provided Tenant immediately shall repair all damage resulting from such removal and shall restore the Premises to a good and tenantable condition.  If Tenant shall fail to remove any unattached and movable trade fixtures and personal property which Tenant is entitled to remove prior to any termination, Landlord may remove the same without any liability to Tenant.  Any fixtures and personal property not so removed upon the vacancy of the Premises by Tenant shall be conclusively presumed to have been abandoned by Tenant, and to the extent Landlord elects to accept the same, title to such property shall pass to Landlord without any payment or credit.  Landlord may, at its option and at Tenant's expense, store and/or dispose of any such property remaining in the Premises.

**4.2. Holdover.** Tenant will, at the termination of this Lease by lapse of time or otherwise, yield up immediate possession of the Premises to Landlord with all repairs and maintenance required herein to be performed by Tenant completed.  If Tenant remains in possession after such termination without Landlord's written consent, such holdover shall not be deemed to be a renewal of this Lease but shall be deemed to create a month-to-month term which may be terminated by either party on the tenth (10th) day after written notice is delivered to the other party.  In the event that any such holdover exists, all of the terms and provisions of this Lease shall be applicable during such holdover period, except that Tenant shall pay Landlord from time to time upon demand, as rent for the period of any holdover, an amount equal to one hundred fifty percent (150%) of the Monthly Base Rent in effect on the termination date, computed on a daily basis for each day of the holdover period.  Tenant agrees to indemnify, defend and hold Landlord harmless from any and all claims, loss or damage arising from Tenant's holdover.

## SECTION 5
## TAXES, INSURANCE EXPENSE, AND CAM CHARGES

**5.1. Operating Expenses Defined.** The charges outlined in this Section 5, relating to the operation, maintenance and repair of the Project shall be referred to collectively as operating expenses ("Operating Expenses").  Operating Expenses shall include without limitation all taxes, assessments and governmental charges of any kind or nature whatsoever levied or assessed against the Project and any land, buildings or other improvements located on the property of which the Project is a part ("Property"), by any municipality, county, or other governmental authority ("Taxes"), the Insurance Expense (as such term is defined in Section 14.1 of this Lease) and any costs and expenses associated with the operation, maintenance, repair or replacement (including parts) of, without limitation: water and sewer services, electricity and natural gas, janitorial services, interior and exterior window washing, pest control, landscaping, irrigation and lawn maintenance, rubbish removal, sidewalks, curbs and gutters, parking lots and driveways, common area lighting, heating, air conditioning and ventilation systems, common signs for the Project, common area and exterior painting, security services, property management services (including administrative and operating costs), snow and ice removal, fire alarm monitoring,

miscellaneous maintenance and repair expenses, fees or dues paid to any property owner's association, any and all storm water related fees and charges and any other fees or charges levied against the Project by an agency or other authority having jurisdiction, adequate reserve allowances for future expenses relating to the aforementioned costs, an onsite management office and a reasonable overhead charge for the administration of all such work.

**5.2.  Base Year.**  The Operating Expenses shall be paid by Landlord during the Term, provided, however that the maximum amount of Operating Expenses to be paid by Landlord in any one calendar year during the Term shall be equal to that amount paid by Landlord in the Base Year, as the Base Year is defined on the Face Page of this Lease (hereinafter referred to as the "Base Year Operating Expenses").  If in any calendar year during the Term or any renewal or extension thereof,  the Operating Expenses incurred by Landlord shall exceed the Base Year Operating Expenses, Tenant shall pay to Landlord as Additional Rent, the amount of Tenant's Proportionate Share of such excess.

**5.3.  Monthly Payments.**  Landlord shall reserve the right to require Tenant to pay monthly, as Additional Rent (due and payable in advance on the first day of each month), an amount which shall equal one-twelfth (1/12th) of Tenant's Proportionate Share of the excess Operating Expenses (as reasonably estimated by Landlord) for the current year.

**5.4.  Annual Reconciliation.**  After the completion of each calendar year during the Term, Landlord shall provide written notice to Tenant of the actual amount of Operating Expenses for such calendar year and Tenant's Proportionate Share of any excess Operating Expenses over the Base Year Operating Expenses.  In the event Tenant's payments during such calendar year exceeded Tenant's Proportionate Share of such excess, Tenant shall receive a credit against the next due installment of Monthly Base Rent or Additional Rent unless this Lease has expired or been otherwise terminated, in which event Landlord shall pay such amount to Tenant within twenty (20) days following receipt by Tenant of Landlord's notice.  In the event Tenant's payments during such calendar year were less than Tenant's Proportionate Share of  such excess, Tenant shall pay as Additional Rent the amount owed to Landlord within twenty (20) days of written notice from Landlord .

**5.5.  Proration.**  If the first year and/or the final year of the Term do not coincide with the calendar year, all of Tenant's obligations hereunder to pay Operating Expenses for such year(s), if any, shall be prorated.

**5.6.  Final Year Adjustments.**  Prior to the expiration or earlier termination of this Lease, Landlord shall have the option to update its estimate of Operating Expenses for the calendar year of such expiration or termination, and Tenant shall pay to Landlord the amount, so estimated by Landlord, of Tenant's obligation hereunder for Operating Expenses for the year in which the Lease expires or terminates.  All such amounts shall be used and held by Landlord for payment of such obligations of Tenant hereunder, with Tenant being liable for any additional costs therefor upon demand by Landlord, or with any excess to be returned to Tenant after all such obligations have been determined and satisfied, as the case may be.

<div align="center">

**SECTION 6**
**USE AND COMPLIANCE**

</div>

The Premises shall be used and occupied for office space only and for no other purpose without the prior written consent of Landlord.  Outside storage, including, without limitation, trucks and other

vehicles, is prohibited without Landlord's prior written consent.  Tenant covenants that it (i) shall comply with all governmental laws, ordinances and regulations (including specifically all zoning, access, and safety regulations) applicable to the operation of Tenant's business or use of the Premises, (ii) shall promptly comply with all governmental orders and directives for the correction, prevention and abatement of any violations and any nuisances in, upon or connected with the Premises, all at Tenant's sole expense, (iii) shall not permit nor take any action, which would constitute a nuisance or would disturb or endanger any other tenants or occupants of the Project or unreasonably interfere with their use of their respective premises or the common areas of the Project and (iv) shall abide by and conform to the Rules and Regulations attached hereto as Exhibit "D" and such further reasonable rules and regulations as Landlord may from time to time make or adopt for the care of the Project or the comfort and welfare of the Project's occupants as long as such are enforced in a non-discriminatory manner.

## SECTION 7
## HAZARDOUS SUBSTANCES

**7.1. Definitions.**  As used in this Section, "Hazardous Substance" means any pollutant, contaminant, toxic or hazardous substance, hazardous waste, dangerous substance, potentially dangerous substance, noxious substance, hazardous, ignitable, explosive, toxic or radioactive material, urea formaldehyde foam insulation, asbestos, PCBs, petroleum products or any other substances the removal of which is required, or the manufacture, production, generation, use, maintenance, disposal, treatment, storage, transfer, handling or ownership of which is restricted, prohibited, regulated or penalized, by any federal, state or local statute, law, regulation or other legal requirement now or at any time hereafter in effect, including but not limited to, the Comprehensive Environmental Response, Compensation, and Liability Act (U.S.C. 9601 *et. seq.*), the Hazardous Materials Transportation Act (49 U.S.C. 1801 *et seq.*), the Resource Conservation and Recovery Act (42 U.S.C. 6901 *et. seq.*), the Federal Water Pollution Control Act (33 U.S.C. 1251 *et seq.*), the Clean Air Act (42 U.S.C. 7401 *et seq.*), the Toxic Substances Control Act, as amended (15 U.S.C. 2601 *et seq.*), and the Occupational Safety and Health Act (29 U.S.C. 651 *et seq.*), as these laws and legal requirements have been or are in the future amended or supplemented.

**7.2. Covenants.**  Tenant shall not use or permit others to use, the Premises or any other part of the Project for the production, generation, manufacture, treatment, transportation, storage or disposal of any Hazardous Substance, except with the prior written consent of Landlord and in compliance with any and all applicable legal requirements.  Tenant covenants with Landlord that it will: (i) deliver promptly to Landlord true and complete copies of all notices received by Tenant from any governmental authority with respect to the generation, storage or use by Tenant of any Hazardous Substance (whether or not on or in the Premises); (ii) permit entry onto the Premises by Landlord or Landlord's representatives at any reasonable time to verify Tenant's compliance with the provisions of this Section 7 and to monitor Tenant's generation, storage or use of any Hazardous Substance, including, but not limited to, the performance of testing required by Landlord, any governmental agency or lender to determine the status of any Hazardous Substance on or in the Premises; (iii) pay to Landlord as Additional Rent, all of Landlord's actual costs and expenses in connection with such entries, verification, monitoring and testing as well as the reporting therefor; and (iv) complete fully, truthfully and promptly any questionnaires sent by Landlord with respect to Tenant's generation, storage or use of any Hazardous Substance and any affidavits, representations and the like from time to time at Landlord's request with respect to Tenant's generation, storage or use of any Hazardous Substance.

**7.3.  Indemnity.**  Tenant hereby indemnifies, defends and holds harmless Landlord from and against any and all liabilities, expenses (including, without limitation, court costs and reasonable attorney fees), demands, damages, costs, losses, clean-up costs, actions, causes of action, claims for relief, penalties, fines and charges incurred, assessed, resulting from or arising out of the presence of any Hazardous Substance on, in or under the Premises or the Property (and any off-site property when such Hazardous Substance emanated from the Premises) resulting from the activities, operations or occupancy of Tenant or any act or omission of Tenant or Tenant's employees, agents, visitors or invitees, regardless of whether Landlord shall have consented to, approved of, participated in or had notice of such act or omission or the presence of such Hazardous Substance.  The provisions of this Section 7.3 shall survive the expiration or earlier termination of this Lease.

Notwithstanding anything to the contrary contained herein, Tenant shall not be liable for conditions existing or events occurring prior to the Commencement Date unless such conditions or events were caused by or exacerbated by Tenant or its employees, agents, visitors or invitees.

## SECTION 8
## LANDLORD'S REPAIRS AND MAINTENANCE

Landlord shall repair and maintain in good order and condition, reasonable wear and tear excepted, the common areas, foundations, structural components and exterior walls of the Project, along with the elevators, the electrical, plumbing, mechanical, fire protection and heating, air conditioning and ventilation systems and any other repair, maintenance or replacement for the Project included in the definition of Operating Expenses in Section 5.1, provided, however that Tenant shall repair and pay for any damage caused by the negligence of Tenant or Tenant's employees, agents, visitors or invitees, or caused by Tenant's default hereunder.  Except as otherwise set forth in this Lease, all costs associated with the repair and maintenance obligations of Landlord under this Section, including the replacement of Project standard fluorescent light tubes in the Premises, shall be included in and constitute Operating Expenses.

## SECTION 9
## TENANT'S REPAIRS AND MAINTENANCE

**9.1.  Tenant's Responsibility.**  Tenant shall maintain the Premises in good repair and in a clean condition.  Except as provided in Section 8 of this Lease, Landlord shall have no maintenance obligations concerning the Premises and no obligations to make any repairs or replacements in, on or to the Premises, and Tenant shall assume the full and sole responsibility for the condition, operation, repair, replacement and maintenance of the Premises, including all improvements through the Term except as specifically set forth in Section 8.

**9.2.  Litter and Damage.**  If Tenant is identified as being responsible for excessive litter or an unsightly mess outside of the Premises or for any damage to the common areas of the Project or the Property (such as an obstruction of a common sewer line, damage to concrete or asphalt paving, damage to the landscaping or grounds, etc.), then Tenant, as Landlord shall reasonably determine, shall pay as Additional Rent the entire cost to clean up such litter or mess and repair or replace such damage.

## SECTION 10
## INSPECTION

**10.1.  Entry.**  Landlord and Landlord's agents and representatives shall have the right to enter and inspect the Premises in the event of an emergency (when no prior notice is required) and at any reasonable time with twenty-four (24) hours' notice, which notice may be made by facsimile or telephone for the purposes of this Section 10.1, for janitorial services or for the purpose of inspecting same or to make any repairs as may be permitted or required to be made by Landlord under the terms of this Lease.  During the period that is six (6) months prior to the end of the Term, Landlord and Landlord's agents and representatives shall have the right to enter the Premises at any reasonable time during business hours with reasonable prior notice under the circumstances for the purpose of showing the Premises and shall have the right to erect on or in front of the Premises, a suitable sign indicating the Premises are available.  Landlord shall use commercially reasonable efforts to minimize any unreasonable interference with Tenant's operations in the Premises in connection with any such entry (other than in the case of an emergency).

**10.2.  Inspection on Termination.**  Upon the expiration or earlier termination of this Lease, Tenant shall give written notice to Landlord at least thirty (30) days prior to vacating the Premises and shall arrange to meet with Landlord for a joint inspection of the Premises prior to vacating.

## SECTION 11
## SERVICES AND UTILITIES

**11.1.  Services Provided.**  Landlord shall furnish the following services to the Project:  (i) heating and air conditioning in the appropriate season during the hours noted in Section 11.2 below, (ii) janitorial and general cleaning services prior to each "Business Day" which is defined as Mondays, Tuesdays, Wednesdays, Thursdays and Fridays except for New Year's Day, Good Friday, Memorial Day, July 4th, Labor Day, Thanksgiving and Christmas, (iii) passenger elevator service to all floors of the Project, (iv) reasonable amounts of cold and hot running water to lavatories and toilets and (v) electricity for the purposes of lighting and general office equipment use in amounts consistent with building standard electrical capacities.

**11.2.  Heating and Air Conditioning.**  The hours of operation of the heating and air conditioning systems in the Project shall be as follows:

Business Days from 7:00 AM to 6:00 PM
Saturday from 8:00 AM to 1:00 PM
There shall be no service provided at other times or on other days

Should Tenant desire heating or air conditioning services for hours before or after the times noted above in this Section 11.2 or on Sundays or holidays, Tenant may request such services and Landlord shall cooperate with Tenant to make such services available.  In such event, Tenant shall pay on demand a building standard charge of Thirty Dollars ($30.00) per hour, which charge may be reasonably increased or decreased from time to time (to reflect operating and administrative costs) upon prior notice by Landlord.

**11.3.  Excess Services.**  To the extent Tenant's usage of any service or utility in the Premises or Project including without limitation electricity, natural gas, water/sewage or janitorial services, exceeds the normal amounts of such services generally used by tenants in the Project, Tenant shall pay as Additional Rent the cost for such excess as reasonably estimated by Landlord.  Landlord reserves the right, in the event Landlord reasonably determines that Tenant's usage level of a utility is disproportionate compared with other tenants in the Project, to  (at Landlord's sole discretion and cost) install a separate meter for such utility to the Premises.  Upon the installation of such meter, Tenant shall pay the costs of such utility service for the Premises directly to the applicable provider.

**11.4.  Interruption of Services or Utilities.**  In no event shall Landlord be liable for any failure or interruption of any service or utility furnished by Landlord under this Lease, and no such failure or interruption shall entitle Tenant to terminate this Lease or abate any payment of Monthly Base Rent or Additional Rent hereunder.

## SECTION 12
## ALTERATIONS

**12.1.  Alterations to Premises.**  Tenant shall not make any alterations, additions or improvements ("Alterations") to the Premises without the prior written consent of Landlord which consent shall not be unreasonably withheld.  Notwithstanding anything to the contrary set forth in this Lease, "Alterations" shall not include Tenant's fixtures, furniture, furnishings, equipment, personal property or IT equipment to the extent that the same are not permanently affixed to the Premises and shall not include server racks in any event.  All such Alterations must be made at Tenant's sole cost and expense by a contractor approved in writing by Landlord and in accordance with any and all applicable laws, ordinances, regulations and insurance policy provisions.  Any Tenant request to make Alterations to the Premises shall be in writing accompanied with all construction drawings (and any additional materials reasonably requested by Landlord) and a review fee of $250.00.  Tenant agrees to pay Landlord all reasonable professional and legal fees incurred by Landlord in connection with Landlord's review of Tenant's request, whether or not Landlord consents to Tenant's request (not to exceed $2,500 without Tenant's consent).  Upon completion of any such Alterations, Tenant will provide Landlord with a copy of the Certificate of Occupancy issued by the applicable governmental authority and final lien waivers and contractors' affidavits from all contractors and subcontractors providing work or materials to the Premises.

**12.2.  Ownership of Alterations; Indemnity.**  All Alterations erected by Tenant shall be and remain the property of Tenant during the Term, and Tenant shall, unless Landlord otherwise elects as hereinafter provided, remove all such Alterations erected by Tenant and restore the Premises to its original condition, reasonable wear and tear excepted, by the expiration or earlier termination of this Lease; provided however, that if Landlord so elects, such Alterations shall become the property of Landlord as of the expiration or earlier termination of this Lease and shall be delivered up to the Landlord with the Premises.  Notwithstanding the foregoing sentence, all shelves, bins, machinery (including telecommunications equipment and wiring) and trade fixtures installed by Tenant shall be removed by Tenant prior to the termination of this Lease unless Tenant notifies Landlord in writing that such items will remain in the Premises, and Landlord consents in writing, in which event all such items shall become the property of the Landlord.  Upon any such removal, Tenant shall restore the Premises to its original condition, reasonable wear and tear excepted and shall repair any damage to the Premises and Project caused by such removal.  Tenant agrees to indemnify, defend and hold Landlord, and its agents and employees forever harmless

against all claims, liabilities and expenses (including reasonable attorney fees) of every kind, nature and description which may arise out of or in any way be connected with any of the work described in this Section 12.

## SECTION 13
## SIGNS

Tenant shall not place or permit to be placed or maintained on any portion of the Project, including on any exterior door, wall or window of the Project or Premises or within the interior of the Premises if visible from the exterior of the Premises, any signage or advertising matter of any kind, without the prior written consent of Landlord which may be arbitrarily withheld.  Landlord shall provide Tenant with a standard listing in the tenant directory located in the Project lobby and a Project standard decorative sign at the main entrance to the Premises.

## SECTION 14
## PROPERTY AND CASUALTY DAMAGE

**14.1.  Insurance.**  Landlord agrees to maintain insurance covering the Project in an amount deemed appropriate by Landlord, insuring against the perils of Fire, Lightning and Extended Coverage, Vandalism and Malicious Mischief, extended by Special Extended Coverage Endorsement to insure against all other Risks of Direct Physical Loss, casualty, liability and business income and such additional reasonable coverages as the Landlord may elect to further protect its interest in the Premises and the Project; such coverages and endorsements to be as defined, provided and limited in the standard bureau forms prescribed by the insurance regulatory authority for the state of North Carolina for use by insurance companies admitted in North Carolina for the writing of such insurance on risks located within North Carolina.  Subject to the provisions of Sections 14.4, 14.5 and 14.6 below, such insurance shall be for the sole benefit of Landlord and under its sole control.  Under no circumstances shall such insurance include nor shall Landlord have any responsibility to insure, repair, or replace Tenant's personal property, Tenant's fixtures or any Alterations or improvements made by Tenant to the Premises.  Landlord (subject to the provisions of Section 5.1 of this Lease) agrees to pay before they become delinquent, the costs and or premiums for such policies of insurance (all of which costs or premiums shall collectively be defined as the **"Insurance Expense"**).

**14.2.  Adjustments.**  If any increase in the insurance premiums to be provided by Landlord under Section 14.1 above is caused by Tenant's use or occupancy of the Premises, then Tenant shall pay to Landlord as Additional Rent, on demand, the amount of such increase.

**14.3.  Notice of Casualty.**  If the Project or Premises should be damaged or destroyed by any peril covered by the insurance to be provided by Landlord under Section 14.1 above, Tenant shall give immediate written notice thereof to Landlord.

**14.4.  Substantial Damage.**  If the Premises should be totally destroyed by any peril covered by the insurance to be provided by Landlord under Section 14.1 above or if the Premises should be so damaged thereby that rebuilding or repairs cannot in Landlord's reasonable estimation be completed within one hundred eighty (180) days after the date upon which Landlord is notified by Tenant of such damage, this

Lease shall terminate, and the Monthly Base Rent and Operating Expenses shall be abated during the unexpired portion of this Lease, effective upon the date of the occurrence of such damage.

**14.5.  Minor Damage.**  If the Premises should be damaged by any peril covered by the insurance to be provided by Landlord under Section 14.1 above, but only to such extent that rebuilding or repairs can in Landlord's reasonable estimation be completed within one hundred eighty (180) days after the date upon which Landlord is notified by Tenant of such damage, this Lease shall not terminate, and Landlord shall at its sole cost and expense (but only to the extent insurance proceeds are available) thereupon proceed with reasonable diligence to rebuild and repair the Premises to substantially the condition in which the Premises existed prior to such damage, except that Landlord shall not be required to rebuild, repair or replace any part of Tenant's personal property, Tenant's fixtures or any Alterations or improvements made by Tenant to the Premises.  If the Premises are untenantable in whole or in part following such damage, the Monthly Base Rent and Operating Expenses payable hereunder during the period in which they are untenantable shall be reduced to such extent as may be fair and reasonable under all of the circumstances.  In the event that Landlord should fail to complete such repairs and rebuilding within one hundred eighty (180) days after the date upon which Landlord is notified by Tenant of such damage, Tenant may at its option terminate this Lease by delivering written notice of termination to Landlord as Tenant's exclusive remedy, whereupon all rights and obligations hereunder shall cease and terminate.

**14.6.  Proceeds to Mortgagee.**  Notwithstanding anything herein to the contrary, in the event the holder of any indebtedness secured by a mortgage or deed of trust covering the Premises or the Project requires that the insurance proceeds paid as a result of a loss covered under the insurance to be provided under the terms of Section 14.1 above be applied to such indebtedness, then Landlord shall have the right to terminate this Lease by delivering written notice of termination to Tenant within fifteen (15) days after such requirement is made by any such holder, whereupon all rights and obligations hereunder shall cease and terminate.

## SECTION 15
## LIABILITY

**15.1.  Injury to Persons or Property.**  Landlord shall not be liable to Tenant or Tenant's employees, agents, patrons or visitors, or to any other person whomsoever, for any injury to person or damage to property on or about the Premises except for such injury or damage which results from the negligence or willful misconduct of Landlord or Landlord's employees or agents and Tenant hereby covenants and agrees that it will at all times indemnify, defend and hold safe and harmless the Premises, the Landlord, Landlord's employees, agents and lender(s) from any loss, liability, claim, suit, or expense, including without limitation attorney fees and damages, both real and alleged, arising out of or relating to any such damage or injury; except injury to persons or damage to property the cause of which is the negligence or willful misconduct of Landlord or Landlord's employees, agents or lenders.

**15.2.  Tenant Insurance.**  Tenant shall, at Tenant's sole expense, procure and maintain throughout the Term a policy or policies of (i) commercial general liability insurance, insuring against all claims, demands or actions arising out of or in connection with Tenant's liability assumed under this Lease, covering injury to persons (including death), and property damage (including loss of use thereof) in the amount of at least $2,000,000 per occurrence with an aggregate limit of at least $2,000,000.00, and (ii) all risk (special form) property insurance in an amount equal to the full replacement cost of all Alterations or improvements made by, for or on behalf of Tenant to the Premises.  All such policies procured by Tenant

shall be issued by an insurance company authorized to transact business in North Carolina with a rating of not less than A: Class VIII by A.M. Best Company.  Certified copies of such policies or valid certificates of insurance evidencing same, naming Landlord, the Project property manager and (at Landlord's sole discretion) Landlord's lender(s) as additional insureds, together with a receipt evidencing payment of premiums therefor, shall be delivered to Landlord prior to the Commencement Date of this Lease.  Not less than thirty (30) days prior to the expiration date of any such policies, certified copies of the renewal policies or valid certificates of insurance evidencing such renewal (bearing notations evidencing the payment of renewal premiums) shall be delivered to Landlord.  Such policies shall further provide that not less than thirty (30) days written notice shall be given to Landlord before such policy may be canceled or changed to reduce insurance provided thereby.  If Tenant shall not comply with this covenant, Landlord may at its option, cause insurance as aforesaid to be issued, and in such event Tenant agrees to pay the premium for such insurance promptly upon Landlord's demand.

## SECTION 16
## WAIVER OF SUBROGATION

**16.1.  Landlord Waiver.**  Tenant shall not be responsible or liable to Landlord for any loss from any event, act or omission to the extent actually paid by the proceeds of insurance obtained and maintained by Landlord in connection with the Project.  Landlord shall cause its policy or policies of insurance to contain effective waivers of subrogation for the benefit of Tenant.

**16.2.  Tenant Waiver.**  Landlord and the Project property manager shall not be responsible or liable to Tenant for any loss, event, act or omission to the extent covered by insurance required to be obtained and maintained by Tenant with respect to the Premises and its use and occupancy thereof (whether or not such insurance is actually obtained or maintained) or otherwise covered by the proceeds of such other insurance as is obtained and maintained by Tenant.  Tenant shall from time to time provide Landlord with effective waivers of subrogation by its insurers for the benefit of Landlord and the Project property manager in a form reasonably satisfactory to Landlord.

**16.3.  Survival.**  The terms and provisions of this Section 16 shall supersede any provisions to the contrary contained in this Lease and shall survive the expiration or earlier termination of this Lease with respect to any occurrences before the effective date of such termination or expiration.

## SECTION 17
## CONDEMNATION

**17.1.  Complete Taking.**  If the whole or any substantial part of the Premises should be taken for any public or quasi-public use under governmental law, ordinance or regulation, or by right of eminent domain, or by private purchase in lieu thereof and the taking would prevent or materially interfere with the use of the Premises for the purpose for which it is being used, this Lease shall terminate, and the Monthly Base Rent and Operating Expenses payable hereunder shall be abated during the unexpired portion of the Term, effective when the physical taking of the Premises shall occur.

**17.2.  Partial Taking.**  If part of the Premises shall be taken for any public or quasi-public use under any governmental law, ordinance or regulation, or by right of eminent domain, or by private purchase in lieu thereof, and this Lease is not terminated as provided in Section 17.1 above, this Lease shall not terminate, but the Monthly Base Rent and Operating Expenses payable hereunder during the

unexpired portion of the Term shall be reduced to such extent as may be fair and reasonable under all of the circumstances.

**17.3.  Proceeds.**  In the event of any such taking or private purchase in lieu thereof, Landlord shall be entitled to the proceeds arising out of any such acquisition of the Premises, or portion thereof, under the power of eminent domain; provided, however, that nothing herein contained shall be construed so as to prevent Tenant from making a claim for a separate award for any relocation expense, or for such losses as it may sustain in connection with any items belonging to Tenant and not a part of the Premises, but Tenant shall in no event be entitled to compensation for the loss of its leasehold interest in the Premises.

<div align="center">

**SECTION 18**
**EVENTS OF DEFAULT**

</div>

The following events shall be deemed to be events of default by Tenant under this Lease:

**18.1.**  Tenant shall fail to pay any installment of Monthly Base Rent or Additional Rent herein reserved when due, or any other reimbursement, Late Payment Charge or other payment to Landlord required herein when due, and such failure shall continue for a period of seven (7) days from the date such payment was due; provided however, before placing Tenant in default, Landlord agrees to give Tenant written notice (which written notice may be made by facsimile for the purposes of this Section 18.1) of any such failure to make a required monetary payment (a "Required Payment") when due one (1) time in any twelve (12) month period.  Upon receipt of said notice, Tenant shall deliver via bona fide overnight carrier the Required Payment to Landlord within three (3) business days. Notwithstanding the foregoing, if Tenant shall fail to:  (i)  deliver the Required Payment in three (3) business days, or (ii) pay any Monthly Base Rent, Additional Rent or other sum of money payable under this Lease after the same is due hereunder and any applicable grace period has expired a second time in any twelve (12) month period, then notwithstanding the fact that such previous failures to make a Required Payment may have been cured by Tenant, any further failure to make a Required Payment after the same is due and any applicable grace period has expired shall be deemed an event of default without notice or the further ability for cure.

**18.2.**  Tenant shall abandon, desert or otherwise vacate all or any substantial portion of the Premises.

**18.3.**  Tenant shall fail to comply with any term, provision or covenant of this Lease,  other than the payment to Landlord of Monthly Base Rent, Additional Rent and/or other monetary payments or reimbursements or other defaults for which a different cure period is set forth in this Section 18 and shall not cure such failure within thirty (30) days written notice thereof to Tenant.

**18.4.**  Reserved.

**18.5.**  Tenant shall become insolvent or shall make a transfer in fraud of creditors or shall make an assignment for the benefit of creditors.

**18.6.**  Tenant shall file a petition or have an involuntary petition filed against it under any section or chapter of the United States Bankruptcy Code, as amended or under any similar law or statute of the United States or any State thereof or Tenant shall be adjudged bankrupt or insolvent in any such proceedings filed against Tenant.

**18.7.**  A receiver or trustee shall be appointed for all or substantially all of the assets of Tenant.

**18.8.**  Tenant shall do or permit to be done anything which creates a lien upon the Premises.

**18.9.**  The business operated by Tenant shall be closed or otherwise caused to cease operations for failure to pay any applicable State or Federal tax as required, or shall be closed or cease to operate for any other reason.

<div align="center">

**SECTION 19**
**REMEDIES**

</div>

Upon the occurrence of any of such events of default described in Section 18 of this Lease, Landlord shall have the option to pursue any one or more of the following remedies without any notice or demand whatsoever:

**19.1.  Termination of Lease.**  Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which it may have for possession or arrearages in Monthly Base Rent or Additional Rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying such Premises or any part thereof, without being liable for prosecution or any claim of damages therefor; and Tenant agrees to pay to Landlord on demand the amount of all loss and damage which Landlord may suffer by reason of such termination, whether resulting from Landlord's inability to relet the Premises on satisfactory terms, any reasonable costs incurred to upfit, modify, repair and/or relet the Premises, or otherwise.

**19.2  Termination of Possession.**  Without terminating the Lease or releasing Tenant in whole or in part, from any obligation, including without limitation, Tenant's obligation to pay Monthly Base Rent and Additional Rent, Landlord may terminate Tenant's right to possession by entering upon and taking possession of the Premises and expelling or removing Tenant and any other person(s) who may be occupying such Premises or any part thereof, without being liable for prosecution or any claim for damages therefor.  Landlord may relet the Premises and receive the rent therefor; and Tenant agrees to pay to Landlord on demand any deficiency that may arise by any reason of such reletting, together with all reasonable costs incurred by Landlord to upfit, modify or repair the Premises for reletting.  In the event Landlord is successful in reletting the Premises at a rent in excess of that agreed to be paid by Tenant pursuant to the terms of this Lease, Landlord and Tenant each mutually agree that Tenant shall not be entitled, under any circumstances, to such excess rent, and Tenant does hereby specifically waive any claim to such excess rent.

**19.3.  Performance of Tenant's Obligations.**  Enter upon the Premises without being liable for prosecution or any claim for damages therefor, and do whatever Tenant is obligated to do under the terms of this Lease; and Tenant agrees to reimburse Landlord, on demand, for any reasonable expenses which Landlord may incur in this effecting compliance with Tenant's obligations under this Lease, and Tenant further agrees that Landlord shall not be liable for any damages resulting to Tenant from such action, whether caused by the negligence of Landlord or otherwise.

**19.4.  Miscellaneous Provisions.**  Pursuit of any remedies defined in this Lease shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any payment or performance due to Landlord or Tenant hereunder or of any damages accruing to Landlord or Tenant by reason of the violation of any of the terms, provisions and covenants herein contained.  No act or thing done by the Landlord or its agents during the Term shall be deemed an acceptance of the surrender of the Premises, and no agreement to terminate this Lease or accept a surrender of the Premises shall be valid unless in writing signed by Landlord and Tenant.  No waiver by Landlord or Tenant of any violation or breach of any of the terms, provisions and covenants herein contained shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions and covenants herein contained.  Landlord's acceptance of the payment of Monthly Base Rent, Additional Rent or other payments hereunder after the occurrence of any event of default shall not be construed as a waiver of such default, unless Landlord so notifies Tenant in writing.  Forbearance by Landlord or Tenant to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of such default or of Landlord's or Tenant's right to enforce any such remedies with respect to such default or any subsequent default.   In any action at law or in equity between the parties hereto occasioned by a default hereunder, the prevailing party shall be entitled to collect its reasonable attorneys' fees and third-party costs actually incurred in the action from the non-prevailing party.  As used herein, the term "prevailing party" shall mean the party who receives substantially the relief sought.  Landlord acknowledges that it shall comply with a commercially reasonable duty to mitigate damages that would otherwise arise in the event of a Tenant default; provided, however, that in no event shall Landlord be required to place the reletting of the Premises higher in priority than the leasing of the remainder of Landlord's portfolio of available space and shall retain the right at all times to reject potential tenants whose financial status or anticipated use of the Premises are not approved by Landlord in its sole discretion.

## SECTION 20
## RESERVED

## SECTION 21
## MECHANIC'S LIENS AND OTHER TAXES

Tenant shall have no authority, express or implied, to create or place any lien or encumbrance of any kind or nature whatsoever upon the Premises or the Project, or in any manner to bind the interests of Landlord in the Premises or the Project or to charge the rents payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs, and each such claim shall affect and each such lien shall attach to, if at all, only the leasehold interest granted to Tenant by this instrument.  Tenant covenants and agrees that it will pay or cause to be paid all sums due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises on which any lien is or can be validly and legally asserted against its leasehold interest in the Premises or the improvements thereon and that it will save and hold Landlord harmless from any and all loss, cost or expense based on or arising out of asserted claims or liens against the leasehold estate or against the right, title and interest of the Landlord in the Premises or under the terms of this Lease.  Tenant agrees to give Landlord immediate written notice if any lien or encumbrance is placed on the Premises.

## SECTION 22

## ASSIGNMENT AND SUBLETTING

**22.1.  Landlord's Consent.**  Tenant shall not, voluntarily, by operation of law, or otherwise, assign, transfer, mortgage, pledge or encumber this Lease, or sublease the Premises or any part thereof, or allow any person other than Tenant, its employees, agents, patrons and invitees to occupy or use the Premises or any portion thereof, without the express written consent of Landlord, such consent not to be unreasonably withheld, and any attempt to do any of the foregoing without such written consent shall be null and void and shall constitute an event of default under this Lease.  Landlord's consent to any assignment or sublease hereunder does not constitute a waiver of its right to consent to any further assignment or sublease.

**22.2.  Consent Process.**  If Tenant desires to assign this Lease or sublet the Premises or any part thereof, Tenant shall give Landlord written notice of such desire at least thirty (30) days in advance of the date on which Tenant desires to make such assignment or sublease, together with a non-refundable fee of One Thousand Dollars ($1,000.00) (the "Transfer Fee").  Landlord shall then have a period of fifteen (15) days following receipt of such notice within which to notify Tenant in writing that Landlord elects (a) to terminate this Lease as to the space so affected as of the date so specified by Tenant, in which event Tenant shall be relieved of all further obligations hereunder as to such space, (b) to permit Tenant to assign this Lease or sublet such space (provided, however, if the monthly rent agreed upon between Tenant and subtenant is greater than the Monthly Base Rent due from Tenant hereunder, any such excess shall be deemed Additional Rent owed by Tenant and payable to Landlord) or (c) to refuse to consent to Tenant's assignment or sublease of such space and to continue this Lease in full force and effect as to the entire Premises.  If Landlord shall fail to notify Tenant in writing of such election within the fifteen (15) day period, Landlord shall be deemed to have elected option (c) above.

**22.3.  Tenant Liability.**  Tenant agrees to use Landlord's standard assignment or sublease forms and to pay Landlord's actual attorney fees associated with Landlord's review and documentation of any requested assignment or sublease hereunder regardless of whether Landlord consents to any such assignment or sublease.  No assignment or sublease by Tenant shall relieve Tenant of any obligations under this Lease, and Tenant shall remain primarily liable for the payment of all amounts due and for the performance of all obligations of Tenant under this Lease.  Any transfer of this Lease by merger, consolidation or liquidation or any change in a majority of the voting rights or other controlling rights or interests of Tenant shall be deemed an assignment for the purposes of this Lease.

## SECTION 23
## SALE, ASSIGNMENT OR TRANSFER OF LANDLORD'S INTEREST

Landlord may freely sell, assign and transfer its rights under this Lease or its interest in the Project and/or Premises.  In the event of the sale, assignment or transfer by Landlord of its interest in the Project and/or Premises or of its rights in this Lease (other than a collateral assignment to secure debt) to an assignee or successor in interest who shall expressly assume the obligations of Landlord hereunder, said purchaser or assignee shall become the Landlord under this Lease and Landlord shall be released from all of its covenants, liabilities and obligations under this Lease, except such obligations which have accrued prior to any such sale, assignment or transfer, and Tenant agrees to look solely to such assignee or successor in interest of Landlord for performance of such obligations.

## SECTION 24

## QUIET ENJOYMENT

Landlord represents and warrants that it has full right and authority to enter into this Lease and that Tenant, upon paying the Monthly Base Rent, Additional Rent and other payments herein set forth and performing its other covenants and agreements herein set forth, shall peaceably and quietly have, hold and enjoy the Premises for the Term without hindrance or molestation from Landlord, subject to the terms and provisions of this Lease.

## SECTION 25
## LANDLORD'S RIGHT TO RELOCATE TENANT

Landlord shall have the right, at its option, upon at least thirty (30) days prior written notice to Tenant, to relocate Tenant and to substitute for the Premises other space in the Project or in the immediate vicinity of where the Project is located, containing a comparable SF area to the Premises. Such substituted space shall be improved by Landlord, at its expense, with improvements comparable in quantity and quality to those in the Premises. Landlord shall reimburse Tenant for all reasonable expenses incurred with and caused by such relocation (including, without limitation, telephone installation, moving of equipment and furniture, IT server room equipment, customer-specific circuits, and printing of stationery with Tenant's new address) within sixty (60) days following receipt from Tenant of invoices or receipts marked "paid in full". In no event shall Landlord be liable to Tenant for any consequential damages as a result of any such relocation, including, but not limited to, loss of business income or opportunity. Prior to Tenant's occupancy of the replacement premises, Landlord and Tenant shall amend this Lease to change the description of the Premises and any other matters affected by such change.

## SECTION 26
## LIMITATION OF LANDLORD'S LIABILITY

Tenant agrees that it will look solely to the estate of Landlord in the land and buildings comprising the Premises and the rent, issues and profits arising therefrom for the collection of any judgment (or any other judicial process requiring the payment of money by Landlord) in the event of any default or breach by Landlord of any terms or provisions of this Lease. No other property or assets of Landlord shall be subject to levy, execution or other procedures for the satisfaction of Tenant's remedies.

## SECTION 27
## SUBORDINATIONS AND ESTOPPELS

**27.1. Subordination and Attornment.** Tenant accepts this Lease subject and subordinate to any mortgages and/or deeds of trust now or at any time hereafter constituting a lien or charge upon the Premises or the improvements situated thereon, provided, however, that if the mortgagee, trustee, or holder of any such mortgage or deed of trust elects to have Tenant's interest in this Lease superior to any such instrument, then by notice to Tenant from such mortgagee, trustee or holder, this Lease shall be deemed superior to such lien, whether this Lease was executed before or after said mortgage or deed of trust. In the event of the foreclosure of any such mortgage by voluntary agreement or otherwise, or the commencement of any judicial action seeking such foreclosure, Tenant, at the request of the then Landlord, shall attorn to and recognize such mortgagee or purchaser in foreclosure as Tenant's Landlord under this Lease. Upon the request of Landlord, Tenant agrees to execute any instruments, releases, subordinations or other documents which may be required by any mortgagee for the purpose of subjecting

and subordinating this Lease to the lien of any such mortgage. Tenant also agrees to execute a commercially reasonable subordination non-disturbance and attornment agreement with Landlord's lender(s) if requested by Landlord.

**27.2. Estoppel Certificate.** Tenant agrees that within ten (10) days after request of Landlord, it will deliver to Landlord or Landlord's designee, an estoppel certificate stating that this Lease is in full force and effect, the date to which rent has been paid, the unexpired Term and such other matters pertaining to this Lease as may be requested by Landlord. It is understood and agreed that Tenant's obligation to furnish such estoppel certificates in a timely fashion is a material inducement for Landlord's execution of this Lease.

<div align="center">

**SECTION 28**
**MISCELLANEOUS PROVISIONS**

</div>

**28.1. Notices.** Any notice or document required or permitted to be delivered hereunder shall be deemed to be delivered (i) if and when personally delivered or (ii) on the day (not including Saturdays, Sundays, or federal holidays) after such notice is deposited with Federal Express or a comparable bona fide overnight courier, for delivery on the next business day with all postage and/or charges paid by sender, addressed to the parties hereto at the respective addresses set out on the Face Page of this Lease, or at such other address as the parties may specify by written notice delivered in accordance herewith.

<div align="center">

**ALL PAYMENTS SHALL BE DELIVERED TO THE ADDRESS SET FORTH IN THE FACE PAGE OF THIS LEASE.**

</div>

**28.2. Processing and Review Fees.** In the event Tenant requests Landlord to process, review and/or execute any third party documents, including, but not limited to, lien waivers, telecommunication access agreements, or other service provider agreements, then Tenant shall submit such documentation to Landlord with the payment of an administrative fee of One Thousand Dollars ($1,000.00). Tenant agrees to pay as Additional Rent all reasonable legal costs and professional costs incurred by Landlord in connection with Landlord's review of such documents (not to exceed $2,500.00). The fees set forth in this Section 28.2 shall not be applicable with respect to Landlord's review and approval of space plan(s) and construction specifications set forth in Exhibit B to this Lease.

**28.3. Survival.** All obligations of Tenant hereunder not fully performed as of the expiration or earlier termination of this Lease shall survive the expiration or earlier termination hereof, including without limitation all obligations with respect to Additional Rent payments and any other payments due Landlord hereunder and all obligations concerning the condition of the Premises.

**28.4. Captions.** Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires. The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way affect the interpretation of this Lease.

**28.5. Enforceability.** If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws effective during the Term, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby.

**28.6.  Authority.**  Each party agrees to furnish to the other, promptly upon demand, a resolution, proof of due authorization by partners, or other appropriate documentation evidencing the due authorization of such party to enter into this Lease.

**28.7.  Lease Amendment.**  Any amendment or agreement of this Lease shall be ineffective to change, waive, amend, modify, supplement, discharge or terminate this Lease in whole or in part unless such amendment or agreement is in writing and signed by Landlord and Tenant.

**28.8.  Time is of the Essence.**  Time is of the essence with regard to all of the terms, covenants and conditions of this Lease.

**28.9.  Governing Law.**  This Lease and the rights of parties hereunder shall be construed and enforced in accordance with the laws and judicial decisions of the State of North Carolina.

**28.10.  Tenant Financials.**  Upon written request by Landlord, but in no event more often than once per calendar year, Tenant shall provide to Landlord annual financial statements.  Such financial statements shall include at a minimum, a balance sheet, an income statement, a statement of cash flows and any necessary notes concerning both the current year-to-date operating results and comparative operating results for the previous two (2) years.  Tenant shall certify that said financials are materially correct and accurate.  Landlord's failure to maintain the confidentiality of Tenant's financial information shall constitute a breach of this Lease.  Notwithstanding the foregoing, Landlord shall have the right to disclose Tenant's financial information to its employees, its legal counsel, lender (or proposed lender), equity investors (or proposed equity investors), any purchaser (or potential purchaser) of the Building, and professional counselors or consultants, provided the receiving party is notified of the confidential nature of such disclosures.

**28.11. Entire Agreement.**  This Lease, including the Face Page and all exhibits and attachments hereto contains the entire agreement between Landlord and Tenant concerning the Premises, and there are no other agreements, either oral or written, regarding the lease of the Premises by Tenant (any prior agreements being merged into this Lease).  Neither Landlord nor any agent of Landlord has made any representations, warranties or promises with respect to the Premises, the Project or the existence or use of any amenities or facilities, except as expressly set forth in this Lease.

**28.12.  Brokers.**  Tenant represents that, except for Cushman & Wakefield|Thalhimer, as Landlord's broker, Tenant has not dealt with any real estate broker, salesperson, or finder in connection with this Lease, and no such person initiated or participated in the negotiation of this Lease or showed the Premises to Tenant.  Tenant agrees to indemnify, defend and hold harmless Landlord  from and against any and all liabilities, claims, commissions, fees and other costs (including without limitation reasonable attorney fees) arising out of a breach of the foregoing representation.  Landlord shall only be responsible for the payment of commissions to the broker, if any, specified in this Section  28.12, if Landlord has entered into a separate written agreement with such broker, and then only as provided in such agreement.  Tenant shall not be responsible for the payment of commissions to the broker, if any, specified in this Section  28.12.

**28.13.  Successors and Assigns.**  The terms, provisions and covenants and conditions contained in this Lease shall apply to, inure to the benefit of, and be binding upon the Landlord and Tenant and upon their

respective heirs, legal representatives, successors and permitted assigns, except as otherwise expressly provided in this Lease.

**28.14.  Incorporation of Face Page and Exhibits.**  The Face Page, the Premises set forth in Exhibit "A", the Improvements set forth in Exhibit "B", the Special Provisions set forth in Exhibit "C", the Rules and Regulations set forth in Exhibit "D", and the Memorandum set forth in Exhibit "E".


*THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK*

**IN WITNESS WHEREOF**, each party hereto has executed this Lease under seal, acknowledging and signifying its authority to enter into this Lease, by its duly authorized officer, manager, or representative, in two or more counterparts on the day and year first written above.

LANDLORD:      Beacon Ventures LLC, a North Carolina limited liability company

          By:    Beacon #7 LLC, a North Carolina limited liability company, Manager

                By: _____

                Gregg E. Sandreuter, Manager


TENANT:        Storeworks Technologies, Limited, a Minnesota corporation

          By: _____
      Name: _____
       Title: _____

**IN WITNESS WHEREOF**, each party hereto has executed this Lease under seal, acknowledging and signifying its authority to enter into this Lease, by its duly authorized officer, manager, or representative, in two or more counterparts on the day and year first written above.

LANDLORD:        Beacon Ventures LLC, a North Carolina limited liability company

                By:    Beacon #7 LLC, a North Carolina limited liability company, Manager

                                By: _____
                                Gregg E. Sandreuter, Manager


TENANT:          Storeworks Technologies, Limited, a Minnesota corporation

            By: _____
          Name: ANIL KONKIMALLA
           Title: Chief officer

**EXHIBIT A**
**PREMISES**

The Premises (deemed to be 6,722 SF) located at 11635 Northpark Drive, Suite 360 is indicated by the area outlined below.



## EXHIBIT B
## IMPROVEMENTS

Landlord shall deliver and Tenant shall accept the Premises in its 'as-is' condition, with no improvements whatsoever to be constructed by Landlord.  However, Landlord shall provide to Tenant a construction allowance not to exceed Sixty-Five Thousand and no/100 Dollars ($65,000.00) (the "Construction Allowance").  The Construction Allowance shall be used to construct improvements to the Premises (the "Improvements") in accordance with the space plan and construction specifications to be prepared by Tenant and approved in writing by Tenant and Landlord (which, when taken together, shall be referred to as the "Plans"); provided, however, that any unused allowance may, at Tenant's option, be applied as a credit to Monthly Base Rent as the same becomes due and payable, taken as a cash allowance, used to pay for space evaluation and design and preparation of construction documents, moving costs, or for the purchase and installation of furniture, fixtures, and equipment.  Such election on unpaid Construction Allowance shall be made on or before June 30,  2015, or any unpaid Construction Allowance as of such date shall be deemed forfeited by Tenant.  The Plans, once they have been mutually approved by Landlord and Tenant, shall not be revised or altered without the consent and approval of both parties, which shall not be unreasonably withheld or delayed.

Landlord shall remit the Construction Allowance to Tenant after the later of (i) November 1, 2014, and (ii) ten (10) days after the satisfactory completion of the following, as reasonably determined by Landlord: 1) substantial completion of the Improvements, 2) Tenant's submission to Landlord of invoice(s) for at least the amount of the Construction Allowance, and 3) a final lien waiver from Tenant's approved contractor and any applicable subcontractors who worked on the Improvements.

Tenant may make, with Landlord's written approval, modifications to the Plans.  However, should any such modifications change the cost to design or construct the Improvements, Tenant shall pay to Landlord on demand as Additional Rent the amount of such change in cost plus ten percent (10%).

# EXHIBIT C

# SPECIAL PROVISIONS

The following terms and provisions are incorporated into this Lease.  Where these Special Provisions conflict with any provision in the body of the Lease, these Special Provisions shall govern.

1.    MONTHLY BASE RENT ESCALATIONS:  Monthly Base Rent, as described in this Lease, shall increase periodically and be due and payable during the Term  in accordance with the following schedule.

| Months Following Commencement Date | Annual Base Rent PSF | Annual Base Rent | Monthly Base Rent |
|---|---|---|---|
| June 1, 2014 – February 29, 2016 | $22.00 | $147,884.04 ($246,473.40 for the 20 month period) | $12,323.67 |
| March 1, 2016- February 28, 2017 | $22.75 | $152,925.48 | $12,743.79 |
| March 1, 2017- February 28, 2018 | $23.50 | $157,967.04 | $13,163.92 |
| March 1, 2018- February 28, 2019 | $24.00 | $161,328.00 | $13,444.00 |

2.    EXISTING LEASE:  Notwithstanding anything to the contrary contained in this Lease, Tenant acknowledges that there is an existing tenant in the Premises (the "Existing Tenant").  Landlord is in negotiations with the Existing Tenant to terminate its lease with respect to the Premises pursuant to a termination agreement acceptable to Landlord, which termination agreement contains provisions for the release and waiver of claims against Existing Tenant.  Notwithstanding anything to the contrary contained herein, Landlord may terminate this Lease without liability or damages to any party by written notice to Tenant if Landlord does not reach an agreement with Existing Tenant with respect to the termination of Existing Tenant's lease with respect to the Premises or if Tenant does not thereafter vacate the Premises by May 31, 2014.

3.    OPERATING EXPENSE EXCLUSIONS:  Operating Expenses shall not include the following:
   A. wages, salaries or fringe benefits paid to any employees above the grade of building manager, or where employees devote time to properties other than the building of which the Premises is a part, the portion properly allocated to such other properties;
   B. leasehold improvements made for a specific tenant which improvements are not generally beneficial to all tenants in the Project;
   C. costs incurred in connection with the making of repairs or replacements which are the obligation of another tenant or occupant of the Project;
   D. brokerage fees or commissions;
   E. financing and refinancing costs in respect of any mortgage or security interest placed upon the Project or any portion thereof, including payments of principal, interest, finance or other charges, and any points and commissions in connection therewith;
   F. costs (including, without limitation, attorneys' fee' and disbursements) incurred in connection with any judgment, settlement or arbitration award resulting from any tort liability;

G. rent or other charges payable under any ground or underlying lease;

H. costs of any item which are reimbursed to Landlord by other tenants or third parties, or which are properly chargeable or attributable to a particular tenant or particular tenants;

I. costs incurred in connection with Landlord's preparation, negotiation, dispute resolution and/or enforcement of leases, including court costs and attorneys' fees and disbursements in connection with any summary proceeding to dispossess any tenant, or incurred in connection with disputes with prospective tenants, employees, consultants, management agents, leasing agents, purchasers or mortgagees;

J. costs of any additions to or expansions of the Project;

K. costs of repairs, restoration or replacements occasioned by fire or other casualty covered by the insurance set forth in Section 14.1 of this Lease or caused by the exercise of the right of eminent domain;

L. any costs in the nature of fees, fines or penalties arising out of Landlord's breach of any obligation (contractual or at law and including, without limitation, costs, fines, interest, penalties and costs of litigation incurred as a result of late payment of taxes and/or utility bills), including attorney's fees related thereto;

M. depreciation or amortization;

N. amounts paid to subsidiaries or affiliates of Landlord for services rendered to the Project to the extent such amounts exceed the competitive costs for delivery of such services were they not provided by such related parties;

O. advertising expenses; and

P. bad debt or rent loss.

4.     PENDING TRANSACTION.  Notwithstanding anything to the contrary contained in this Lease, Landlord acknowledges that (i) the Existing Tenant has entered into an asset purchase agreement to sell substantially all of its assets to Tenant, and (ii) that such sale has not yet closed.  Tenant is in negotiations with the Existing Tenant to finalize and satisfy several remaining closing conditions.  Accordingly, notwithstanding anything to the contrary contained herein, Tenant may terminate this Lease without liability or damages to any party by written notice to Landlord if Tenant does not close its asset purchase with Existing Tenant on or before May 31, 2014.  If Landlord does not receive Tenant's written notice on or before May 31, 2014, this Lease shall be deemed to be in full force and effect and Tenant shall have no further right to terminate pursuant to this Section 4, and Tenant shall upon Landlord's request acknowledge the same in writing no later than June 3, 2014.

5.     CONDITION OF PREMISES. Landlord acknowledges that the current occupant of the Premises has experienced issues with water leaking through the ceiling into the Premises, and Landlord will remediate all such issues before August 1,2014.

6.     MEMORANDUM OF LEASE:  Landlord and Tenant shall execute a short form memorandum of lease ("Memorandum"), in substantially the form of Exhibit "E", and Tenant may record such executed Memorandum. Tenant shall pay the costs and expenses of recordation.  In the event of an early termination of this Lease, including, without limitation, pursuant to Section 2 or Section 4 of this Exhibit C, Tenant shall promptly execute a termination of the Memorandum in commercially reasonable on request of Landlord, and Landlord, at Landlord's sole cost and expense, may record such termination (such obligation to survive the termination of the Lease).

7.      UNDERGROUND PARKING: Landlord shall provide Tenant, throughout the Term, with two (2) underground parking space so long as Tenant leases at least six thousand seven hundred twenty-two (6,722 rentable square feet) SF of Premises for use on an unreserved, non-exclusive basis in common with other Tenants of the Project in the underground parking deck serving the Project but subject to Landlord's rules and regulations governing such underground parking deck.

8.      USE OF SERVER ROOM:  The Existing Tenant currently utilizes a server room located outside of the Premises (located in Suite 320 of the Building) (the "Server Room").  Landlord hereby consents to Tenant's continued temporary use of the Server Room under the same terms and conditions of this Lease applicable to the Premises other than the payment of Rent (which shall be in the amount set forth below) and except as otherwise provided in this Section 8.  Tenant shall not be required to pay any Rent for its use of the Server Room for the month of June 2014.  After June 2014, in lieu of other Rent under this Lease, Tenant shall pay Landlord rent for the Server Room monthly, in advance, at such time as other Rent for the applicable month is due in an amount equal to Two Thousand and no/100 Dollars for the month of July 2014, and Four Thousand Seven Hundred Twenty and no/100 Dollars ($4,720.00) per month for each month or partial month thereafter that Tenant continues occupancy of the Server Room.  Tenant shall give Landlord at least fourteen (14) days written notice of its vacation of the Server Room and shall surrender the Server Room to Landlord in the condition otherwise required for the surrender of the Premises. Tenant shall have no right to reoccupy the Server Room following any such vacation.  Notwithstanding anything to the contrary contained herein, Landlord may terminate Tenant's occupancy of the Server at any time after July 31, 2014, by giving Tenant at least fourteen (14) days' notice of such termination, in which Tenant shall surrender the Server Room to Landlord in the condition otherwise required for the surrender of the Premises by the date given in Landlord's notice and Tenant shall have no further right to occupy the Server Room.  Notwithstanding anything to the contrary contained herein, the Server Room may only be used for the location and operation of servers associated with Tenant's operations in the Premises.

# EXHIBIT D
## RULES & REGULATIONS

Landlord shall control and operate the common areas, and the facilities furnished for the common use of tenants in such manner as Landlord deems best for the benefit of the tenants generally.  Adherence to the rules and regulations listed below will aid in each tenant's full use and enjoyment of the common areas.

A.    The common areas of the property shall not be obstructed by Tenant or used for any purpose other than ingress and egress to and from Tenant's Premises.  No tenant shall permit the visit to its Premises of persons in such number or under such conditions to interfere with the use by other tenants of the common areas.

B.    Outside storage of any kind is strictly prohibited without Landlord's written consent.

C.    Tenant, its servants, agents, invitees, employees and/or licensees shall only park on or utilize parking and loading areas directly related to such Tenant's premises.  No parking space shall be designated reserved or marked for special use without Landlord's written consent. Tenant shall not park in a manner which would block or restrict the access of other tenants to their leased premises.

D.    Tenant will not inscribe, affix or otherwise display signs, advertisements or notices in, on, or behind any windows, walls, doors, partitions or other part of the exterior of the property without prior written consent of Landlord.  Any sign of a temporary nature will not be permitted.

E.    Tenant will not attach or place awnings, antennas, satellites or other projections on the outside walls or any exterior portion of the property without prior written consent of Landlord.

F.    No curtains, blinds, shades or screens will be attached to, hung in or used in connection with any window or door of the Premises unless previously approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.

G.    Tenant shall not receive, store or otherwise handle any product, material or merchandise which is explosive or highly flammable without prior written consent of Landlord.

H.    Tenant shall not permit nor take any action that would constitute a nuisance or would disturb or endanger any other tenants of the property or unreasonably interfere with their use of their respective premises.

I.    The plumbing facilities will not be used for any purpose other than that for which they are constructed, and no foreign substance of any kind will be disposed into them.  The cost and expense of any breakage, stoppage, damage or excessive usage resulting from a violation of this provision by Tenant, its employees, agents or invitees will be borne by Tenant.

J.    Tenant agrees that the point pressure resulting from Tenant's racking system, inventory, forklifts and/or equipment shall not exceed allowable design floor loading for the floor slabs in the Premises.

K.    Tenant will not permit the Premises to be used for any purpose or in any manner that would render the insurance thereon void or the insurance risk more hazardous.

L.   Tenant shall comply with all governmental laws, ordinances and regulations applicable to the operation of its business in the Premises and to the use of the Premises and shall promptly comply with all governmental orders and directives for the correction, prevention and abatement of nuisances in or upon, or connected with, the Premises, all at Tenant's sole cost and expense.

M.   Tenant shall not allow smoking in the Premises or elsewhere in the Project.  Smoking is allowed in designated areas outside of the Project only.  Landlord reserves the right to relocate smoking areas from time to time.

N.   Tenant shall comply with Landlord's standard move-out policy upon vacating the Premises.

O.   If Tenant uses its own architect at any time (original build out or Alterations), Tenant must submit CAD drawings of the 'as builts' to Landlord within 30 days of completion of work.

## EXHIBIT E
## MEMORANDUM OF LEASE

Prepared by and return to:
Kilpatrick Townsend & Stockton LLP (JCL), 1408 Six Forks Road, Suite 1400, Raleigh, NC 27609

STATE OF NORTH CAROLINA

MEMORANDUM OF LEASE

COUNTY OF WAKE

THIS MEMORANDUM OF LEASE ("Memorandum") is of that certain unrecorded Office Lease Agreement dated _____, 2014, including all Exhibits attached thereto ("Lease"), by and between Beacon Ventures LLC, a North Carolina limited liability company ("Landlord") and Storeworks Technologies, Limited, a Minnesota corporation ("Tenant").

## W I T N E S S E T H:

Pursuant to and subject to the terms and conditions set forth in the Lease, Landlord has leased to Tenant the demised premises known as Suite 360 (as more particularly described in the Lease, the "Premises," as the same may be expanded or contracted from time to time) of that building located at 11635 Northpark Drive, Wake Forest, Wake County, North Carolina, on that parcel of land more particularly described on Exhibit A incorporated herein by reference for a term beginning on June 1, 2014, and continuing until February 28, 2019, unless sooner terminated in accordance with the terms of the Lease.

This Memorandum is not a complete summary of the Lease, and the provisions contained herein shall not be construed to modify or amend the terms thereof.  In the event of a conflict between this Memorandum and the Lease, said Lease shall control.  Upon the expiration of the stated Lease term, this Memorandum shall automatically terminate.

**(Signature pages follow)**

IN WITNESS WHEREOF, Tenant has executed this Memorandum as of the _____ day of _____, 2014.

**TENANT:**

Storeworks Technologies, Limited, a Minnesota corporation

By:
Name:
Title:

STATE OF _____
COUNTY OF _____

I certify that the following person(s) personally appeared before me this day, each acknowledging to me that s/he signed the foregoing document in the capacity indicated: _____, as _____ of Storeworks Technologies, Limited.

Date: _____, 201__.

_____
Notary Public

_____
Notary Printed Name

_____
My Commission Expires

(Official Seal)

IN WITNESS WHEREOF, Landlord has executed this Memorandum as of the _____ day of _____, 201__.

**LANDLORD:**

Beacon Ventures LLC, a North Carolina limited liability company

By:    Beacon #7 LLC, a North Carolina limited liability company, Manager

By:    _____
Gregg E. Sandreuter, Manager

STATE OF _____
COUNTY OF _____

I certify that the following person(s) personally appeared before me this day, each acknowledging to me that s/he signed the foregoing document in the capacity indicated: _____, as manager of Beacon Ventures LLC.

Date: _____, 201__.

_____
Notary Public

_____
Notary Printed Name

_____
My Commission Expires

(Official Seal)

# EXHIBIT A

## Legal Description

The Property herein referred to is situated in Wake County, State of North Carolina and is described as:

**Tract I:**

BEING all of Lot 1 of North Park Subdivision containing 3.549 acres as shown on that plat recorded in Book of Maps 1996, page 1319, Wake County Registry.

## Shetty, Susan M.

| | |
|---|---|
| **From:** | Anil Konkimalla <anilk@storeworks.com> |
| **Sent:** | Thursday, July 11, 2019 11:33 AM |
| **To:** | Bushnell, Sarah E. |
| **Subject:** | FW: Xenia Outstanding Invoices - Rent and Late Fees |
| **Attachments:** | Xenia Inv#NC-2019-01-29 (Feb'19 Rent) dtd 1.29.19.pdf; Xenia Inv#NC-2018-12-18 (Jan'19 Rent) dtd 12.18.18.pdf; Xenia Inv#NC-2018-12-28 (Late Fees) dtd 12.28.18.pdf; Xenia Inv#NC-2019-03-04 (Late Fees) dtd 3.4.19.pdf |

**From:** Anil Konkimalla
**Sent:** Tuesday, May 28, 2019 2:54 PM
**To:** Troy Stelzer <Troy.Stelzer@xeniaretail.com>; Paul Harris <Paul.Harris@xeniaretail.com>
**Subject:** FW: Xenia Outstanding Invoices - Rent and Late Fees

Any update guys? This amount is way past due.

Anil

**From:** Anil Konkimalla
**Sent:** Tuesday, March 05, 2019 8:32 PM
**To:** 'Troy Stelzer' <Troy.Stelzer@xeniaretail.com>; Paul Harris <Paul.Harris@xeniaretail.com>
**Subject:** Xenia Outstanding Invoices - Rent and Late Fees

Troy, Paul,

Please find enclosed attachments:

- Past Due Rent Invoice (January)
- Past Due Rent Invoice (February)
- Late Fee invoice (Oct-Nov-Dec)
- Late Fee Invoice (Jan – Feb)

TOTAL BALANCE DUE $30,249.00

Thank you in advance for giving this matter your immediate attention.

Anil

If you do not recognize this email or feel it is suspicious please click on the following link Submit Spam

**EXHIBIT 3**



# StoreWorks Technologies Limited

7300 Washington Avenue S.
Eden Prairie, MN  55344

Ph: 952-698-4600

**INVOICE #: NC-2013-01-29**

**INVOICE DATE: 1/29/2019**

**Due Date: 1/21/2019**

## BILL TO

**Xenia Retail, Inc.**
**7760 France Avenue South, Suite 1112**
**Bloomington, MN  55435**

**Attention: Troy Stelzer**

## FOR

**Office Lease**
**Monthly Rent**

| Details | AMOUNT |
|---|---|
| Monthly Base Rent - February 2019 | $13,444.00 |
| Per Sublease Agreement Article 3 | |

| | |
|---|---|
| SUBTOTAL | $13,444.00 |
| TAX at 0%: | $0.00 |
| Late Fee: | $0.00 |
| TOTAL | $13,444.00 |

**Make all checks payable to:**
***"StoreWorks Technologies Limited" AND "CCP Raleigh-Durham, LLC"***

**THANK YOU FOR YOUR PROMPT PAYMENT !**



# StoreWorks Technologies Limited

7300 Washington Avenue S.
Eden Prairie, MN  55344

Ph: 952-698-4600

**INVOICE #: NC-2018-12-18**

**INVOICE DATE: 12/18/2018**

**Due Date: 12/21/2018**

## BILL TO

**Xenia Retail, Inc.**
**7760 France Avenue South, Suite 1112**
**Bloomington, MN  55435**

**Attention: Troy Stelzer**

## FOR

**Office Lease**
**Monthly Rent**

| Details | AMOUNT |
|---|---|
| Monthly Base Rent - January 2019 | **$13,444.00** |
| Per Sublease Agreement Article 3 | |

| | |
|---|---|
| SUBTOTAL | **$13,444.00** |
| TAX at 0%: | $0.00 |
| Late Fee: | $0.00 |
| TOTAL | **$13,444.00** |

**Make all checks payable to:**
***"StoreWorks Technologies Limited" AND "CCP Raleigh-Durham, LLC"***

**THANK YOU FOR YOUR PROMPT PAYMENT !**



# StoreWorks Technologies Limited

7300 Washington Avenue S.
Eden Prairie, MN  55344

Ph: 952-698-4600

**INVOICE #: NC-2018-12-28**

**INVOICE DATE: 12/28/2018**

**Due Date: 12/21/2018**

## BILL TO

**Xenia Retail, Inc.**
**7760 France Avenue South, Suite 1112**
**Bloomington, MN  55435**

**Attention: Troy Stelzer**

## FOR

**Office Lease**
**Late Fees of Monthly Rent**

| Details | AMOUNT |
|---|---|
| Late Fee - October 2018 | $672.20 |
| Late Fee - November 2018 | $672.20 |
| Late Fee - December 2018 | $672.20 |

| | |
|---|---|
| SUBTOTAL | $2,016.60 |
| TAX at 0%: | $0.00 |
| TOTAL | $2,016.60 |

**Make all checks payable to:**
*"StoreWorks Technologies Limited" AND "CCP Raleigh-Durham, LLC"*

**THANK YOU FOR YOUR PROMPT PAYMENT !**



# StoreWorks Technologies Limited

7300 Washington Avenue S.
Eden Prairie, MN  55344

Ph: 952-698-4600

**INVOICE #: NC-2019-03-04**

**INVOICE DATE: 3/4/19**

**Due Date: 03/04/2019**

## BILL TO
**Xenia Retail, Inc.**
**7760 France Avenue South, Suite 1112**
**Bloomington, MN  55435**
**Attention: Troy Stelzer**

## FOR
**Office Lease**
**Late Fees of Monthly Rent**

| Details | AMOUNT |
|---|---|
| Late Fee - January 2019 | $672.20 |
| Late Fee - February 2019 | $672.20 |
| | |
| SUBTOTAL | $1,344.40 |
| TAX at 0%: | $0.00 |
| TOTAL | $1,344.40 |

**Make all checks payable to:**
**_"StoreWorks Technologies Limited" AND "CCP Raleigh-Durham, LLC"_**

**THANK YOU FOR YOUR PROMPT PAYMENT !**